# Case No. 23-2575

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

―――――――――――――――――――――

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

-vs-

**JOHN T. TERRY, a/k/a Tyree Terry,**

*Defendant-Appellant.*

―――――――――――――――――――――

Appeal from the United States District Court
for the Western District of Pennsylvania, Johnstown Division
District Case No. 3:18-cr-00024-KRG-1
Honorable District Court Judge Kim R. Gibson, Presiding

―――――――――――――――――――――

## OPENING BRIEF OF APPELLANT JOHN T. TERRY

―――――――――――――――――――――

Matthew M. Robinson, Esq.
Robinson & Brandt, PSC
Attorney for the Appellant
629 Main Street, Suite B
Covington, Kentucky 41011
(859) 581-7777 phone
(8590 581-5777 fax

**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

UNITED STATES OF AMERICA,   *      App. No.  23-2575

    Plaintiff-Appellee,                        *

v.                                                        *

JOHN T. TERRY, a/k/a Tyree Terry,  *

    Defendant-Appellant.                  *

**F.R.A.P. 26.1(b) CERTIFICATE OF CORPORATE DISCLOSURE
AND INTERESTED PERSONS**

The undersigned counsel of record certifies that the following individuals have an interest in the outcome of this case: John T. Terry, Appellant; Honorable Kim R. Gibson, U.S. District Judge; Assistant U.S. Attorneys Arnold P. Bernard, Jr., Lee J. Karl, Maureen Sheehan-Balchon, Stephanie L. Haines, Stephen R. Kaufman; and defense attorney Sandra Thompson. Appellant is convicted of a nonviolent drug offense and there are no identifiable victims.

I hereby certify that, to the best of my knowledge, the preceding list is a complete list of all parties having an interest in the outcome of this case. Appellant is not a subsidiary or affiliate of a publicly owned corporation and he knows of no publicly-owned corporation that has a financial interest in the outcome.

Dated: April 26, 2024                              /s/ Matthew M. Robinson

## TABLE OF CONTENTS

Certificate of Corporate Disclosure and Interested Persons. . . . . . . . . . . . . . . . . . . ii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-iv

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v-x

Statement of Subject Matter and Appellate Jurisdiction. . . . . . . . . . . . . . . . . . . 1

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Related Cases or Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of the Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Law and Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.　　The district court erred in failing to grant Terry's motion to suppress all evidence seized during the traffic stop.. . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.　　Prosecutorial misconduct occurred when the government knowingly presented false evidence during grand jury proceedings and, during closing arguments, vouched for the credibility of witnesses and falsely told the jury that they could review and inspect government exhibits... . . . . . . . . . . . . . 25

III.　　District Court reversibly erred in permitting Agent Simpson to render opinions outside of the scope of his expertise and within the province of the factfinder, including: (a) the identity of cell phone users and subscribers; (b) the identity of a person sending a text; (c) that the photographs containing cocaine were taken with an iPhone; (d) opinion that Terry used the iPhone; and (e) opinion on the meta data on the government's exhibits.. . . . . . . . . 32

IV.   The court applied and incorrect statutory punishment and guideline range of imprisonment based solely on methamphetamine, when the substance seized from the vehicle contained both cocaine and methamphetamine and the jury returned a general verdict finding the offense involved 500 grams or more of a substance containing cocaine and methamphetamine.. . . . . . . . . . . . 39

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Certificate of Bar Membership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Certificate of Compliance with Rule 32(a). . . . . . . . . . . . . . . . . . . . . . . 48

Certificate of Virus Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Apprendi v. New Jersey</u>,
    530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). . . . . . . . . . .  43-45

<u>Berckeley Inv. Grp., Ltd. v. Colkitt</u>, 455 F.3d 195 (3d Cir. 2006).. . . . . . . . . . . 37

<u>Berger v. United States</u>, 295 U.S. 78 (1935).. . . . . . . . . . . . . . . . . . . . . . . 26, 27

<u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 121 S.Ct. 447 (2000). . . . . . . . . . 16

<u>Colorado v. Spring</u>, 479 U.S. 564 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Darden v. Wainwright</u>, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>,
    509 U.S. 579, S. Ct. 2786, 125 L. Ed. 2d 469 (1993).. . . . . . . . . . . . . . . 33

<u>Delaware v. Prouse</u>, 440 U.S. 648; 99 S.Ct. 1391 (1970).. . . . . . . . . . . . . . . . . 16

<u>Donnelly v. DeChristoforo</u>,
    416 U.S. 637, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974). . . . . . . . . . . . . . . 27

<u>Estate of Schneider v. Fried</u>, 320 F.3d 396 (3d Cir. 2003).. . . . . . . . . . . . . . . . 34

<u>First Nat. State Bank v. Reliance Elec. Co.</u>, 668 F.2d 725 (3d Cir. 1981). . . .  37-38

<u>Florida v. J.L.</u>, 529 U.S. 266, 120 S.Ct. 1375 (2000). . . . . . . . . . . . . . . . . . . . 17

<u>Florida v. Jimeno</u>, 500 U.S. 248,111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991).  . . . 22

<u>Florida v. Royer</u>, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). . . . . . 17

<u>Gall v. United States</u>, 552 U.S. 38 (2007).. . . . . . . . . . . . . . . . . . . . . . . . .  40-42

Giglio v. United States, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . 27

Greer v. Miller, 483 U.S. 756 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Illinois v. Caballes, 543 U.S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). . . . 17

In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994). . . . . . . . . . . . . . 34

Kimbrough v. United States, 128 S.Ct. 558 (2007).. . . . . . . . . . . . . . . . . . . . 42

Lambert v. Blackwell, 387 F.3d 210 (3d Cir. 2004).. . . . . . . . . . . . . . . . . . . . 28

Marshall v. Hendricks, 307 F.3d 36 (3rd Cir. 2002). . . . . . . . . . . . . . . . . . . . 27

Maryland v. Wilson, 519 U.S. 408, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997). . . . 18

Michigan v. Tyler, 436 U.S. 499; 98 S.Ct. 1942 (1978).. . . . . . . . . . . . . . . . . 15

Minnesota v. Carter, 525 U.S. 83 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . 19

Miranda v. Arizona, 384 U.S. 436 (1966).. . . . . . . . . . . . . . . . . . . . . . . . *passim*

Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). . . . . . . 28

Pineda v. Ford Motor Co., 520 F.3d 237 (3d Cir. 2008). . . . . . . . . . . . . . . 34, 35

Rakas v. Illinois, 439 U.S. 128 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Rawlings v. Kentucky, 448 U.S. 98 (1980). . . . . . . . . . . . . . . . . . . . . . . . . 20

Rita v. United States, 551 U.S. 338, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007).. 41

Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). . . . . . 25

Solesbee v. Balkcom, 339 U.S. 9, 70 S. Ct. 457, 94 L. Ed. 604 (1950). . . . . . . . 26

Steigler v. Anderson, 496 F.2d 793 (3d Cir. 1974).. . . . . . . . . . . . . . . . . . . . 24

United States v. Agurs, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). . . 28

United States v. Baker, 221 F.3d 438 (3d Cir. 2000). . . . . . . . . . . . . . . . . . 19-20

United States v. Barbosa, 271 F.3d 438 (3d Cir. 2001).. . . . . . . . . . . . . 43, 44, 45

United States v. Biberfeld, 957 F.2d 98 (3d Cir. 1992). . . . . . . . . . . . . . . . . 28

United States v. Bowens, 224 F.3d 302 (4th Cir 2000),. . . . . . . . . . . . . . . . . 43

United States v. Brennan, 326 F.3d 176 (3d Cir. 2003). . . . . . . . . . . . . . . 25, 30

United States v. Brewer, 1 F.3d 1430 (4th Cir. 1993). . . . . . . . . . . . . . . . . . 35

United States v. Cessa, 861 F.3d 121 (5th Cir. 2017). . . . . . . . . . . . . . . . . . 28

United States v. Dinitz, 96 S.Ct. 1075 (1976).. . . . . . . . . . . . . . . . . . . . . . 27

United States v. Freeman, 730 F.3d 590 (6th Cir. 2013). . . . . . . . . . . . . . . 36, 37

United States v. Fulton, 837 F.3d 281 (3d. Cir. 2016)... . . . . . . . . . . . . . . . 35

United States v. Garcia, 413 F.3d 201 (2d Cir. 2005). . . . . . . . . . . . . . . . . . 36

United States v. Garcia-Vasquez, 2017 U.S. Dist. LEXIS 202047
      (D.East.Pa. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Gibbs, 190 F.3d 188 (3d Cir. 1999). . . . . . . . . . . . . . . . . . 33

United States v. Givan, 320 F.3d 452 (3d Cir. 2003). . . . . . . . . . . . . . . . . . 17

United States v. Gooch, 915 F.Supp.2d 690 (W.D.Pa. 2012).. . . . . . . . . . . . . 22

United States v. Graham, 622 F.3d 445 (6th Cir. 2010). . . . . . . . . . . . . . . . . 40

United States v. Howard, 210 F.Supp.2d 503 (D.Del 2002). . . . . . . . . . . . . 20-21

United States v. Kim, 27 F.3d 947 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Lipscomb, 14 F.3d 1236 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . 38

United States v. Lore, 430 F.3d 190 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 30

United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).  26

United States v. Merced, 603 F.3d 203 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . 41

United States v. Mitchell, 365 F.3d 215 (3d Cir. 2004). . . . . . . . . . . . . . . . . . . . 36

United States v Moore, 2015 U.S.AppLEXIS 21506 (6th Cir. 2015). . . . . . . . . . . 44

United States v. Morales, 861 F.2d 396 (3d Cir. 1988). . . . . . . . . . . . . . . . . . 22-23

United States v. Perez, 280 F.3d 318 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . 35

United States v. Phillip, 2021 U.S. Dist. LEXIS 219037 (D.V.I. 2021). . . . . . . . 28

United States v. Pinto, 850 F.2d 927 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . 26

United States v. Price, 558 F.3d 270 (3d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 21

United States v. Randolph, 230 F.3d 243 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . 43

United States v. Riddick, 156 F.3d 505 (3d Cir. 1998). . . . . . . . . . . . . . . . . . . . 14

United States v. Rivas, 493 F.3d 131 (3d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 30

United States v. Rivera, 867 F.2d 1261 (10th Cir.1989). . . . . . . . . . . . . . . . . . . . 16

United States v. Sharpe, 470 U.S. 675, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985).18

United States v. Stephens, 549 F.3d 459 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . 41

United States v. Tanzola, 416 Fed. App.x (3d Cir. 2011). . . . . . . . . . . . . . . . . . . 40

United States v. Theodoropoulos, 866 F.2d 587, 590-91 (3d Cir. 1989)........ 35

United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2009). ................. 40

United States v. Tomko, 562 F.3d 558 (3d Cir. 2009)(en banc). ............ 40

United States v. Velasquez, 885 F.2d 1076 (3d Cir. 1989). ................. 21

United States v. Vazquez, 271 F.3d 93 (3d Cir. 2001)(en banc). ........... 42

United States v. Young, 470 U.S. 1 (1985).......................... 27, 30

United States v. Zillgitt, 286 F.3d 128 (2d 2002)........................ 43

Whren v. United States, 517 U.S. 806; S.Ct. 1769 (1996)................... 16

Wong Sun v. United States, 371 U.S. 471(1963). ........................ 14

**Statutes and Other Authorities**

U.S. Const. amend. IV........................................ *passim*

U.S. Const. amend. V. ....................................... *passim*

18 U.S.C. §922(g)(1)......................................... 1, 5

18 U.S.C. §924(a)(1)(A). ...................................... 1, 5

18 U.S.C. §924(c)(1)(C)(I). .................................... 1, 5

18 U.S.C. § 3231............................................. 1

18 U.S.C. § 3553(a)....................................... 40, 41, 45

18 U.S.C. § 3553(a)(2). ........................................ 42

18 U.S.C. § 3553(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

18 U.S.C. § 3742(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. §841(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

21 U.S.C. §841(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

21 U.S.C. §841(b)(1)(A)(viii). . . . . . . . . . . . . . . . . . . . . . . . . *passim*

21 U.S.C. §841(b)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

21 U.S.C. §841(b)(1)(B)(vii).. . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 42

21 U.S.C. §846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Federal Rule of Evidence 701. . . . . . . . . . . . . . . . . . . . . . . . . . 3, 36, 37

Federal Rule of Evidence 702. . . . . . . . . . . . . . . . . . . . . . . . . 33, 34, 36

Federal Rule of Evidence 704. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Federal Rule of Evidence 704(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Fed. R. App. P. 4(b)(1)(A)(i).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S.S.G. § 2D1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 39, 45

U.S.S.G. § 2D1.1(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 as Appellant was charged with offenses against the United States, including: conspiracy to distribute 500 grams or more of a mixture containing methamphetamine and cocaine in violation of 21 U.S.C. §§841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(ii) and 846 (Count One); possession with intent to distribute 500 grams or more of a mixture containing a detectable amount of methamphetamine and cocaine in violation of 21 U.S.C. §841(a)(1), (b)(1)(A)(viii) and (b)(1)(B)(ii) (Count Two); possession of a firearm by a convicted felon in violation of 18 U.S.C. §922(g)(1) (Count Three); and unlawful possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §924(a)(1)(A) and (c)(1)(C)(I) (Count Five). District Court Document ("Doc.") 62, Superseding Indictment.

This Court has jurisdiction under 18 U.S.C. § 3742(a), 28 U.S.C. § 1291, and Fed. R. App. P. 4(b)(1)(A)(i), because Appellant's notice of appeal was filed timely following the district court's entry of the final judgment, August 15, 2023. Doc. 270 Judgment; Appendix ("Apx.") Vol I at 140; Doc. 273 Notice of Appeal; Apx Vol I at 148.

## STATEMENT OF THE ISSUES

**I.     The district court erred in failing to grant Terry's motion to suppress all evidence seized during the traffic stop.**

The district court erred in failing to grant the Appellant's motion to suppress evidence. The entire interaction between Trooper Marmol, the Appellant and Gerald Terry was fraught with Fourth and Fifth Amendment violation. The traffic stop was pre-textual and improperly extended beyond the purported purpose of the stop. The consent to search the vehicle was not voluntarily given and the scope of the search far exceeded the alleged consent. Appellant was then subjected to a custodial interrogation in the absence of counsel and without being provided the required <u>Miranda</u> warning. Accordingly, Appellant's motion to suppress should have been granted and his convictions must be vacated. Doc.26 Motion to Suppress, Doc.57 Memorandum Opinion & Order; Apx.Vol. I at 1-63.

**II.    Prosecutorial misconduct occurred when the government knowingly presented false evidence during grand jury proceedings and, during closing arguments, vouched for the credibility of witnesses and falsely told the jury that they could review and inspect government exhibits.**

The prosecution engaged in misconduct rendering the trial unfair. Appellant was a passenger in a vehicle driven by his brother. The vehicle was stopped for a traffic violation, a search occurred, and drugs and a weapon was discovered. At some point, Appellant told authorities he was responsible for the vehicle. But in order to

secure an indictment, the government falsely asserted to the Grand Jury that Appellant confessed responsibility for all of the contraband and instrumentalities of the crime. Later during closing arguments, the prosecution vouched for the witnesses who prepared the cell phone data summaries and vouched for the veracity of the summaries themselves. Because the government engaged in prosecutorial misconduct from start to finish in this case, Appellant's right to due process was violated and the district court should have granted Appellant's motion for new trial. Doc.245 Motion for Acquittal & New Trial at 11; Doc.231 Trial Day-3 at 45-47, 75-76, 78; Doc.232 Trial Day-4 at 127; Doc.262 Memorandum and Order; Apx at 93-105, 123-124.

**III. District Court reversibly erred in permitting Agent Simpson to render opinions outside of the scope of his expertise and within the province of the factfinder, including: (a) the identity of cell phone users and subscribers; (b) the identity of a person sending a text; (c) that the photographs containing cocaine were taken with an iPhone; (d) opinion that Terry used the iPhone; and (e) opinion on the meta data on the government's exhibits.**

The district court erred in permitting Special Agent Simpson to testify as to cell phone data and related information. Simpson was certified as an expert in drug related investigations. Said certification did not extend into extracting and explaining cellular telephone data. Further, Simpson's opinion testimony was inadmissible under Federal Rule of Evidence 701, as it was not admissible lay testimony. And even if Agent Simpson properly testified as an expert, his testimony encroached on the purview of

the jury, as Simpson testified as to the ultimate issue in this case, that Appellant was guilty of the crimes charged. Accordingly, Appellant's convictions must be vacated. Doc.231 Trial Day-3 at 35-38, 58-65; Doc.245 Motion New Trial; Doc.262 Memorandum Order 12-15; Apx 72-75, 80, 110-116.

**IV.    The court applied and incorrect statutory punishment and guideline range of imprisonment based solely on methamphetamine, when the substance seized from the vehicle contained both cocaine and methamphetamine and the jury returned a general verdict finding the offense involved 500 grams or more of a substance containing cocaine *and* methamphetamine.**

The district court erred in sentencing Appellant under 21 U.S.C. § 841(b)(1)(A) and U.S.S.G. § 2D1.1. The jury returned a general verdict finding that the drug offenses involved 500 grams or more of methamphetamine and cocaine. The jury did not determine how much of each substance was involved in the offenses and no evidence was presented as to the quantity of cocaine versus methamphetamine. Therefore, Appellant should have been sentenced upon the least-punished drug type, 500 grams or more of cocaine, carrying a penalty of five to 40 years' imprisonment under § 841(b)(1)(B). However, Appellant was sentenced to the statutory minimum 10 years under § 841(b)(1)(A) based on 500 grams or more of methamphetamine. The error was harmful because the court would have imposed a sentence at the correct statutory minimum for the drug offense, 5-years' imprisonment under § 841(b)(1)(B). See Apx Vol. I at 78-80, 84-85; Apx Vol. II at 373-395.

**STATEMENT OF RELATED CASES AND PROCEEDINGS**

This Court has not previously heard this case. Undersigned counsel is unaware of any previous or pending appeals before the Court arising out of the same case.

**STATEMENT OF THE CASE**

A superseding indictment was returned on July 9, 2019, charging Appellant with: conspiracy to distribute 500 grams or more of a mixture containing methamphetamine and cocaine in violation of 21 U.S.C. §§841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(ii) and 846 (Count One); possession with intent to distribute 500 grams or more of a mixture containing a detectable amount of methamphetamine and cocaine in violation of 21 U.S.C. §841(a)(1), (b)(1)(A)(viii) and (b)(1)(B)(ii) (Count Two); possession of a firearm by a convicted felon in violation of 18 U.S.C. §922(g)(1) (Count Three); and unlawful possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §924(a)(1)(A) and (c)(1)(C)(I) (Count Five). District Court Document ("Doc.") 62, Superseding Indictment.

Appellant filed a motion to suppress evidence stemming from an April 4, 2018 traffic stop. Doc.26 Motion. Appellant argued that the stop, as well as the subsequent seizure of his person, occurred in violation of the Fourth Amendment to the United States Constitution. Id. Appellant argued that the initial traffic stop was conducted without probable cause or reasonable suspicion. Id at 5. Further, the detention of the

Appellant was longer than necessary to effectuate the resolution of the alleged motor vehicle violation. Id at 5-6. Appellant also argued that the consent to search the vehicle was not given voluntarily, and that if consent was validly given, said consent only extended to the interior and trunk of the vehicle. Id at 6. Further, any statements made by the Appellant were given absent a valid Miranda warning. Id at 6-7.

The court denied the motion. Doc.57, Opinion; Apx Vol. I at 1-63. Regarding the stop, the court found that Marmol initiated the stop for minor traffic violations. Apx at 20. Marmol observed the Taurus "dart from the left lane to the right lane, less than one car length behind a vehicle traveling in the right lane of traffic. Id. Reasonable suspicion was deemed to have been present supporting the stop and a warning was issued regarding the traffic violations. Apx Vol I at 23-26. The court found that the extension of the traffic stop and request to search the vehicle was also based upon reasonable suspicion. Apx Vol I at 36. The court found Appellant did not possess standing to challenge the voluntariness of the driver's consent, but regardless, the consent was found to be valid. Apx Vol I at 41-42. According to the court, the extension the search into the hidden compartment was also based upon reasonable suspicion. Apx Vol I at 49. The court found that the Appellant voluntarily waived his rights and admitted responsibility for the vehicle while sitting in an open patrol room and after being interrogated and Mirandized by Marmol. Apx Vol I at 60.

On August 22, 2022, the Appellant proceeded to a jury trial in the United States District Court for the Western District of Pennsylvania before the Honorable Kim R. Gibson on Counts One and Two. The government noted that it intended to introduce testimony through Case Agent James Simpson that it was his opinion that information from an iPhone seized from the Appellant, specifically a contact named "Gees" and the associated telephone number belonged to Gerald Terry. Doc.230 Trial Day-2, p 6-7. Simpson was also to offer opinion testimony that a contact from the seized iPhone named "Floc" was Kelli Royster. Id. Simpson was also to offer opinion as to who was involved in text messages contained on the seized iPhone. Id. Opinion testimony was also to be offered that a photograph of cocaine was taken on the seized iPhone, as well as analysis of metadata on the phone. Id at 8-9. Defense counsel objected to the admission of Simpson's opinion testimony as being hearsay and lacking foundation or knowledge. Id at 15. The evidence was found to be admissible. Id at 18-19.

Defense counsel argued that Simpson needed to clarify that the exhibits that he prepared were not direct reports, but contained his conclusions. Id at 36. The court agreed. Id at 36-37. Over objection, Simpson provided testimony about meta data. Id at 45-47, 75-76.

During closing arguments, the prosecution asked the jury to return a guilty

verdict based upon the employment history of the government's law enforcement witnesses. Doc.232 Trial Day-4; Apx Vol II at 341-42, 359. The prosecution also told the jury that they could review the cell phone summaries prepared by Simpson, despite that not being the case. Apx Vol II at 345, 358.

The jury returned guilty verdicts on Counts One and Two, finding that each offense involved "500 grams or more" of a mixture containing "Methamphetamine and Cocaine." Doc.217 Jury Verdict Form. Appellant then proceeded to a bench trial on Counts Three and Five whereupon he was found guilty. Doc.233 Trial Day-5.

Appellant filed a motion for judgment of acquittal and a motion for new trial. Doc.245, Amended Omnibus Post-trial Motion. Appellant argued that: (1) the convictions were not supported by sufficient evidence; (2) the government presented false statements to the grand jury; (3) evidence was insufficient as the government presented false and unbelievable evidence; (4) the prosecution improperly vouched for witnesses during closing arguments and improperly stated that the jury could view and inspect government exhibits; (5) jurors engaged in collusion; (6) the government failed to clarify that Simpson's exhibits were not direct reports but were interpretations; (7) the government failed to prove the amount of methamphetamine detected was within the margin of error; (8) the government engaged in investigatory error; and (9) 404(b) evidence was improperly admitted. Id.

A pre-sentence investigation report (PSR) was prepared. Appellant's base offense level was 32 pursuant to U.S.S.G. §2D1.1(c), finding that the 2,995 grams of seized drugs was entirely methamphetamine. Doc.239 PSR ¶s32,35. The report stated the minimum term of imprisonment on Counts One and Two was ten years incarceration, under 21 U.S.C. §841(b)(1)(A). Doc.239 PSR ¶74. The guideline range was determined to be 151 to 188 months, to be followed by a mandatory consecutive 300-month sentence on Count Five. Doc. 239, PSR ¶ 76.

Appellant filed a sentencing memorandum. Doc.266 Memorandum. It was argued that the base offense level should be based upon cocaine as opposed to methamphetamine. Id at 3. Appellant also argued the mandatory minimum sentences as applied to Counts One, Two and Five violated due process, equal protection, cruel and unusual punishment and separation of powers doctrines. Id. These constitutional claims were denied. Apx at 126-139.

Appellant proceeded to sentencing on August 10, 2023. Doc.275 Sentencing; Apx at 373. Utilizing methamphetamine as the controlling substance, the base offense level was found to be 32. Id. The court granted a request for variance based on Appellant's age, drug dependence, family ties and responsibilities and sentenced Appellant to 120 months incarceration on each of Counts One, Two, and Three to be served concurrently, plus a consecutive 300 months on Count Five. Apx Vol I at 142.

9

Judgment was entered on August 15, 2023 and a notice of appeal was entered on August 28, 2023. Apx 142-148.

## STATEMENT OF FACTS

On April 4, 2018, Trooper Marmol was patrolling the Pennsylvania Turnpike near the Somerset area. Doc.230 Trial Day-2 at 40, 42. Marmol initiated a traffic stop on a 2010 red Ford Taurus. Id at 43. Marmol observed the vehicle engage in an unsafe lane change and following too closely. Id at 43-44. The driver of the vehicle was identified as Gerald Terry. Id at 47. Terry stated that the vehicle belonged to his friend's wife. Id at 48. Marmol noticed that the passenger in the vehicle, identified as the Appellant, was nervous, as indicated by a pulsating carotid artery. Id at 48-49.

Marmol returned to his patrol car and called for a backup officer to conduct a vehicle search. Id at 49. Trooper Petrosky arrived at the scene. Id at 50. Marmol allegedly obtained consent from Gerald Terry to search the vehicle. Id at 50-51. Marmol found a hidden compartment in the passenger side dash area of the vehicle. Id at 52. Marmol pried the compartment open. Id at 54. Inside the compartment, police found three packages and a loaded Smith & Wesson 40-caliber pistol. Id at 56. The packages contained substances that field-tested positive for cocaine. Id at 57.

Once the cocaine was discovered, Gerald Terry and the Appellant were arrested. Id. An iPhone and a Samsung Galaxy cellular device were seized. Id at 85.

While the Appellant was being booked, he stated that he was responsible for the vehicle and that he borrowed the vehicle. Id at 93. The statement occurred after Marmol completed an interview of the Appellant, during which "nothing of substance" was said. Id at 133.

James Simpson, a Special Agent with the Federal Bureau of Investigation, testified as to his experience in investigating drug related cases. Doc 231 Trial Day-3 at 6-19. Simpson was certified as an expert in drug trafficking cases and the coded language of drug trafficking. Id at 19. Simpson was provided the extraction reports from the phones by Sarvey. Id at 22, 29. Simpson and Sarvey prepared a summary of the report. Id at 26, 29.

Simpson testified as to the content of text messages and photographs on the iPhone. Id at 42, 48, 51-56, 80-81. Simpson testified that a photograph of the Appellant's driver's license was found on the phone. Id at 44-45. Simpson testified regarding the exit data as to how the image was found on the phone. Id. Simpson testified that the Appellant had sent the texts from the phone. Id at 84. Simpson also testified that the Samsung phone belonged to the Appellant and gave his opinion as to the text messages in the Samsung. Id at 57-63, 70-71, 82.

Simpson gave his opinion on photographs purported to be kilograms of cocaine, as well as drug paraphernalia, found on the iPhone. Id at 72-74, 79. Simpson

provided opinion testimony concerning meta data and the extraction of the photos from the phone. Id at 72-73, 75, 78-79.

Morgan Wiernusz, a forensic scientist with the Pennsylvania State Police Crime Lab, testified that the seized drugs were determined to be a mixture of cocaine and methamphetamine. Id at 166. The total weight of the substances was 2,995 grams, plus or minus ten grams. Doc. 231 Trial Day-3 at 167.

Robert Dillard was awaiting sentencing on federal drug conspiracy charges when he testified against Appellant. Id at 180-181. Dillard testified that he obtained cocaine from the Appellant in 2017 and 2018 for re-distribution. Id at 191. Dillard met the Appellant through Gerald Terry. Id at 193. Dillard would purchase two kilograms of cocaine at a time from the Appellant. Id at 193.

The Appellant testified. Doc.232 Trial Day-4 at 7. The Appellant went with Gerald Terry to Pittsburgh on April 4, 2018, as Gerald was speaking at Narcotics Anonymous. Id at 10-11. Gerald picked up the Appellant, with the Appellant not knowing to whom the vehicle belonged. Appellant stated that he possessed the seized Samsung cell phone, although his fiancee also used the phone. Id at 15, 45. Appellant denied possessing or using the iPhone. Id at 31. Appellant denied that he was introduced to Robert Dillard by Gerald Terry for drug sale purposes. Id at 47.

## SUMMARY OF THE ARGUMENT

The district court erred in failing to grant the Appellant's motion to suppress evidence. Law enforcement officials effectuated a pre-textual traffic stop against the vehicle in which the Appellant was a passenger. Once the illegal stop occurred, officers engaged in an unduly long extension of the stop during which time an invalid consent to search the vehicle was obtained. The Fourth Amendment violations were compounded when an un-<u>Mirandized</u> statement was obtained from the Appellant. Further inadmissible evidence was admitted through F.B.I. Special Agent Simpson. Although certified as a drug expert, Simpson's testimony was centered upon technical matters such as cell phone data extraction and other matters for which Simpson was not certified as an expert. Simpson's opinion testimony was unreliable and amounted to a de facto statement that Appellant was guilty.

The prosecution engaged in misconduct during grand jury proceedings, by knowingly presenting false testimony that Appellant had confessed to the drugs and gun found in the vehicle. The prosecution's misconduct continued to closing arguments, where it vouched for its witnesses and incorrectly told the jury that it would have access to exhibits prepared by said witnesses, thereby lending undue credibility to the exhibits.

In addition, the sentence of 420 months is procedurally and substantively

unreasonable. The jury returned a general verdict as to drug type, finding the drug crimes involved 500 grams or more of cocaine *and* methamphetamine. Yet Appellant was sentenced under a higher statutory minimum and maximum penalty as if the jury found him guilty of an offense involving exclusively 500 grams of methamphetamine.

## LAW AND ARGUMENT

**I.    The district court erred in failing to grant Terry's motion to suppress all evidence seized during the traffic stop.**

**Standard of Review:** This Court reviews the district court's findings of fact for clear error and subject the lower court's legal analysis and application of law to plenary review. United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998).

**Law and Argument:**

The Fourth Amendment to the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV. "The basic purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." Michigan v. Tyler, 436 U.S. 499, 504; 98 S.Ct. 1942, 1947 (1978).

The Supreme Court has held that even evidence *indirectly* obtained through an

14

illegal search or an illegal arrest may be excludable "as fruit of the poisonous tree."

Wong Sun v. United States, 371 U.S. 471, 484-87(1963). The Court stated:

> We need not hold that all evidence is 'fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has come at by exploitation of that primary illegality or instead by means sufficiently distinguishable to be purged of primary taint.

Id. at 487-88.

Herein, the initial traffic stop was conducted without probable cause or reasonable suspicion. Further, the detention of Appellant was longer than necessary to effectuate the resolution of the alleged motor vehicle violation. Consent to search the vehicle was not given voluntarily, and if consent was validly given, the consent only extended to the interior and trunk of the vehicle. Later after Appellant was arrested, officers elicited statements from the Appellant absent valid Miranda warnings.

### A. The initial traffic stop was conducted without the necessary cause or suspicion.

An automobile stop is considered a seizure of persons, making the Fourth Amendment applicable. Whren v. United States, 517 U.S. 806, 809 116 S.Ct. 1769 (1996). Temporary detention of individuals during the stop of an automobile by the

police, even if only for a brief period and for a limited purpose constitutes a seizure of persons within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391 (1970).

"An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren, 517 U.S. at 810. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a *traffic* violation has occurred." Id (emphasis added). A pretextual stop occurs when the police lack reasonable suspicion necessary to support a stop and use a minor infraction to stop the vehicle and search for evidence of an unrelated serious crime. United States v. Rivera, 867 F.2d 1261 (10th Cir.1989).

In City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447 (2000), motorists brought a class action against the city and others alleging that drug interdiction checkpoints violated the Fourth Amendment to the Constitution. The Supreme Court ultimately concurred with the plaintiffs. Id. The Court stated that individualized suspicion of a particular vehicle for particular illegal conduct is a requisite to a stop of a vehicle under the Fourth Amendment. Id.

It is well settled that reasonable suspicion of criminal activity is necessary to make an investigatory stop. Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375 (2000). But the stop at issue was pre-textual, in that it was done solely to search the vehicle for

controlled substances. Marmol allegedly observed traffic violations, stopped the vehicle and issued a warning. Apx at 20-26. However, the true purpose of the stop was revealed when he extended the stop to search the vehicle. As the traffic stop at issue was pre-textual, the subsequently seized evidence should have been suppressed.

**B.  The detention of the Appellant was longer than necessary to effectuate the resolution of the alleged motor vehicle violation.**

A valid traffic stop becomes unreasonable when its scope exceeds the justification for its initiation. Illinois v. Caballes, 543 U.S. 405, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). "An investigative detention must be temporary and last no longer than necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). The Third Circuit has further explained: "After a traffic stop that was justified at its inception, an officer who develops reasonable, articulable suspicion of criminal activity may extend the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification" for extending the scope of inquiries incident to a traffic stop. Id.

In determining  whether a detention is too long for an investigatory stop, it is

"appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985), see also Maryland v. Wilson, 519 U.S. 408, 414, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997)("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").

Herein, the vehicle was allegedly stopped for minor traffic violations. Apx at 26. Marmol's actions in obtaining Appellant's driver's license and the driver's driver's license was not improper. However, checking the driver's criminal history was unnecessary and was not justified by any articulable suspicion of wrong doing. Upon discovering the driver's criminal history, Marmol called for backup to conduct a vehicle search. Apx 35. Marmol justified his actions due to the driver's nervousness, the itinerary of the vehicle (traveling from Philadelphia to Pittsburgh), and the vehicle being registered to a third party. Id at 36-38.

These factors did not provide a reasonable articulable suspicion to justify prolonging the stop. It is not uncommon for drivers to be nervous upon being stopped by police, especially an African-American male. Appellant need not recount the gruesome history of how African-Americans have been treated during seemingly

innocuous traffic stops. Further, Appellant traveled from Philadelphia to Pittsburgh via roads built by the state and federal governments. Appellant is unaware of any law prohibiting travel between the two largest cities in Pennsylvania. Finally, the fact that the vehicle was registered to a third party is innocuous and hardly indicative of criminal activity. Under the circumstances, the extension of the traffic stop to call for back up and a search of the vehicle was not justified and the evidence obtained in the search should have been suppressed.

**C.    Voluntary consent was not given to search the vehicle.**

Of course, one must possess standing to raise a Fourth Amendment claim. Rakas v. Illinois, 439 U.S. 128 (1978).  In order to have standing to challenge a search or seizure in the Fourth Amendment context, a defendant "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998). The burden rests upon the defendant to prove that he possessed a reasonable expectation of privacy. Rakas v. Illinois, 439 U.S. 128 (1978).

To determine if a legitimate expectation of privacy exists, a two-part inquiry is utilized. United States v. Baker, 221 F.3d 438, 441 (3d Cir. 2000). The first part asks whether the individual, by conduct, has exhibited an actual expectation of privacy (for example, by hiding something illegal there). Id. The second part asks

whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable (like the privacy of one's home). Id. The determination is to be made on a case-by-case basis. Id.

Several factors have been identified in making a determination about the defendant's subjective or actual expectation of privacy. One is a person's proprietary or possessory interest in the place to be searched or the item to be seized, but this alone is not determinative. Id. Other factors include whether the defendant has the right to exclude others from the place in question; whether he has taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises. Rawlings v. Kentucky, 448 U.S. 98 (1980)).

In United States v. Howard, 210 F.Supp.2d 503 (D.Del 2002), the defendant was found to possess standing to challenge the search of a third party's vehicle. The defendant possessed the keys to the vehicle and had permission to be in the vehicle. Id. The fact that the defendant had permission to be in the vehicle, but not to drive it, did not defeat his standing status. Id. In the instant case, Appellant had permission to be in the vehicle as a passenger. Appellant also told police he was responsible for the vehicle. Apx at 60. As in Howard, Appellant possessed standing to challenge the search of the vehicle.

"The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent." United States v. Velasquez, 885 F.2d 1076, 1081 (3d Cir. 1989); see also United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009). "A voluntarily given consent is an exception to the search warrant requirement and is therefore constitutionally permissible." Velasquez, 885 F.2d at 1081. An analysis of whether consent was voluntary is based on the totality of the circumstances. United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994). "[W]hether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single criterion." Id. Factors to consider include: the age, education and intelligence of the defendant; whether he was advised about his constitutional rights; the length of the detention; the repetition or duration of the questioning; and the use of physical punishment. Price, 558 F.3d at 278. Also relevant is "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." Price, 558 F.3d at 278.

In the instant case, Gerald Terry, the driver of the vehicle, gave consent to search the vehicle. The consent was given after Marmol took possession of Terry's driver's license. Apx 44. Further, the consent was given after a warning for the traffic violation was issued and the traffic stop was improperly extended. See United States v. Gooch, 915 F.Supp.2d 690, 713-714 (W.D.Pa. 2012)(the length of time of a police

encounter is relevant regarding the voluntariness of consent to search). And a second officer at the scene, Trooper Petrosky, was standing with his hand on a firearm while Marmol requested consent to search. Apx at 45.

These factors demonstrate the consent could not have been voluntarily given. Neither Gerald Terry nor the Appellant were free to leave the scene, as the driver of the vehicle was not in possession of his driver's license and the stop had been improperly extended. Even if Terry had been in possession of his license, an armed Petrosky ready to use his firearm was standing by Marmol when consent was requested. Given these circumstances, consent was not valid.

**D.     The search of the vehicle extended beyond the consent given to search the vehicle.**

An objective standard is used to determine what a reasonable person would have understood from the exchange between the officer and the defendant in order to gauge the scope of consent. Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991). Where a defendant consents to a "full search of his vehicle," it is reasonable to conclude that he consents to a search of "enclosed and hidden" areas within the vehicle. See United States v. Morales, 861 F.2d 396, 401 (3d Cir. 1988)("It would be incongruous to allow an officer to open a glove compartment or trunk during a consensual full vehicle search but not to allow him to pull a seat

backrest forward to search for contraband."). For example, in <u>United States v. Garcia-Vasquez</u>, 2017 U.S. Dist. LEXIS 202047 (D.East.Pa. 2017), the defendant gave written consent to search the "entirety of her vehicle," which the court held included a search of the hidden compartment. The officer informed the defendant that he would be searching for drugs and guns. <u>Id.</u>

Herein, no written consent was presented and there is no indication from the testimony and evidence that Gerald Terry gave consent to search the entirety of the vehicle. In fact, the consent given consisted of the driver merely responding "yeah, yeah" when Marmol requested consent to search the vehicle. <u>Id</u> at 44. Accordingly, the driver of the vehicle did not give consent to dismantle the vehicle and search a hidden compartment wherein contraband was stored and the court erred in failing to suppress the fruits of the illegal search.

**E.    Appellant's statement to law enforcement officials was made without valid <u>Miranda</u> warnings being given.**

Under the Fifth Amendment to the United States Constitution, "[n]o person shall. . . be compelled in any criminal case to be a witness against himself. U.S. Const., amend. V. In order to protect a citizen's right against self-incrimination as guaranteed by the Fifth Amendment, the Supreme Court held in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), that suspects must be read certain warnings before they are

subjected to "custodial interrogation." <u>Id.</u> at 444. A suspect must be both "in custody" and subject to "interrogation" to trigger the <u>Miranda</u> warnings requirement. If a suspect is subject to multiple custodial interrogations, a <u>Miranda</u> warning must be issued at the start of each custodial interrogation. <u>Steigler v. Anderson</u>, 496 F.2d 793 (3d Cir. 1974). For the Government to prove by a preponderance of the evidence that a defendant has validly waived his rights under <u>Miranda</u> and offered a confession, they must show that the waiver was knowing, voluntary, and intelligent. <u>Colorado v. Spring</u>, 479 U.S. 564 (1987).

Herein, Appellant was subject to custodial interrogation at the Pennsylvania State Police barracks, an encounter during which the Appellant was properly <u>Mirandized</u>. Appellant waived his <u>Miranda</u> rights and spoke with Marmol. At the conclusion of the interrogation, Appellant was taken to an open patrol room where he was placed with Gerlad Terry on benches. Apx at 58-60. The prior interrogation had ended when Marmol approached the Appellant, and without re-<u>Mirandizing</u> him, elicited from the Appellant that he took responsibility for the vehicle. <u>Id</u>.

The Appellant submits that he did not waive his <u>Miranda</u> rights regarding the statements elicited because the initial interrogation had concluded and the authorities failed to issue a renewed <u>Miranda</u> warning prior to eliciting the statement. Given the duty to <u>Mirandize</u>, the lack of any such action, and the subsequent lack of a valid

Miranda waiver, Appellant submits that the statement regarding responsibility for the vehicle should not have been admitted.

Based on the foregoing, that the lower court erred in failing to grant the motion to suppress. Accordingly, Appellant's convictions should be vacated.

**II.    Prosecutorial misconduct occurred when the government knowingly presented false evidence during grand jury proceedings and, during closing arguments, vouched for the credibility of witnesses and falsely told the jury that they could review and inspect government exhibits.**

**Standard of Review:** When contemporaneous objections of prosecutorial misconduct are asserted, this Court reviews the "District Court's ruling . . . for abuse of discretion." United States v. Brennan, 326 F.3d 176, 182 (3d Cir. Eliciting). "Any non-contemporaneous objections are subject to plain error review." Id.

**Law and Argument:** The Fifth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. In evaluating due process claims, this court inquires whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). As stated by Justice Frankfurter, due process:

> embodies a system of rights based on moral principles so
> deeply imbedded in the traditions and feelings of our

25

> people as to be deemed fundamental to a civilized society as conceived by our whole history. Due process is that which comports with the deepest notions of what is fair and right and just.

Solesbee v. Balkcom, 339 U.S. 9, 16, 70 S. Ct. 457, 461, 94 L. Ed. 604 (1950).

The Due Process Clause will be validated upon actions that "violate those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." United States v. Lovasco, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977). Thus, the rule is well established that the government may prosecute with earnest and vigor, but "while [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). "It is as much [the prosecutors] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Id. A prosecutor is more that an advocate; she or he is a representative of the sovereign, and in that capacity, is expected to exercise restraint and to be fair to all. United States v. Pinto, 850 F.2d 927, 938 (2d Cir. 1988). Prosecutors must exercise restraint because "[a]rguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury." Berger, 295 U.S. 78 (1934); Marshall v. Hendricks, 307 F.3d 36 (3rd Cir. 2002).

26

A defendant's due process rights are violated when the prosecutor's misconduct renders a trial "fundamentally unfair." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986). The test is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974). "[I]t is fundamentally unfair to an opposing party to allow an attorney, with the standing and prestige inherent in being an officer of the court, to present to the jury not susceptible to proof but intended to influence the jury in reaching a verdict." <u>United States v. Dinitz</u>, 96 S.Ct. 1075, 1082 (1976).

In ascertaining whether a prosecutor's remarks constitute a denial of due process the court should determine if a prosecutor's remarks misstate or manipulates the evidence. <u>Darden</u>, 477 U.S. at 182. Further, the overall weight of the evidence of guilt should be considered in determining the denial of due process. <u>United States v. Young</u>, 470 U.S. 1, 19 (1985). Misconduct related to a critical part of the case can result in an unfair trial. <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972). It is necessary to review the entire proceedings and place the prosecutor's remarks in context. <u>Greer v. Miller</u>, 483 U.S. 756, 765-66 (1987).

**A.    The prosecution presented false evidence during grand jury proceedings.**

27

The government "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." See Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). It is "fundamentally unfair to the accused where 'the prosecution knew, or should have known, of the perjury.'" See Lambert v. Blackwell, 387 F.3d 210, 242 (3d Cir. 2004) (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)). "The same is true when the government, although not soliciting false evidence, allows it to go uncorrected when it appears at trial." United States v. Biberfeld, 957 F.2d 98, 102 (3d Cir. 1992). Where false evidence is offered in grand jury proceedings, the testimony does not demand dismissal of the indictment under the district court's supervisory power unless it was knowingly "sponsored by the government." United States v. Phillip, 2021 U.S. Dist. LEXIS 219037 (D.V.I. 2021)(citing United States v. Cessa, 861 F.3d 121, 142 (5th Cir. 2017).

In the instant case, the government presented false statements from Agent Simpson to the grand jury, specifically that Appellant confessed to responsibility for the hidden compartment, drugs and the firearm found in the vehicle. Doc. 245 Motion at 13-14. As put forth during trial, said testimony was false. At no time did Appellant admit to knowledge and responsibility for the hidden compartment, the drugs and the firearm and the authorities knew that Appellant had not confessed to these facts.

28

Using the above standard, the government knew of and sponsored the false testimony, which should have resulted in the indictment being dismissed.

The lower court found that Simpson did not offer perjured testimony during grand jury proceedings in making the above statements, as his testimony was based upon a misunderstanding of information relayed to him by Officer Marmol as to the extent of the Appellant's admissions. Apx at 96. This rationale is unavailing because Appellant's statement that he was responsible for the vehicle was clear and unambiguous. To suppose that the two arresting officers did not have a discussion regarding an alleged "admission" by the Appellant to ownership of the drugs and weapon found in a hidden compartment is patently unbelievable.

As the government knowingly used false testimony to obtain an indictment against the Appellant, the government's misconduct should have resulted in the indictment being dismissed.

**B.     The prosecution, during closing arguments, vouched for the credibility of government witnesses and falsely told the jury that they could review and inspect government exhibits.**

"A prosecutor improperly vouches when he (1) assures the jury that the testimony of a government witness is credible, and (2) . . . bases his assurance on either his claimed personal knowledge or other information not contained in the record." United States v. Lore, 430 F.3d 190, 211-12 (3d Cir. 2005); see also United

States v. Brennan, 326 F.3d 176, 183 (3d Cir. 2003). Vouching poses two dangers. First, it "convey[s] the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." United States v. Young, 470 U.S. 1, 18-19, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985). Second, the prosecutor's statements carry "the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." Id. See United States v. Rivas, 493 F.3d 131, 138 (3d Cir. 2007)(statements that Government witnesses told the truth are improper when the prosecution suggests it knew from extra-record evidence that the witnesses were telling the truth)

During closing arguments, the prosecution asked the jury to return a guilty verdict based upon the employment history of the government's law enforcement witnesses. Apx Vol II 341-342, 359. The prosecution also told the jury that they could review the cell phone summaries prepared by Simpson, despite that not being the case. Apx Vol II 345,358.

Although evidence in the record supported the prosecution's reliance upon employment records of its witnesses, the reference to the employment histories was meshed with a reference to the Appellant's alleged dishonesty, a fact that was not in

evidence. <u>Id</u> at 101. And the reference made by the prosecution to the juror's ability to review exhibits served to bolster the authenticity and credibility of the records presented at trial. Despite this clear and improper bolstering of the government's evidence, the trial court found that the statements were brief and the Appellant challenged the truthfulness of the officers working on the exhibits during cross-examinations. Apx Vol I at 107.

The district court's conclusions are erroneous. Any claim referring the jury to review exhibits will necessarily be brief. However, brevity is not a measure of whether misconduct has occurred. The court, although reconsidered the issue of letting the jury view the exhibits, ultimately did not allow the jury to view the exhibits. Although the truthfulness of the officers working on the exhibits was challenged, the law does not permit the government to improperly vouch for the veracity of its witnesses and evidence in response. Indeed, the fact the veracity of the government's evidence was in question is precisely why it is unfair for the government to attribute the credibility United States to its witnesses.

The court should have found that the prosecution engaged in misconduct. Further, the misconduct tipped the scales in favor of the government and resulted in a conviction that would otherwise not have been obtained. Importantly, the evidence of Appellant's guilt was indirect at best. He was a passenger in a vehicle that was

searched and found to contain cocaine and a firearm. Information found on cell phones found in the vehicle provided merely an inference that Appellant could have known about the contraband found in the vehicle. The statements made by the prosecution during closing argument improperly bolstered the weight of this evidence. Further, the prosecution elicited false testimony that the Appellant was not merely present at the crime scene, but that he admitted responsibility for all instrumentalities of the crime. Regarding the cell phone data and those who prepared summaries of said data, the government improperly vouched for its veracity.

In sum, the improper comments violated due process because the comments artificially bolstered the value of the evidence in the minds of the jury and resulted in a fundamentally unfair proceeding. Appellant's convictions should be vacated.

**III.    District Court reversibly erred in permitting Agent Simpson to render opinions outside of the scope of his expertise and within the province of the factfinder, including: (a) the identity of cell phone users and subscribers; (b) the identity of a person sending a text; (c) that the photographs containing cocaine were taken with an iPhone; (d) opinion that Terry used the iPhone; and (e) opinion on the meta data on the government's exhibits.**

**Standard of Review:** The admissibility of expert testimony is reviewed for an abuse of discretion. United States v. Gibbs, 190 F.3d 188, 211 (3d Cir. 1999).

**Law and Argument:** Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Federal Rule of Evidence 702.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the United States Supreme Court provided the analytical framework to determine the admissibility of expert testimony under Federal Rule of Evidence 702. The Court in Daubert stated that Rule 702 imposes a "gatekeeping" obligation on the trial court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 598. Also under Rule 702, the United States Court of Appeals for the Third Circuit has held that it "has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the

trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). These requirements are also referred to as "qualification, reliability and fit." Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

The Third Circuit has "interpreted Rule 702's qualification requirement liberally." Pineda, 520 F.3d at 244; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). Accordingly, a "broad range of knowledge, skills, and training qualify an expert." Paoli, 35 F.3d at 741. Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have specialization that the court considers most appropriate." Pineda, 520 F.3d at 244. Turning to the "reliability" requirement, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Pineda, 520 F.3d at 244.

In the instant case, Special Agent Simpson testified against the Appellant. Simpson was certified as an expert in drug trafficking cases and the coded language of drug trafficking. Doc. 231 Trial Day-3 at19. Simpson provided testimony concerning: (a) his opinion of the the identity of cell phone users and subscribers; (b) his opinion of the identity of individuals who sent a text messages; (c) that the photographs containing cocaine were taken with an iPhone belonging to Appellant;

(d) his opinion that Terry used the iPhone; and (e) his opinion on the meta data on the government's exhibits showed Appellant use of the phones seized.

Typically, an expert is required to present testimony regarding specifics about cell phone usage and data contained therein. See, e.g, United States v. Fulton, 837 F.3d 281 (3d. Cir. 2016). As noted, Simpson was not certified an expert in such matters. Thus, Simpson's testimony was the purview of an expert in the cell phone field, of which Simpson was not certified. Further, Simpson's testimony on these matters was unreliable  as he was not an expert on these matters. Pineda, 520 F.3d at 244. Therefore, the testimony should not have been permitted. Id.

Courts have routinely permitted law enforcement agents to testify as experts on the practices and habits of drug dealers, including phone use. See United States v. Perez, 280 F.3d 318, 341-42 (3d Cir. 2000); United States v. Brewer, 1 F.3d 1430, 1436 (4th Cir. 1993)(phone use by drugs dealers); see also United States v. Theodoropoulos, 866 F.2d 587, 590-91 (3d Cir. 1989)(jargon used by drug dealers). Moreover, police investigative techniques are also often the subject of expert testimony. United States v. Mitchell, 365 F.3d 215, 234 (3d Cir. 2004)(fingerprint analysis).

Here, Agent Simpson did more than testify as to the typical cell phone usage or habits of a drug dealer. Simpson provided testimony as to who owned and used

35

seized cell phones, which were matters at issue. Doc. 231 Trial Day-3 at 19, 23-22, 49-50, 57, 84. Further, Simpson testified that a photograph of the cocaine at issue was taken by one of the seized cell phones. Id at 72-74, 79. Simpson testified as to the phones' meta data. Id at 45-46, 75-76. 78. There can be little doubt that such conclusions can only be reached by experts in the operation of cell phone users. Meta data and the internal workings of cell phones are the purview of experts, of which Simpson was not.

Federal Rule of Evidence 701 permits a non-expert witness to offer opinion to the jury if, and only if, the testimony is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Such testimony is known as lay opinion testimony, and the proponent of the testimony bears the burden of providing an adequate foundation for that testimony. United States v. Freeman, 730 F.3d 590, 595-96 (6th Cir. 2013); United States v. Garcia, 413 F.3d 201, 211 (2d Cir. 2005).

The objective of such testimony is to put "the trier of fact in possession of an accurate reproduction of the event." Freeman, 730 F.3d at 595. In other words, "lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing

upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." Id. at 597.

As noted above, the cell phone testimony regarding the cell phones was not lay opinion, but was specialized knowledge that should have been presented by an expert. Simpson's testimony was not based upon "sensory and experiential observations that were made as a first-hand witness to a particular event." Assuming, *arguendo*, that Simpson was permitted to testify as an expert as to the cell phone data, FRE 704 should have barred his testimony amounting to a legal opinion that Appellant was guilty.

FRE 704(a) allows the expert to testify to the "ultimate issue" in the case. However, "[a]lthough Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006). The reason for this prohibition is because it is the role of the trial judge to explain the law to the jury. First Nat. State Bank v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir. 1981)(affirming trial court decision allowing expert witness to testify as to banking customs "to assist the trier of fact with bank and industry practices" but prohibiting expert from giving opinion "as to the legal duties arising therefrom").

In <u>United States v. Lipscomb</u>, 14 F.3d 1236 (7th Cir. 1994), police officers' expert opinion on whether cocaine found on the defendant was for distribution rather than his personal use was not excludable as "ultimate issue" opinion since each of the challenged opinions was immediately followed by precise explanation of the grounds for the opinion and the grounds cited made it clear that the officers were relying on their knowledge of common practices in the drug trade, rather than some special familiarity with the workings of the defendant's mind.

Herein, testimony that the picture of the package containing cocaine was taken on an iPhone and that the iPhone belonged to the Appellant was offered by Simpson based upon an examination of texts and cell phone meta data, constituted testimony as to the ultimate issue, as whoever took the picture of the cocaine also possessed it for distribution. As the Appellant was present in the car where the cocaine was seized, if he possessed a cell phone that took photographs of the cocaine, he was guilty. Unlike in <u>Lipscomb</u>, Agent Simpson was not relying upon common practices of the drug trade to reach a conclusion as to the ultimate issue of fact, but was relying upon meta data retrieved from a cell phone. Accordingly, Simpson's testimony in this regard should not have been permitted and Appellant's convictions should be vacated.

**IV.** **The court applied an incorrect statutory punishment and guideline range of imprisonment based solely on methamphetamine, when the substance seized from the vehicle contained both cocaine and methamphetamine and the jury returned a general verdict finding the offense involved 500 grams or more of a substance containing cocaine *and* methamphetamine.**

The district court erred in sentencing Appellant under 21 U.S.C. § 841(b)(1)(A) and U.S.S.G. § 2D1.1. The jury returned a general verdict finding that the drug offenses involved 500 grams or more of methamphetamine *and* cocaine. The jury did not determine the weight of each substance involved in the offenses and no evidence was presented as to the quantity of cocaine versus methamphetamine. Therefore, Appellant should have been sentenced upon the least-punished drug type, 500 grams or more of cocaine, carrying a penalty of five to 40 years' imprisonment under § 841(b)(1)(B). However, the court applied a higher statutory minimum and maximum penalty under § 841(b)(1)(A), as if the jury returned a verdict finding Appellant guilty of 500 grams or more of methamphetamine. The error was harmful because the guideline range calculation would have been lower and the court would likely have imposed a sentence at the correct statutory minimum for the drug offense, 5-years' imprisonment under § 841(b)(1)(B). See Apx Vol. I at 78-80, 84-85.

**Standard of Review:**   This Court reviews a district court's sentence for procedural and substantive reasonableness under an abuse of discretion standard of review. United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2009)(en banc).

**Law and Argument:** A sentence is procedurally unreasonable if the district court incorrectly calculates the Guidelines, Gall v. United States, 552 U.S. 38, 41 (2007), or fails to provide an individualized sentence, see United States v. Tanzola, 416 Fed. App.x (3d Cir. 2011). Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the §3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence--including an explanation for any deviation from the Guidelines range." Gall, 128 S. Ct. at 597; see also United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2009).

Substantive review involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. §3553(a). United States v. Graham, 622 F.3d 445, 464 (6th Cir. 2010). In reviewing a district court's sentence for substantive reasonableness under the §3553(a) factors, this Court gives substantial deference to the district court because it has an unquestionable institutional advantage, involving greater familiarity with individual cases and defendants, to consider whether the facts of the case justify a variance under §3553(a). See id.; Rita v. United States, 551 U.S. 338, 350, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007).

When rendering a sentence, the district must "state in open court" the particular

reasons supporting its chosen sentence. 18 U.S.C. §3553(c). In doing so, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority." Id This not only "allow[s] for meaningful appellate review" but it also "promote[s] the perception of fair sentencing." Gall, 128 S. Ct. at 597. Accordingly, "a talismanic recitation of the §3553(a) factors without application to the defendant being sentenced does not demonstrate reasoned decision making or provide an adequate basis for appellate review." United States v. Stephens, 549 F.3d 459, 466-467 (6th Cir. 2008).

Procedurally, a sentencing court should first correctly calculate the range of imprisonment under the Guidelines. United States v. Merced, 603 F.3d 203, 215 (3d Cir. 2010). Second, after determining the appropriate sentencing range, the district court should decide if a "traditional departure" is appropriate. Id. at 1136-38. Finally, after the district court determines the Guidelines sentence, it must consider all other factors in 18 U.S.C. §3553(a) to determine whether to impose the sentence under the guidelines or a non-guidelines sentence. Id.

The overriding principle and basic mandate of the statute requires district courts to impose a sentence "sufficient, but not greater than necessary," to achieve the four purposes of sentencing set forth in §3553(a)(2): (a) retribution; (b) deterrence;

41

(c) incapacitation; and (d) rehabilitation. This requirement is often referred to as the "parsimony provision." See, Kimbrough v. United States, 128 S.Ct. 558, 570 (2007); Gall v. United States, 128 S.Ct. 586, 597 n.6 (2007). The parsimony provision sets an independent limit on the sentence a court may impose and imposition of sentence greater than necessary to meet those purposes is reversible, even if within guideline range. Gall, 128 S.Ct. at 597.

Herein, the district court erred in its calculation of the drug type attributable to the Appellant. The jury returned a general verdict finding that the offense involved a mixture or substance containing 500 grams of cocaine *and* methamphetamine. Doc. 217, Jury Verdict Form. The pre-sentence investigation report calculated Appellant's offense level and statutory penalty based on exclusively on methamphetamine. See PSR¶s 27, 74. However, under §841(b)(1), drug identity and quantity must be treated as elements of the § 841(a) drug offenses because drug identity and quantity are factors that increase the applicable statutory minimum and maximum. United States v. Vazquez, 271 F.3d 93, 98 (3d Cir. 2001)(en banc). Said decision flowed from the decision issued in Apprendi v. New Jersey, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), which stated that any fact that increases a defendant's sentence beyond the statutory maximum must be submitted to the jury and proved beyond a reasonable doubt. After Apprendi, "other than the fact of a prior conviction, any fact

42

that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. Such facts are the "functional equivalent[s]" of "elements" of an aggravated offense that carries a higher statutory maximum penalty. Id. at 494 n.19.

After Apprendi when a jury returns a general verdict that does not specify which type of drugs was distributed, the court must sentence the defendant based on drug type carrying the lower penalty under § 841(b)(1). United States v. Barbosa, 271 F.3d 438, 452-53 (3d Cir. 2001). In United States v. Bowens, 224 F.3d 302 (4th Cir 2000), the court found when a jury returns an ambiguous guilty verdict in a multiple-drug conspiracy, the defendant may be sentenced only up to the maximum for the least-punished drug offense on which that conspiracy is based. United States v. Randolph, 230 F.3d 243 (6th Cir. 2000)(finding "plain error" to impose on such a defendant a sentence which surpasses the maximum allowable for the object of the conspiracy carrying the least grave sentencing consequences); United States v. Zillgitt, 286 F.3d 128 (2d 2002)(Where a jury returns a general guilty verdict on a single count involving multiple controlled substances, the district court must sentence the defendant as if convicted of a conspiracy involving only the drug that triggers the lowest statutory sentencing range.); United States v Moore, 2015 U.S.AppLEXIS 21506 (6th Cir. 2015)(when a general verdict for a conspiracy to distribute multiple

substances is returned, defendant must be sentenced according to the shortest maximum statutory period for any of the possible violations.

The defendant in Barbosa was charged with trafficking in heroin and cocaine and the jury returned a guilty verdict that did not specify the drug involved. Id. The district court sentenced the defendant according to the relatively harsher provisions for cocaine. See id. at 449. The Third Circuit concluded that the absence of a jury finding as to the drug's type made it impossible for the trial judge to determine which Sentencing Guidelines applied to the defendant without fact-finding. See id. at 456-457, 459. Because the district court implicitly found a fact that had the effect of increasing the bottom end of the Barbosa's statutory range, an Apprendi violation occurred. Id at 457.[1]

Here, the jury did not return specific findings as to the amount of each substance involved in the instant matter. Instead, the jury verdict reports a finding of guilt as to an offense involving 500 grams or more of methamphetamine *and* cocaine. A specific finding was important because under §841, a defendant involved with 500 grams or more of cocaine is sentenced under §841(b)(1)(B), which carries a sentence of between five and forty years incarceration. However, a 500 grams mixture

---

[1]Because the sentence Barbosa received was appropriate for either drug, the court concluded that the Apprendi violation in Barbosa was a harmless error.

containing methamphetamine would subject a defendant to a sentence under §841(b)(1)(A), and a statutory minimum sentence of ten years incarceration.

Because the jury verdict is ambiguous, Apprendi dictates that Appellant should have been sentenced pursuant to §841(b)(1)(B), because the drug type and amount justifying an increased statutory sentence were not found by the jury. As the drug mixture at issue should have been counted as 500 grams of cocaine under §841, such should have also been the Guideline finding. Barbosa, 271 F.3d 438, 452-53; see also U.S.S.G. §2D1.1, application note 2. Such would have resulted in a lesser offense level and ultimately, a lesser Guideline and statutorily calculated sentence.

The fact that the district court failed to properly apply the correct sentencing statute and guideline calculations renders Appellant's sentence procedurally unreasonable. The court sentenced Appellant to 10 years on the drug crimes believing that a sentence at the statutory minimum was required to achieve the goals of sentencing under § 3553(a).

As set forth above, the district court was statutorily required to impose a sentence that is minimally sufficient to accomplish the purposes of sentencing, and the Guidelines are only one of five equally important factors to be considered in determining the minimally sufficient sentence. Imposition of a sentence greater than necessary to meet those purposes is reversible.

Appellant submits that the district court improperly calculated the drug type attributable to the Appellant under both § 841(b)(1) and §2D1.1(c), thereby artificially inflating the starting point for any downward departure calculation. The district court departed downward to issue a 120 month sentence, which was erroneously believed to be the statutory minimum sentence permitted, as discussed above. Apx Vol II at 387. However, the statutory minimum punishment was actually five years imprisonment under § 841(b)(1)(B). Had the sentence range been properly calculated, the guideline range would have been lower and the court could have imposed a sentence of 60 months on Counts One and Two.

In sum, the district court erred in its sentencing calculations resulting in a sentence that is procedurally and substantively unreasonable. Therefore, Appellant's sentence must be vacated and remanded for a new sentencing determination.

## <u>CONCLUSION</u>

The net effect of the lack of suppression, prosecutorial misconduct, the admission of improper testimony, and the erroneous sentencing, resulted in a fundamental miscarriage of justice in this case, thereby depriving the Appellant of a fair trial and sentencing. Accordingly, the Appellant submits that his convictions and subsequent sentences must be vacated.

Respectfully submitted,

Robinson & Brandt, PSC

/s/Matthew M. Robinson
Matthew M. Robinson, Esq.
Attorney for the Appellant
629 Main Street, Suite B
Covington, Kentucky 41011
859-581-7777 phone
859-581-5777 fax
mrobinson@robinsonbrandt.com

### <u>Certificate of Bar Membership</u>

I, Matthew M. Robinson, certify that I am a member of the bar of the Third Circuit Court of Appeals, having become a member on May 13, 2003. Pursuant to 28 U.S.C. §1746, I certify under penalty of perjury that the foregoing is true and correct.

/s/ Matthew M. Robinson
Matthew M. Robinson, Esq.

**F.R.A.P. 32(a) & L.A.R. 31.1 Certificate of Compliance**

I certify that this amended opening brief complies with Third Circuit limitations with respect to font, type size and type-volume. The brief is prepared using Times New Roman in type-size 14 and contains 11,058 words, that I relied on my word processor, Corel WordPerfect Version 11, to obtain the word count; the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry; and the text of the electronic brief is identical to the text in the paper copies.

/s/ Matthew M. Robinson
Matthew M. Robinson, Esq.
Attorney for the Appellant

**Certificate of Virus Protection**

I certify that this PDF of the opening brief has been scanned for viruses using WordPerfect 11. I certify that the text of the electronic brief and the hard copies are identical.

/s/ Matthew M. Robinson
Matthew M. Robinson, Esq.
Attorney for the Appellant

**<u>Certificate of Service</u>**

The undersigned certifies that a true and accurate copy of the foregoing was electronically filed with the Office of the Clerk of the United States Court of Appeals for the Third Circuit by using the Third Circuit's CM/ECF system which will send an electronic copy to all interested parties, including the Office of the United States Attorney, on this 26th Day of April, 2024.

/s/ Matthew M. Robinson
Matthew M. Robinson, Esq.
Attorney for the Appellant

# Case No. 23-2575

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

————————————————

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

-vs-

**JOHN T. TERRY, a/k/a Tyree Terry,**

*Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Western District of Pennsylvania, Johnstown Division
District Case No. 3:18-cr-00024-KRG-1
Honorable District Court Judge Kim R. Gibson, Presiding

————————————————

**APPENDIX VOL. 1**
**Pages 1-149**

————————————————

Matthew M. Robinson, Esq.
Robinson & Brandt, PSC
Attorney for the Appellant
629 Main Street, Suite B
Covington, Kentucky 41011
(859) 581-7777 phone
(8590 581-5777 fax

**TABLE OF CONTENTS**

**Volume I**

**District Court Document ("Doc.")**                                    **Page No.**

Doc. 57      Memorandum Opinion & Order on Motion to Suppress. . . . . . . . . . . 1

Doc. 262    Memorandum Order on Judgment Acquittal .. . . . . . . . . . . . . . . . . 64

Doc. 268    Memorandum Order Sentencing Objections. . . . . . . . . . . . . . . . . 126

Doc. 270    Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Doc. 273    Notice of Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

**Volume II**

District Court Docket Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Doc. 48      Transcript Suppression Hearing 2/25/19. . . . . . . . . . . . . . . . . . . 180

Doc. 232    Trial Transcript Day 4.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

Doc. 275    Transcript Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 373

**CERTIFICATE OF SERVICE**

The undersigned certifies that on April 26, 2024, a true and accurate copy of the foregoing was entered in this Court's ECF/CM filing system, constituting delivery upon the Office of the Assistant United States Attorney for the U.S. Court of Appeals for the Third Circuit and all parties to the appeal.

/s/Matthew M. Robinson
Matthew M. Robinson, Esq
629 Main Street, Suite B
Covington, KY 41011
859-581-7777 phone
859-581-5777 fax

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 3:18-cr-24 |
| | ) | |
| v. | ) | JUDGE KIM R. GIBSON |
| | ) | |
| JOHN T. TERRY, a/k/a TYREE TERRY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. Introduction

Before the Court is Defendant John T. Terry's ("Defendant") Motion to Suppress Evidence (ECF No. 26). This Motion has been fully briefed (ECF Nos. 26, 32, 51, 52) and is ripe for disposition. The Court has jurisdiction over this matter pursuant to 18 U.S.C. § 3231.

This matter arises from a three-count federal grand jury indictment, returned on October 16, 2018, charging Defendant with (1) possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(B)(ii)(II); (2) unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1); and (3) unlawful possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(C)(i). (*See* ECF No. 1.) On November 28, 2018, Defendant filed the present Motion to Suppress Evidence (ECF No. 26). After the United States of America (the "Government") filed its Response (ECF No. 32), the Court held a Suppression Hearing on February 25, 2019. (*See* ECF No. 43.)

1

At the Hearing, Pennsylvania State Police Trooper Ryan Marmol ("Trooper Marmol") testified for the Government. (*See id.*) The Government introduced the following exhibits into evidence: (1) a DVD copy of a dash camera recording taken from Trooper Marmol's patrol vehicle of the April 4, 2018 vehicle stop (the "MVR") (Gvm't Ex. 1); (2) a photocopy of Trooper Marmol's *Miranda* card (Gvm't Ex. 2); (3) a document entitled "Police Criminal Complaint" dated April 4, 2018 and signed by Trooper Marmol (Gvm't Ex. 3); and (4) a Pennsylvania State Police Incident Report dated May 4, 2018 and signed by Trooper Marmol (Gvm't Ex. 4).

On cross-examination of Trooper Marmol, the defense introduced the following exhibits into evidence: (1) a Preliminary Hearing Transcript in *Commonwealth v. Terry*, Docket No. 00050-2018 (Def. Ex. 1); and (2) a Pennsylvania State Police Property Record, unsigned (Def. Ex. 2).

Following the Hearing, Defendant submitted Proposed Findings of Fact and Conclusions of Law in Support of Defendant's Motion to Suppress Evidence (ECF No. 51) and the Government filed a Response thereto (ECF No. 52).[1]

In his Motion, Defendant moves to suppress all physical evidence seized and statements made on April 4, 2018, as a result of the traffic stop of a 2010 Ford Taurus (the "Ford Taurus" or "Taurus") in which Defendant was a passenger. (ECF No. 26 at 1.) Defendant raises five grounds for the suppression of this evidence.

First, Defendant argues that Trooper Marmol lacked reasonable suspicion to believe that a motor vehicle offense occurred when he stopped the Ford Taurus on April 4, 2018. (*Id.* ¶ 28.) Second, Defendant contends that the traffic stop was longer than necessary to resolve the alleged

---

[1] Defendant was also given a five-day window to file a reply brief, but he did not do so. (*See* ECF No. 44.)

2

motor vehicle violations and that the extension of the stop was unsupported by reasonable suspicion to believe a non-motor-vehicle offense occurred. (*Id.* ¶ 29.) Third, Defendant asserts that the Taurus driver's consent to the search of the vehicle was involuntary. (*Id.* ¶ 30.) Fourth, Defendant argues that, to the extent the driver's consent was voluntary, the consent was limited to the interior and trunk of the vehicle and that Trooper Marmol's search exceeded the scope of this consent. (*Id.* ¶ 31.) Fifth, Defendant contends that Trooper Marmol did not properly advise Defendant of his *Miranda* rights before questioning him. (*Id.* ¶ 32.)

The Court disagrees with Defendant on these issues, and, for the reasons that follow, the Court will **DENY** Defendant's Motion to Suppress Evidence (ECF No. 26).

## II. Findings of Fact

The Court makes the following findings of fact based on the evidence and testimony[2] presented at the Suppression Hearing on February 25, 2019:[3]

### A. Trooper Marmol's Background and Experience

1.  Trooper Marmol has worked for the Pennsylvania State Police for over six years. (ECF No. 48 at 4.)

2.  In 2013, prior to becoming a State Police trooper, Trooper Marmol graduated from the Pennsylvania State Police Academy (the "Academy"). (*Id.* at 4-5.)

3.  At the Academy, Trooper Marmol received training on the Pennsylvania Motor

---

[2] The transcript of the Suppression Hearing is docketed at ECF No. 48.

[3] "It is settled that at a hearing on a motion to suppress, 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" *United States v. Leveto*, 343 F. Supp. 2d 434, 442 (W.D. Pa. 2004) (quoting *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir. 1993); citing *United States v. Matthews*, 32 F.3d 294, 298 (7th Cir. 1994); *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990); *Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974)).

3

**3**

Vehicle Code. (*Id.* at 5.)

4. Once Trooper Marmol graduated from the Academy, he served as a patrol office for two-and-a-half to three years. (*Id.* at 6.)

5. Trooper Marmol was then transferred to the Safe Highway Initiative through Effective Law Enforcement Detection ("SHIELD") unit. (*Id.*)

6. At the time of the Suppression Hearing, Trooper Marmol still worked as a SHIELD officer. (*Id.* at 6.)

7. Trooper Marmol underwent specialized training to become a SHIELD officer. (*Id.* at 6-7.)

8. His SHIELD training was approximately forty hours and included training on conducting traffic stops, deceptive behaviors, hidden compartments, and commercial motor vehicles. (*Id.* at 7.)

9. With respect to deceptive behaviors, Trooper Marmol has received approximately fifty hours of training on this subject. (*Id.*)

10. As to identifying hidden compartments, Trooper Marmol has received some training on this subject and has had personal experience locating hidden compartments in vehicles. (*Id.* at 7-8.)

11. Over his career, Trooper Marmol has conducted thousands of traffic stops, including approximately 500 stops in the last year. (*Id.* at 9-10.)

12. Trooper Marmol has conducted traffic stops based on Pennsylvania Motor Vehicle Code Section 3310—following too closely, Section 3309—roadways laned for traffic, and the general lighting requirements provisions, among others. (*Id.* at 5-6.)

4

4

13. Trooper Marmol has also searched hundreds of vehicles over his six-year career. (*Id.* at 10.)

14. About forty to fifty of Trooper Marmol's vehicle stops in the last year led to vehicle searches. (*Id.*)

15. When conducting searches, Trooper Marmol is particularly looking for: (1) contraband, (2) tooling on certain panels, (3) air fresheners that are methodically placed, and (4) glued carpet, black-over spray, and other indications of aftermarket hidden compartments. (*Id.* at 12.)

16. Trooper Marmol has located approximately thirteen hidden compartments during his vehicle searches. (*Id.* at 7-8, 130.)

17. Furthermore, he has found hidden compartments when backing up other officers at their traffic stops. (*Id.* at 8.)

18. Of the thirteen hidden compartments Trooper Marmol has located during his vehicle searches, approximately ten contained contraband, including guns or drugs. (*Id.* at 13, 130.)

19. In Trooper Marmol's training and experience, when he locates a hidden compartment, he suspects drug trafficking is occurring because such compartments are used for only one purpose—concealing contraband. (*Id.* at 12-13, 44; Gvm't Ex. 4 at 6.)

**B. Trooper Marmol's April 4, 2018 Vehicle Stop of the Ford Taurus**

20. On April 4, 2018, Trooper Marmol was working in his capacity as a SHIELD officer. (ECF No. 48 at 13; Gvm't Ex. 3.)

21. Trooper Marmol was in uniform. (Gvm't Ex. 1; Gvm't Ex. 3; Gvm't Ex. 4 at 3; Def. Ex.

5

1 at 9.)

22. Trooper Marmol was patrolling a 50-mile stretch of the Pennsylvania Turnpike in Somerset County, Pennsylvania. (ECF No. 48 at 13-14.)

23. This portion of the Pennsylvania Turnpike is a four-lane highway with two lanes traveling eastbound and two lanes traveling westbound. (*Id.* at 16.) The lanes of the Turnpike are clearly marked. (*See* Gvm't Ex. 1.)

24. Around 2:30 p.m., Trooper Marmol was travelling in a marked Pennsylvania State Police patrol vehicle that was equipped with lights, sirens, a dash camera on the windshield that faced toward the front of the vehicle, and a camera that captured the inside of the vehicle. (ECF No. 48 at 14-16; Gvm't Ex. 3; Gvm't Ex. 4 at 3; Def. Ex. 1 at 9, 16.)

25. Trooper Marmol was wearing a lapel microphone on his person that began recording when the police vehicle's emergency lights were activated and was also manually turned on and off at certain times. (ECF No. 48 at 15, 85; Gvm't Ex. 4 at 3; Def. Ex. 1 at 16.)

26. Trooper Marmol was in the left lane of the Turnpike, traveling westbound, heading home after the completion of his shift. (*Id.* at 17-18, 73; Gvm't Ex. 4 at 3.)

27. The speed limit on this portion of the Turnpike was 70 miles per hour. (ECF No. 48 at 17, 73.)

28. At this time, Trooper Marmol conducted a traffic stop of a Ford Taurus with two adult occupants. (*Id.* at 17, 29, 73; Gvm't Ex. 1; Gvm't Ex. 3; Gvm't Ex. 4 at 2.)

29. Trooper Marmol's dash camera recorded this traffic stop. (ECF No. 48 at 18-19; Gvm't

6

6

Ex. 4 at 3; *see* Gvm't Ex. 1.)

30. Trooper Marmol explained that the dash camera truly and accurately captures what he sees as he travels in his vehicle; however, he noted that the dash camera footage has some limitations in terms of capturing distance and events that take place at the sides of the police vehicle. (ECF No. 48 at 21, 84-85.)

31. A portion of the audio from the stop was recorded on Trooper Marmol's lapel microphone. (*Id.* at 19; *see* Gvm't Ex. 1.)

32. The Ford Taurus was traveling in the left lane of the Turnpike, in front of Trooper Marmol. (ECF No. 48 at 24; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

33. Although Trooper Marmol did not remember exactly when, at some point while he was driving behind the Ford Taurus, he noticed that the Taurus had tinted taillights, which he believed violated the Pennsylvania Motor Vehicle Code. (ECF No. 48 at 18, 24; Gvm't Ex. 4 at 3.)

34. In spite of the tinted taillights, the brake lights of the Taurus appeared to be red and the right turn signal light appeared to be yellow. (ECF No. 48 at 84; *see* Gvm't Ex. 1.)

35. As Trooper Marmol's marked patrol vehicle approached the Ford Taurus in the left lane, Trooper Marmol was passing the vehicles that were travelling in the right lane. (ECF No. 48 at 73; Gvm't Ex. 1.)

36. When Trooper Marmol's patrol vehicle came up behind the Ford Taurus, the Taurus decelerated, allowing the vehicle that was traveling beside it in the right lane to pull ahead. (ECF No. 48 at 79-80; Gvm't Ex. 1.)

37. The Ford Taurus then activated its right turn signal and quickly changed lanes such

7

that the Taurus was in the right lane following only one vehicle length behind the vehicle in front of it. (ECF No. 48 at 24, 76, 78-79, 81, 151; Gvm't Ex. 1; Gvm't Ex. 4 at 3; Def. Ex. 1 at 11-12.)

38. Following the lane change, the Ford Taurus decelerated. (ECF No. 48 at 81; Gvm't Ex. 1.)

39. Trooper Marmol thought this lane change was unsafe. (ECF No. 48 at 24; Gvm't Ex. 4 at 3.)

40. Trooper Marmol also thought the Ford Taurus was following the vehicle in front of it too closely because the Taurus was only one vehicle length behind the vehicle in front of it. (ECF No. 48 at 25-26, 83.)

41. Moreover, Trooper Marmol's understanding of the Pennsylvania Driver's Manual was that the Manual required a four-second following distance between vehicles, which, based on Trooper Marmol's training and experience, was not met in this case. (*Id.* at 25-26, 83, 151; Gvm't Ex. 4 at 3.)

42. Trooper Marmol then maneuvered his patrol vehicle into the right lane behind the Ford Taurus, activated his lights, and conducted a traffic stop on the side of the Turnpike. (ECF No. 48 at 24-25, 77, 82; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

43. Trooper Marmol's basis for conducting the traffic stop was (1) the tinted taillights, (2) the unsafe lane change, and (3) following too closely. (ECF No. 48 at 25; Gvm't Ex. 3; Gvm't Ex. 4 at 3; Def. Ex. 1 at 9.)

44. After pulling the Taurus over, Trooper Marmol approached the vehicle on the passenger side and requested the driver's license, which the driver provided. (ECF

8

8

No. 48 at 27-28, 90; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

45. When the driver gave Trooper Marmol his license, Trooper Marmol did not immediately retrieve it. (ECF No. 48 at 28, 90-91; Gvm't Ex. 4 at 3.)

46. At this time, Trooper Marmol observed the driver's hand to be visibly shaking, which Trooper Marmol noted as nervous behavior. (ECF No. 48 at 28, 91; Gvm't Ex. 4 at 3-4.)

47. The license provided by the driver indicated that the driver was Gerald Terry.[4] (ECF No. 48 at 29; Gvm't Ex. 4 at 3.)

48. Trooper Marmol then asked if the driver owned the vehicle. (ECF No. 48 at 29; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

49. The driver responded that the vehicle belonged to a friend. (ECF No. 48 at 29; Gvm't Ex. 4 at 3.)

50. Trooper Marmol asked for the name of the friend and the driver simply handed Trooper Marmol the vehicle's registration. (*See* Gvm't Ex. 1.)

51. To Trooper Marmol, it seemed as though the driver did not know to whom the vehicle was registered. (Gvm't Ex. 4 at 4.)

52. Trooper Marmol then asked if the owner was a "girl," and the driver said that his friend's wife owned the vehicle. (ECF No. 48 at 29, 93; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

53. Trooper Marmol's suspicion was raised by the fact that the vehicle was owned by a third party, which is indicative of narcotics smuggling because the occupants of the

---

[4] Gerald Terry will be referred to as "the driver" so as to distinguish between Gerald Terry and Defendant John Terry.

9

9

vehicle can distance themselves from the contraband that is located within the vehicle. (ECF No. 48 at 29, 94; Gvm't Ex. 4 at 3-4.)

54. Trooper Marmol then explained the reasons for the stop, stating that when the Ford Taurus changed lanes, it was too close to the vehicle in front of it. (ECF No. 48 at 86-87; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

55. Trooper Marmol explained that such a lane change and close following distance could cause an accident if, for example, a deer jumped in front of the car in front and the car in front then had to stop suddenly. (Gvm't Ex. 1.)

56. Trooper Marmol then asked for the toll ticket (*id.*), which the driver provided, so that he could verify where the driver and Defendant got on the Turnpike. (ECF No. 48 at 87, 96; Gvm't Ex. 4 at 3.)

57. Trooper Marmol did not need the toll ticket to issue a traffic citation, but he always asks for the toll ticket when he conducts a traffic stop. (ECF No. 48 at 88.)

58. Trooper Marmol asked where the Taurus was coming from—to which the driver responded that they were coming from Philadelphia—and where they were going—to which the driver responded that they were heading to Pittsburgh. (ECF No. 48 at 30, 97; Gvm't Ex. 1; Gvm't Ex. 4 at 3-4.)

59. Trooper Marmol asked how long they would be in Pittsburgh. The driver responded that they were returning to Philadelphia a few hours later, after he spoke at a Narcotics Anonymous ("NA") meeting. (ECF No. 48 at 31, 97, 99; Gvm't Ex. 1; Gvm't Ex. 4 at 3.)

60. Trooper Marmol was suspicious because, in his training and experience, Philadelphia, Pennsylvania, is a known source area for the distribution of narcotics and Pittsburgh,

10

10

Pennsylvania, is a consumption and local distribution area for narcotics. (ECF No. 48 at 31; Gvm't Ex. 4 at 3-4.)

61. Moreover, Trooper Marmol was suspicious because, in his experience, quick trips such as this one are made to evade law enforcement. (ECF No. 48 at 32; Gvm't Ex. 4 at 4.)

62. Furthermore, Trooper Marmol felt that the trip's purpose was implausible, as they were traveling four-and-a-half hours to speak at an NA meeting and then turning around and traveling directly back. (ECF No. 48 at 32, 99; Gvm't Ex. 4 at 4.)

63. Trooper Marmol found this purpose odd particularly because he thought that there would be NA meetings in the Philadelphia area that the driver and Defendant could have attended. (ECF No. 48 at 32; Gvm't Ex. 4 at 4.)

64. Trooper Marmol then asked for the passenger's driver's license, which the passenger provided. (ECF No. 48 at 102; Gvm't Ex. 1; Gvm't Ex. 4 at 4.)

65. The license identified the passenger as Defendant John Terry. (ECF No. 48 at 29; Gvm't Ex. 4 at 4.)

66. Defendant's carotid artery was pulsating, which Trooper Marmol noted as nervous behavior. (ECF No. 48 at 30, 103; Gvm't Ex. 4 at 4.)

67. Trooper Marmol returned to his vehicle and conducted a criminal history check on the driver. (ECF No. 48 at 32, 104; Gvm't Ex. 4 at 4.)

68. The check indicated that the driver had previously been arrested. (ECF No. 48 at 33, 105.)

69. At this point, Trooper Marmol contacted police dispatch and requested backup for a vehicle search. (*Id.* at 33-34, 104-05; Gvm't Ex. 1; Gvm't Ex. 4 at 4.)

11

**11**

70. Trooper Marmol then conducted various criminal history queries on the driver and Defendant, driver's license queries, and registration queries. (ECF No. 48 at 35; Gvm't Ex. 4 at 4.)

71. The criminal history query for the driver showed that the driver had been arrested for drug and firearm offenses. (Gvm't Ex. 4 at 4.)

72. The criminal history query for Defendant indicated that Defendant had been arrested for various firearm-related offenses, assaults, and robberies. (*Id.* at 4-5.)

73. At some point, Trooper Marmol reviewed information regarding the identity of the vehicle's registered owner. (ECF No. 48 at 33; Gvm't Ex. 4 at 5.)

74. The vehicle was registered to a male, although the driver had said that his friend's wife owned the vehicle. (ECF No. 48 at 33; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

75. When Trooper Marmol ran a criminal history query on the vehicle's registered owner, he found that the owner had been arrested for drug and firearm offenses and was on federal probation. (ECF No. 48 at 37; Gvm't Ex. 4 at 5.)

76. After a roughly fifteen-minute wait, Trooper Nicholas Petrosky ("Trooper Petrosky") arrived from the Somerset Barracks to serve as Trooper Marmol's backup officer. (ECF No. 48 at 37; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

77. Trooper Marmol then approached the Ford Taurus and asked the driver to exit the vehicle. (ECF No. 48 at 109-10; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

78. The driver exited the Ford Taurus and Defendant also got out of the vehicle. (Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

79. Trooper Marmol told the driver he was going to give him a verbal warning but no

12

**12**

ticket for the traffic violations. (ECF No. 48 at 110; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

80. Trooper Marmol also mentioned for the first time that the Ford Taurus had tinted taillight covers. (ECF No. 48 at 110; Gvm't Ex. 1.)

81. Trooper Marmol told the driver in a conversational manner that he was aware of his extensive criminal history. (ECF No. 48 at 114; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

82. Trooper Marmol asked the driver if there was anything illegal in the Ford Taurus, to which the driver responded, "no." (ECF No. 48 at 38, 114, 116; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

83. Trooper Marmol then asked the driver if he could search the vehicle, to which the driver responded, without hesitation, "yeah, yeah." (ECF No. 48 at 38, 113-14, 116; Gvm't Ex. 1; Gvm't Ex. 3; Gvm't Ex. 4 at 5; Def. Ex. 1 at 10.)

84. The driver did not limit the scope of the vehicle search. (ECF No. 48 at 40; Gvm't Ex. 1.)

85. Trooper Marmol did not inform the driver that he could withhold or terminate his consent to search. (ECF No. 48 at 126; Gvm't Ex. 1.)

86. Trooper Marmol asked for the driver's consent to search the Ford Taurus about twenty minutes into the traffic stop. (*See* Gvm't Ex. 1.)

87. The driver was not handcuffed when he gave Trooper Marmol his consent to search. (*See id.*)

88. During Trooper Marmol's encounter with the driver, Defendant was standing a few feet away from where Trooper Marmol and the driver were speaking. (ECF No. 48 at 38, 115; *see* Gvm't Ex. 1.)

13

13

89. Defendant gave no indication during the driver and Trooper Marmol's conversation that he was responsible for the Ford Taurus. (ECF No. 48 at 40; Gvm't Ex. 1.)

90. Trooper Marmol then said he was going to give the driver and Defendant's documentation to Trooper Petrosky. (Gvm't Ex. 1.)

91. Trooper Marmol asked if the driver "had anything on him." (*Id.*; Gvm't Ex. 4 at 5.)

92. Trooper Marmol asked the driver if he could pat the driver down, to which the driver consented. (ECF No. 48 at 39; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

93. Trooper Marmol patted down the driver. (ECF No. 48 at 39; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

94. The pat-down yielded negative results. (Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

95. Trooper Marmol then asked Defendant if he "had anything on him" and asked if he could pat him down. (Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

96. Defendant consented to the pat-down and Trooper Marmol conducted a pat-down that yielded negative results. (Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

97. Trooper Marmol gave the licenses, registration, and toll ticket to Trooper Petrosky, who had been standing close by during Trooper Marmol's conversation with the driver. (ECF No. 48 at 111; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

C. **Trooper Marmol's Search of the Ford Taurus**

98. Trooper Marmol then began the vehicle search. (ECF No. 48 at 42; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

99. During at least a portion of the search, Trooper Petrosky stood by Trooper Marmol's patrol vehicle with the driver and Defendant and with his hand on his weapon. (ECF

14

14

No. 48 at 117, 123-24; Gvm't Ex. 1.)

100. Trooper Marmol started the vehicle search on the passenger side of the vehicle, then searched the driver's side, the back seat, the trunk, and the glove compartment/passenger-side dash area. (ECF No. 48 at 42; Gvm't Ex. 1.)

101. Neither the driver nor Defendant interrupted the search to revoke consent to search. (ECF No. 48 at 42; *see* Gvm't Ex. 1.)

102. Furthermore, Defendant never interrupted the search to say that he had authority over the vehicle. (ECF No. 48 at 42; *see* Gvm't Ex. 1.)

103. According to Trooper Marmol and as shown by the MVR, neither the driver nor Defendant said anything to him during the search of the Ford Taurus, prior to the point at which Trooper Marmol handcuffed them. (ECF No. 48 at 42-43; Gvm't Ex. 1.)

104. Eventually, Trooper Marmol believed that he located a hidden aftermarket compartment in the passenger-side dash area. (ECF No. 48 at 43; Gvm't Ex. 1; Gvm't Ex. 4 at 6; Def. Ex. 1 at 10.)

105. Trooper Marmol located the aftermarket compartment by opening the glove compartment and dropping the compartment down the entire way so that he could look into the dash area. (ECF No. 48 at 43.)

106. When doing this, Trooper Marmol noticed a metal box and "some welds," that, to him, indicated the presence of an aftermarket compartment. (*Id.* at 43, 143; Gvm't Ex. 1; Gvm't Ex. 4 at 5.)

107. This box was located in the passenger's dash area where the passenger's airbag would have normally been located. (ECF No. 48 at 44; Gvm't Ex. 4 at 5.)

15

15

108.    But the box was not consistent with the airbag mechanisms that Trooper Marmol had previously observed in vehicles and Trooper Marmol knew that in order for the welded box to fit in that area, the air bag had to be removed.  (ECF No. 48 at 44; Gvm't Ex. 4 at 5.)

109.    Trooper Marmol then handcuffed the driver and Defendant and placed them in Trooper Petrosky's patrol vehicle.  (ECF No. 48 at 124, 126; Gvm't Ex. 1; Gvm't Ex. 4 at 6.)

110.    Trooper Marmol explained to the driver and Defendant that he believed he found an aftermarket compartment in the Ford Taurus and that he was going to investigate it.  (ECF No. 48 at 126; Gvm't Ex. 1.)

111.    Based on Trooper Marmol's training and experience that aftermarket compartments are used to smuggle contraband and his belief that he had located an aftermarket compartment, he believed he had probable cause to search the compartment and he accessed the compartment by prying it open.  (ECF No. 48 at 45-46, 135, 139.)

112.    It took Trooper Marmol approximately fifty-five minutes to open the aftermarket compartment.  (*See* Gvm't Ex. 1.)

113.    Inside the compartment, Trooper Marmol located three kilograms of a substance, a Smith & Wesson pistol, a vial of liquid, and some circular pills.  (ECF No. 48 at 46, 131; Gvm't Ex. 3; Gvm't Ex. 4 at 6; Def. Ex. 1 at 9; Def. Ex. 2.)

114.    Trooper Marmol placed the contents of the compartment on the hood of his police vehicle after he rendered the firearm safe.  (ECF No. 48 at 46-47, 141; Gvm't Ex. 1.)

16

115.    A tow truck towed the vehicle back to the Pennsylvania State Police Somerset County barracks.  (ECF No. 48 at 48, 65, 143.)

### D. Defendant's Arrest and Statement at Somerset County Barracks

116.    Trooper Marmol placed the driver and Defendant under arrest and read *Miranda* warnings to them using a *Miranda* card that he carries.  (ECF No. 48 at 49-64, 142-43; Gvm't Ex. 2; Gvm't Ex. 3; Gvm't Ex. 4 at 6.)

117.    The driver and Defendant were transported to the Somerset County police barracks.  (ECF No. 48 at 65, 143; Gvm't Ex. 4 at 6.)

118.    At the barracks, the driver and Defendant were seated on prisoner benches in the patrol room.  (ECF No. 48 at 65-66.)

119.    Trooper Marmol processed the evidence while in the same room as the driver and Defendant.  (*Id.* at 66, 146.)

120.    Trooper Marmol then interviewed Defendant in the interview room.  (*Id.* at 66.)

121.    Trooper Marmol stated that during the interview, Defendant did not request to have an attorney present and did not indicate at any time that he wished to terminate the interview.  (*Id.* at 67.)

122.    According to Trooper Marmol, "nothing of substance" was discussed during the interview.  (*Id.* at 66.)

123.    Then, in the patrol room with the driver sitting across from him, Defendant told Trooper Marmol that he borrowed the Ford Taurus and that he was responsible for it.  (*Id.* at 67, 147, 148, 150; Gvm't Ex. 3; Gvm't Ex. 4 at 6; Def. Ex. 1 at 10, 18.)

124.    Trooper Marmol could not remember whether Defendant's statement was made

17

in response to questioning or a dialogue between Trooper Marmol and Defendant. (ECF No. 48 at 67-68.)

## III. Conclusions of Law

As discussed *supra*, Defendant's Motion to Suppress Evidence (ECF No. 26) raises five grounds for the suppression of the physical evidence seized and statements made as a result of the April 4, 2018 traffic stop. First, Defendant argues that Trooper Marmol lacked reasonable suspicion to believe that a motor vehicle offense occurred when he stopped the Ford Taurus on April 4, 2018. (*Id.* ¶ 28.) Second, Defendant contends that the traffic stop was longer than necessary to resolve the alleged motor vehicle violations and that the extension of the stop was unsupported by reasonable suspicion to believe a non-motor-vehicle offense occurred. (*Id.* ¶ 29.) Third, Defendant asserts that the vehicle driver's consent to the search of the vehicle was involuntary. (*Id.* ¶ 30.) Fourth, Defendant argues that, to the extent the driver's consent was voluntary, Trooper Marmol's search exceeded the scope of the consent. (*Id.* ¶ 31.) Fifth, Defendant contends that Trooper Marmol did not properly advise Defendant of his *Miranda* rights before questioning him. (*Id.* ¶ 32.)

The Government filed a Response to Defendant's Motion to Suppress Evidence (ECF No. 32). The Government addressed Defendant's arguments as follows. First, the Government contends that Trooper Marmol had reasonable suspicion that vehicle code violations occurred, justifying the stop of the Ford Taurus. (*Id.* at 11-13.) Second, the Government avers that while Trooper Marmol's call for backup extended the traffic stop, at this moment Trooper Marmol had reasonable suspicion to justify the continued seizure of Defendant and the driver. (*Id.* at 17.) Third, the Government claims that Defendant has no standing to challenge the consent search

18

18

and that, even if he did, the driver had actual and apparent authority to consent to the search and his consent was voluntary. (*Id.* at 18-21.) Fourth, the Government contends that the search did not exceed the scope of consent until Trooper Marmol discovered the aftermarket compartment, at which time the search became a lawful probable cause search. (*Id.* at 22-26.) Fifth, the Government argues that *Miranda* does not apply to traffic stops and that Defendant was given *Miranda* warnings at the appropriate time. (*Id.* at 26-27.)

The Court addresses each of these issues in turn.

## A. Reasonable Suspicion for the Vehicle Stop

### 1. The Parties' Arguments

Defendant argues that evidence obtained as a result of the stop of the Ford Taurus must be suppressed because Trooper Marmol did not have reasonable suspicion to believe that a motor vehicle offense occurred. (ECF No. 26 ¶ 28; ECF No. 51 at 9, 10-11.) According to Defendant, Trooper Marmol's stated reason for executing the stop—following too closely, in violation of 75 Pa. Cons. Stat. § 3310—was pretext for performing a criminal investigation. (ECF No. 26 at 7; ECF No. 51 at 9, 11.) Moreover, Defendant argues that Trooper Marmol did not have reasonable suspicion or probable cause to believe a traffic violation occurred because (1) Trooper Marmol did not observe the tinted taillights until after the stop; (2) the tint did not change the colors of the taillights, and thus did not violate the Pennsylvania Motor Vehicle Code; and (3) the Ford Taurus did not unsafely change lanes or follow too closely. (ECF No. 26 at 7-9; ECF No. 51 at 10.) On this last point, Defendant asserts that Trooper Marmol was traveling at a high rate of speed when he approached the Taurus. (ECF No. 26 at 7.) The Taurus allowed the vehicle to its right to pull ahead, activated its right turn signal, and switched lanes behind the other vehicle. (*Id.* at

19

**19**

8.) Defendant claims that no reasonable police officer would believe that the Taurus violated a traffic law under these circumstances. (ECF No. 51 at 10.)

In response, the Government contends that Trooper Marmol had reasonable suspicion that three traffic violations occurred, including violations of (1) 75 Pa. Cons. Stat. § 3309 — driving on roadways laned for traffic ("Section 3309"); (2) 75 Pa. Cons. Stat. § 3310 — following too closely ("Section 3310"); and (3) 67 Pa. Code § 175.66(g) — tinted vehicle lights ("Section 175.66"). (ECF No. 32 at 11-12.) According to the Government, when Trooper Marmol's patrol vehicle approached the Ford Taurus, it was still a substantial distance behind the Ford Taurus when the driver activated his turn signal and "darted from the left lane to the right lane, less than one car length behind a vehicle traveling in the right lane of traffic." (*Id.* at 12; ECF No. 52 at 8.) These circumstances gave Trooper Marmol reasonable suspicion that the lane change was unsafe, in violation of Section 3309, and that the Ford Taurus's distance behind the vehicle in front of it was not reasonable and prudent, in violation of Section 3310. (ECF No. 32 at 12.) As for the tinted taillights, the Government explains that the tint is difficult to discern on the video of the traffic stop but that an experienced highway patrolman like Trooper Marmol — who received numerous trainings on traffic stops and conducted hundreds of stops over his career — would be able to spot tinted taillight covers more easily than untrained eyes. (*Id.* at 12-13.) Finally, the Government indicates that as long as a traffic stop is supported by reasonable suspicion, an officer's subjective motives for the stop are irrelevant. (ECF No. 52 at 8.)

### 2. Legal Standard

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

20

and seizures." U.S. Const. amend. IV. A traffic stop by police is a "seizure" of "persons" under this Amendment and thus must be "reasonable" to pass constitutional muster. *See Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018); *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006).

A traffic stop is reasonable under the Fourth Amendment when a law enforcement officer has reasonable suspicion that a traffic violation occurred. *See United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (citing *Navarette v. California*, 572 U.S. 393 (2014); *Delfin-Colina*, 464 F.3d at 396-97)). The reasonable suspicion standard is a lower standard than probable cause. *See Navarette*, 572 U.S. at 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *Delfin-Colina*, 464 F.3d at 396 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). But reasonable suspicion must be based on more than a hunch. *Navarette*, 572 U.S. at 397 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). "Though reasonable suspicion is a generally undemanding standard, a police officer does have the initial burden of providing the 'specific, articulable facts' to justify a reasonable suspicion that an individual has violated the traffic laws." *Delfin-Colina*, 464 F.3d at 397 (citing *United States v. Cortez*, 449 U.S. 411, 416 (1981)). And the reviewing court must consider the totality of the circumstances when evaluating the reasonableness of the stop, including the "content of the information possessed by police and its degree of reliability," *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)), and "whether the 'rational in[ferences] from those facts reasonably warrant [the] intrusion,'" *Delfin-Colina*, 464 F.3d at 397 (second alteration in original) (quoting *Terry*, 392 U.S. at 21).

21

### 3. Analysis

The Court finds that Trooper Marmol did have reasonable suspicion of a traffic violation to support the traffic stop of the Ford Taurus.

Trooper Marmol executed the stop of the Ford Taurus based on two provisions of the Pennsylvania Motor Vehicle Code and one Pennsylvania Department of Transportation regulation.

The first provision—Section 3309—states:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others not inconsistent therewith shall apply:
> (1) Driving within single lane.—A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety.

75 Pa. Cons. Stat. § 3309(1). Here, the Turnpike was divided into two or more clearly marked lanes and thus Section 3309 applies. (*See* Gvm't Ex. 1.) Under Section 3309, whether the Ford Taurus's lane change provided reasonable suspicion for the traffic stop depends on whether the lane change was safe. *See United States v. Prado*, 3:15-CR-151, 2017 WL 1653957, at *4 (M.D. Pa. May 1, 2017) ("[A] violation of section 3309(1) occurs when a driver's 'deviations from his lane of travel create[s] a significant safety hazard on the roadway'" (quoting *Commonwealth v. Feczko*, 10 A.3d 1285, 1292 (Pa. Super. Ct. 2010))); *Commonwealth v. Thrower*, No. 258 WDA 2012, 2013 WL 11276824, at *5 (Pa. Super. Ct. Feb. 28, 2013) (explaining that whether a police officer can stop a vehicle pursuant to Section 3309(1) "depends largely upon whether a driver's movement from his lane is done safely").

22

Here, Trooper Marmol credibly testified that he observed the Ford Taurus make an abrupt lane change that resulted in the Taurus driving only one car length behind another vehicle on a 70 mile-per-hour stretch of the Turnpike. (ECF No. 48 at 17, 24, 81, 151.) And the MVR supports Trooper Marmol's reasonable belief that the lane change was unsafe. (*See* Gvm't Ex. 1.) Thus, the Court finds that Trooper Marmol had reasonable suspicion to believe that the Ford Taurus violated Section 3309(1) by changing lanes without ascertaining that the change could be made safely.

The Court recognizes that the driver of the Ford Taurus acted in response to a fast-approaching, marked police vehicle. (ECF No. 48 at 14, 73; *see* Gvm't Ex. 1.) The driver's deceleration and lane change may have been reasonable responses to his situation and may have been done in a safe manner. However, to establish reasonable suspicion, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place." *Delfin-Colina*, 464 F.3d at 398. And here, the Government has met its burden of identifying facts that show that Trooper Marmol was reasonable in believing that the Ford Taurus violated Section 3309, even if his belief was factually inaccurate.

Although Section 3309 provided a basis for stopping the Ford Taurus, the Court will nevertheless address Trooper Marmol's other reasons for executing the stop. Trooper Marmol justified the stop based on Section 3310(a) of the Motor Vehicle Code, which provides:

> (a) General rule.—The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway.

23

23

75 Pa. Cons. Stat. § 3310(a). "[T]he purpose of the statute is to prevent accidents. Requiring a reasonable and prudent distance allows a driver to stop or take evasive maneuver if the vehicle in front stops or slows suddenly." *Commonwealth v. Tarrach*, 42 A.3d 342, 348 (Pa. Super. Ct. 2012) (citing *Commonwealth v. Phinn*, 761 A.2d 176 (Pa. Super. Ct. 2000)).

Trooper Marmol testified that when determining whether the Ford Taurus was following the car in front of it too closely in violation of Section 3310, Trooper Marmol followed a standard that he claimed came from the Pennsylvania Driver's Manual. (ECF No. 48 at 25.) Trooper Marmol said that "following too closely" referred to following another vehicle at less than a four-second following distance. (*Id.*) After observing the following distance in this case, Trooper Marmol concluded that the gap between the vehicles was less than the four seconds recommended by the Pennsylvania Driver's Manual. (*Id.* at 26.)

While it is difficult for the Court to assess the distance between the Ford Taurus and the car in front of it based on the MVR, the MVR does support a reasonable belief that the Ford Taurus was following the car in front of it closer than was safe, particularly considering the 70 mile-per-hour speed limit. (ECF No. 48 at 17; *see* Gvm't Ex. 1.) Trooper Marmol identified his particular safety concerns during the stop when he stated that following that closely could cause an accident if, for example, a deer jumped in front of the car in front of the Taurus and the car in front then had to stop suddenly. (*See* Gvm't Ex. 1.) And while Trooper Marmol admitted that, after the Ford Taurus changed lanes, it decelerated such that it was a greater distance from the car in front of it (ECF No. 48 at 81), he stated that he still believed the Ford Taurus was following too closely. (*Id.*) The Court finds that based on Trooper Marmol's experience and training on traffic stops

24

24

and the Motor Vehicle Code, his testimony, and the MVR footage, he reasonably believed that the Ford Taurus was following too closely in violation of Section 3310(a).

And finally, Trooper Marmol relied on a tinted taillight violation to execute the stop of the Ford Taurus. Title 67 of the Pennsylvania Code, Section 175.66(g) states that vehicle lamps shall "not be so obstructed by a screen, bar, auxiliary equipment or a device as to obscure, change the color of or obstruct beam." 67 Pa. Code § 175.66(g).

Defendant argues that Trooper Marmol did not observe the tinted taillights until after the stop. (ECF No. 26 at 8.) Defendant explains that Trooper Marmol did not mention the tint until twenty minutes into the stop, after he observed the rear of the Ford Taurus for a period of time. (ECF No. 26 at 8; ECF No. 51 at 3.) However, although Trooper Marmol did not mention the tinted taillights until he told the driver he was going to give him a verbal warning for the traffic violations (ECF No. 48 at 110; *see* Gvm't Ex. 1), Trooper Marmol credibly testified that he observed the tinted taillights prior to the stop. (ECF No. 48 at 18, 24-25.) Moreover, the Police Criminal Complaint written and signed by Trooper Marmol on the date of the stop and Trooper Marmol's testimony at Defendant's preliminary hearing in state court less than ten days after the traffic stop support Trooper Marmol's assertion that he observed the tinted taillight covers prior to stopping the Ford Taurus. (Gvm't Ex. 3; Def. Ex. 1 at 9.) Thus, the Court rejects Defendant's argument that Trooper Marmol did not have reasonable suspicion to believe a traffic violation occurred because Trooper Marmol did not observe the tinted taillights until after the stop.

Defendant's next argument on this provision—that the tinted taillights did not violate the Motor Vehicle Code—is more persuasive. Trooper Marmol testified that the taillights on the Ford Taurus were tinted. (ECF No. 48 at 24.) However, there was no testimony or evidence that the

25

**25**

taillights were obscured or obstructed or that their colors were changed. In fact, there was testimony that suggests that the taillight covers did not change the color of the light beams. (*Id.* at 84.) While the Court accepts Trooper Marmol's "reasonable explanation that there are some limitations on what the MVR can capture because of its position in the vehicle, as opposed to what he is able to see in real time from his vantage point," *United States v. Meran*, Criminal No. 16-222, 2017 WL 4803927, at *8 (W.D. Pa. Oct. 23, 2017) (Conti, C.J.); (*see* ECF No. 48 at 84-85; *see also* ECF No. 32 at 12-13), without testimony that the Ford Taurus's covers obscured or obstructed the light beams, the Court cannot determine whether Trooper Marmol had reasonable suspicion that the Ford Taurus violated Section 175.66(g). The Court thus finds that the Government has not met its burden of identifying specific facts that justify a reasonable suspicion that the driver of the Ford Taurus violated Section 175.66(g).

However, because Trooper Marmol did have reasonable suspicion that the Ford Taurus violated Sections 3309(1) and 3310(a),[5] the stop of the Ford Taurus was reasonable under the Fourth Amendment and the Court will not suppress the evidence obtained as a result of the stop.

## B. The Extension of the Traffic Stop

### 1. The Parties' Arguments

Defendant next asserts that that the traffic stop was longer than necessary to resolve the alleged motor vehicle violations and that the extension of the stop was unsupported by

---

[5] As for Defendant's argument of pretext, "any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren*, 517 U.S. 806). Thus, because the Court finds that Trooper Marmol had reasonable suspicion that the Ford Taurus violated Sections 3309(1) and 3310(a), Trooper Marmol's alleged pretext is irrelevant to the present Motion to Suppress.

26

reasonable suspicion to believe a non-motor-vehicle offense occurred. (ECF No. 26 ¶ 29; ECF No. 51 at 11.) According to Defendant, the traffic stop was extended beyond its traffic-based purpose the moment Trooper Marmol requested the driver's toll ticket. (ECF No. 51 at 11.) This began Trooper Marmol's criminal investigation, which included calling for backup and conducting background checks. (ECF No. 26 at 9.) Trooper Marmol continued to investigate without terminating the traffic stop—he kept the driver and Defendant's identifications, the vehicle registration card, and the toll ticket during the entire encounter. (*Id.*; ECF No. 51 at 11.)

In response, the Government assumes that the stop was extended when Trooper Marmol called for backup. (ECF No. 32 at 17.) The Government contends that at this time, Trooper Marmol had reasonable suspicion justifying the continued seizure of Defendant and the driver. (*Id.*) The Government identifies the following facts supporting reasonable suspicion: (1) during the stop, the driver's hand was shaking, which is an indicia of nervousness; (2) the driver did not know to whom the vehicle was registered; (3) the Ford Taurus belonged to a third party, which indicates drug smuggling activity; (4) the Ford Taurus was coming from Philadelphia, a known source city for narcotics; (5) the Ford Taurus was traveling to Pittsburgh, a known consumption/distribution city for narcotics; (6) the trip was short, which is typical of drug-smuggling activities; (7) the reason for the trip seemed implausible to Trooper Marmol; (8) Defendant's carotid artery was pulsing, which Trooper Marmol identified as nervous behavior; and (9) the driver had an arrest record. (*Id.* at 6-7, 17.)

## 2. Legal Standard

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes,*

27

543 U.S. 405, 407 (2005). "An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *Green*, 907 F.3d at 179 (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)).

The analysis of whether a traffic stop was unreasonably extended involves three separate inquiries. First, the Court must determine whether the traffic stop was extended to facilitate the investigation of non-traffic-based crimes. *Id.* Second, if an extension occurred, the Court must identify the *Rodriguez* moment—the moment at which the stop was "measurably extend[ed]" longer than necessary to effectuate its traffic-based purpose. *Id.* (alteration in original) (quoting *Rodriguez*, 135 S. Ct. at 1615). Finally, the Court determines whether the facts known to the police officer at the *Rodriguez* moment were sufficient to establish reasonable suspicion that criminal activity was afoot, justifying a prolonged stop. *Id.*

The United States Supreme Court has explained that a police officer executing a lawful traffic stop may conduct "ordinary inquiries incident to such a stop." *Caballes*, 543 U.S. at 408; *Rodriguez*, 135 S. Ct. at 1615. For example, the officer may check the driver's license, determine whether there are outstanding warrants against the driver, and inspect the vehicle's registration and proof of insurance. *Rodriguez*, 135 S. Ct. at 1615. Such inquiries are permissible because they serve the purpose of the traffic stop: ensuring roadway safety. *Id.*; *Clark*, 902 F.3d at 410. However, "measures aimed at detecting criminal activity more generally," such as a dog sniff, cannot be performed in a way that measurably extends the stop unless the officer has reasonable suspicion. *Green*, 897 F.3d at 179-80 (citing *Rodriguez*, 135 S. Ct. at 1615).

28

### 3. Analysis

Under *Rodriguez* and *Green*, the Court must first determine whether this traffic stop was extended beyond the time necessary to address the traffic violations that warranted the stop. *See Rodriguez*, 135 S. Ct. at 1614; *Green*, 897 F.3d at 179. In this case, there is no dispute that the traffic stop was extended to include a criminal investigation that culminated in the search of the Ford Taurus and the arrest of Defendant and the driver. The dispute here centers on when the extension occurred and whether Trooper Marmol had reasonable suspicion to justify the extension at that point. *See Green*, 897 F.3d at 179.

Defendant argues that when Trooper Marmol asked for the driver's toll ticket, he "initiated a criminal investigation" without reasonable suspicion. (ECF No. 51 at 11.) The Court disagrees. Although not specifically mentioned by the Supreme Court in *Rodriguez*, the Court finds that requesting the driver's toll ticket during a traffic stop on the Turnpike is an "ordinary inquir[y] incident to [the traffic] stop." *Rodriguez*, 135 S. Ct. at 1615 (quoting *Caballes*, 543 U.S. at 408). Such a request, though not necessary to complete the traffic citation (ECF No. 48 at 88), allows the police officer to ensure that vehicles on the Turnpike are operated responsibly and in compliance with Pennsylvania traffic regulations. *See Rodriguez*, 135 S. Ct. at 1615 (describing a police officer's mission during a traffic stop as "ensuring that vehicles on the road are operated safely and responsibly"); 67 Pa. Code §§ 601.12-601.13 (requiring each vehicle to obtain a toll ticket upon entering the Turnpike and providing certain penalties for evasion of fares). Thus, taking a

29

toll ticket when stopping a vehicle on the Turnpike is "fairly characterized as part of the officer's traffic mission."[6] *Rodriguez*, 135 S. Ct. at 1615.

Aside from addressing the request for the toll ticket, Defendant does not identify any other potential *Rodriguez* moments. However, before proceeding to discuss the later *Rodriguez* moment identified by the Government (Trooper Marmol's call for backup), the Court will address the events between Trooper Marmol asking for the toll ticket and his call for backup to ascertain that there was no earlier moment at which the stop was extended beyond its traffic-based purpose. The following events occurred in this time frame:

1. Trooper Marmol asked where the Taurus was coming from and going to. He then asked how long the driver and Defendant would be in Pittsburgh. (ECF No. 48 at 30-31; 97-99; Gvm't Ex. 1; Gvm't Ex. 4 at 3-4.)

2. Trooper Marmol asked for Defendant's driver's license, which Defendant provided. (ECF No. 48 at 102; Gvm't Ex. 1; Gvm't Ex. 4 at 4.)

3. Trooper Marmol returned to his vehicle and conducted a criminal history check on the driver. (ECF No. 48 at 32, 104; Gvm't Ex. 4 at 4.)

Turning first to Trooper Marmol's itinerary questions, questions about a driver's travel plans are ordinary inquiries incident to a traffic stop. *See United States v. Caraballo*, 104 F. App'x 820, 822 (3d Cir. 2004) (finding that a traffic stop was not improperly extended by questions about vehicle occupants' travel plans); *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)

---

[6] In this case, Trooper Marmol agreed on cross-examination that the reason he took the toll ticket was to verify the Ford Taurus's point of origination on the Turnpike. (ECF No. 48 at 96.) This information does not change the Court's conclusion that taking a toll ticket is part of a police officer's traffic mission. Assuming that Trooper Marmol's reason for taking the ticket indicates that he was attempting to "detect[] evidence of ordinary criminal wrongdoing,'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)), the constitutionality of a traffic stop does not depend on the subjective motivations of the involved officers. *See Whren*, 517 U.S. at 813; *United States v. Hawkins*, 646 F. App'x 254, 256 n.4 (3d Cir. 2016); *United States v. Richardson*, 504 F. App'x 176, 181 n.7 (3d Cir. 2012).

("[Q]uestions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop.");[7] *United States v. Quintanilla*, No. CRIM. 3:2006-17, 2006 WL 3392439, at *5 (W.D. Pa. Nov. 22, 2006) (Gibson, J.) ("Questioning of the driver as to any 'travel plans' . . . [is] within the 'proper scope of a traffic stop.'"); *United States v. Campbell*, 912 F.3d 1340, 1354 (11th Cir. 2019) ("Generally, questions about travel plans are ordinary inquiries incident to a traffic stop."); *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) (explaining that an officer involved in a routine traffic stop may inquire into the driver's itinerary); *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016) (stating that, during a traffic stop, an officer may complete routine tasks related to the stop, including asking questions about the driver's itinerary); *United States v. Spears*, 636 F. App'x 893, 901 (5th Cir. 2015) ("The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to . . . ask the purpose and itinerary of the trip."); *United States v. Pena-Gonzalez*, 618 F. App'x 195, 198 (5th Cir. 2015) (stating that inquiries related to a driver's itinerary are related to the "mission" of the traffic stop); *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011) (finding that inquiring about occupants' destination, route, and purpose during a traffic stop is a routine matter related to the traffic violation); *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."). Thus, the conversation regarding the driver and Defendant's itinerary did not extend the stop beyond its traffic-based purpose.

---

[7] Although the cited Third Circuit cases were decided prior to the Supreme Court's decision in *Rodriguez*, the Court finds that the rationale of these decisions still stands post-*Rodriguez*. Moreover, at least four circuit courts have determined post-*Rodriguez* that questions relating to travel plans are ordinary inquiries incident to a traffic stop. The Court finds these decisions persuasive.

Next, as to Trooper Marmol's request for Defendant's driver's license, most courts confronted with the issue have determined that checking a passenger's driver's license in addition to the vehicle driver's license is not an impermissible extension of a traffic stop.

Some courts have held that checking a passenger's identification during a traffic stop is appropriate because it is necessary to ensure officer safety, which is part of the "mission" of a traffic stop. *See Rodriguez*, 135 S. Ct. at 1614 ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop and attend to related safety concerns." (citations omitted)); *United States v. Baldonado-Garcia*, Criminal No. 11-215, 2012 WL 135698, at *3 (W.D. Pa. Jan. 17, 2012) (finding that a police officer could request a passenger's identification during a traffic stop without violating the Fourth Amendment because such a request is "reasonably based on ensuring officer safety at the scene"); *Davila v. N. Reg'l Joint Police Bd.*, 2:13-cv-00070, 2019 WL 948833, at *6 (W.D. Pa. Feb. 27, 2019) (Hornak, C.J.) ("[T]here is a legitimate officer safety rationale for confirming the identities of individuals that are seized during a traffic stop."); *United States v. Reynolds*, 729 F. App'x 639, 643 (10th Cir. 2018) (explaining that an officer may protect his safety during a traffic stop by asking for identification from passengers); *United States v. Clark*, 879 F.3d 1, 5 (1st Cir. 2018) ("[D]ue to the 'inherent dangers of a traffic stop,' the police may request identification from passengers in the vehicle, so long as those requests 'do not measurably extend the duration of the stop.'" (quoting *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009)); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) ("If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification. . . . When an officer legitimately

32

stops a vehicle, the identity of the persons in whose company the officer suddenly finds himself may be pertinent to the officer's well-being." (citation omitted)); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (explaining that an officer may ask for identification from passengers during a traffic stop because "passengers present a risk to officer safety equal to the risk presented by the driver"); *United States v. Hicks*, 18-CR-6041CJS, 2018 WL 6595934, at *7 (W.D.N.Y. Dec. 14, 2018) (report and recommendation) ("[A]lthough the Supreme Court has not explicitly held that inquiry into a passenger's identity is permissible, numerous lower courts have held that questions relating to the identity of a passenger are routine and ordinary inquiries to a traffic stop and, in any event, are permissible considering the inherent dangerousness of traffic stops." (citations omitted)); *United States v. Espinosa*, Case No. 1:17-cr-55-CW, 2018 WL 1972466, at *4 (D. Utah Apr. 26, 2018) (finding that, for reasons of officer safety, "as a part of a lawful traffic stop, an officer may request a passenger's identification information").

Other courts have determined that checking a passenger's license is permissible because it is a normal inquiry related to addressing a traffic violation. *See Hicks*, 2018 WL 6595934, at *7 ("[N]umerous lower courts have held that questions relating to the identity of a passenger are routine and ordinary inquiries to a traffic stop . . . ."); *see also United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) (finding that it was not an unnecessary extension of a traffic stop for a police officer to check whether the passenger had valid identification); *United States v. Pack*, 612 F.3d 341, 351 (5th Cir. 2010) (stating that a police officer may ask passengers in a traffic stop to identify themselves and may run license checks on them); *United States v. Rodriguez-Hernandez*, 353 F.3d 632, 635 (11th Cir. 2003) (finding that because the initial traffic stop was valid, the police officer could ask the driver and passengers to produce identification). *But see United States v. Landeros*,

33

913 F.3d 862, 868 (9th Cir. 2019) ("A demand for a passenger's identification is not part of the mission of a traffic stop. . . . The identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle." (citations omitted)); *United States v. Henderson*, 463 F.3d 27, 46 (1st Cir. 2006) (concluding that a police officer's request for a passenger's identification and his subsequent investigation of the passenger "expanded the scope of the stop, changed the target of the stop, and prolonged the stop").

The Court finds the reasoning of these cases persuasive under *Rodriguez*. Trooper Marmol's request for Defendant's driver's license was within the mission of the traffic stop and did not impermissibly extend the stop for purposes of criminal investigation.

Finally, in terms of Trooper Marmol's criminal history check on the driver, the Court finds that the check did not extend the stop outside of its traffic- and safety-related purposes. *See Rodriguez*, 135 S. Ct. at 1616 (recognizing that an officer may need to take safety precautions during a traffic stop and citing *United States v. Holt*, 264 F.3d 1215, 1221-22 (10th Cir. 2001), which explained that there are safety reasons for running criminal history checks on drivers); *United States v. Frierson*, 611 F. App'x 82, 85 (3d Cir. 2015) ("Upon initially detaining the men, [the officer] reasonably addressed the traffic violation that warranted the stop and attended to safety concerns. For example, any preliminary delay in checking [the driver's] license, registration, and criminal history was justified as part of the stop."); *United States v. Palmer*, 820 F.3d 640, 651 (4th Cir. 2016) ("A police officer is entitled to inquire into a motorist's criminal record after initiating a traffic stop."); *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015) ("The trooper checked the occupants' criminal history on the computer in his car—a procedure permissible even without reasonable suspicion . . . .").

34

34

This brings us to the *Rodriguez* moment identified by the Government: Trooper Marmol's call for backup to assist in a vehicle search. (ECF No. 32 at 17; ECF No. 52 at 10.) The Court agrees that calling for backup to assist in a vehicle search is "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *Edmond*, 531 U.S. at 40-41; citing *Florida v. Jardines*, 569 U.S. 1 (2013)). The Court will thus proceed on the assumption that this was the *Rodriguez* moment, although the Court need not definitively decide whether the call and wait for backup "measurably extend[ed]" the stop pursuant to *Rodriguez*.[8] *See Rodriguez*, 135 S. Ct. at 1615 (quoting *Johnson*, 555 U.S. at 333).

Having identified the call for backup as the earliest possible *Rodriguez* moment, the Court must now determine whether the facts known to Trooper Marmol at this moment were sufficient to establish reasonable suspicion that criminal activity was afoot and to justify prolonging the stop. *See Green*, 897 F.3d at 179.

Defendant claims that Trooper Marmol lacked reasonable suspicion to begin a criminal investigation. (ECF No. 26 at 9; ECF No. 51 at 11-12.) The Government contends, however, that at the moment Trooper Marmol called for backup, he possessed reasonable suspicion of criminal

---

[8] The Court need not determine whether the request and wait for backup—which lasted no more than fifteen minutes (Gvm't Ex. 1)—"measurably extended" the stop. *See Rodriguez*, 135 S. Ct. at 1615 (quoting *Johnson*, 555 U.S. at 333). As the Third Circuit explained in *Green*, there are divergent interpretations of *Rodriguez*'s "measurably extend" language. *Green*, 897 F.3d at 180. "Several [circuit courts] have applied *Rodriguez*'s language quite rigidly, holding that any diversion from a stop's traffic-based mission is unlawful absent reasonable suspicion." *Id.* at 180-81. However, "[o]ther [c]ircuits have applied *Rodriguez* more leniently, evaluating police actions by something more akin to a reasonableness standard." *Id.* at 181. In *Green*, the Third Circuit did not choose which approach to adopt. *Id.* at 182. Thus, this Court will "err on the side of caution and proceed on the assumption—not conclusion—that the '*Rodriguez* moment' occurred" when Trooper Marmol called for backup, as opposed to at a later moment. *Id.* at 182. Accordingly, the Court will next address whether Trooper Marmol had reasonable suspicion at the time he called for backup. *Id.* "Because we conclude that [Trooper Marmol] did possess reasonable suspicion at this moment, there will be no need to address the possible implications of a later '*Rodriguez* moment.'" *Id.*

35

activity based on the following facts: (1) the driver's hand was shaking when he handed his license to Trooper Marmol, exhibiting nervousness; (2) the driver gave confusing information about the vehicle's registered owner; (3) the Ford Taurus was owned by a third party; (4) the Ford Taurus was coming from Philadelphia, a known source city for narcotics; (5) the Ford Taurus was traveling to Pittsburgh, a known consumption/distribution city for narcotics; (6) the trip itinerary was short, which is typical of drug smuggling activities; (7) the travel itinerary given by the driver was implausible; (8) Defendant's carotid artery was pulsing, which is a nervous behavior; and (9) the driver had an arrest record. (ECF No. 32 at 17; ECF No. 52 at 10.)

The Court agrees that Trooper Marmol had reasonable suspicion to extend the traffic stop by calling for backup.

First, during Trooper Marmol's interaction with the driver and Defendant prior to his call for backup, he noticed two signs of nervousness—(1) the driver's hand was shaking when he gave his license to Trooper Marmol (ECF No. 48 at 28, 91; Gvm't Ex. 4 at 3-4); and (2) Defendant's carotid artery was pulsating (ECF No. 48 at 30, 103; Gvm't Ex. 4 at 4). Trooper Marmol had significant training on motor vehicle stops, deceptive behavior, and related subjects, and, at the time of this traffic stop, Trooper Marmol had about three years' experience as a patrol officer and experience as a SHIELD officer. (ECF No. 48 at 6-7.) Based on this training and experience and common sense, the Court finds that Trooper Marmol reasonably concluded that these signs indicated nervousness. *See Wardlow*, 528 U.S. at 124 ("[C]ourts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences

36

about human behavior."). Although nervous behaviors alone cannot establish reasonable suspicion, they can contribute to it. *See, e.g., id.* at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. West*, 103 F. App'x 460, 462 (3d Cir. 2004) (explaining that nervousness is not necessarily enough to establish reasonable suspicion but concluding that nervous behavior accompanied by other conduct could establish reasonable suspicion); *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) (finding that nervous behavior contributed to reasonable suspicion); *United States v. Bennett*, No. CRIM. A. 00-409, 2000 WL 1358480, at *2, *8 (E.D. Pa. 2000) (concluding that a pulsating carotid artery and other nervous behaviors contributed to reasonable suspicion); *United States v. Garcia*, No. CRIM. A. 99-64-1 MMS, 2000 WL 654377, at *8 (D. Del. 2000) (finding reasonable suspicion based on, among other factors, shaking hands that indicated nervousness).

Second, in addition to the indicia of nervousness, Trooper Marmol noticed various signs that, in his training and experience, pointed to narcotics smuggling. The occupants of the Ford Taurus were traveling from Philadelphia to Pittsburgh. (ECF No. 48 at 30-31.) Philadelphia is a known source area for the distribution of narcotics, and Pittsburgh is a local distribution and consumption area for narcotics. (*Id.*; Gvm't Ex. 4 at 3-4.) Moreover, the trip from Philadelphia to Pittsburgh and back was short—a day-trip only—and Trooper Marmol testified that quick trips are made to evade law enforcement. (ECF No. 48 at 32; Gvm't Ex. 4 at 4.) And, in light of the trip itinerary and his training and experience, Trooper Marmol reasonably found the explanation provided by the driver—that this long trip in a short period of time was being made to speak at an NA meeting—to be implausible. (ECF No. 48 at 32, 99; Gvm't Ex. 4 at 4.) Finally, the Ford Taurus was registered to a third party and the driver seemed confused about the identity of the

37

vehicle's registered owner. (Gvm't Ex. 4 at 4.) Trooper Marmol knew that third-party vehicles are often utilized to smuggle narcotics because the vehicle's occupants can distance themselves from any contraband that is located within the vehicle. (ECF No. 48 at 29, 94; Gvm't Ex. 4 at 3-4.) When considered together, the facts contributed to Trooper Marmol's reasonable suspicion that criminal activity was afoot. *See, e.g., United States v. Robinson*, 529 F. App'x 134, 136 (3d Cir. 2013) (noting that third-party vehicle ownership, coupled with an unusual travel itinerary, criminal history, and other factors, established reasonable suspicion of criminal activity); *Meran*, 2017 WL 4803927, at *9 (concluding that an officer possessed reasonable suspicion of drug smuggling based on, *inter alia*, the involvement of a third-party vehicle, the fact that Philadelphia is a major source and consumption area for drugs, and the vehicle occupants' attempt to travel a long distance in a short period of time); *United States v. Walker*, 719 F. Supp. 2d 586, 597, 599-601 (W.D. Pa. 2010) (Gibson, J.) (finding reasonable suspicion based on, *inter alia*, the stopped vehicle's origin and destination, the short stay at the destination, and the third-party vehicle).

Third, the driver had an arrest record. (ECF No. 48 at 33, 105); *see Robinson*, 529 F. App'x at 138 (finding that a driver's criminal history, among other factors, contributed to reasonable suspicion to expand the scope of a traffic stop).

The Court finds that these facts, taken together and considered in conjunction with Trooper Marmol's training and experience as a SHIELD officer, gave Trooper Marmol reasonable suspicion to extend the traffic stop by calling for backup in order to search the vehicle. Thus, Defendant's Motion to Suppress will be **DENIED** to the extent Defendant argues that the stop's extension was unsupported by reasonable suspicion.

38

## C. Involuntary Consent

### 1. The Parties' Arguments

Third, Defendant argues that the driver's consent to Trooper Marmol's search of the Ford Taurus was not valid or voluntary. (ECF No. 26 at 6.) Defendant explains that the driver did not take authority or responsibility for the Ford Taurus and thus could not give valid consent. (*Id.* at 11.) Furthermore, even if the driver had the authority to consent, his consent was involuntary because he merely submitted to Trooper Marmol's show of authority. (*Id.*) Defendant contends that because Trooper Marmol did not obtain voluntary consent to search and otherwise did not have a warrant or probable cause to search the Ford Taurus, evidence obtained as a result of the search must be suppressed. (*Id.* at 10-11.)

In response, the Government asserts that Defendant's argument fails for two reasons: (1) Defendant lacks standing to challenge the search because he did not own, borrow, or drive the vehicle; and (2) the driver had apparent and actual authority to consent to the search and his consent was voluntary. (ECF No. 32 at 18-19.)

### 2. Standing

#### a. Legal Standard

"[T]he Fourth Amendment's protection against unreasonable searches is predicated on the invasion by the government of a person's reasonable expectation of privacy . . . ." *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006) (citing *Rakas v. Illinois*, 439 U.S. 128 (1978)); *see also United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) ("An individual challenging a search has the burden of establishing that he had a reasonable expectation of privacy in the property searched and the item seized." (citing *Minnesota v. Olson*, 495 U.S. 91, 95-97 (1990)). "A person must show

39

both that he had a subjective expectation of privacy in the area searched and that his expectation was objectively reasonable." *Burnett*, 773 F.3d at 131. "To demonstrate that he had a subjective expectation of privacy, the defendant must show that he 'took normal precautions to maintain his privacy.'" *Id.* (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980)); *see United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011) ("Regarding the subjective prong, 'we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that "he [sought] to preserve [something] as private."'" (alteration in original) (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000))).

In the vehicle context, "[p]assengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding." *Mosley*, 454 F.3d at 253; *see Burnett*, 773 F.3d at 131; *United States v. Baker*, 221 F.3d 438, 441-42 (3d Cir. 2000) (citing *Rakas*, 439 U.S. at 133-34). Thus, "passengers are generally held to lack 'standing' to object to evidence discovered in a search of a vehicle." *Mosley*, 454 F.3d at 253 (citing *Rakas*, 439 U.S. at 128); *Baker*, 221 F.3d at 441-42.

However, in *United States v. Baker*, 221 F.3d 438, 442 (3d Cir. 2000), the Third Circuit acknowledged an exception to the aforementioned rule for those who borrow vehicles. *See Baker*, 221 F.3d at 442. In *Baker*, the court found that a defendant had a reasonable expectation of privacy in a borrowed vehicle because the defendant (1) was driving the car alone; (2) had substantial control over the car because he borrowed it and had been driving it for four to six weeks; and (3) carried the keys to the car with him. *Baker*, 221 F.3d at 442. Moreover, there was no evidence that the car was stolen. *Id.* The Third Circuit articulated the following rule for standing in cases involving borrowed vehicles: "whether the driver of a car has the reasonable expectation of

40

privacy necessary to show Fourth Amendment standing is a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it; ownership is not necessary." *Id.; see United States v. Jones*, CRIMINAL NO. 16-27, 2017 WL 1190501, at *3 (W.D. Pa. Mar. 31, 2017) (Conti, C.J.).

### b. Analysis

Here, Defendant did not have an objectively reasonable expectation of privacy in the Ford Taurus. Although there is evidence that Defendant borrowed the vehicle, there is no evidence that Defendant had "substantial control" over the vehicle. *See Baker*, 221 F.3d at 442. Unlike the facts in *Baker*, Defendant was not driving the vehicle and was not its sole occupant. *See Baker*, 221 F.3d at 442; *United States v. Schofield*, 80 F. App'x 798, 802 (3d Cir. 2003) (explaining that the unique facts of *Baker*—that the defendant was alone in the borrowed car and had been driving it with permission for four to six weeks—created the expectation of privacy). Moreover, unlike *Baker*, there is no evidence that Defendant borrowed the Ford Taurus for a significant period of time. *See Baker*, 221 F.3d at 442 (noting that the defendant borrowed the car for four to six weeks and had a reasonable expectation of privacy in it); *Schofield*, 80 F. App'x at 802; *United States v. Pete*, Criminal No. 09-82, 2010 WL 887364, at *6 (W.D. Pa. Mar. 10, 2010) (finding that a driver had no reasonable expectation of privacy in a borrowed vehicle because he was a one-time borrower of the vehicle); *see also United States v. King*, No. 2:13cr136, 2015 WL 3457484, at *2 (W.D. Pa. May 29, 2015) ("Rakas and its progeny have made clear that more than temporary occupancy or possession of a vehicle is needed to maintain standing."). Thus, Defendant failed to meet his burden of establishing that he had a reasonable expectation of privacy in the vehicle that would confer standing on him to challenge the search of the vehicle. *See Rakas*, 439 U.S. at 130 n.1 ("The

41

proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.").

Furthermore, Defendant lacks standing to object to the search of the Ford Taurus because he did not manifest a subjective expectation of privacy in the vehicle. *See Burnett*, 773 F.3d at 131. During the search, Defendant did not object or give any indication that he was responsible for the vehicle and that he had the authority to consent or withhold consent to the search. (ECF No. 48 at 40, 42); *see United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) ("Moreover, it is uncontroverted that while the car was being searched, [the defendant] stood by and watched without objection. Such behavior is completely inconsistent with the contention that [the defendant] retained an expectation of privacy."); *see also United States v. Valle-Irizarry*, Crim. Action No. 14-00103 (JLL), 2014 WL 3673139, at *6 (D.N.J. July 22, 2014) (finding no expectation of privacy when the defendant did not express ownership over the searched item before or during the vehicle search). Defendant also failed to introduce other evidence suggesting that he took steps to maintain his privacy in the borrowed vehicle. Therefore, Defendant failed to establish a subjective expectation of privacy in the Ford Taurus and lacks standing to challenge the search of the Ford Taurus.

Accordingly, the Court will **DENY** Defendant's Motion to Suppress to the extent Defendant challenges the consent search because Defendant lacks standing to object to the search.

### 3. Voluntary Consent

Assuming *arguendo* that Defendant has standing to object to the search of the Ford Taurus, the Court will nevertheless deny Defendant's Motion to Suppress to the extent it is based on the driver's involuntary consent because the driver's consent was voluntary.

42

### a. Legal Standard

The Fourth Amendment prohibits searches conducted without search warrants unless an exception applies. *See Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is voluntary consent. *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005); *Givan*, 320 F.3d at 459.

For this exception to the warrant requirement to apply, the individual who consents to the search must have authority to consent. *See United States v. Shabazz*, 533 F. App'x 158, 161 n.2 (3d Cir. 2013) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Matlock*, 415 U.S. 164, 171 (1974)); *United States v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988). "A driver of a vehicle has the authority to consent to a search of that vehicle." *Morales*, 861 F.2d at 399; *see Shabazz*, 533 F. App'x at 161 n.2; *United States v. Gooch*, 915 F. Supp. 2d 690, 712 (W.D. Pa. 2012) (Gibson, J.); *United States v. Skeffery*, CRIMINAL NO. 2005-2J, 2006 WL 8446120, at *5 (W.D. Pa. May 22, 2006) (Gibson, J.). "As the driver, he is the person having immediate possession of and control over the vehicle." *Morales*, 861 F.2d at 399. "As driver, he also has general access to all areas of the vehicle." *Id.* "Therefore, a driver has the requisite 'joint access and control' giving rise to the authority to consent to a full search of a vehicle." *Id.*

Furthermore, the driver's consent must have been voluntary. "The voluntariness of an individual's consent is a question of fact to be determined from all the circumstances." *Wilson*, 413 F.3d at 388; *Givan*, 320 F.3d at 459. Relevant factors include "the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual." *Givan*, 320 F.3d at 459. The Government has the burden of demonstrating that voluntary consent to search was given by a preponderance

43

43

of the evidence. *Skeffery*, 2006 WL 8446120, at *5 (citing *Matlock*, 415 U.S. at 177); *Gooch*, 915 F. Supp. 2d at 712 (citing *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009)).

### b. Analysis

Based on the sources above, the driver of the Ford Taurus clearly had authority to consent to the search of the vehicle. *Morales*, 861 F.2d at 399; *Shabazz*, 533 F. App'x at 161 n.2; *Gooch*, 915 F. Supp. 2d at 712; *Skeffery*, 2006 WL 8446120, at *5. Defendant's silence during Trooper Marmol's search supports this conclusion. *Morales*, 861 F.2d at 400.

In terms of the voluntariness of the driver's consent, the MVR footage shows that Trooper Marmol asked for the driver's consent to search the vehicle, to which the driver responded "yeah, yeah," without hesitation. (ECF No. 48 at 38, 113-14, 116; Gvm't Ex. 1.) Applying the factors listed above, the Court finds that the driver voluntarily consented to the search.

Trooper Marmol asked for the driver's consent while on the side of the Turnpike in the middle of the afternoon. *See United States v. Velasquez*, 885 F.2d 1076, 1082 (3d Cir. 1989) (finding no coercion when "consent took place on the shoulder of a major highway during daylight hours"); *Givan*, 320 F.3d at 459. The driver was not handcuffed when Trooper Marmol asked for his consent. *Givan*, 320 F.3d at 459. Although another officer was present, there is nothing particularly coercive or intimidating about this presence, aside from the normal intimidation inherent in formal encounters with police.

Moreover, Trooper Marmol's verbal exchange with the driver cannot be considered coercive. While Trooper Marmol told the driver that he knew about his criminal history before asking if he could search the car, Trooper Marmol did so in a civil manner. (ECF No. 48 at 114; *see* Gvm't Ex. 1.) And Trooper Marmol did not extensively question the driver in an intimidating

44

44

way. (*See* Gvm't Ex. 1); *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994) (finding voluntary consent when, among other factors, the officer was polite and courteous and there was no repeated or prolonged questioning); *United States v. Mendoza*, Criminal No. 06-167, 2007 WL 1795663, at *6 (W.D. Pa. June 20, 2007) (Conti, J.), *aff'd*, 334 F. App'x 515 (3d Cir. 2009). Furthermore, while Defendant argues that Trooper Petrosky's non-verbal actions were coercive— namely, standing by Trooper Marmol with his hand on his firearm—there is no evidence that Trooper Petrosky had his hand on his firearm before or during Trooper Marmol's request for consent. Instead, the MVR footage does not show what Trooper Petrosky was doing when Trooper Marmol asked for the driver's consent.[9] Thus, there is no evidence of coercive language or physically threatening behavior on the part of Troopers Marmol and Petrosky that suggests the driver's consent was involuntary.[10]

And while no specific evidence about the driver's age, educational background, or intelligence is before the Court, the MVR footage shows that the driver was an adult who understood English and was capable of understanding and responding to Trooper Marmol's questions. (*See* Gvm't Ex. 1.) There is no evidence that the driver suffered from any mental

---

[9] And even if Trooper Petrosky was standing with his hand on his firearm when Trooper Marmol asked for the driver's consent, the Court would still conclude that, considering the totality of the circumstances, the driver's consent was voluntary.

[10] Moreover, Defendant's citations to support his argument that the driver was seized by means of physical force or a show of authority are inapposite. (ECF No. 26 at 12.) For example, *United States v. Mendenhall*, 446 U.S. 544 (1980), did not discuss the nature of voluntary consent. Instead, the Court in *Mendenhall* was discussing the definition of a "seizure." *Id.* at 552-53. According to *Mendenhall*, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* at 553. Here, whether Defendant and the driver were seized is not at issue. The pages to which Defendant cites in *Wilson*, 413 F.3d at 386-87, *California v. Hodari D.*, 499 U.S. 621, 628 (1991), and *Kim*, 27 F.3d at 951, also discuss whether the defendant was seized and are similarly unpersuasive as to the issue of voluntary consent.

45

impairment that would have impeded his ability to understand the events that were occurring. *See Gooch*, 915 F. Supp. 2d at 713. Furthermore, the driver had at least some experience with the criminal justice system due to his prior arrests (ECF No. 48 at 33, 105), which further supports the conclusion that his consent was voluntary. *See Gooch*, 915 F. Supp. 2d at 713; *Mendoza*, 2007 WL 1795663, at *5-6 (explaining that when a court evaluates whether consent to a search was voluntary, the court may consider a defendant's previous experience with the criminal justice system).

Defendant points to other relevant facts. First, Defendant notes that the driver had to wait in the Ford Taurus for about twenty minutes before Trooper Marmol asked for consent to search. While the length of time of a police encounter is relevant to whether consent was voluntary, *see Gooch*, 915 F. Supp. at 713-14, the twenty-minute wait here is not lengthy enough to become coercive. In fact, twenty minutes seems to be a reasonable time to wait in a traffic stop situation, even without a police search of the vehicle.

Second, Defendant argues that Trooper Marmol did not inform the driver that he could withhold consent to the search. "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." *Schneckloth*, 412 U.S. at 227; *see Price*, 558 F.3d at 279; *Velasquez*, 885 F.2d at 1082; *Meran*, 2017 WL 4803927, at *15. Thus, while Trooper Marmol's failure to inform the driver that he could withhold consent is relevant to this inquiry, it is not dispositive.

And finally, Defendant indicates that Trooper Marmol withheld the driver and Defendant's licenses and toll ticket so they were unable to leave. (*See* ECF No. 48 at 111.) While relevant, *see United States v. Chatterpaul*, 200 F. App'x 147, 151 (3d Cir. 2006); *Givan*, 320 F.3d at

46

46

459, the MVR shows that Trooper Marmol did not tell the driver that he was withholding the licenses and toll ticket until after the driver had already consented to the search. (*See* Gvm't Ex. 1.) Thus, the Court finds that at the time Trooper Marmol asked for the driver's consent, that consent was given voluntarily.

In light of the factors discussed above, the testimony at the Suppression Hearing, and MVR footage, the Court finds that the Government has established by a preponderance of the evidence that the driver voluntarily consented to the search of the Ford Taurus.

The Court will therefore **DENY** Defendant's Motion to Suppress to the extent Defendant challenges the voluntariness of the driver's consent.

### D. Scope of Consent

#### 1. The Parties' Arguments

Next, Defendant asserts that Trooper Marmol's search of the Ford Taurus exceeded the scope of the driver's consent. (ECF No. 26 at 13; ECF No. 51 at 12.) According to Defendant, a reasonable person who consented to a vehicle search would understand such a search to involve examining the passenger compartment and trunk of the vehicle—not using tools to take the vehicle apart. (ECF No. 26 at 13.)

In response, the Government again argues that Defendant lacks standing to challenge the scope of the consent search. (ECF No. 32 at 22.) Furthermore, the Government contends that Trooper Marmol stayed within the scope of the driver's consent throughout the search, until the search became a valid probable cause search when Trooper Marmol discovered the hidden compartment. (*Id.*; ECF No. 52 at 12-14.)

47

47

### 2. Legal Standard

"When a warrantless search is authorized by voluntary consent, the extent of that search is limited to the terms of the consent." *United States v. Birt*, 120 F. App'x 424, 428 (3d Cir. 2005) (citing *Kim*, 27 F.3d at 956). "An objective reasonableness standard is used to measure the scope of a suspect's consent." *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). To determine whether an officer stayed within the scope of consent, the Court must ask what the typical reasonable person would have understood by the exchange between the officer and the suspect. *Id.* (quoting *Jimeno*, 500 U.S. at 251).

If a police officer's search does exceed the scope of consent, the Court then considers whether the search falls within a different exception to the Fourth Amendment's warrant requirement, rendering the search constitutionally permissible.

One such exception is the automobile exception. Under the automobile exception, "law enforcement [may] seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)); *see Maryland v. Dyson*, 527 U.S. 465, 467 (1999) ("[W]here there was probable cause to search a vehicle 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained.*'" (quoting *United States v. Ross*, 456 U.S. 798, 809 (1982))); *United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014). Provided that the police have probable cause to believe a vehicle contains contraband, the police may search "every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825. The Government must establish the

48

**48**

applicability of the automobile exception by a preponderance of the evidence. *Donahue*, 764 F.3d at 300.

The Third Circuit has explained probable cause as follows:

The probable cause inquiry is "commonsense," "practical," and "nontechnical;" it is based on the totality of the circumstances and is judged by the standard of "reasonable and prudent men." We evaluate "the events which occurred leading up to the . . . search, and then . . . [decide] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause."

*Id.* at 301 (alterations in original) (citations omitted). In general, "[i]f there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 302 (1983)).

### 3. Analysis

First, for the reasons explained *supra*, Defendant lacks standing to challenge the execution of the consent search. Thus, Defendant's Motion to Suppress will be **DENIED** on this basis.

Second, even if Defendant does have standing to challenge the consent search, the Court finds that Trooper Marmol did not exceed the scope of the driver's consent because the consent search morphed into a vehicle search based on probable cause.

Defendant and the Government agree that a reasonable person in the driver's position would have understood the driver to be consenting to a search of the passenger compartment and the trunk.[11] (ECF No. 26 at 13; ECF No. 32 at 23.) It is clear from the MVR and Trooper Marmol's testimony that he stayed within the bounds of this consent during the initial part of his

---

[11] Because the Government does not argue that the scope of the consent search included the search of the aftermarket compartment, *see Meran*, 2017 WL 4803927, at *16-17, the Court will not address this argument. The Court thus proceeds under the assumption that the scope of the driver's consent included searching the passenger compartment and the trunk, but not accessing the aftermarket compartment.

49

49

search of the Ford Taurus—he searched the areas around the passenger seat, the driver's seat, the back seat, the trunk, and the glove compartment. (ECF No. 48 at 42, 121.) And Defendant does not argue that the initial part of Trooper Marmol's search exceeded the scope of the consent.

Instead, Defendant focuses on Trooper Marmol's accessing of the aftermarket compartment. Defendant argues that accessing the compartment went beyond the scope of the driver's consent and was thus impermissible. However, the Court concludes that Trooper Marmol had probable cause to believe that he located the aftermarket compartment and that contraband would be found within the compartment. Thus, the search of the aftermarket compartment was constitutional pursuant to the automobile exception to the warrant requirement.

In addition to the various facts identified in the reasonable suspicion analysis, *supra*, which contributed to probable cause, Trooper Marmol knew the following: (1) the registered owner of the vehicle had a criminal history that included drug and firearm offenses (ECF No. 48 at 37; Gvm't Ex. 4 at 5); (2) the driver had been arrested for drug and firearm offenses (Gvm't Ex. 4 at 4); (3) Defendant had been arrested for firearm violations, assaults, and robberies (*id.* at 4-5); (4) when searching the glove compartment, Trooper Marmol could see a box with "some welds" where the air bag should have been that, in his experience and based on his training on the subject, led him to believe that an aftermarket compartment had been added to the vehicle (ECF No. 48 at 7-8, 43-44; Gvm't Ex. 4 at 5-6); (5) in his training and experience, aftermarket compartments are "used for one purpose and one purpose only"—concealing contraband (ECF No. 48 at 12-13, 44; Gvm't Ex. 4 at 6); and (6) of the thirteen hidden compartments that Trooper Marmol personally

50

located in past traffic stops, approximately ten of those compartments contained contraband (ECF No. 48 at 13, 130).

These facts and beliefs have ample support in the record and lead the Court to determine that, under these circumstances, a reasonable police officer with similar training and experience would conclude that there was a fair probability that (1) the Ford Taurus was outfitted with an aftermarket compartment and (2) the compartment contained contraband. *See Meran*, 2017 WL 4803927, at *18 (concluding that an officer's discovery of an aftermarket compartment, "which he knew was used to hide contraband based on his training and experience," in conjunction with the other facts of the case, led to probable cause to search the compartment); *Gooch*, 915 F. Supp. 3d at 719 (explaining that "evidence of a hidden compartment within a suspect's automobile can contribute to, and, under appropriate circumstances, may even single-handedly establish, a finding of probable cause"). Thus, Trooper Marmol's accessing and search of the compartment (ECF No. 48 at 45) did not violate the Fourth Amendment and the seized contraband is admissible.

The Court will therefore **DENY** Defendant's Motion to Suppress to the extent Defendant challenges the scope of the consent search.

### E. *Miranda* Warnings

#### 1. The Parties' Arguments

Finally, Defendant argues that the statements[12] the driver and Defendant made to the police during and after the vehicle stop must be suppressed because they were obtained in violation of their constitutional rights. (ECF No. 26 at 6-7, 14-15; ECF No. 51 at 11.) Defendant

---

[12] Defendant does not identify the particular statements that he claims were obtained in violation of his Fifth and Fourteenth Amendment rights.

51

states that the driver and Defendant were detained by Trooper Marmol and unable to leave when Trooper Marmol first approached the vehicle. (ECF No. 26 at 14.)  Because Trooper Marmol then questioned the driver and Defendant without advising them of their *Miranda* rights, Defendant claims Trooper Marmol violated Defendant and the driver's rights under the Fifth and Fourteenth Amendments to the Constitution. (*Id.* at 15.)

In response, the Government explains that *Miranda* does not apply to traffic stops because those detained through traffic stops are not "in custody." (ECF No. 32 at 26-27.)  Thus, any statements made by Defendant during the traffic stop did not implicate his *Miranda* rights and should not be suppressed. (*Id.* at 27; ECF No. 52 at 14.)  The Government also asserts that Defendant was appropriately apprised of his *Miranda* rights at the time of his arrest. (ECF No. 32 at 26-27; ECF No. 52 at 14.)  Moreover, any statements Defendant made after he was arrested were spontaneous utterances. (ECF No. 32 at 27.)

### 2.  Legal Standard

Under the Fifth Amendment of the Constitution, "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1967), the Supreme Court explained that, in order to protect a suspect from compelled self-incrimination, a suspect who has "been taken into custody or otherwise deprived of his freedom of action in any significant way" must be provided with warnings of his Fifth Amendment rights—called "*Miranda* warnings"—before he is interrogated. *Id.* at 437; *see also United States v. Valenta*, Criminal No. 15-161, 2017 WL 2131375, at *3-*9 (W.D. Pa. May 17, 2017) (Conti, C.J.) (discussing *Miranda*, its progeny, and the legal standard applicable to custodial

52

**52**

interrogations). *Miranda* warnings are required because custodial interrogation involves "inherently compelling pressures." *Miranda*, 384 U.S. at 467.

Here, the Government does not contest that Defendant was interrogated during the traffic stop before he was given *Miranda* warnings. Therefore, the Court's focus is on whether Defendant was in custody when he was subjected to that questioning.

There are two discrete inquiries in determining whether an interrogation was custodial: "(1) the circumstances surrounding the interrogation and, (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave." *Yarborough v. Alvarado*, 541 U.S. 652, 653 (2004). "Once the . . . players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Courts should consider all the circumstances surrounding the interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave. *J.D.B. v. North Carolina*, 564 U.S. 261, 270-71 (2011). The mindset or subjective views and opinions of either the person being questioned or the interrogating officer is irrelevant to the inquiry. *Id.* at 271.

The Third Circuit has compiled a list of five factors which courts must consider as part of a *Miranda* custody inquiry: "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect

53

voluntarily submitted to questioning." *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006); *see United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010).

Beyond these five factors from *Willaman*, the Third Circuit has also instructed courts to consider "the information known by the officer concerning the suspect's culpability," *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (citing *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)), and "whether the officer revealed his or her belief that the suspect was guilty." *Id.*; *Stansbury v. California*, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."). The application of the five *Willaman* factors and the two additional considerations from *Jacobs* to determine whether a suspect is in custody is an objective inquiry, *J.D.B.*, 564 U.S. at 270-71, which is determined on a case-by-case basis. *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999).

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992)). "However, once the defendant has established a basis for his motion . . . the burden shifts to the government." *Johnson*, 63 F.3d at 245 (citing *United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993)). A defendant "satisfies that burden if he alleges that he was subjected to custodial questioning without the benefit of *Miranda* warnings," at which point the government must "prove by a preponderance of the evidence that 'there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or . . . [the defendant] was properly Mirandized and waived his rights.'" *Valenta*, 2017 WL 2131375, at *4 (quoting *United States v. Tudoran*, 476 F. Supp. 2d 205, 216 (N.D.N.Y. 2007)); *see Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Kofsky*, Criminal Action No. 06-392, 2007 WL

54

**54**

2480971, at *14 (E.D. Pa. Aug. 28, 2007) ("Where a defendant seeks to suppress a statement under *Miranda*, the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of Miranda warnings.").

### 3. Analysis

As a preliminary matter, the Court notes that Defendant lacks standing to challenge any purported violations of the driver's Fifth and Fourteenth Amendment rights. *See United States v. Salinas-Calderon*, 728 F.2d 1298, 1302 (10th Cir. 1984) (finding that the defendant did not have standing to object to the purported violation of other individuals' Fifth Amendment rights resulting from failure to give *Miranda* warnings); *United States v. Fredericks*, 586 F.2d 470, 480-81 (5th Cir. 1978) ("Although Alderman and most other 'standing' cases have involved Fourth Amendment violations, the principle has also been applied where, as in this case, one codefendant or coconspirator seeks to suppress evidence incriminating him that was obtained from a coparticipant in crime without proper compliance with the procedural requirements of Miranda or otherwise in violation of that party's Fifth or Sixth Amendment rights.") (listing cases); *Bryson v. United States*, 419 F.2d 695, 699 (D.C. Cir. 1969) ("Fifth Amendment rights are, a fortiori, personal rights . . . ."); *United States v. Richardson*, 1 F. Supp. 2d 495, 497 (D.V.I. 1998) ("So it is clear that the general rule is that defendants do not have standing to raise a third-party's Fifth Amendment violations for their own defense."); *State v. Baum*, 972 A.2d 1127, 1133 (N.J. 2009) ("This limitation on the Fifth Amendment, as affording an entirely personal right, has been

55

understood among the federal courts to support the conclusion that the Fifth Amendment 'cannot be asserted vicariously.'" (quoting *United States v. Fortna*, 796 F.2d 724, 732 (5th Cir. 1986))).

In terms of Defendant's challenge to his own questioning, the Court divides the interaction between Defendant and Trooper Marmol into three periods of time for purposes of the present analysis: (1) the initial, pre-*Rodriguez*-moment portion of the traffic stop and the extension of the traffic stop, prior to Trooper Marmol handcuffing Defendant; (2) the time period between Defendant's handcuffing and Defendant's arrival at the police barracks; and (3) Defendant's interrogation at the police barracks.

Regarding the initial portion of the traffic stop, the Court agrees with the Government that Defendant was not "in custody" during this interaction. Thus, Trooper Marmol had no obligation to inform Defendant of his *Miranda* rights.

Generally, "the questioning of a motorist detained pursuant to a routine traffic stop does not constitute custodial interrogation for *Miranda* purposes." *Meran*, 2017 WL 4803927, at *19 (citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *Anderson*, 859 F.2d at 1177); *see Berkemer*, 468 U.S. at 440 ("[P]ersons temporarily detained pursuant to [traffic] stops are not 'in custody' for purposes of Miranda."); *United States v. Ley*, 876 F.3d 103, 108-09 (3d Cir. 2017) (explaining that a roadside interrogation during a traffic stop is not "custodial interrogation" for *Miranda* purposes). Thus, at least during the pre-*Rodriguez*-moment portion of the stop, Trooper Marmol could question Defendant without implicating *Miranda*.

Furthermore, prior to Defendant being handcuffed, Defendant was not "subjected to treatment that render[ed] him 'in custody' for practical purposes." *Berkemer*, 468 U.S. at 440. Although Defendant was not told that he was free to leave, he was not told that he was under

56

arrest. He was on the side of the Turnpike during daylight hours. And, at the time Trooper Marmol asked Defendant questions, the entire vehicle stop had only been taking place for about twenty minutes. *See United States v. Caraballo*, 643 F. App'x 163, 169 (3d Cir. 2016) ("The afternoon traffic stop was relatively brief and occurred in public—the same features found in *Berkemer* to 'mitigate the danger that a person questioned will be induced to speak where he would not otherwise do so freely.'" (internal quotations omitted) (quoting *Berkemer*, 468 U.S. at 437)). The questioning lasted even less time, taking no more than three minutes total. (*See* Gvm't Ex. 1.)

Moreover, Trooper Marmol and Trooper Petrosky did not act in a coercive manner. Trooper Marmol's tone was polite and conversational and neither officer displayed his weapon or physically restrained Defendant. *Caraballo*, 643 F. App'x at 169. While Trooper Marmol had reason to believe that the driver and/or Defendant may have been involved in criminal activity, as discussed above, there is no evidence that his beliefs caused him to "bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*." *Jacobs*, 431 F.3d at 105 (quoting *Steigler*, 496 F.2d at 799). Furthermore, although Trooper Marmol did imply to the driver that he suspected criminal activity by telling the driver that he knew about his criminal history and asking to search the vehicle, there is evidence that Defendant did not hear this exchange. (ECF No. 48 at 115-16.) Even if Defendant did, Defendant was never informed that his own detention would not be temporary or that he would be arrested. *Berkemer*, 468 U.S. at 441. Finally, Trooper Petrosky's retention of Defendant's identification and the toll ticket weighs in favor of finding that Defendant was in custody. However, based on the totality of the circumstances, the Court determines that the brief questioning of Defendant in conjunction with the traffic stop and vehicle search—in spite of the retention of Defendant's identification—did

57

not involve "restraint on freedom of movement of the degree associated with a formal arrest" and thus was not custodial interrogation. *Thompson*, 516 U.S. at 112. Trooper Marmol was therefore not obligated to give *Miranda* warnings to Defendant before questioning him and any statements made by Defendant during this time period are not subject to suppression.

During the second portion of the stop, the driver and Defendant were handcuffed, placed in a police vehicle, and ultimately arrested and taken to the police barracks. Defendant was clearly in custody when he was handcuffed and placed in the police car. *See, e.g., United States v. McMillan*, 227 F. Supp. 3d 432, 440 (W.D. Pa. 2017) (Hornak, J.) (finding that the defendant was in custody when, among other circumstances, he was handcuffed); *Meran*, 2017 WL 4803927, at *20 ("Obviously, one is not free to leave when sitting in a police car with handcuffs on. When defendants were placed in [the police officer's] vehicle, they were in custody for *Miranda* purposes because their freedom of movement was restricted to 'the degree associated with formal arrest.'" (citations omitted)). However, there is no evidence of any interrogation during this time period. Neither the MVR footage nor the testimony at the Suppression Hearing suggests that Defendant was interrogated between his handcuffing and his arrival at the police barracks.[13] Thus, to the extent Defendant made any statements during this time period, those statements were not the result of custodial interrogation and will not be suppressed.

Finally, while Defendant was at the police barracks, he was certainly in custody.[14]

---

[13] Nor is there any evidence that Defendant made any statements during this time period that Defendant would now seek to suppress.

[14] There is no evidence that Defendant was interrogated at the barracks when he gave his statement taking responsibility for the Ford Taurus. However, Trooper Marmol also could not remember whether Defendant admitted responsibility for the Ford Taurus in response to questioning or some sort of dialogue with Trooper Marmol. (ECF No. 48 at 67-68.) The Court will assume that Defendant made the statement regarding his responsibility for the vehicle during an interrogation.

58

However, by that point, Defendant was properly Mirandized and validly waived his *Miranda* rights.

"A defendant may waive his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) (citing *Miranda*, 384 U.S. at 444). Two factors are relevant to this totality-of-the-circumstances determination. First, the relinquishment of the right must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the defendant must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Considerations relevant to this analysis include: "(1) evidence of police coercion; (2) the length and location of the interrogation; (3) the defendant's maturity, physical condition, mental health and level of education; (4) whether *Miranda* warnings were given; and (5) whether an attorney was present for the interview." *United States v. Clemons*, Criminal No. 16-76, 2017 WL 3394615, at *4 (W.D. Pa. Aug. 8, 2017) (Fischer, J.) (citing *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994)).

In addition to the Fifth Amendment's requirement of a voluntary waiver of *Miranda* rights, the Fourteenth Amendment's Due Process Clause requires a confession to be voluntary to be admissible.[15] *See Swint*, 15 F.3d at 289. When determining whether a confession was voluntary, courts consider the voluntary waiver factors referenced above. *Swint*, 15 F.3d at 289. The crucial factor in the voluntariness inquiry is police coercion—to find that a statement was involuntary, the court must conclude that it was the produce of "police overreaching." *Id.* While compliance

---

[15] Although Defendant does not explicitly argue that his statements to Trooper Marmol were involuntary, he does generally assert that his Fourteenth Amendment rights were violated in the context of his statements. Thus, the Court will address the Fourteenth Amendment's voluntary confession standard.

59

with *Miranda* does not conclusively establish that ensuing statements were voluntary, "cases in which a defendant can make a colorable argument that a self-incrimination statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." *Berkemer*, 468 U.S. at 433 n.20.

The Government bears the burden of proving by a preponderance of the evidence that Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights, *United States v. Nance*, Criminal No. 09-193, 2010 WL 4065478, at *10 (W.D. Pa. Oct. 15, 2010) (citing *Connelly*, 479 U.S. at 169), and that Defendant's statement was made voluntarily, *United States v. Griggie*, 105 F. App'x 431, 435 (3d Cir. 2004) (quoting *Swint*, 15 F.3d at 289).

Considering the totality of the circumstances, the Court concludes that the Government has met its burden of showing that Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights and voluntarily made a statement in which he took responsibility for the Ford Taurus. Defendant was taken into custody without force or threats of force, advised of his rights under *Miranda*, and then transported to the barracks. Throughout the interaction with Defendant captured by the MVR, Trooper Marmol spoke in a conversational manner and treated Defendant and the driver with respect and professionalism. At the barracks, Defendant was sitting in the open patrol room with the driver on prisoner benches when he told Trooper Marmol that he was responsible for the Ford Taurus. (ECF No. 48 at 65-66, 67.) Nothing about these circumstances suggests coercion.

Moreover, from the MVR footage, it is apparent that Defendant is an adult who understands English, (Gvm't Ex. 1); *see Skeffery*, 2006 WL 8446120, at *6, and there is no suggestion that his maturity, physical condition, mental health, or level of education would have prevented

60

him from understanding his *Miranda* rights, the circumstances, or the significance of waiving his rights. This conclusion is buttressed by the fact that Defendant had been arrested before (Gvm't Ex. 4 at 4-5), which suggests that he would have been familiar with his rights and the consequences of waiving his rights and speaking with police. *See United States v. Drayton,* Criminal No. 07-0135, 2009 WL 4262385, at \*8 (W.D. Pa. Nov. 24, 2009); *Skeffery,* 2006 WL 8446120, at \*6.

Based on these facts, the Court finds that Defendant's statement to Trooper Marmol at the barracks was voluntary and that Defendant voluntarily waived his *Miranda* rights. The Court will thus **DENY** Defendant's Motion to Suppress his pre- and post-arrest statements.[16]

## IV. Conclusion

In summary, Trooper Marmol did have reasonable suspicion of a traffic violation to support the traffic stop of the Ford Taurus. After Trooper Marmol executed the stop and took care of various inquiries incident to the traffic stop and numerous safety-related issues, Trooper Marmol presumably did extend the stop by calling for backup in order to search the vehicle. However, he did so based on reasonable suspicion that criminal activity was afoot and thus, the extension of the stop was constitutional. Furthermore, to the extent Defendant challenges the consent search of the Ford Taurus, this challenge fails for two reasons. First, Defendant lacks standing to challenge the search. Second, the driver—who had authority to consent—voluntarily consented to the search of the vehicle. And Trooper Marmol's search of the Ford Taurus did not

---

[16] In Defendant's Motion to Suppress Evidence (ECF No. 26), Defendant also argued that Defendant's statements should be suppressed because they were the fruit of the illegal stop, search, and seizure of the Ford Taurus. (*Id.* at 6-7.) Because the Court previously found that the stop and search of the Ford Taurus and the seizure of its occupants was constitutional, the Court rejects these alternative bases for suppressing Defendant's pre- and post-arrest statements.

61

exceed the scope of the driver's consent until the consent search permissibly morphed into a vehicle search based on probable cause. Therefore, Trooper Marmol's stop and search of the Ford Taurus and seizure of Defendant did not violate Defendant's Fourth Amendment rights and the evidence found as a result of the stop and vehicle search is admissible.

In terms of Defendant's arguments for suppressing his statements, the only time period in which Defendant was subjected to custodial interrogation was following his arrest at the police barracks. By this point, Defendant had been properly Mirandized. Defendant thereafter knowingly and voluntarily waived his *Miranda* rights and made a voluntary statement regarding his responsibility for the Ford Taurus to Trooper Marmol. Thus, there was no violation of Defendant's Fifth and Fourteenth Amendment rights and his statements are admissible.

Based on the foregoing, the Court will **DENY** Defendant's Motion to Suppress Evidence (ECF No. 26).

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 3:18-cr-24 |
| | ) | |
| v. | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| JOHN T. TERRY, a/k/a TYREE TERRY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

NOW, this 20th day of May, 2019, upon consideration of Defendant John T. Terry's

Motion to Suppress Evidence (ECF No. 26), the Government's Response thereto (ECF No. 32),

Defendant's Proposed Findings of Fact and Conclusions of Law (ECF No. 51), and the

Government's Response (ECF No. 52), and for the reasons set forth in the accompanying

Memorandum Opinion, **IT IS HEREBY ORDERED** that Defendant's Motion to Suppress

Evidence (ECF No. 26) is **DENIED**.

BY THE COURT

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE

**63**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 3:18-cr-24 |
| | ) | |
| v. | ) | JUDGE KIM R. GIBSON |
| | ) | |
| JOHN T. TERRY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.      Introduction

Pending before the Court are Defendant John T. Terry's ("Mr. Terry") "Omnibus Post-Trial Motion for Judgment of Acquittal and/or Motion for a New Trial" (ECF No. 226) and "Amended Omnibus Post-Trial Motion for Judgment of Acquittal, or in the Alternative, Motion for a New Trial[.]" (ECF No. 245). Mr. Terry's Motions are fully briefed (ECF Nos. 226, 245, 254, 259) and ripe for disposition. For the following reasons, the Court **DENIES** Mr. Terry's Motions at ECF Nos. 226 and 245.

### II.     Background

By way of Superseding Indictment, a Grand Jury charged Mr. Terry with four offenses. (ECF No. 62).[1] At Count One ("Count I"), the Grand Jury charged Mr. Terry with conspiring to distribute and to possess with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, and a detectable amount of cocaine, both Schedule II controlled substances, in violation of Title 21, United States Code,

---

[1] The Superseding Indictment contains six counts. (*See* ECF No. 62). Counts IV and VI are counts containing charges against Mr. Terry's co-defendant, Gerald Terry, alone. (*Id.* at 4, 6). The Superseding Indictment charges John T. Terry at Counts I, II, III, and V. (*Id.* at 1–5).

64

Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii), and in violation of Title 21, United States Code, Section 846. (*Id.* at 1). At Count Two ("Count II"), the Grand Jury charged Mr. Terry with possessing with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, and a detectable amount of cocaine, both Schedule II controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii). (*Id.* at 2). At Count Three ("Count III"), the Grand Jury charged Mr. Terry with unlawful possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1). (*Id.* at 3). Finally, at Count Five ("Count V"), the Grand Jury charged Mr. Terry with unlawful possession of a firearm in furtherance of a drug trafficking crime (the crime charged at Count II of the Superseding Indictment), in violation of Title 18, United States Code, Sections 924 (c)(1)(A) and 924(c)(1)(C)(i). (*Id.* at 5).

On November 22, 2021, Mr. Terry filed a "Motion to Sever or Bifurcate the Jury Trial[.]" (ECF No. 180). In that Motion, Mr. Terry noted that in order to prove the offense at Count III, the Government would need to show beyond a reasonable doubt that he was previously convicted of a felony. (*Id.* at 2). Therefore, he requested that the Court bifurcate "the issue of the prior conviction and [withhold] any evidence of a felony conviction … until the jury has resolved the other issues in the case." (*Id.*). Mr. Terry also noted that the fact that he had a prior felony conviction was evidence that could be used to prove the offense at Count V of the Superseding Indictment. (*Id.* at 3).

On March 14, 2022, the Court granted Mr. Terry's Motion to the extent that he sought the bifurcation of Counts I and II (the counts not implicating evidence of his prior felony conviction) from Counts III and V (the counts implicating evidence of his prior felony conviction). (ECF No.

65

190). Specifically, the Court ordered that the trial would "occur in two phases. During phase one, the jury [would] determine [Mr.] Terry's guilt or innocence with respect to the charges at Counts I and II of the Superseding Indictment. During that phase of the trial, the Government [would not be] permitted to introduce evidence of Terry's prior felony conviction[.]" (*Id.* at 25). Then, during phase two of the trial, the jury would "decide [Mr.] Terry's guilt or innocence with respect to the charges at Counts III and V of the Superseding Indictment. During that phase of the trial, the Government [would be permitted] to introduce the fact of [Mr.] Terry's prior felony conviction." (*Id.*).

On August 22, 2022, phase one of the trial began. (ECF No. 209). On August 25, 2022, the jury found Mr. Terry guilty of the offenses at Count I and Count II of the Superseding Indictment. (ECF No. 217).

On August 26, 2022, Mr. Terry waived his right to trial by jury with respect to the charges at Counts III and V of the Superseding Indictment and proceeded to a bench trial. (ECF Nos. 218, 219). On that same date, the Court found Mr. Terry guilty of the offenses at Counts III and V of the Superseding Indictment. (ECF No. 220).

On September 9, 2022, Mr. Terry filed his "Omnibus Post-Trial Motion for Judgment of Acquittal and/or Motion for a New Trial[.]" (ECF No. 226). In that Motion, Mr. Terry noted that he had requested a transcript of the trial in this matter, and he therefore requested an extension of time within which to amend his post-trial Motion. (*Id.* at 6). With the Court's leave, Mr. Terry filed his "Amended Omnibus Post-Trial Motion for Judgment of Acquittal, or in the Alternative, Motion for a New Trial" on January 13, 2023. (ECF No. 245). On April 14, 2023, the Government

66

filed its Response in Opposition to Mr. Terry's Amended Motion. (ECF No. 254). Finally, on May 5, 2023, Mr. Terry filed a Reply to the Government's Response. (ECF No. 259).

## III.  Legal Standard

### A.  Federal Rule of Criminal Procedure 29

"'[T]he Rule 29 judgment of acquittal is a substantive [judicial] determination that the prosecution has failed to carry its burden.'" *United States v. Rodriguez-Mendez*, No. 1:17-CR-15-1, 2021 WL 6143581, at *1 (W.D. Pa. Dec. 29, 2021) (quoting *United States v. John-Baptiste*, 727 F.3d 186, 200 n.8 (3d Cir. 2014)). A "defendant 'challenging the sufficiency of the evidence' pursuant to Rule 29 'bears a heavy burden.'" *John-Baptiste*, 747 F.3d at 201 (quoting *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992)).

In "deciding whether to grant a motion for acquittal, the trial court is required to view the evidence in the light most favorable to the prosecution and to draw all reasonable inferences in the Government's favor." *Rodriguez-Mendez*, 2021 WL 6143581, at *1 (citing *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984)). The "court 'must determine whether the government has adduced sufficient evidence respecting each element of the offense charged to permit jury consideration.'" *Id.* (quoting *United States v. Giampa*, 758 F.2d 928, 934–35 (3d Cir. 1985)). A "reviewing court 'must be ever vigilant … not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [its] judgment for that of the jury.'" *Id.* (quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013)). Courts must "review the evidence as a whole, not in isolation, and ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt" and must "sustain the jury's verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's

decision." *Caraballo-Rodriguez*, 726 F.3d at 430 (internal quotation marks and citation omitted). Indeed, the "jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Rodriguez-Mendez*, 2021 WL 6143581, at *1 (quoting *Caraballo-Rodriguez*, 726 F.3d at 431).

Finally, the same standard that governs a Rule 29 motion in the context of a jury trial governs a Rule 29 motion in the context of a bench trial. *United States v. Robinson*, No. 2:14-CR-64, 2015 WL 3967085, at *2 (W.D. Pa. June 30, 2015); *see also United States v. Stubler*, 271 F. App'x 169, 170 (3d Cir. 2008); *Gov't of the V.I. v. Bryan*, 29 F. App'x 65, 68 (3d Cir. 2002) (stating that, when reviewing a trial court's findings in a non-jury criminal trial, the relevant question is whether the evidence "adduced at trial would permit 'reasonable mind[s]' to accept a particular conclusion.'") (quoting *United States v. Delerme*, 457 F.2d 156, 160 (3d Cir. 1972)).

## B.      Federal Rule of Criminal Procedure 33

"Federal Rule of Criminal Procedure 33(a) permits a court to 'vacate any judgment and grant a new trial if the interest of justice so requires.'" *Rodriguez-Mendez*, 2021 WL 6143581, at *3 (quoting FED. R. CRIM. P. 33(a)). If the "case was tried without a jury, the court may take additional testimony and enter a new judgment." FED. R. CRIM. P. 33(a).

The "decision to grant or deny a motion for new trial lies within the court's discretion." *Rodriguez-Mendez*, 2021 WL 6143581, at *3 (citing *United States v. Vitillo*, 490 F.3d 314, 325 (3d Cir. 2007)). In considering a motion for a new trial, district courts must "'exercise great caution in setting aside a verdict reached after fully-conducted proceedings,' and particularly so where 'the action has been tried before a jury.'" *Id.* (quoting *United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008)).

68

Even if a "trial court improperly admits evidence, this 'does not automatically mandate a new trial. There must be prejudice that affects a substantial right of the defendant.'" *Id.* (quoting *United States v. Giampa,* 904 F. Supp. 235, 302 (D.N.J. 1995)). Accordingly, a "district court may order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *Id.* (quoting *United States v. Staten,* 557 F. App'x 119, 121 (3d Cir. 2014)).

## IV.    Discussion

In his post-trial submissions, Mr. Terry generally asserts that the evidence against him was insufficient for the jury and the Court to deem him guilty of the offenses at Counts I, II, III, and V of the Superseding Indictment. (ECF No. 226 at 4). He further contends that there were several errors before, during, and after trial that should lead the Court to grant him relief. (ECF Nos. 226, 245, 259).

The Court first turns its attention to Mr. Terry's argument that the verdicts entered by the jury and the Court warrant a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The Court then addresses Mr. Terry's additional assignments of error.

### A.    The Court Denies Mr. Terry's Motion for a Rule 29 Judgment of Acquittal

Based on the evidence presented at the jury and non-jury trials in this matter, the Court finds that reasonable minds could deem Mr. Terry guilty of the offenses at Counts I, II, III, and V of the Superseding Indictment beyond a reasonable doubt. In order to explain that finding, the Court first outlines four categories of evidence that the Government produced at trial. After doing so, the Court explains why the Government's evidence warrants the denial of Mr. Terry's Motion for Judgment of Acquittal.

69

### 1. Outline of the Evidence Produced at Trial

### a. Evidence Obtained From the Car in Which Mr. Terry Was Riding

At trial, Pennsylvania State Police Officer Ryan Marmol ("Trooper Marmol") testified on behalf of the Government. (ECF No. 230 at 35–36). Trooper Marmol stated that, on April 4, 2018, he stopped a red 2010 Ford Taurus. (*Id.* at 43:2–6). Upon stopping the vehicle, he obtained a driver's license from the driver, which identified that individual as Gerald Terry. (*Id.* at 47:15–18). Trooper Marmol also obtained identification from the passenger, which identified that individual as John T. Terry. (*Id.* at 48:25–49:5).

After obtaining consent to search the Ford Taurus, Trooper Marmol found "an after-market hidden compartment that was in the passenger side dash area of the vehicle." (*Id.* at 51–52). Inside that compartment, Trooper Marmol discovered "three kilogram-sized packages that were wrapped in black duct tape and clear cellophane wrapping. [He also discovered] a Smith & Wesson 40-caliber pistol that was loaded, and there was one round in the chamber and six rounds in the magazine, for a total of seven rounds." (*Id.* at 54–56; 77:18–22; 123:9–17). Trooper Marmol then conducted a field test on the unknown substance inside the black duct tape and clear cellophane wrapping, which resulted in a "positive test for suspected cocaine." (*Id.* at 57:4–13). Notably, certain of the cocaine that Trooper Marmol seized from the Ford Taurus was stamped with a backwards two. (*Id.* at 64–68; Government's Exhibit 2–2C; ECF No. 215 at 1). Finally, during his stop of the Ford Taurus, Trooper Marmol seized two electronic devices—an iPhone and a Samsung Galaxy. (ECF No. 230 at 85:3–9).

After taking Mr. Terry back to the state police barracks, Mr. Terry made a statement in the presence of Trooper Marmol that he "was responsible for the [Ford Taurus] and that he borrowed the [Ford Taurus]." (*Id.* at 92:19–93:1).

### b. Evidence Obtained From the iPhone and the Samsung Galaxy

In this subsection, the Court outlines the following evidence: (1) the process by which the Federal Bureau of Investigation ("FBI") extracted data from the iPhone and the Samsung Galaxy and prepared to present that evidence at trial, (2) the extent to which the FBI editorialized the information that the Government presented at trial, and (3) the evidence that the Government presented at trial from the iPhone and the Samsung Galaxy tending to connect Mr. Terry to those phones.

### i. The Process by Which the FBI Extracted Data From the iPhone and the Samsung Galaxy and Prepared to Present That Evidence at Trial

Senior Forensic Examiner Justin Sarvey ("SFE Sarvey") of the FBI testified at trial regarding the process by which he extracted the data from the iPhone and the Samsung Galaxy that Trooper Marmol found in the Ford Taurus during the stop on April 4, 2018, and that the Government produced at trial. (ECF No. 230 at 170–77).[2] With respect to the Samsung Galaxy, SFE Sarvey extracted all of the data that he could off of the device and made it available for the

---

[2] The Court notes that Trooper Marmol testified that the iPhone that the Government produced at trial as Exhibit 7 appeared to be the same iPhone that he had recovered from the Ford Taurus during the traffic stop. (ECF No. 230 at 85:17–86:3; Government's Exhibit 7; ECF No. 215 at 1). Likewise, Trooper Marmol testified that the Samsung Galaxy that the Government produced at trial as Exhibit 8 appeared to be the same Samsung Galaxy that he had seized from the Ford Taurus during the traffic stop on April 4, 2018. (ECF No. 230 at 88:18–89:11; Government's Exhibit 8; ECF No. 215 at 1). SFE Sarvey then testified that the iPhone that was Exhibit 7 and the Samsung Galaxy that was Exhibit 8 were the phones that he had searched pursuant to the warrants signed by United States Magistrate Judge Keith A. Pesto. (ECF No. 230 at 173–77).

case agent to review. (*Id.* at 177–78; Government's Exhibit 22; ECF No. 215 at 2). In like fashion, SFE Sarvey extracted the data from the iPhone and made it available for the case agent to review. (ECF No. 230 at 184:14–185:2; Government's Exhibit 24; ECF No. 215 at 2). The case agent to whom SFE Sarvey provided the data for the iPhone and the Samsung Galaxy was Special Agent James Simpson ("Agent Simpson"). (ECF No. 230 at 186:11–14).[3]

Specifically, SFE Sarvey testified that once he extracted the data from the iPhone and Samsung Galaxy and processed it, he "put [it] up onto [the] internal review system[,]" at which point Agent Simpson would have gone "through all the data on the phone, identifie[d] [his] items of interest[,]" and then let SFE Sarvey "know that he was finished with his review and that he had tagged the items of interest." (*Id.* at 190:23–191:8). After Agent Simpson completed that process, SFE Sarvey generated a new report, which was in PDF format, of the items that Agent Simpson had tagged. (*Id.* at 191:3–10).[4] In short, SFE Sarvey testified that: (1) he extracted all of the data that he could from the iPhone and the Samsung Galaxy, (2) he posted that data to the

---

[3] On cross-examination, SFE Sarvey was asked the following regarding the data that he extracted from the phones and made available to Agent Simpson for his review: "[i]sn't it correct that even though the file's in read-only format, if it's saved into another program, then it can be edited." (ECF No. 230 at 190:12–15). In response, SFE Sarvey stated that he "guess[ed] it could be edited." (*Id.* at 190:16).

[4] During trial, SFE Sarvey was asked whether the report generated by the case agent can contain data "other than the specific items that the agent identifies, such as … text messages, contact lists, or images?" (ECF No. 230 at 185:22–24). In response, SFE Sarvey testified that the "report may also contain metadata for the files that[ are] listed in the report." (*Id.* at 185:22–186:1). SFE Sarvey explained that metadata:

> [I]s basically information about a file. So if you had a file that was a picture, the metadata would be information like the file name for that picture. It would be where that picture is stored on a device. It could contain the creation date, so the time that that photo was taken. It may also include things like the type of device or the model of device, such as like an iPhone or a Samsung device, that took that photo.

(*Id.* at 186:2–10).

72

FBI's internal review system, (3) Agent Simpson reviewed the data and tagged items of interest, and then (4) SFE Sarvey made a new, shorter report consisting of the items that Agent Simpson had tagged. (*Id.* at 170–91).

For his part, Agent Simpson explained that after he received the shorter report that he and SFE Sarvey had created, he prepared additional summary reports. (ECF No. 231 at 27:1–4). Specifically, Agent Simpson created an 18-page report containing data found on the iPhone that he wanted to present at trial—Government's Exhibit 31. (*Id.* at 27:10–19; Government's Exhibit 31; ECF No. 215 at 2). In like fashion, he created a 3-page report containing data found on the Samsung Galaxy that he wanted to present at trial—Government's Exhibit 33. (ECF No. 231 at 30:1–15; Government's Exhibit 33; ECF No. 215 at 3).

Finally, the Government and Mr. Terry stipulated to the following regarding the cell phones:

> The chain of custody of all seized evidence was unbroken, proper, and in accord with the procedures of the Pennsylvania State Police and [FBI]. The evidence seized was maintained in constant law enforcement custody. It was logged into and secured in evidence at all times. It has been securely transported by law enforcement members to the federal courthouse in Johnstown for trial. Proper documentation reflects any movement of the items.

(ECF No. 230 at 63:23–64:9).

### ii. The Extent to Which the FBI Editorialized the Evidence that the Government Presented at Trial

At trial, the Government presented evidence of communications extracted from the iPhone and the Samsung Galaxy, along with testimony from Agent Simpson explaining that evidence. (ECF No. 231 at 35–38, 58–65). Certain evidence from the phones was admitted by way of Government's Exhibits 32 and 34. (*Id.*).

-10-

73

Notably, Agent Simpson explained what information in Exhibits 32 and 34 he personally added to those Exhibits, and what information came directly from the phones. For example, he testified that the conclusion in Exhibit 32A indicating that the iPhone belonged to Mr. Terry was his conclusion—that information was not populated by the phone itself. (*Id.* at 38:16–39:5).[5] However, other information in the reports that he presented during trial was populated by the iPhone itself, such as the name of a contact in the iPhone. (*Id.* at 39:12–24, 145:13–23). Finally, with respect to "all of [the] communications" from the iPhone and the Samsung Galaxy that Agent Simpson discussed at trial, he testified that he did not change the content of those communications in any way. (*Id.* at 42:10–12). Indeed, Agent Simpson testified that he did not create the contents of the text messages or other communications coming from or going to the cell phones. (*Id.* at 143:5–14).

### iii. The Evidence That the Government Presented at Trial From the iPhone and the Samsung Galaxy Tending to Connect Mr. Terry to Those Phones

During trial, the Government offered various pieces of evidence that had the potential to show that Mr. Terry was the owner and user of the iPhone and the Samsung Galaxy that Trooper Marmol found in the Ford Taurus on April 4, 2018. (*See* ECF No. 231 at 38–65, 82–89; Government's Exhibit 32; Government's Exhibit 34; ECF No. 215 at 2–3).

---

[5] During a sidebar conference regarding Exhibit 32, the Court stated that the Government could admit the evidence in Exhibit 32 as long as the Government "made clear to the jury that this is taken from these other reports and he (Agent Simpson) has added some of his own—I guess you would call expertise or interpretation as to what these things mean. As long as that's clear, I think that's fair." (ECF No. 231 at 35–38). Based on the information that the Government adduced from Agent Simpson, such as the fact that he added to Exhibit 32A the conclusion that the iPhone belonged to Mr. Terry, the Court finds that the Government complied with the Court's admonition on this issue.

By way of example, with respect to the iPhone, two outgoing text messages from December 18, 2017, contained photographs of Mr. Terry's identification card, along with a message stating in relevant part: "I'm so embarrassed I couldn't find my f***ing [ID] … so here nothing I got a duplicate[.]" (ECF No. 231 at 38–42; Government's Exhibit 32A; Government's Exhibit 32B; Government's Exhibit 32C; ECF No. 215 at 2).

Further, on March 8, 2018, approximately one month before Trooper Marmol stopped Gerald Terry and John T. Terry in the Ford Taurus, the iPhone captured a picture of what appeared to be cocaine stamped with a backwards two. (ECF No. 231 at 72:7–73:8; Government's Exhibit 32O; ECF No. 215 at 3). Agent Simpson explained that, while he was going through the data from the iPhone, he found "this image of a backwards two which matched, you know, the kilograms that were seized out of the vehicle on April 4th, 2018." (ECF No. 231 at 72:14–16). Agent Simpson could also see that the cocaine was "on a scale being weighed. And [he] could tell from the kilograms that were seized, which were approximately 1,000 grams, that this picture was of a half kilogram, which is 500 grams of cocaine. It had the same backwards two on it." (*Id.* at 72:16–20).

Turning to the Samsung Galaxy, that phone received a message on March 29, 2018, at 6:15 P.M. that read the following: "Gerald (215) 494-8544[.]" (ECF No. 231 at 58:25–60:13; Government's Exhibit 34C; ECF No. 215 at 3). Approximately four minutes later, the Samsung Galaxy sent a text message to the phone number associated with "Gerald" stating: "Other phone died it's me big bro[.]" (ECF No. 231 at 61:4–24; Government's Exhibit 34B; ECF No. 215 at 3). Finally, approximately ten minutes later, the Samsung Galaxy received two text messages. (ECF No. 231 at 61:25–63:4; Government's Exhibit 34A; ECF No. 215 at 3). The first message read: "This

is big bro wife 1429 Grant Street Braddock PA 15104[.]" (Government's Exhibit 34A; ECF No. 215 at 3). The second message read: "Your bro other phone is down[.]" (Government's Exhibit 34A; ECF No. 215 at 3). With respect to the address on Grant Street, Agent Simpson testified that it was significant because that was "the address [law enforcement] identified where the three kilograms of cocaine were going to." (ECF No. 231 at 62:19–23).

c.      **Robert Dillard's Testimony**

At trial, Robert Dillard ("Mr. Dillard") testified on behalf of the Government. (ECF No. 215 at 4). Mr. Dillard testified that he acquired cocaine from Mr. Terry over time, and that he would typically purchase one or two kilos from him at a time. (ECF No. 231 at 193:8–11). Further, Mr. Dillard testified that: (1) the largest quantity of cocaine that he had ever ordered off of Mr. Terry was three kilograms, (2) he ordered that amount in March or April 2018, and (3) he did not actually receive the three kilograms at that time. (*Id.* at 193:23–194:5). Rather, Mr. Dillard learned that Mr. Terry and Gerald Terry had been stopped on the turnpike with the three kilograms of cocaine that were intended for him. (*Id.* at 194:6–9). Mr. Dillard also stated that in 2017 or 2018, the address that he would have provided to Mr. Terry or Gerald Terry would have been 1429 Grant Street, North Braddock. (*Id.* at 195:4–11).

Finally, Mr. Dillard testified that: (1) he had pleaded guilty to conspiracy to possess with intent to distribute 500 grams or more of cocaine and (2) the cocaine to which that guilty plea was related was the three kilograms inside the Ford Taurus when Trooper Marmol stopped Mr. Terry and Gerald Terry on April 4, 2018. (*Id.* at 196:21–197:2).

d.      **Testimony of Morgan Wiernusz**

-13-

76

During trial, Morgan Wiernusz ("Ms. Wiernusz") testified on behalf of the Government. (ECF No. 215 at 3). Ms. Wiernusz explained that, as of the trial in this matter, she was a forensic scientist with the Pennsylvania State Police Crime Lab. (ECF No. 231 at 159:8–10). Further, she stated that she was asked to analyze suspected narcotics relative to this case—specifically the three bricks containing compressed white powder that Trooper Marmol found in the Ford Taurus on April 4, 2018. (*Id.* at 160:13–161:3).

With respect to all three bricks, Ms. Wiernusz detected cocaine and methamphetamine, both of which are Schedule II controlled substances. (*Id.* at 165:16–167:2). Moreover, she stated that the net weight of the three bricks was 2,995 grams, plus or minus ten grams. (*Id.* at 167:3–7).

On cross examination, Ms. Wiernusz testified that she did not know the margin of error for drug detection. (*Id.* at 170:15–25).

Finally, Ms. Wiernusz testified that the work that she performs in the lab and the results of the tests that she conducts are reviewed by her supervisor before they are finalized. (*Id.* at 176:21–177:7).

> **2. The Government's Evidence Warrants the Denial of Mr. Terry's Motion for Judgment of Acquittal With Respect to Counts I, II, III, and V of the Superseding Indictment**

Having outlined portions of the evidence that the Government produced at trial, the Court now turns its attention to whether the jury and the Court's conclusions that Mr. Terry is guilty of the offenses at Counts I, II, III, and V of the Superseding Indictment were rational. The Court begins by analyzing the offenses at Counts I and II.

> **a. The Jury's Conclusion that Mr. Terry is Guilty of the Offenses at Counts I and II of the Superseding Indictment Was Rational**

-14-

77

### i. The Offenses at Count I and Count II

During phase one of the trial, the jury unanimously found Mr. Terry guilty as "to Count [I] (Conspiracy to Distribute or Possess with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Methamphetamine and Cocaine)[.]" (ECF No. 217 at 1). Further, in interrogatories relative to Count I, the jury unanimously found beyond a reasonable doubt that: (1) the mixture or substance involved in the conspiracy was methamphetamine and cocaine and (2) the weight of the mixture or substance involved in the conspiracy was 500 grams or more. (*Id.* at 2).

Further, with respect to the offense at Count II of the Superseding Indictment, the jury unanimously found Mr. Terry guilty of "Possession with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Methamphetamine and Cocaine[.]" (*Id.* at 3). In interrogatories relative to Count II, the jury unanimously found beyond a reasonable doubt that: (1) the mixture or substance that Mr. Terry possessed with the intent to distribute contained a detectable amount of methamphetamine and cocaine and (2) the weight of the mixture or substance that Mr. Terry possessed with the intent to distribute was 500 grams or more. (*Id.* at 4).

With respect to the conspiracy offense at Count I, the "essential elements of a drug distribution conspiracy under 21 U.S.C. § 846 are: '(1) a shared unity of purpose, (2) an intent to achieve a common goal, and (3) an agreement to work together toward the goal.'" *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008) (quoting *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006)). Among the "factors courts have considered in determining whether a conspiracy has been shown are 'the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and

-15-

78

whether there is a demonstrated level of mutual trust.'" *Id.* (quoting *United States v. Gibbs*, 190 F.3d 188, 199 (3d Cir. 1999) (citation omitted)).

Further, the "'essential elements of the substantive offense of possession of a controlled substance with intent to distribute are that the defendant (1) knowingly possessed a controlled substance with (2) the intent to distribute it.'" *Id.* (quoting *Bobb*, 471 F.3d at 497)). A jury can convict a defendant of possession charges if it concludes that "he actually or constructively possessed" the controlled substance. *Id.* Constructive possession "requires an individual to have the power and intent to exercise both dominion and control over the object he or she is charged with possessing" and may be proved by circumstantial evidence. *Id.* (internal quotation marks and citation omitted).

Finally, "drug identity and quantity must be treated as elements of a section 841 possession with intent to distribute offense when taking either factor into account increases the applicable statutory maximum." *United State v. Lacy*, 446 F.3d 448, 453 (3d Cir. 2006); *see also United States v. Williams*, 974 F.3d 320, 365–66 (3d Cir. 2020) (noting that the Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99 (2013), requires that the jury determine the drug quantity involved in an offense when that quantity increases the statutory mandatory minimum and holding that "[t]he jury, when determining drug quantity for purposes of the mandatory minimum, may attribute to a defendant only those quantities involved in violations of § 841(a) that were within the scope of, or in furtherance of, the conspiracy and were reasonably foreseeable to the defendant as a result of the unlawful agreement.").

### ii.  The Parties' Arguments

-16-

79

In relevant part, Mr. Terry advances six arguments regarding the sufficiency of the evidence that the Government produced at trial relative to the offenses at Count I and Count II. (ECF Nos. 226, 245, 259). First, as a general matter, Mr. Terry argues that the Government "failed to present sufficient evidence beyond a reasonable doubt that [he] was a participant in a conspiracy and that [he]: (1) [had] a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal." (ECF No. 245 at 12). Second, Mr. Terry contends that, for Counts I and II, the Government "failed to present sufficient evidence [that he] 'knowingly' possessed a controlled substance, was aware of the illegal object of the conspiracy, and knew of the commission of the substantive offense and acted with the intent to facilitate it." (Id.). Third, Mr. Terry asserts that the quantity and identity of the methamphetamine that he allegedly possessed with intent to distribute must be treated as an element of the offense at Count II in this case. (Id. at 14). And Mr. Terry argues that the Government failed to prove that element beyond a reasonable doubt because Ms. Wiernusz "did not testify about what was the margin of error for detection [of controlled substances] and whether the alleged methamphetamine fell within the margin of error." (Id. at 7). Fourth, Mr. Terry contends that the Government failed to prove that the evidence from the iPhone and the Samsung Galaxy were the work product of SFE Sarvey. (Id. at 4). Instead, Mr. Terry asserts that the evidence from the phones were the interpretations and creations of Agent Simpson, especially since SFE Sarvey acknowledged that the files from the phones could be altered. (Id. at 4–5). Fifth, Mr. Terry argues that the Government did not properly inform the jury that the evidence from the phones were Agent Simpsons' interpretations, but rather the Government "offered testimony that the reports were as if directly from the full extraction reports." (Id. at 5). Finally, Mr. Terry avers that Mr.

-17-

80

Dillard's testimony was unreliable because: (1) he was a career criminal, (2) he gave information to assist himself on a separate drug trafficking investigation, (3) and he pleaded guilty to lesser charges and a lesser controlled substance, among other factors. (*Id.* at 7–8).

In response, the Government generally argues that Mr. Terry's objections are unavailing and points to the evidence obtained from the cellphones, as well as the testimony of Mr. Dillard, in support of the jury's verdict. (*See* ECF No. 254).

### iii. Analysis

Before examining whether a reasonable juror could find that Mr. Terry was guilty of each element of the offenses at Counts I and II beyond a reasonable doubt, the Court makes three preliminary notes. First, the Court stresses the "well-established principle that witness credibility determinations must be made by the jury." *United States v. Lewis*, 284 F. App'x 940, 942 (3d Cir. 2008). Therefore, it was up to the jury to determine how much weight to assign to the testimony of Trooper Marmol, SFE Sarvey, Agent Simpson, Mr. Dillard, and Ms. Wiernusz. Evidently, the jury assigned their testimonies significant weight.

Second, based on the evidence outlined above, *see supra* Section IV.A.1, and other evidence produced by the Government at trial, a reasonable juror could find that: (1) Trooper Marmol found the iPhone and the Samsung Galaxy during the traffic stop of the Ford Taurus on April 4, 2018; (2) SFE Sarvey extracted all of the data that he could from those same phones and made the data available for Agent Simpson's review; (3) SFE Sarvey and Agent Simpson worked to condense the information on the phones in order to present that information at trial; and (4) Agent Simpson presented information from the phones at trial, without editing any of the communications sent from or to the phones. *See id.* Indeed, although SFE Sarvey testified that it

was theoretically possible for a case agent to save and then alter evidence from a cell phone, Agent Simpson testified that he did not change the contents of the messages or other communications extracted from the iPhone or the Samsung Galaxy. *See id.* Likewise, Mr. Terry points to no evidence at trial indicating that anyone changed the contents of the messages, other communications, or photographs extracted from the iPhone or the Samsung Galaxy. (ECF Nos. 226, 245, 259).

Finally, the Court finds that the Government appropriately clarified to the jury the ways in which Agent Simpson editorialized the information obtained from the phones. *See supra* Section IV.A.1. For example, the Government adduced testimony from Agent Simpson that he placed the conclusion on Exhibit 32A indicating that the iPhone belonged to Mr. Terry. *See id.*

With those initial findings in place, the Court turns to the issue of whether the Government produced sufficient evidence to permit a reasonable juror to conclude beyond a reasonable doubt that Mr. Terry participated in a conspiracy, as is necessary to prove the offense at Count I of the Superseding Indictment. Here, the evidence at trial permitted a reasonable juror to find the following: (1) the iPhone and the Samsung Galaxy belonged to Mr. Terry because he sent and received text messages from those phones indicating that he possessed and used them; (2) Mr. Terry took a picture of cocaine using the iPhone that bore a marking akin to the marking on at least certain of the cocaine that Trooper Marmol found in the hidden compartment of the Ford Taurus on April 4, 2018; (3) Mr. Terry received a text message on the Samsung Galaxy mere days before April 4, 2018, that referenced both Gerald Terry and the address 1429 Grant Street, Braddock, Pennsylvania; (4) Mr. Terry was found riding in a vehicle with Gerald Terry on April 4, 2018, and inside the vehicle there was a hidden compartment holding a mixture and substance

containing methamphetamine and cocaine that was stamped with the same (or at least a very similar) marking as the cocaine in the picture on Mr. Terry's iPhone; (5) Mr. Dillard testified that Mr. Terry was intending to bring the cocaine in the Ford Taurus to him at 1429 Grant Street, Braddock, Pennsylvania; (6) Mr. Dillard pleaded guilty to conspiring to possess with the intent to distribute that same cocaine; and (7) Mr. Dillard had purchased a standard amount of cocaine from Mr. Terry in the past. *See supra* Section IV.A.1. In light of all of that evidence, as well as the additional evidence that the Government produced at trial but which the Court has not explicitly referenced in this opinion, a reasonable juror could find, beyond a reasonable doubt, that Mr. Terry and his coconspirator(s) "shared a common goal (the distribution of a mixture and substance containing methamphetamine and cocaine), the intent to achieve that goal, and a tacit (or explicit) agreement to cooperate to achieve it[.]" *Iglesias*, 535 F.3d at 156.

The Court next turns to the issue of whether the Government sufficiently proved that Mr. Terry knowingly possessed a controlled substance with the intent to distribute it. Here, once again, based on the strong evidence demonstrating that Mr. Terry used and possessed the iPhone and the Samsung Galaxy, a reasonable juror could conclude that he was the individual who used and possessed those phones. Therefore, a reasonable juror could find that Mr. Terry took a picture of a distribution-quantity of cocaine on March 8, 2018, that bore the same (or a very similar) marking as at least some of the approximately 2,995 grams of a mixture and substance containing methamphetamine and cocaine in the Ford Taurus, a mixture and substance that Mr. Dillard testified Mr. Terry was bringing to him, and that Mr. Dillard pleaded guilty to conspiring to possess with intent to distribute. *See supra* Section IV.A.1. This evidence strongly connects Mr. Terry to the mixture and substance containing methamphetamine and cocaine in the Ford Taurus,

-20-

83

permitting a reasonable juror to find beyond a reasonable doubt that he knowingly possessed that mixture and substance with the intent to distribute it. Further, the Court notes that Mr. Terry took responsibility for the Ford Taurus that Trooper Marmol stopped on April 4, 2018. *See supra* Section IV.A.1. In light of all of this evidence, as well as the additional evidence set forth in the paragraphs above, and the evidence that the Government produced at trial but which the Court has not explicitly referenced in this opinion, the Court finds that a reasonable juror could conclude, beyond a reasonable doubt, that Mr. Terry knowingly possessed the mixture and substance containing methamphetamine and cocaine in the hidden compartment of the Ford Taurus with the intent to distribute that mixture and substance. *Iglesias*, 535 F.3d at 156–57.

Finally, the Court turns to the issue of whether the evidence that the Government produced at trial would permit a reasonable juror to find beyond a reasonable doubt that Mr. Terry conspired to distribute and possess with intent to distribute and possessed with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine. Based on the evidence that the Government presented at trial, a reasonable juror could find the following: (1) Trooper Marmol conducted a field test on the substance that he found in the hidden compartment, and it returned a positive for suspected cocaine; (2) Ms. Wiernusz, a trained forensic scientist with the Pennsylvania State Police Crime Lab, tested the bricks that Mr. Terry conspired to distribute and possess with intent to distribute and possessed with the intent to distribute, and those bricks contained cocaine and methamphetamine and weighed a cumulative 2,995 grams, plus or minus ten grams; and (3) Ms. Wiernusz's supervisor reviewed the results of her tests before she finalized them. *See supra* Section IV.A.1. Based on this evidence, as well as all of the evidence that the Government

-21-

84

produced at trial, the Court finds that a reasonable juror could conclude, beyond a reasonable doubt, that Mr. Terry conspired to distribute and possess with intent to distribute and possessed with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine,[6] regardless of whether Ms. Wiernusz knew the margin of error for drug detection and whether these particular drugs fell within that margin of error. *Cf. United States v. Stewart*, 179 F. App'x 814, 818 (3d Cir. 2006) ("It is well-established that lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction. So long as the government produces sufficient evidence, direct or circumstantial, from which the jury is able to identify the substance beyond a reasonable doubt, the lack of scientific evidence is not objectionable.") (internal quotation marks and citations omitted).[7]

Therefore, the Court holds that the jury's guilty verdict at Counts I and II did not fall below the "threshold of bare rationality" and must be upheld. Indeed, in the Court's opinion, the evidence of Mr. Terry's guilt at Counts I and II of the Superseding Indictment was very strong. Further, the Court finds that Mr. Terry's additional arguments, (ECF Nos. 226, 245, 259), which

---

[6] Indeed, the Court finds that a reasonable juror could conclude, beyond a reasonable doubt, that more than 500 grams of a mixture and substance containing a detectable amount of methamphetamine and cocaine "were within the scope of, or in furtherance of, the conspiracy and were reasonably foreseeable to [Mr. Terry] as a consequence of the unlawful agreement." *Williams*, 974 F.3d at 366.

[7] In this case, the Government did present scientific evidence (Ms. Wiernusz's testing and related testimony) that the mixture and substance that Mr. Terry conspired to distribute and possess with intent to distribute and possessed with intent to distribute was in excess of 500 grams and contained methamphetamine and cocaine. However, Ms. Wiernusz's presentation of that evidence was perhaps not perfect insofar as she did not know, at trial, the margin of error for drug detection and whether the drugs in this case fell within that margin. But if scientific evidence is not necessary to establish the identity of a substance, then completely perfect scientific evidence is not necessary either. In short, in this case, the evidence that the Court outlined above was certainly a sufficient basis upon which a reasonable juror could determine the type and quantity of drugs found in the Ford Taurus on April 4, 2018.

generally relate to issues of credibility and the weight that the jury should have assigned to certain evidence, do not alter in any way the Court's holding relative to Counts I and II. Accordingly, the Court denies Mr. Terry's Motions (ECF Nos. 226, 245) to the extent that he seeks a judgment of acquittal at Count I of the Superseding Indictment, and it likewise denies his Motions to the extent that he seeks a judgment of acquittal at Count II.

### b. The Evidence That the Government Presented Permitted Reasonable Minds to Find Mr. Terry Guilty of the Offense at Count III

#### i. The Offense at Count III

With respect to the offense at Count III of the Superseding Indictment, the Court found, beyond a reasonable doubt, that Mr. Terry was guilty of the crime of being a felon in possession of a firearm. (ECF No. 220 at 1–3).

As the Court explained in its verdict, the elements of the offense at Count III of the Superseding Indictment are as follows: "(1) First, that [Mr. Terry] has been convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year; and that on the dates set forth in the First Superseding Indictment; [Mr. Terry] knew he had been convicted of a crime punishable by imprisonment for a term exceeding one year." (*Id.* at 1). "(2) Second, that after this conviction, [Mr. Terry] knowingly possessed the firearm described in Count [III] of the First Superseding Indictment." (*Id.*). "(3) Third, that [Mr. Terry's] possession was in or affecting interstate or foreign commerce." (*Id.*) (citing *United States v. Adams*, 36 F.4th 137, 143–44 (3d Cir. 2022) (noting that, in *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019), the Supreme Court held that a defendant must knowingly possess a firearm and also know that he "'belong[s] to the relevant category of persons barred from possessing a firearm['"]); *see also Greer v. United States*,

-23-

86

141 S. Ct. 2090, 2095–97 (2021) [(noting that individuals "who are convicted felons ordinarily know that they are convicted felons")]).

With respect to the second element, proof of actual or constructive possession is sufficient. *Iglesias*, 535 F.3d at 156. "'Constructive possession requires an individual to have the power and intent to exercise both dominion and control over the object he or she is charged with possessing.'" *Id.* (quoting *United States v. Garth*, 188 F.3d 99, 112 (3d Cir. 1999)). And constructive possession "may be proved by circumstantial evidence." *Id.*

### ii. The Parties' Arguments

Generally speaking, Mr. Terry argues that the Government failed to present substantive "evidence beyond a reasonable doubt that [he] constructively possessed the firearm found in the hidden compartment, when the Government failed to provide substantive evidence that [he] acted knowingly with both the power and the intention at a given time to exercise dominion or control over the firearm[.]" (ECF No. 245 at 13). Further, Mr. Terry notes that Mr. Dillard stated that "the 'Terry[s] were not known to carry a firearm[.]'" (*Id.* at 8). Accordingly, Mr. Terry asserts that "there is no substantial evidence of proof beyond a reasonable doubt that [he] would have known a firearm was in the hidden compartment … [or] that he intended to control it[.]" (*Id.*).

In response, the Government argues that the "circumstantial evidence from the cell phones independently and in combination with the testimony of [Mr.] Dillard provided sufficient evidence to prove [Mr.] Terry's … unlawful possession of a firearm[.]" (ECF No. 254 at 15–16).

### iii. Analysis

The Court begins by noting that Mr. Terry does not contest the Court's finding that the Government proved beyond a reasonable doubt that the first and third elements of the crime of

-24-

87

being a felon in possession of a firearm are satisfied in this case. (ECF Nos. 226, 245, 259). Therefore, the Court adheres to its previous findings with respect to those elements, (ECF No. 220 at 1–3), again concluding that reasonable minds could deem them satisfied beyond a reasonable doubt by the Government's evidence.

Turning to the second element of the crime of being a felon in possession of a firearm— that, after Mr. Terry's prior felony conviction, he knowingly possessed the firearm described in Count III of the Superseding Indictment (a loaded Smith & Wesson, M & P Shield, .40 caliber semi-automatic pistol)—the Court finds that reasonable minds could conclude, beyond a reasonable doubt, that Mr. Terry knowingly possessed that firearm on April 4, 2018. (ECF No. 62 at 3; ECF No. 220 at 1). Indeed, as the Court explained above, *see supra* Section IV.A.2.a, there was substantial evidence at trial, and the Court itself is convinced, that Mr. Terry possessed the three bricks containing methamphetamine and cocaine that were in the hidden compartment of the Ford Taurus that Trooper Marmol stopped on April 4, 2018. Further, Trooper Marmol testified that he found a loaded Smith & Wesson, .40 caliber pistol, inside the hidden compartment of the Ford Taurus. *See supra* Section IV.A.1. Because the Court concludes that Mr. Terry possessed the mixture and substance containing methamphetamine and cocaine in the hidden compartment, the Court finds that Mr. Terry knew of and controlled the contents of that compartment, which leads the Court to conclude, beyond a reasonable doubt, that Mr. Terry knowingly possessed the firearm that was with the drugs in that hidden compartment. *United States v. Wiltshire*, 568 F. App'x 135, 137, 140 (3d Cir. 2014) (noting that: (1) use of the Third Circuit's model jury instructions is generally favored and (2) the Third Circuit's model jury instruction regarding the crime of being a felon in possession of a firearm indicates that possession "may be sole or joint.").

88

Before concluding, the Court briefly addresses Mr. Dillard's statement that the Terrys were not known to carry a firearm. (ECF No. 245 at 8). There are several reasons why this statement does not alter the Court's conclusion that Mr. Terry knowingly possessed the Smith & Wesson in the hidden compartment on April 4, 2018. First, Mr. Dillard did not state that the Terrys did not carry a firearm *on April 4, 2018*—he simply stated that they were not known to carry a firearm. Second, Mr. Dillard testified that the cocaine that Mr. Terry was transporting on April 4, 2018, was the most cocaine that he had ever purchased from Mr. Terry. *See supra* Section IV.A.1. It is possible that Mr. Terry acted in an unusual manner by carrying a gun on April 4, 2018, because he was transporting an unusual quantity of drugs on that date. Third, and most fundamentally, the Court believes Trooper Marmol's testimony that he found a Smith & Wesson in the hidden compartment of the Ford Taurus on April 4, 2018. Given that testimony, one of the Terrys undoubtedly possessed a firearm on that date. And given the strong evidence at trial connecting Mr. Terry to the contents of the hidden compartment, the Court concludes, beyond a reasonable doubt, that Mr. Terry knowingly possessed the Smith & Wesson firearm in that compartment on April 4, 2018.

Therefore, considering the aforementioned evidence, and the other evidence that the Government produced at trial, the Court finds that reasonable minds could conclude, beyond a reasonable doubt, that Mr. Terry is guilty of the offense at Count III of the Superseding Indictment. As with Counts I and II, in the Court's opinion, the evidence of Mr. Terry's guilt at Count III is very strong. Further, the Court finds that Mr. Terry's additional arguments regarding Count III (ECF Nos. 226, 245, 259) do not alter the Court's holding in any way. Accordingly, the

-26-

89

Court denies Mr. Terry's Motions (ECF Nos. 226, 245) to the extent that he seeks a judgment of acquittal at Count III of the Superseding Indictment.

### c. The Evidence That the Government Presented Permitted Reasonable Minds to Find Mr. Terry Guilty of the Offense at Count V

#### i. The Offense at Count V

With respect to Count V of the Superseding Indictment, the Court found that the Government proved, beyond a reasonable doubt, that Mr. Terry is guilty of the offense of possessing a firearm in furtherance of a crime of violence or a drug trafficking crime. (ECF No. 220 at 3–4).

Turning to the elements of that offense, they are as follows: "(1) First, that [Mr. Terry] committed the crime of possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine, as charged in Count [II] of the First Superseding Indictment." (*Id.* at 3). And "(2) [s]econd, that [Mr. Terry] knowingly possessed a firearm in furtherance of this crime." (*Id.*) (citing *United States v. Sparrow*, 371 F.3d 851, 852–53 (3d Cir. 2004)). In deciding whether Mr. Terry knowingly possessed a firearm in furtherance of the crime at Count II, the:

> [F]ollowing nonexclusive factors are relevant: the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.

*Iglesias*, 535 F.3d at 157 (quoting *Bobb*, 471 F.3d at 496). To determine whether there was sufficient evidence that Mr. Terry's possession of the Smith & Wesson was "'in furtherance of' his drug trafficking, [the Court] scrutinize[s] the 'totality of the evidence, both direct and circumstantial,'

-27-

90

and make[s] 'all available inferences in favor of the government.'" *Id.* (quoting *Sparrow*, 371 F.3d at 852) (citation omitted).

### ii. The Parties' Arguments

As he does with respect to Count III, Mr. Terry generally argues that the Government failed to present substantive "evidence beyond a reasonable doubt that [he] constructively possessed the firearm found in the hidden compartment, when the Government failed to provide substantive evidence that [he] acted knowingly with both the power and the intention at a given time to exercise dominion or control over the firearm[.]" (ECF No. 245 at 13). Further, Mr. Terry asserts that the "Government failed to present substantive evidence to prove beyond a reasonable doubt that [he] possessed the firearm and that he possessed it 'in furtherance of' drug activity." (*Id.*). Indeed, Mr. Terry argues that, at best, the Government "showed that the firearm was in relation to the drugs, not in furtherance of drug activity." (*Id.*).

As the Court has previously noted, the Government contends that the "circumstantial evidence from the cell phones independently and in combination with the testimony of [Mr.] Dillard provided sufficient evidence to prove [Mr.] Terry's … unlawful possession of a firearm in furtherance of his drug trafficking conduct." (ECF No. 254 at 15–16).

### iii. Analysis

Turning to the first element of the crime of possessing a firearm in furtherance of a drug trafficking crime, the Court concurs with the jury that Mr. Terry is guilty, beyond any reasonable doubt, of the offense at Count II of the Superseding Indictment. Therefore, the Court finds that reasonable minds could conclude, beyond a reasonable doubt, that the first element is satisfied.

Turning to the second element—whether Mr. Terry knowingly possessed the firearm *in furtherance of* the drug trafficking crime at Count II—the Court finds that reasonable minds could reach the following conclusions given the evidence that the Government presented: (1) Mr. Terry possessed with intent to distribute a significant quantity of a mixture and substance (2,995 grams, plus or minus ten grams) containing a detectable amount of methamphetamine and cocaine; (2) the firearm that he knowingly possessed was located with that significant, distribution-quantity of controlled substances in a hidden compartment in the vehicle in which he was riding; (3) the firearm that Mr. Terry possessed was loaded; (4) the firearm that Mr. Terry possessed was stolen; and (5) his knowing possession of the firearm was illegal because Mr. Terry had a prior felony conviction of which he knew and the firearm had traveled in interstate commerce. *See supra* Section IV.A.1; (ECF No. 208 at 1–3). Based on these facts, and in light of the other evidence that the Government produced in this case, the Court finds that reasonable minds could conclude that the Government proved beyond a reasonable doubt that Mr. Terry possessed the Smith & Wesson in furtherance of a drug trafficking crime and is guilty of the offense at Count V of the Superseding Indictment. *Iglesias*, 535 F.3d at 157 (finding that a rational juror could have easily concluded that the defendant possessed a firearm in furtherance of drug-trafficking activities on facts similar to those before this Court).

Indeed, just as with the previous counts, in the Court's opinion, the evidence of Mr. Terry's guilt at Count V is strong. Further, the Court finds that Mr. Terry's additional arguments regarding Count V (ECF Nos. 226, 245, 259) do not alter the Court's holding in any way. Accordingly, the Court denies Mr. Terry's Motions (ECF Nos. 226, 245) to the extent that he seeks a judgment of acquittal at Count V of the Superseding Indictment.

92

In sum, the Court denies Mr. Terry's Motion for Judgment of Acquittal in full. (ECF Nos. 226, 245). Having considered all of the Government's evidence and Mr. Terry's arguments, the Court concludes that rational minds could deem Mr. Terry guilty of the offenses at Counts I, II, III, and V of the Superseding Indictment beyond a reasonable doubt.

**B.      The Court Denies Mr. Terry's Motion for a New Trial Pursuant to Rule 33**

The Court now turns its attention to Mr. Terry's Motion for a New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Mr. Terry raises seven assignments of error allegedly occurring before, during, and after the jury trial in this matter. The Court examines each of Mr. Terry's seven arguments in turn.[8]

**1.   Mr. Terry's First Argument is Unavailing**

**a.      The Parties' Arguments**

In his first assignment of error, Mr. Terry argues that his Fifth Amendment Due Process Clause rights were violated when he "stood trial on an indictment which the Government knew was at least partially based on perjured material when [Agent] Simpson … knowingly testified to information that he knew was either false and/or was intentionally misleading to the Grand Jury." (ECF No. 245 at 2) (citing ECF No. 231 at 129–147). Specifically, Mr. Terry argues that Agent Simpson's testimonies before the Grand Jury indicating that Mr. Terry took responsibility for the firearm and the drugs in the hidden compartment of the Ford Taurus constituted perjury. (ECF No. 259 at 1–3). Mr. Terry further contends that without "Agent Simpson's false testimony, the

---

[8] It is not completely clear whether all of Mr. Terry's seven assignments of error relate to his Motion for a Judgment of Acquittal or his Motion for a New Trial. (ECF Nos. 226, 245). Therefore, the Court stresses that although it considers his seven assignments of error in this subsection, it has considered all of Mr. Terry's arguments in resolving each of Mr. Terry's Motions. (ECF Nos. 226, 245). Upon doing so, the Court finds that it is appropriate to deny Mr. Terry's Motions at ECF Nos. 226 and 245 in full.

[G]rand [J]ury is unlikely to have indicted" because, at each convening of the Grand Jury in this case, the Jury was concerned about whether Mr. Terry took responsibility for the firearm and the drugs in the hidden compartment. (*Id.* at 2). Therefore, pursuant to the Ninth Circuit's decision in *United States v. Basurto*, 497 F.2d 781, 786 (9th Cir. 1974), Mr. Terry argues that this Court should reverse his conviction. (*Id.* at 4–5).

In response, the Government first asserts that the Third Circuit "has not formally adopted the *Basurto* test and … the Third Circuit … has only once cited *Basurto* in an Opinion (a non-precedential one)." (ECF No. 254 at 8). Second, the Government argues that Agent Simpson's testimony before the Grand Jury did not constitute perjury because his understanding of Mr. Terry's statement to Trooper Marmol was that Mr. Terry was "'taking ownership of everything found in the vehicle, to include the cocaine and the gun.'" (*Id.* at 9–10) (quoting ECF No. 231 at 147–148). The Government therefore contends that while his testimony before the Grand Jury "could have perhaps been more precise, his testimony did not include any falsehood and … Agent Simpson did not offer any false testimony with knowledge of its falsity." (*Id.* at 11). Finally, the Government argues that even if Agent Simpson's testimony "were false, it was not material. There was substantial additional evidence presented to the [G]rand [J]ury … from which [it] could find probable cause to return the Superseding Indictment." (*Id.*).[9]

### b. Legal Standard

In *Basurto*, the "Ninth Circuit held that a defendant's Fifth Amendment rights are violated when he must stand trial on an indictment which (1) the Government knows is based partially

---

[9] Mr. Terry also argues that Agent Marmol presented false testimony. (ECF No. 226 at 4). However, he does not refer the Court to any instance in the record where that allegedly false testimony occurred. (ECF Nos. 226, 245, 259). Therefore, the Court finds that this argument is unavailing.

on perjured testimony, (2) the perjured testimony is material, and (3) jeopardy has not attached." *United States v. Liciardello*, 93 F. Supp. 3d 365, 367 (E.D. Pa. 2015) (citing *Basurto*, 497 F.2d at 785). The "Ninth Circuit later noted that evidence of perjured testimony must go beyond mere speculation, and suggested that the defendant must show that the Government had a reason to believe the testimony was perjured." *Id.* (citing *United States v. Claiborne*, 765 F.2d 784, 792 (9th Cir. 1985), *abrogation on other grounds recognized by United States v. Hernandez*, 312 F. App'x 937, 938 (9th Cir. 2009)).

While some circuits have adopted *Basurto* in part, others have declined to decide whether to adopt the Ninth Circuit's rule from *Basurto* because the facts would not warrant relief in any event. *Id.* For its part, the Third Circuit has only cited *Basurto* one time—in a non-precedential opinion. *See id.*

###### c. Relevant Testimonies

Agent Simpson testified before the Grand Jury on October 16, 2018, regarding Trooper Marmol stopping the Ford Taurus on April 4, 2018. (*See* ECF No. 231 at 129:1–13). During that Grand Jury testimony, Agent Simpson stated the following: "Yes, Trooper Marmol interviews [Mr.] Terry and asks him about what was found in the hidden compartment, and he admits to those being his, the gun and the suspected cocaine." (Defendant's Exhibit A at 11:5–8; ECF No. 215 at 3). Later, Agent Simpson told the Grand Jury that Mr. Terry "accepted responsibility for the drugs and the gun." (Defendant's Exhibit A at 17:2–3; ECF No. 215 at 3).

Agent Simpson again testified before the Grand Jury on July 9, 2019. (ECF No. 231 at 137:16–18). During that testimony, Agent Simpson stated the following: "Yes, Trooper Marmol interviews [Mr.] Terry and asks him about what was found in the hidden compartment, and he

admits to those being his, the gun and the suspected cocaine." (Defendant's Exhibit E at 13:8–11; ECF No. 215 at 3). Further, Agent Simpson stated that Mr. Terry "admitted that the firearm and cocaine [were] his property." (Defendant's Exhibit E at 16:2–5; ECF No. 215 at 3).

For his part, Trooper Marmol testified at trial that after he arrested Mr. Terry, Mr. Terry stated that "he was responsible for the vehicle and that he borrowed the vehicle." (ECF No. 230 at 122:5–9). However, Trooper Marmol also testified that Mr. Terry did not say that he was taking responsibility for any drugs or a firearm. (*Id.* at 122:13–18). Further, Trooper Marmol stated that he did not remember telling Agent Simpson that Mr. Terry took responsibility for the hidden compartment, firearm, and drugs. (*Id.* at 122:19–21). Indeed, Trooper Marmol testified that Mr. Terry did not specifically take responsible for the hidden compartment, firearm, and drugs. (*Id.* at 123:14–17).

When Agent Simpson was asked at trial to explain his understanding of the statement that Mr. Terry gave to Trooper Marmol after his arrest, Agent Simpson testified that he understood Mr. Terry to be "taking ownership of everything found in the vehicle, to include the cocaine and the gun." (ECF No. 231 at 147:23–148:1). Agent Simpson had this understanding because: (1) Mr. Terry "advised Trooper Marmol that he would take responsibility for everything in the vehicle" and (2) the three kilograms of cocaine and the gun were found inside the vehicle. (*Id.* at 148:2–9).

### d. Analysis

In this case, this Court does not need to decide whether to adopt *Basurto* because even if that rule applied, the Court finds that Agent Simpson did not offer perjured testimony at either convening of the Grand Jury. Indeed, having examined the relevant testimonies above, the Court

agrees with the Government that Agent Simpson's testimonies could have perhaps been more precise, (ECF No. 254 at 11), but the Court cannot find that Agent Simpson perjured himself. *United States v. Rodgriguez*, 88 F. App'x 548, 548–49 (3d Cir. 2004) (affirming the District Court's denial of the motion to dismiss the indictment pursuant to *Basurto* where the District Court found that neither of the witnesses identified by the defendant perjured themselves before the Grand Jury).

With respect to Agent Simpson's testimony about the drugs and the gun in the hidden compartment, Trooper Marmol testified that Mr. Terry told him that he was responsible for the vehicle. (ECF No. 230 at 122:5–9). And Trooper Marmol testified that he found the approximately 2,995 grams of a mixture and substance containing a detectable amount of methamphetamine and cocaine and the gun *inside the same vehicle for which Mr. Terry took responsibility*. *See supra* Section IV.A.1. Therefore, the Court finds that Agent Simpson's Grand Jury testimonies that Mr. Terry took responsibility for the drugs and the gun constituted a reasonable deduction from the evidence that Agent Simpson had at his disposal. As a corollary, the Court finds that Agent Simpson's testimonies were not false, and they certainly were not *willfully* false. Accordingly, the Court holds that Agent Simpson did not offer perjured testimony regarding the drugs or the gun during either convening of the Grand Jury. *Cf. United States v. Jabateh*, 974 F.3d 281, 300 (3d Cir. 2020) (explaining that the elements of perjury in violation of 18 U.S.C. § 1621(1) are "1) willfully 2) ma[king] a false statement 3) under oath 4) before a tribunal or officer 5) about a material matter"); *Perjury*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The act or an instance of a person's deliberately making material false or misleading statements while under oath …").

Further, even if Agent Simpson had willfully testified falsely before the Grand Jury, the Court seriously doubts whether Mr. Terry would be entitled to the relief he now seeks. That is because the Court would be prone to find that the events at trial negated any constitutional error that occurred during either convening of the Grand Jury.

Indeed, in *Talamante v. Romero*, 620 F.2d 784, 789–91 (10th Cir. 1980), the Tenth Circuit held that perjured testimony before a grand jury was immaterial where: (1) the perjury was recanted at trial, (2) the individual whose location was relevant to the perjured testimony was exhaustively examined at trial, and (3) the jury found the defendant guilty after a full trial. *Id.* ("We consider the perjured testimony immaterial. The perjury was recanted at trial. [The individual whose location was relevant to the perjured testimony] was exhaustively examined. The record establishes that [the defendant's] conviction was not affected by the perjured testimony. Even if the perjured testimony had been brought to the attention of the grand jury, it seems highly unlikely, in view of the petit jury's later finding of guilt after a full trial, that the grand jury would have failed to indict based on probable cause. Such negates the inference of constitutional error.") (internal citation omitted). Similarly, here: (1) Agent Simpson explained, at trial, what Trooper Marmol did and did not write in his report, the nature of his Grand Jury testimony, and the basis for that testimony, (ECF No. 231 at 129–48); (2) Trooper Marmol fully explained, at trial, exactly what Mr. Terry said to him following the traffic stop, (ECF No. 230 at 122–23); and (3) the Government presented very strong evidence at trial that led the jury and the Court to find Mr. Terry guilty of the offenses at Counts I, II, III, and V, even after hearing Agent Simpson and Trooper Marmol explain exactly what Mr. Terry said following his arrest. *See supra* Section IV.A. Therefore, even if Agent Simpson had offered perjured testimony during either convening of the

Grand Jury, the Court would be prone to find that the events that occurred at trial negated the inference of any constitutional error. *Talamante*, 620 F.2d at 790–91.

Finally, the Court notes that Mr. Terry cites to a broad portion of Agent Simpson's testimony when arguing that he perjured himself before the Grand Jury. (ECF No. 245 at 2) (citing ECF No. 231 at 129–47). The Court has examined the entirety of Agent Simpson's testimony to which Mr. Terry cites, and the Court finds that all of that testimony: (1) was not false, (2) was not willfully false, (3) was not material, or (4) some combination of the foregoing.

Accordingly, the Court holds that Mr. Terry's request for relief based on Agent Simpson's testimonies before the Grand Jury is unavailing, and the Court will deny his Motions at ECF Nos. 226 and 245 to the extent that he seeks relief based on those testimonies.

### 2. Mr. Terry's Second Argument is Unavailing

#### a. The Parties' Arguments

In his second assignment of error, Mr. Terry argues that, in the Government's closing, it "improperly argued for the jury to consider Trooper Marmol and Agent Simpson's employment, occupation, and position in life as law enforcement officers[.]" (ECF No. 245 at 10) (citing ECF No. 232 at 118–19, 152–55). Mr. Terry contends that, as a result of these statements by the Government, the "jury's verdict of guilt in Counts [I] and [II], and the determination that [Mr. Terry] knew or was involved in a conspiracy was irrational and based on suspicion or conjecture and/or bias and/or ill will against [Mr. Terry] and a propensity to believe law enforcement[.]" (ECF No. 226 at 5).

In response, the Government cites Third Circuit precedent indicating that "'in order for vouching to be improper, the prosecutor's assurance of a witness's credibility must be based on

-36-

99

either the prosecutor's personal knowledge, or other information not contained within the record.'" (ECF No. 254 at 30) (quoting *United States v. Weatherly*, 525 F.3d 265, 271 (3d Cir. 2008) (citation omitted)). The Government further notes that in *Weatherly*, the Third Circuit "found that the statement of the prosecutor was proper 'because it was a reasonable response to allegations of perjury' by the Defendant's attorney.'" (*Id.*) (citing *Weatherly*, 525 F.3d at 272). Therefore, the Government asserts that it did not engage in improper vouching because its "remarks during closing argument were based on facts entered into evidence and were furthermore proper and justified because [Mr. Terry] claimed that the officers and agents involved in the case had lied." (*Id.* at 31). Finally, the Government contends that even if it did engage in improper vouching, that vouching was harmless. (*Id.*).

In Mr. Terry's Reply, he again argues that the Government "inappropriately used its office to defend the credibility of government witnesses." (ECF No. 259 at 17). Further, Mr. Terry asserts that the "Government's defense that [he] opened the door fails. The 'Invited [R]esponse' doctrine doesn't apply." (*Id.*).

b.      Legal Standard

As the "Supreme Court explained in *United States v. Young*, 'a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.'" *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting 470 U.S. 1, 11 (1985)). With "respect to improper vouching, two criteria must be met: '(1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance [must be] based on either the prosecutor's personal knowledge,

or other information not contained in the record.'" *Id.* (quoting *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998)).

When a defendant does not object to allegedly improper vouching during trial, the Third Circuit reviews such a claim under the plain error standard. *Id.* at 512–13.[10] Under plain error review, courts may grant relief if: (1) an error was committed, (2) that error was plain, and (3) the error affected substantial rights. *Id.* at 511. An error is a "'deviation from a legal rule.'" *Id.* (quoting *United States v. Russell*, 134 F.3d 171, 180 (3d Cir. 1998)). It "is 'plain' when it is 'clear under current law.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). And "it affects substantial rights when it is prejudicial, i.e., it affects the outcome of the district court proceedings." *Id.* (internal quotation marks and citation omitted). "Even if these requirements are satisfied, the court should only exercise discretion to grant relief in those circumstances in which a miscarriage of justice would otherwise result." *Id.* (internal quotation marks and citation omitted).

### c.     Analysis

The Court finds that Mr. Terry's argument on this issue is unavailing for two reasons.

First, the statements that Mr. Terry references from the prosecutor's closing argument were based on evidence in the record and were therefore proper. Indeed, Mr. Terry's argument on this issue centers on the following two statements made by the prosecutor during his closing argument: (1) "The judge will instruct you on the factors that you're to consider when determining a witness's credibility; but, broadly speaking, your question is: Do I believe Trooper Marmol, a nine-year member of the Pennsylvania [Safe Highway Initiative through Effective Law

---

[10] Mr. Terry does not assert that he objected to the vouching at trial, (ECF Nos. 226, 245, 259), and the Court is not aware of him having done so.

Enforcement Detection ("SHIELD")] Unit? Or do I believe [Mr.] Terry?" and (2) "[I]f you have doubts that these [exhibits] were something that was created out of full cloth by Agent Simpson for the specific purpose of incriminating [Mr.] Terry, Agent Simpson who's been with the FBI for over ten years," who had "stations in Newark prior to coming to Johnstown, if you believe that Agent Simpson would risk his entire career to copy, paste, edit PDF documents and create falsified evidence, then, by all means, compare it to the original." (ECF No. 245 at 10) (citing ECF No. 232 at 118–19, 152–55). But Trooper Marmol testified that he was a State Police Officer who had been a member of the SHIELD unit for almost six years as of the trial in this matter.[11] (ECF No. 230 at 36–37). And Agent Simpson testified that: (1) he had been a member of the FBI for approximately fourteen years as of the trial in this matter and (2) he had previously been assigned to the FBI's office in Newark. (ECF No. 231 at 6–8). Therefore, the Court finds that the prosecutor did not engage in improper vouching in this case because his comments were based on evidence in the record. *Weatherly*, 525 F.3d at 271–72 (holding that the "statements by the prosecutor in this case were proper because they were based on evidence in the record" and noting that "the average juror could easily infer that a police officer who conspired with another officer to deliberately fabricate evidence and perjured himself in open court while testifying under oath in an official capacity would risk at least *some* sort of disciplinary action.") (emphasis in original).

Second, even if the prosecutor had engaged in improper vouching, the Court would still find that that vouching did not lead to a "miscarriage of justice" requiring reversal because of: (1) this Court's jury instructions, (2) the strength of the Government's evidence, and (3) the particular

---

[11] The Court finds that the prosecutor's mistaken comment that Trooper Marmol was a member of the SHIELD unit for nine years rather than six years is immaterial.

nature of the prosecutor's comments. *Harris*, 471 F.3d at 512–13. Indeed, in this case, the Court "gave clear instructions to the jury regarding the evidentiary value of statements by lawyers, the jury's exclusive role in making determinations of credibility, and the weight of [law enforcement] testimony relative to that of other evidence." *Id.* at 513; (ECF No. 232 at 163–64, 165, 172–73). Further, as the Court noted above, *see supra* Section IV.A, the Government's evidence in this case was very strong. Finally, the prosecutor's comments regarding Trooper Marmol and Agent Simpson's positions and experience were isolated and "made in response to [Mr. Terry's] allegations that" certain of their assertions were not true. *Harris*, 471 F.3d at 512–13; (ECF No. 232 at 75–76). Therefore, even if the prosecutor had engaged in improper vouching, the Court would find that his comments did not constitute "the kind of miscarriage of justice that would require reversal." *Harris*, 471 F.3d at 513 (internal quotation marks and citation omitted).

Accordingly, the Court holds that Mr. Terry's second assignment of error is unavailing and denies his Motions at ECF Nos. 226 and 245 to the extent that he seeks relief based on that alleged error.

### 3. Mr. Terry's Third Argument is Unavailing

#### a. The Parties' Arguments

Mr. Terry's third argument is that his rights to due process and a fair trial were violated when the prosecutor stated, in his closing, that the "jury could view and inspect the Government's [E]xhibits 22 [and] 24–26[,] that were discs entered into evidence over [Mr. Terry's] objections limited to chain of custody purposes." (ECF No. 226 at 5). Indeed, Mr. Terry contends that the Court precluded the jury from viewing these discs, and he was prejudiced by the prosecutor stating that the jury could view them. (ECF No. 245 at 5–6).

-40-

103

In response, the Government asserts that Mr. Terry did not object to these statements during trial, meaning that this issue is analyzed under plain error review. (ECF No. 254 at 18). The Government argues that the Court "did not err in allowing the [prosecutor's] statement in closing" because Mr. Terry "'opened the door' to the jury's consideration of the contents of the full extractions and reports." (*Id.* at 19). Further, the Government contends that even if the Court did err in allowing those statements, that error was not plain. (*Id.*).

In his Reply, Mr. Terry asserts that the Government's error "negatively affected the outcome of the trial, as it bolstered the authenticity and credibility by asserting verification could be conducted knowing it could not have been. Prejudice resulted even if the jury did not request to see the exhibits when the power of the government told them they could." (ECF No. 259 at 10). Further, Mr. Terry argues that prosecutorial misconduct, "including improper statements made during a closing argument, merits reversal under the plain error standard when the record reveals 'egregious error or a manifest miscarriage of justice.'" (*Id.* at 11) (quoting *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003)). And Mr. Terry argues that there was an "egregious error or a manifest miscarriage of justice" in this case. (*Id.*).

b.    **Legal Standard**

The Fifth Amendment's "Due Process Clause secures a defendant's right to a fair trial." *Gov't of the V.I. v. Mills*, 821 F.3d 448, 456 (3d Cir. 2016). When "confronted with a claim that a prosecutor's remarks violated this right, [courts] first determine whether those remarks constituted misconduct." *Id.* Courts then determine "whether that misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process, taking into account the entire proceeding." *Id.* (internal quotation marks and citation omitted). In conducting this

-41-

inquiry, courts consider "'the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant.'" *United States v. Welshans*, 892 F.3d 566, 574 (3d Cir. 2018) (quoting *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001)). "Mere misconduct is not grounds for a reversal." *United States v. Mack*, 629 F. App'x 443, 445–46 (3d Cir. 2015) (finding that, even if the Government had committed misconduct, that misconduct did not unfairly prejudice the Defendant where the District Court instructed the jury that statements of attorneys are not evidence and the weight of the evidence against the Defendant was overwhelming).

Further, where, as in this case,[12] a defendant "did not object to prosecutorial misconduct at trial, [courts] review for plain error." *Mills*, 821 F.3d at 456. As the Court noted above, under this standard of review, "'before [a] court can correct an error not raised at trial, there must be (1) error (2) that is plain and (3) that affects substantial rights.'" *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)). "In the ordinary case, an error affects substantial rights when it affected the outcome of the [district] court proceedings." *Id.* at 456–57 (internal quotation marks and citation omitted). If these "conditions are met, [courts] may exercise … discretion to remedy the error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 457 (internal quotation marks and citation omitted).

c.      **Relevant Statements by the Court and the Prosecutor**

---

[12] Mr. Terry offers no argument that he objected to the Government's statement(s) regarding Exhibits 22 and 24–26 at trial, (ECF Nos. 226, 245, 259), and the Court is unaware of him having lodged such an objection at trial. Further, Mr. Terry argues that the Government's statement(s) during closing argument constituted plain error, (ECF No. 259 at 11), indicating his implicit agreement that this issue is governed by the plain error standard at this juncture. Therefore, the Court finds that plain error review applies to this assignment of error.

-42-

105

As the Court noted earlier, Mr. Terry's argument on this issue centers around the Government's Exhibits 22 and 24–26. (ECF No. 226 at 5; ECF No. 245 at 5–6).

With respect to the Government's Exhibits 22 and 24–26, the Court stated that it would admit those Exhibits for the purpose of showing chain of custody, and the Court further stated that they would not be displayed to the jury, at least as of the time that it made its ruling on their admissibility. (ECF No. 230 at 178–83, 193–97). Indeed, in response to the Government's argument that Mr. Terry was asserting that the Government had tampered with evidence in Exhibits 22 and 24–26, the Court stated the following:

> At this time we would not permit [the Exhibits] to go out to the jury, and at this time we would not permit it to be published to the jury, subject to later developments which are perhaps fair or raise issues that should be in some form published to the jury; but that's—at this point in time we don't need to do that.

(*Id.* at 196–97).

In his closing argument, and apparently with reference to the Government's Exhibits 22 and 24–26 (and potentially additional exhibits), the prosecutor stated that:

> If you so choose, if you have any doubts about the authenticity of the items included in the presentation by the Government, you can compare them directly to the information from the source. So I tell you don't be distracted by these claims of manufactured evidence. You have the ability to compare and see for yourself if you so choose.

(ECF No. 232 at 121–22).

Finally, the prosecutor stated that he believed the jury would, and maybe they should "have an opportunity to compare those [E]xhibits if you have questions about them." (*Id.* at 154:12–19).

### d.     Analysis

-43-

**106**

Here, the Court finds that the prosecutor's statements regarding the jury viewing Government's Exhibits 22 and 24–26 likely constituted minor misconduct. Although the Government argues that Mr. Terry raised the issue of tampering, meaning that the prosecutor's statements were simply responses to Mr. Terry's assertions, the Government does not point to a ruling by the Court that the jury could in fact view Government's Exhibits 22 and 24–26 (or portions thereof). (ECF No. 254). In the absence of such a ruling, the prosecutor committed a misstep by stating that the jury could view those Exhibits. *Cf. Kinard v. Palakovich*, No. 05-CV-2804, 2006 WL 3366168, at *18 (E.D. Pa. Nov. 16, 2018) (calling a prosecutor's comment inviting the jury to draw an inference that exceeded the evidence in the record "inartful[,]" but also finding that that comment did not violate due process).

However, the Court finds that this misconduct did not render Mr. Terry's convictions a denial of due process. Indeed, the prosecutor's conduct in this case was not at all severe because: (1) it consisted of two quite brief statements, *see supra* Section IV.B.3.c; (2) the Court did indicate a willingness to reconsider the issue of letting the jury view portions of Exhibits 22 and 24–26 in the event that Mr. Terry continued to question whether they were altered, *see id.*; and (3) Mr. Terry did challenge the truthfulness of the law enforcement officer(s) working with Exhibits 22 and 24–26. (*See* ECF No. 232 at 75–76). Further, the Court instructed the jury that the statements of lawyers are not evidence. (*Id.* at 163:21–164:1); *Welshans*, 892 F.3d at 577 (noting that juries are presumed to follow their instructions). And the evidence against Mr. Terry was very strong. *See supra* Section IV.A. Finally, the jury did not request to see Government's Exhibit 22, 24, 25, or 26. (ECF No. 232 at 198–213). Therefore, the Court finds that the potentially minor prosecutorial misconduct in this case does not warrant a new trial—the prosecutor's statements did not unfairly

-44-

prejudice Mr. Terry, and they likewise did not make his convictions a denial of due process. *Mack,* 629 F. App'x at 446. As a corollary, the Court finds that the prosecutor's minor misstep did not affect Mr. Terry's substantial rights. *See Mills,* 821 F.3d 460–65.

Accordingly, the Court holds that Mr. Terry's third assignment of error is unavailing and denies his Motions at ECF Nos. 226 and 245 insofar as he seeks relief based on that assignment of error.

### 4. Mr. Terry's Fourth Assignment of Error is Unavailing

#### a. The Parties' Arguments

In his fourth assignment of error, Mr. Terry argues that:

> [H]e was denied due process and a fair trial, because there was juror bias, misconduct and/or collusion that contributed to his guilty verdict, in that on August 26, 2022, hours after the jurors were dismissed, [his] family observed three jurors approaching the courthouse with flowers, but upon seeing the family, the jurors continued to walk past the courthouse.

(ECF No. 226 at 7).

In response, the Government asserts that the "legal standard for obtaining a hearing on a claim of juror misconduct is a high one: 'while the evidence of juror misconduct need not be literally incontrovertible to warrant a hearing, it still must constitute clear, strong, and substantial evidence of a specific, nonspeculative impropriety.'" (ECF No. 254 at 33) (quoting *United States v. Noel,* 905 F.3d 258, 274 (3d Cir. 2018)). The Government contends that that standard is not met in this case. (*Id.*).

In his Reply, Mr. Terry argues that it is:

> [C]lear, strong and substantive evidence when hours after the jurors were dismissed, while [Mr. Terry] awaited the bench trial verdict, three different jurors with no identified connection walked together with flowers toward the

-45-

108

courthouse, as though they are going to reward someone associated with the court. Yet, when they observe [Mr. Terry's] family outside of the court building, they continue together past the court building.

(ECF No. 259 at 18). Mr. Terry asserts that this evidence requires a hearing. (*Id.*) (citing *Waldorf v. Shuta*, 3 F.3d 705, 710–13 (3d Cir. 1993)).

### b.     Analysis

To obtain a hearing relative to a claim of juror misconduct, a movant must offer allegations that "rise to the level of clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *United States v. Nucera*, 67 F.4th 146, 162–63 (3d Cir. 2023) (internal quotation marks and citation omitted); *see also United States v. Gilsenan*, 949 F.2d 90, 97 (3d Cir. 1991) ("We are always reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences. As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting jury room deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.") (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (internal quotation marks and citation omitted)).

The Court finds that Mr. Terry's allegations do not warrant a hearing in this case. Indeed, Mr. Terry's assertions on this issue constitute no more than threadbare speculation that there was juror bias. *United States v. Claxton*, 766 F.3d 280, 300–01 (3d Cir. 2014) (concluding that the district court did not abuse its discretion in denying the defendant's motion for a new trial and declining to hold an evidentiary hearing where the defendant offered "speculation" that juror misconduct occurred). Mr. Terry's assertion that the jurors were bringing flowers to someone at the courthouse is wholly unsubstantiated. (ECF Nos. 226, 245, 259). The jurors could have just as

-46-

109

easily been walking past the courthouse with the flowers as walking to the courthouse with the flowers.

Further, as a general matter, the Court conducted an extensive voir dire of all of the prospective jurors in this case, and the Court watched the jurors carefully during trial. Having witnessed the jury's conduct in this matter, the Court has every confidence that the jurors who returned the guilty verdict on Counts I and II were attentive, appropriately applied the law, and acted without bias.

Therefore, given the highly speculative nature of Mr. Terry's assertions of juror misconduct, the Court denies his request for a hearing, as well as his Motions at ECF Nos. 226 and 245 to the extent that he seeks relief on the basis of that alleged juror misconduct.

### 5. Mr. Terry's Fifth Assignment of Error is Unavailing

#### a. The Parties' Arguments

In his fifth assignment of error, Mr. Terry contends that while Agent Simpson was admitted as an expert in drug trafficking and coded language, he was "permitted to render opinions outside of the scope of his expertise and within the province of the factfinder, including but not limited to:" (1) the identity of cellphone users and subscribers, (2) the identity of a person sending a text, (3) that the photographs containing cocaine were taken with an iPhone, (4) an opinion that Mr. Terry used the iPhone, and (5) an opinion on the metadata on the Government's exhibits. (ECF No. 245 at 6) (citing ECF No. 230 at 6–7, 15; ECF No. 231 at 19, 32–33, 45–46, 49–50, 73, 75–76, 78, 150). Indeed, Mr. Terry argues that Agent Simpson rendered impermissible expert testimony because he entered the province of the trier of fact. (*Id.* at 14). Specifically, he asserts that an "expert may not render an opinion about either intent or mental state or on the conclusion

-47-

110

of an element charged or a defense." (*Id.*) (citing *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988)).

In response, the Government contends that Agent Simpson's testimony at trial fell within his areas of expertise in "'drug trafficking and coded language.'" (ECF No. 254 at 26) (quoting ECF No. 231 at 19). Further, the Government argues that even if some portion of Agent Simpson's testimony was improper lay witness opinion testimony, the Court's error in permitting that testimony was harmless in light of the other evidence presented at trial. (*Id.* at 26–27).

In his Reply, Mr. Terry asserts that he "contemporaneously objected to Agent Simpson's testimony" and that there is a "reasonable probability that the verdicts rendered in this case were influenced by Agent Simpson's improper testimony resulting in a prejudicial conviction." (ECF No. 259 at 12). Further, Mr. Terry contends that Agent Simpson's testimony that Mr. Terry used the iPhone was improper lay opinion testimony because it merely told the jury what result to reach. (*Id.* at 13–14).

### b.    Legal Standard

It is well-established that "a district judge has a 'general gatekeeping obligation' with respect to all testimony based on specialized knowledge of some form." *United States v. Williams*, 974 F.3d 320, 358 (3d Cir. 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). Under Federal Rule of Evidence 702, a district judge must ensure that "such testimony is both reliable and relevant, including under the standard laid down in Rule 403." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594–95 (1993)). Further, under Federal Rule of Evidence 704(a), an opinion by an individual offering expert testimony "is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704(a). However, in a criminal case, a district judge

-48-

111

"must … ensure that 'an expert witness [does] not state an opinion about whether [a] defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.'" *Williams*, 974 F.3d at 358 (quoting FED. R. EVID. 704(b)). Finally, the "permissible scope of expert testimony is quite broad, and District Courts are vested with broad discretion in making admissibility determinations." *Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 423 (3d Cir. 2006).

The standard of review for objected-to evidentiary rulings is abuse of discretion. *United States v. Wheeler*, No. 16-3780, 2021 WL 4129731, at *5 (3d Cir. Sept. 10, 2021).[13] An "abuse of discretion occurs only where the district court's decision is arbitrary, fanciful, or clearly unreasonable—in short, where no reasonable person would adopt the district court's view." *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (internal quotation marks and citation omitted). However, "even erroneous rulings only require a new trial if the ruling affects a 'substantial right of the party[.]'" *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011) (quoting FED. R. EVID. 103(a)). An "error in an evidentiary ruling is harmless error when it is highly probable that the error did not affect the result." *Id.* (internal quotation marks and citation omitted). Indeed, errors are harmless when a reviewing court can "have a sure conviction that the error did not prejudice the defendant," and the Third Circuit will not reverse an evidentiary ruling under harmless error review "when the other evidence in the record of the defendant's guilt is overwhelming." *United States v. Evdokimow*, 726 F. App'x 889, 896 (3d Cir. 2018) (internal quotation marks and citations omitted). Finally, when a witness offers improper testimony

---

[13] The Court notes that Mr. Terry did object to Agent Simpson's testimony on at least certain of the occasions that are relevant to this assignment of error. By way of example, he objected to "Agent Simpson interpreting the metadata" from the iPhone. (ECF No. 231 at 75:20–23).

regarding evidence in the record, but when the jury can review that evidence and would all but certainly reach the same conclusion as the witness, the witness's improper testimony constitutes harmless error. *Wheeler*, 2021 WL 4129731, at *7; *cf. United States v. Fattah*, 914 F.3d 112, 177 (3d Cir. 2019) (holding that it was harmless error for the district court to allow the prosecutor to make a certain inquiry when there was other evidence in the record that made it "highly probable" that the jury would have reached the same result even without the improper inquiry).

c.     **Analysis**

In this case, the Court permitted Agent Simpson to give opinion testimony with regard to the field of drug trafficking and drug trafficking coded language. (ECF No. 231 at 19:12–19). Mr. Terry did not object to Agent Simpson offering such testimony. (*Id.* at 19:5–11). Further, as the Government laid the foundation for Agent Simpson to give expert testimony in the field of drug trafficking and drug trafficking coded language, the prosecutor asked Agent Simpson about his experience in "cases involving the analysis of communications of drug traffickers that are later found on [a] cellular phone[.]" (*Id.* at 17:5–9). In response, Agent Simpson testified to the following:

> [S]o the buildup for a lot of these wiretap investigations requires a lot of historical background. So a lot of times we'll end up arresting lower level distributors underneath, you know, the main targets that we're looking to investigate.
>
> And then we'll seize their phones, we'll get search warrants for their phones, and then we'll go through their phones to understand, you know, who they're talking to, we'll start learning their language, how they're texting their street level distributors or users, so we'll learn how they, you know, communicate the narcotic, how they communicate the amounts. We'll also see some text communications with their, you know, suppliers or higher level distributors.

In addition, we'll look for images on those phones and videos to try and—you know, sometimes they'll post pictures of the actual drugs that they are, you know, distributing.

(*Id.* at 17:10–25).[14]

Although the Court does not presently enumerate each line of testimony by Agent Simpson to which Mr. Terry objects, the Court has reviewed every such portion of Agent Simpson's testimony, and the Court finds that the entirety of that testimony fell squarely within the permissible scope of Agent Simpson's expert testimony in the fields of drug trafficking and drug trafficking coded language.  (ECF No. 230 at 6–7, 15; ECF No. 231 at 19, 32–33, 45–46, 49–50, 73, 75–76, 78, 150); *Hill*, 435 F.3d at 423 ("[The] permissible scope of expert testimony is quite broad, and District Courts are vested with broad discretion in making admissibility determinations."). Further, the Court finds that none of Agent Simpson's testimony violated Rule 704(b) because Agent Simpson did not offer an opinion regarding "whether [Mr. Terry] did or did not have a mental state or condition that constitutes an element of the crime[s] charged or of a defense." (ECF No. 230 at 6–7, 15; ECF No. 231 at 19, 32–33, 45–46, 49–50, 73, 75–76, 78, 150); FED. R. EVID. 704(b). In short, the Court found Agent Simpson's testimony at trial to fall squarely within the scope of the testimony that he was qualified to offer under the Federal Rules of Evidence, and the Court adheres to that finding at this time.

---

[14] Agent Simpson also testified at trial that he had become familiar "with looking at cellphone extraction and just gleaning basic information, meaning did this communication come to the cellphone or did it come from the cellphone, basic information like that[.]" (ECF No. 231 at 46:4–13). Further, the Court overruled an objection by Mr. Terry regarding Agent Simpson testifying about certain metadata from cellphones. (*Id.* at 46:18–47:1) ("I'll permit the question based on the fact that it's not expert testimony regarding metadata, but just basically being able to glean whether something is sent or received[.]").

-51-

114

Further, even if the Court had erred in admitting certain portions of Agent Simpson's testimony, the Court would decline to grant Mr. Terry's request for a new trial because the Court finds it all but certain that the jury would reach the same conclusions that Agent Simpson reached upon reviewing the evidence that he referenced. *Wheeler*, 2021 WL 4129731, at *7. Indeed, by way of example, the jury could review the photograph of Mr. Terry's identification card, which was sent from the iPhone, as well as the other evidence that the Government offered tending to show Mr. Terry's ownership, possession, and use of that phone. *See supra* Section IV.A.1. Upon doing so, the Court finds it highly probable that the jury would conclude that Mr. Terry used and possessed the iPhone. The Court finds it highly probable that the jury would then take that evidence, couple it with the photograph of the cocaine on the iPhone and the testimony of Mr. Dillard, as well as the rest of the Government's evidence, and find Mr. Terry guilty of the offenses at Counts I and II beyond a reasonable doubt, all without the aid of Agent Simpson's testimony on these issues.[15] Likewise, even in the absence of this testimony by Agent Simpson, the Court would deem Mr. Terry guilty of the offenses at Counts III and V beyond a reasonable doubt. Therefore, the Court finds that it is highly probable that any error that it made in permitting any portion(s) of Agent Simpson's testimony did not affect the result of the trial in this matter.

Accordingly, the Court finds Mr. Terry's fifth assignment of error unavailing, and the Court denies his Motions at ECF Nos. 226 and 245 to the extent that he seeks relief based on that assignment of error.

### 6. Mr. Terry's Sixth Argument is Unavailing

---

[15] The Court also notes that Mr. Terry admitted that the Samsung Galaxy found in the Ford Taurus on April 4, 2018, was his. (ECF No. 232 at 15:14–18, 21:6–9).

### a. The Parties' Arguments

In his sixth assignment of error, Mr. Terry contends that the Government violated Federal Rule of Evidence 404(b) because it improperly argued propensity when it referenced a "hidden compartment in another vehicle that was not of the same triggers, location, or complexity" as the hidden compartment in the Ford Taurus. (ECF No. 245 at 9) (citing ECF No. 232 at 9–46, 48–49, 63–82, 101–09). Relatedly, Mr. Terry asserts that in its closing, the Government violated Rule 404(b) when it "improperly argued the jury should consider [Mr. Terry's] propensity for committing the offenses based on Government Exhibits 31 through 34." (*Id.* at 10–11) (citing ECF No. 230 at 161–62; ECF No. 231 at 70–71; ECF No. 232 at 126–27).

In response, the Government notes that Mr. Terry's contention on this ground is based on "three portions of the [trial] transcript related to a text message conversation found on the iPhone wherein the user of the iPhone, whom the Government argued is [Mr.] Terry, indicated his knowledge of the storage of a firearm in a hidden compartment in a vehicle." (ECF No. 254 at 32). The Government asserts that it presented this information "through testimony and referenced it in its closing argument for a permissible purpose—to prove Mr. Terry's knowledge of vehicle traps, and the identity of the owner of the firearm found in the vehicle trap in this case (and thus, the possessor of the drugs found there, as well)." (*Id.*). Finally, the Government argues that the jury in this case was not made aware of the fact that Mr. Terry has a prior felony conviction, meaning that his possession of the firearm was not itself a "bad act." (*Id.* at 32 n.17).

In his Reply, Mr. Terry again contends that the Government improperly argued Rule 404(b) "evidence of [his] character and propensity to carry a firearm, sell drugs, and to use vehicles with a trap." (ECF No. 259 at 17).

-53-

116

### b.    Legal Standard

Federal Rule of Evidence 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). However, evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). "'Rule 404(b) is a rule of general exclusion … That is, Rule 404(b) directs that evidence of prior bad acts be excluded—*unless* the proponent can demonstrate that the evidence is admissible for a non-propensity purpose.'" *United States v. Wright*, 534 F. Supp. 3d 384, 399 (M.D. Pa. 2021) (quoting *United States v. Repak*, 852 F.3d 230, 240 (3d Cir. 2017) (emphasis in original)). The threshold inquiry "'a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character.'" *Id.* at 400 (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)).

Rule 404(b) "carries 'no presumption of admissibility.'" *Id.* (quoting *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014)). Admissibility of other-acts evidence under Rule 404(b) therefore requires the proponent to show that the evidence is: "(1) offered for a proper purpose under Rule 404(b)(2); (2) relevant to that purpose; (3) sufficiently probative under the Rule 403 balancing requirement; and (4) accompanied by a limiting instruction, if requested." *United States v. Davis*, 726 F.3d 434, 441 (3d Cir. 2013). All "this really means is that such evidence must have a nonpropensity purpose and satisfy the same relevancy requirements as any other evidence." *Id.*

A "district court should apply 'care and precision … in ruling on the admission of prior act evidence for a non-propensity purpose' and, if admitting the evidence, must 'articulate

-54-

117

reasons why the evidence also goes to show something other than character … The reasoning should be detailed and on the record[.]'" *Wright*, 534 F. Supp. 3d at 400 (quoting *Caldwell*, 760 F.3d at 277)).

With respect to the first step in the inquiry (i.e., whether the evidence is offered for a proper purpose under Rule 404(b)(2)), the Court must determine "'whether the evidence is probative of a material issue other than character.'" *United States v. Davis*, No. 2:14-CR-271, 2016 WL 3406056, at *3 (W.D. Pa. June 21, 2016) (quoting *United States v. Boone*, 279 F.3d 163, 187 (3d Cir. 2002)). To determine "whether an 'identified purpose is at issue, courts should consider the material facts the government must prove to obtain a conviction.'" *Id.* (quoting *Caldwell*, 760 F.3d at 276). Indeed, the "specific purpose must be 'of consequence in determining the action.'" *Id.* (quoting *Campbell*, 760 F.3d at 276).

At the second step of the analysis, "the government must 'explain how the evidence is relevant' to, or how it tends to establish, the identified non-propensity purpose.'" *Id.* (quoting *Caldwell*, 760 F.3d at 276). To "be relevant, proffered evidence must fit into a 'chain of inferences— a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference.'" *Repak*, 852 F.3d at 243 (quoting *Davis*, 726 F.3d at 442). "'[T]his chain [must] be articulated with careful precision because, even when a non-propensity purpose is at issue in a case, the evidence offered may be completely irrelevant to that purpose, or relevant only in an impermissible way.'" *Id.* (quoting *Caldwell*, 760 F.3d at 281).

Finally, as the Court has previously noted, "as with other non-constitutional trial errors, the improper admission of evidence does not require reversing a conviction it if is 'highly probable that the error did not contribute to the judgment.'" *United States v. Cross*, 308 F.3d 308,

-55-

118

326 (3d Cir. 2002) (quoting *United States v. Tyler*, 281 F.3d 84, 101 n. 26 (3d Cir. 2002)). Under the "highly probable" standard, there is no "need to disprove every reasonable possibility of prejudice." *Id.* at 326–27 (internal quotation marks and citation omitted) (finding harmless error where the cumulative, inadmissible evidence may have prejudiced the defendants, but where the Third Circuit could "confidently say that it [was] 'highly probable' that the superfluous evidence made no difference in the ultimate verdict of the jury" given the overwhelming evidence in the case, among other factors).

### c.     Analysis

Mr. Terry's argument on this issue centers on two categories of evidence that the Government offered during trial. (ECF No. 245 at 9–11).[16] The first category of evidence is comprised of four photographs that were captured by the iPhone and that were addressed in this Court's August 19, 2022, Memorandum Order. (ECF No. 205 at 5–8; ECF No. 207 at 13–17; ECF No. 232 at 126–27; ECF No. 245 at 10–11). In that Memorandum Order, the Court denied Mr. Terry's Motion to exclude these four photographs, finding that they were admissible at trial under Federal Rule of Evidence 404(b). (ECF No. 207 at 13–17). Mr. Terry has provided the Court with no reason to depart from its prior finding of admissibility, (ECF Nos. 226, 245, 259), and the Court is not aware of such a reason. Further, having examined the Government's discussion of those four photographs in the portion of the trial transcript to which Mr. Terry cites, (ECF No. 232 at 126–27), the Court finds that the Government's argument at trial regarding the four photographs

---

[16] The Court has examined each portion of the transcript that Mr. Terry cites relative to his sixth assignment of error, (ECF Nos. 245, 259), and the Court finds that the only two potentially relevant categories of prior act evidence contained within those portions of the transcript are the two categories that the Court outlines in the text above. Therefore, the Court confines its analysis on this issue to those two categories of evidence.

-56-

119

was appropriate. Therefore, with respect to this first category of evidence, the Court finds Mr. Terry's sixth assignment of error unavailing.

The second category of evidence that Mr. Terry references is the Government's Exhibit 32AA. (Government's Exhibit 32AA; ECF No. 215 at 3; ECF No. 245 at 10–11). That Exhibit shows a text message sent from the iPhone on March 2, 2018, reading: "If you take the thing off the radio where I put my pistol it would come on[.]". (Government's Exhibit 32AA). During trial, Agent Simpson noted that Trooper Marmol found a firearm in the Ford Taurus on April 4, 2018, and he further noted that, from his own law enforcement experience, "you can remove [radios] and store things behind those radios. They can be set up as traps." (ECF No. 231 at 71:1–7). The prosecutor also referenced this text message during his cross examination of Mr. Terry. (ECF No. 232 at 72:24–73:2). Finally, the prosecutor referenced this text message during his closing argument:

> Members of the jury, what do you see in this conversation? Well, what you see is that the user of the iPhone, whom we've established as [Mr.] Terry, indicates that he's familiar with vehicle traps, "If you take the thing off the radio," and that he has access to and ownership of a pistol, "where I put my pistol it would come on." Kind of like the pistol that was found in the hidden trap in the Ford Taurus.

(*Id.* at 126:8–16).

With respect to this second category of evidence, Mr. Terry orally moved for its exclusion during trial. (ECF No. 224 at 1). For the reasons set forth in the Court's August 30, 2022, Memorandum Order, the Court denied Mr. Terry's request and deemed this evidence admissible under Rule 404(b). (*Id.* at 3–5). Mr. Terry offers no reason why the Court should depart from its prior holding on this issue, (ECF Nos. 226, 245, 259), and the Court is not aware of such a reason.[17]

---

[17] Indeed, the Court briefly outlines why this evidence is admissible to show: (1) Mr. Terry's knowledge of vehicle traps, (2) the identity of the owner of the firearm found in the hidden compartment in the Ford Taurus, and (3) the fact that Mr. Terry had the opportunity to be the individual who possessed that firearm.

_____

At the outset, the Court notes that the issue of who possessed the items in the hidden compartment in the Ford Taurus was the central issue in this case, and resolution of that issue directly informs whether Mr. Terry was guilty of the offenses with which he was charged because his knowing possession of the item(s) in the hidden compartment is a recurring element of those offenses.

With that reality in view, the Court first reaffirms its earlier finding that Mr. Terry's prior text message does indicate his knowledge of vehicle traps generally, which is a permissible purpose for prior act evidence under Rule 404(b), and his knowledge of vehicle traps generally is relevant to the highly material issue of whether he knowingly possessed and controlled the items in the hidden compartment in the Ford Taurus. FED. R. EVID. 404(b)(2). Second, Mr. Terry's general knowledge of vehicle traps does make it more likely that Mr. Terry knew of and used the hidden compartment in the Ford Taurus, which, in turn, makes it more likely that Mr. Terry used and possessed the drugs and the gun therein. Indeed, the Court has no indication that most members of the general public know much about vehicle traps. Mr. Terry's knowledge on this score therefore puts him in a limited category of people who could be aware of and use such traps, making it more likely that he used the one in the Ford Taurus, regardless of whether the vehicle trap Mr. Terry referenced in his text message was completely identical to the one in the Ford Taurus. *Davis*, 726 F.3d at 443 (noting that evidence of past drug distribution is relevant to prove knowledge of a different drug in a later possession trial). Third, this evidence has fairly high probative value insofar as it makes it more likely that Mr. Terry knowingly possessed the items in the hidden compartment in the Ford Taurus, which goes directly to whether he committed all (or some) of the offenses at Counts I, II, III, and V. Further, while this evidence does indicate that Mr. Terry engaged in an unorthodox activity and is therefore potentially unfairly prejudicial, that risk of unfair prejudice does not substantially outweigh the fairly high probative value of this evidence. Accordingly, this evidence was admissible under Rule 403, especially because the Court gave a jury instruction regarding the proper use of this evidence at trial. (ECF No. 232 at 175–76).

Turning to Mr. Terry's identity as the individual possessing the items in the hidden compartment of the Ford Taurus, the Court reaffirms its earlier finding that the fact that Mr. Terry possessed a gun in a hidden compartment in a vehicle one month before the traffic stop is relevant to showing the identity of the individual who possessed the gun and the drugs in the hidden compartment in the Ford Taurus, which is a permissible use for this evidence under Rule 404(b) and relates directly to the central issue in this case. FED. R. EVID. 404(b)(2). Second, the fact that Mr. Terry knowingly possessed a gun in a hidden compartment in a vehicle approximately one month before the traffic stop is relevant because it makes it more likely that he knew of the gun in the hidden compartment in the Ford Taurus and that *he* was the individual who possessed that gun. Third, the probative value of this evidence is somewhat high because it has a tendency to make it more likely that Mr. Terry was responsible for the items in the hidden compartment of the Ford Taurus. And the risk of unfair prejudice was mitigated in this case because the jury did not know of Mr. Terry's prior felony conviction when it heard this evidence. Accordingly, the Court finds that the risk of unfair prejudice from this evidence does not substantially outweigh its probative value, meaning that this evidence was admissible under Rule 403.

Finally, the Court turns its attention to whether the text message demonstrates that Mr. Terry had the opportunity to possess the firearm in the hidden compartment in the Ford Taurus. First, the Court finds that Mr. Terry's possession of a firearm approximately one month before the traffic stop does relate to whether Mr. Terry had the opportunity to possess the firearm in the hidden compartment of the Ford Taurus one month later, which is a permissible purpose under Rule 404(b) and is relevant to the highly material issue of whether he did in fact possess the firearm in the hidden compartment. FED. R. EVID. 404(b)(2). Second, the fact that Mr. Terry had access to and possession of a firearm in March 2018 makes it

-58-

121

Therefore, the Court reaffirms its holding that the evidence in the Government's Exhibit 32AA was admissible at trial.[18]

Further, the Court finds that even if it erred in admitting this second category of evidence, thereby leading to a degree of prejudice against Mr. Terry, that error was harmless in light of the overwhelming evidence at trial. *Cross*, 308 F.3d at 326–27. Indeed, setting aside the Government's Exhibit 32AA and the related testimony and argument, there was very strong evidence, such as the other text messages and pictures on the phones and the testimony of Mr. Dillard, upon which the jury and the Court could find Mr. Terry guilty of the offenses at Counts I, II, III, and V beyond

---

more likely that he had the opportunity to possess a firearm approximately one month later. Third, this evidence has fairly high probative value insofar as it makes it more likely that Mr. Terry possessed the firearm in the hidden compartment of the Ford Taurus. On the other hand, because the jury did not know of Mr. Terry's prior felony conviction when it heard evidence of the text message in the Government's Exhibit 32AA, the risk of unfair prejudice to Mr. Terry from this evidence was fairly low. Therefore, the Court finds that the risk of unfair prejudice from this evidence does not substantially outweigh its probative value, and it was admissible under Rule 403.

Finally, the Court reiterates that it gave a jury instruction regarding the proper use of this Rule 404(b) evidence at trial. (ECF No. 232 at 175–76).

[18] The Court makes one brief clarifying point relative to its August 30, 2022, Memorandum Order. In that Order, the Court wrote that the "jury ha[d] no basis for drawing the forbidden inference of propensity from the messages because the Court ha[d] not allowed it to learn of [Mr.] Terry's felony conviction. Insofar as the gun is evidence of a prior bad act, the jury would have no way of recognizing it as such. The risk of the jury inferring propensity here is negligible." (ECF No. 224 at 4). By way of clarification, the Court notes that it is not only prior *bad* act evidence that falls within the ambit of Rule 404(b). *Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 520 (3d Cir. 2003) ("The evidence admitted in this case differs from garden variety Rule 404(b) matter because it is evidence, not of a prior bad act in a criminal case, but of a subsequent good act in a civil case. Nonetheless, this evidence is encompassed by the plain text of Rule 404(b) which addresses 'other … act[s,]' not just prior bad acts.") (quoting FED. R. EVID. 404(b)). Indeed, the Court now notes that its prior point that the jury could not necessarily infer a prior *bad* act from Mr. Terry's possession of the firearm was true. However, the fact that his possession of the firearm was not a prior bad act did not take that evidence out of the operation of Rule 404(b). Even so, the Court adheres to its previous ruling that the evidence in Exhibit 32AA and the related testimony and argument were admissible under Rule 404(b).

122

a reasonable doubt.[19] Therefore, the Court finds that it is highly probable that any error by the Court in admitting this second category of evidence did not contribute to the judgment—any error by the Court was harmless beyond a reasonable doubt.

Accordingly, for all of the foregoing reasons, the Court finds Mr. Terry's sixth assignment of error unavailing and denies his Motions at ECF Nos. 226 and 245 insofar as he seeks relief on that basis.

### 7. Mr. Terry's Seventh Assignment of Error is Unavailing

In Mr. Terry's seventh assignment of error, he asserts that in the prosecutor's closing argument, he "improperly argued the metadata was sufficient evidence when there was no qualified testimony to authenticate the metadata of the evidence." (ECF No. 245 at 11) (quoting ECF No. 231 at 45–47, 75–76, 78; ECF No. 232 at 127).

The Court finds this objection unavailing. With respect to authenticating the metadata, SFE Sarvey testified regarding the process by which he extracted the data from the Samsung Galaxy and the iPhone, including the metadata, (ECF No. 230 at 177–86), and the Court has previously explained how a reasonable jury could find that the data that the Government presented at trial was the data extracted directly from those phones. *See supra* Section IV.A.2.a.iii. Further, the Court has examined the portion of the prosecutor's closing argument to which Mr. Terry refers, (ECF No. 232 at 127), and the prosecutor did not assert that the metadata alone is a

---

[19] The Court stresses that it has not considered the evidence in the Government's Exhibit 32AA and the related testimony and argument while weighing the sufficiency of the Government's evidence in this case. Throughout this Memorandum Opinion and Order, when the Court has referenced "the other evidence that the Government produced at trial" or the like, the Court has excluded from its consideration the evidence in the Government's Exhibit 32AA and the related testimony and argument.

sufficient basis upon which to convict Mr. Terry. Therefore, the Court denies Mr. Terry's Motions at ECF Nos. 226 and 245 to the extent that he seeks relief based on this assignment of error.

Before concluding, the Court notes that Mr. Terry argues that the cumulative effect of the alleged errors before, during, and after trial should lead this Court to grant him relief. (ECF No. 245 at 11; ECF No. 259 at 18–19). However, because the Court has found that there was only one error at trial (the prosecutor's minor misstep relative to the Government's Exhibits 22 and 24–26), and because that error alone does not warrant granting Mr. Terry's request for relief, the Court finds that Mr. Terry's argument regarding cumulative errors likewise does not warrant granting his request for relief.

## V.    Conclusion

Therefore, for the reasons set forth above, the Court denies Mr. Terry's Motions at ECF Nos. 226 and 245.

An appropriate order follows.

124

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 3:18-cr-24 |
| | ) | |
| v. | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| JOHN T. TERRY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this ___11th___ day of July, 2023, upon consideration of Defendant John T. Terry's "Omnibus Post-Trial Motion for Judgment of Acquittal and/or Motion for a New Trial" (ECF No. 226) and "Amended Omnibus Post-Trial Motion for Judgment of Acquittal, or in the Alternative, Motion for a New Trial[,]" (ECF No. 245), and for the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that the Motions at ECF Nos. 226 and 245 are **DENIED.**

BY THE COURT

_____
KIM R. GIBSON
UNITED STATES DISTRICT JUDGE

125

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 3:18-cr-24 |
| | ) | |
| v. | ) | JUDGE KIM R. GIBSON |
| | ) | |
| JOHN T. TERRY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM ORDER**</u>

## I.      Introduction

On December 27, 2022, the United States Probation Office filed the Final Presentence Investigation Report ("PSR"). (ECF No. 239). In Mr. Terry's "Position With Respect to Sentencing Factors[,]" which he filed on July 14, 2023, he lodged several objections to the PSR. (ECF No. 264). On July 19, 2023, the Probation Office submitted a Supplemental Addendum to the PSR, in which it addressed the majority of Mr. Terry's objections to the PSR. (ECF No. 265). The Court concurs with the Probation Office's assessment of Mr. Terry's objections to the PSR and therefore **ADOPTS** the Probation Office's Supplemental Addendum to the PSR, including all changes to the PSR reflected in the Supplemental Addendum.

Having adopted the Supplemental Addendum to the PSR, the Court is left to address the following three objections by Mr. Terry: (1) his contention that the imposition of the mandatory minimum sentences that he is facing at Counts I, II, and V violate certain constitutional principles; (2) his challenges to his base offense level and adjusted offense level; and (3) his additional requests for a departure and/or a variance (i.e., those that the Probation Office did not address in its Supplemental Addendum). For the following reasons, the Court finds Mr. Terry's first two

126

objections **UNAVAILING**. The Court will address Mr. Terry's additional requests for a departure and/or a variance (i.e., those that the Probation Office did not address in its Supplemental Addendum) at the time of sentencing.

## II.    Background

By way of Superseding Indictment, a Grand Jury charged Mr. Terry with four offenses. (ECF No. 62). At Count One ("Count I"), the Grand Jury charged Mr. Terry with conspiring to distribute and to possess with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, and a detectable amount of cocaine, both Schedule II controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii), and in violation of Title 21, United States Code, Section 846. (*Id.* at 1). At Count Two ("Count II"), the Grand Jury charged Mr. Terry with possessing with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, and a detectable amount of cocaine, both Schedule II controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii). (*Id.* at 2). At Count Three ("Count III"), the Grand Jury charged Mr. Terry with unlawful possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1). (*Id.* at 3). Finally, at Count Five ("Count V"), the Grand Jury charged Mr. Terry with unlawful possession of a firearm in furtherance of a drug trafficking crime (the crime charged at Count II of the Superseding Indictment), in violation of Title 18, United States Code, Sections 924 (c)(1)(A) and 924(c)(1)(C)(i). (*Id.* at 5).

127

On August 25, 2022, the jury unanimously found Mr. Terry guilty of the offenses at Counts I and II of the Superseding Indictment. (ECF No. 217). On August 26, 2022, the Court found Mr. Terry guilty of the offenses at Counts III and V of the Superseding Indictment. (ECF No. 220).

### III. Discussion

**A. The Court Finds Unavailing Mr. Terry's Objections to the Constitutionality of the Three Statutory Mandatory Minimums in This Case**

Three of Mr. Terry's counts of conviction—Counts I, II, and V—carry mandatory minimum sentences. (ECF No. 239 at 21). Counts I and II carry a mandatory minimum term of imprisonment of ten (10) years per count. (*Id.*) (citing 21 U.S.C. §§ 846, 841(b)(1)(A)(viii)). Further, because of Mr. Terry's prior conviction for use of a firearm during a crime of violence, (*id.* at 13), Mr. Terry's conviction at Count V carries a mandatory minimum term of imprisonment of twenty-five (25) years, which must be imposed consecutively to any other counts. (*Id.* at 21) (citing 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(C)(i)); *see also* 18 U.S.C. § 924(c)(1)(D)(2).

With respect to the statutory mandatory minimums at Counts I, II, and V, Mr. Terry argues that they violate his constitutional rights to "Due Process, Equal Protection, Cruel and Unusual Punishment … and/or the separation-of-powers doctrine." (ECF No. 264 at 3, 6). Mr. Terry offers no further argument on this score. (*See* ECF No. 264).

In resolving Mr. Terry's arguments, the Court proceeds in three stages: (1) first, the Court examines Mr. Terry's claims that the mandatory minimum sentences at Counts I, II, and V violate his Due Process rights and the separation of powers doctrine; (2) second, the Court examines Mr. Terry's claims that the mandatory minimum sentences at Counts I, II, and V violate his rights

-3-

128

under the Equal Protection principles of the Fifth Amendment[1]; and (3) third, the Court examines

Mr. Terry's claims that the mandatory minimum sentences at Counts I, II, and V violate his Eighth

Amendment protections against Cruel and Unusual Punishments.

### 1. None of the Statutory Mandatory Minimums in This Case Violate Mr. Terry's Due Process Rights or the Separation of Powers Doctrine

Turning first to Mr. Terry's argument that the mandatory minimum sentences at Counts

I, II, and V violate his Due Process rights and run afoul of the separation of powers doctrine, the

Third Circuit has "squarely addressed and rejected the argument that mandatory sentences

violate the doctrine of separation of powers and the Due Process Clause." *United States v. Walker*,

473 F.3d 71, 76 (3d Cir. 2007) (holding that "the 55-year mandatory consecutive sentence required

by Section 924(c)(1) does not violate the separation of powers doctrine or the Due Process Clause

of the Fifth Amendment."). Therefore, the Court finds that none of the statutory mandatory

minimums in this case violate Mr. Terry's Due Process rights or run afoul of the separation of

powers doctrine.

### 2. None of the Statutory Mandatory Minimums in This Case Violate Mr. Terry's Rights Under the Equal Protection Principles of the Fifth Amendment

#### a. Legal Standard

The Supreme Court "has explained that 'a classification neither involving fundamental

rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a

classification cannot run afoul of the Equal Protection Clause if there is a rational relationship

between the disparity of treatment and some legitimate governmental purpose.'" *Walker*, 473 F.3d

---

[1] The Supreme Court has long held that the "Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976).

-4-

129

at 76 (quoting *Heller v. Doe*, 509 U.S. 312, 319–20 (1993) (internal quotations and citations omitted)).[2] Consequently, the principles of equal protection are satisfied so long as there is a "plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Id.* (internal quotation marks and citation omitted). Further, in conducting rational basis review, a "statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller*, 509 U.S. at 320–21 (internal quotation marks and citation omitted).

> **b.** **The Mandatory Minimum Sentences at Counts I and II Survive Rational Basis Review**

---

[2] Mr. Terry has provided the Court with no indication that the mandatory minimum sentence at Count I or Count II involves fundamental rights or proceeds along suspect lines. (ECF No. 264). At Count V, he does note that, "[i]n the fiscal year of 2020, there were 2525 cases of [Section 924(c)] offenses whereas 51% of the persons charged were African American." (ECF No. 266 at 5). However, this argument alone is insufficient to warrant the application of anything other than rational basis review to Mr. Terry's Equal Protection claim relative to this Count. *Washington*, 426 U.S. at 242 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule … that racial classifications are to be subjected to the strictest scrutiny[.]") (internal citation omitted); *cf. United States v. Alton*, 60 F.3d 1065, 1069 (3d Cir. 1995) ("In *United States v. Frazier*, we explicitly rejected an equal protection challenge to the relevant statutory and guideline procedures. We first observed that the statutes and guidelines do not on their face classify defendants by race. Next, we determined that the provisions do not employ a facially non-racial characteristic that strongly correlates with race for cultural or socioeconomic reasons as a sham disguising invidious racial classification. We concluded that there was no evidence whatsoever that suggests that the distinction drawn between cocaine base and cocaine was motivated by any racial animus or discriminatory intent on the part of either Congress or the Sentencing Commission. We held that *absent such an explicit or inferable discriminatory purpose, the statutory distinction … is subject to rational basis review*[.]") (internal quotation marks and citations omitted) (emphasis added).

In explaining its holding that the Anti-Drug Abuse Act of 1986 survives rational basis review, the Supreme Court wrote the following:

> The penalty scheme set out in the Anti-Drug Abuse Act of 1986 is intended to punish severely large-volume drug traffickers at any level. It assigns more severe penalties to the distribution of larger quantities of drugs. By measuring the quantity of the drugs according to the "street weight" of the drugs in the diluted form in which they are sold, rather than according to the net weight of the active component, the statute and the Sentencing Guidelines increase the penalty for persons who possess large quantities of drugs, regardless of their purity. That is a rational sentencing scheme.

*Chapman v. United States*, 500 U.S. 453, 465 (1991) (holding that, in this context, "an argument based on equal protection essentially duplicates an argument based on due process").[3]

With respect to the offenses at Counts I and II, the Court reiterates that Mr. Terry offers no specific argument as to *why* the statutory mandatory minimums violate his Equal Protection rights. (ECF No. 264). Especially in light of that reality, the Court holds that there is a rational relationship between punishing more harshly certain drug offenses involving more than 500 grams of a mixture and substance containing methamphetamine and Congress's legitimate governmental purpose in severely punishing large-volume drug traffickers. Certainly, insofar as Congress punishes those committing offenses involving greater quantities of substances more harshly than those committing offenses involving lesser quantities of substances, Congress acts in a manner that is rationally related to a legitimate governmental interest (that is, punishing

---

[3] The Court notes that the Anti-Drug Abuse Act of 1986's mandatory minimum penalties are set forth in 21 U.S.C. § 841(b)(1)(A)–(C). *Dorsey v. United States*, 567 U.S. 260, 266 (2012). Thus, although the Anti-Drug Abuse Act of 1986 has been amended since it became effective in 1986, *id.* at 265–70, the Supreme Court's holding in *Chapman* is still highly applicable in the context of Mr. Terry's Equal Protection challenge to the mandatory minimum sentence set forth in 21 U.S.C. § 841 (b)(1)(A)(viii).

131

more harshly large-volume traffickers). Therefore, the Court finds that the mandatory minimum sentences at Counts I and II survive rational basis review.

### c. The Mandatory Minimum Sentence at Count V Survives Rational Basis Review

With respect to the mandatory minimum sentence that Mr. Terry faces at Count V, the Third Circuit has held that "Congress had a rational basis for treating second or subsequent offenses under Section 924(c)(1) more harshly than first offenses and for imposing severe mandatory punishments for such offenses." *Walker*, 473 F.3d at 79 (holding that the defendant's "55-year mandatory consecutive sentence for his three violations of Section 924(c)(1) does not, therefore, violate the equal protection principles of the Fifth Amendment"). Accordingly, the Court finds that the mandatory minimum sentence that Mr. Terry faces at Count V survives rational basis review and does not violate the Equal Protection principles of the Fifth Amendment.

### 3. None of the Statutory Mandatory Minimums in This Case Violate Mr. Terry's Eighth Amendment Protections From Cruel and Unusual Punishment

### a. Legal Standard

The "Supreme Court has long recognized that the Eighth Amendment, which forbids cruel and unusual punishments, contains a narrow proportionality principle that applies to noncapital sentences." *Walker*, 473 F.3d at 79 (internal quotation marks and citation omitted). Although the proportionality principle "applies to sentences for terms of years, only an extraordinary case will result in a constitutional violation." *Id.* (citing *Lockyear v. Andrade*, 538 U.S. 63, 72, 77 (2003)).

132

In *Rummel v. Estelle*, 445 U.S. 263 (1980), the Supreme Court explained that "'the Eighth Amendment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime.'" *Walker*, 473 F.3d at 80 (quoting *Rummel*, 445 U.S. at 271). However, "'[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.'" *Id.* (quoting *Rummel*, 445 U.S. at 272).

Then, in *Solem v. Helm*, 463 U.S. 277 (1983), the Supreme Court utilized the following three factors in analyzing whether the defendant's sentence was "so disproportionate that it violated the Eighth Amendment: '(1) the gravity of the offense and the harshness of the penalty;' (2) 'the sentences imposed on other criminals in the same jurisdiction;' and (3) 'the sentences imposed for commission of the same crime in other jurisdictions.'" *Walker*, 473 F.3d at 80 (quoting *Helm*, 463 U.S. at 292).

Critically, in *Harmelin v. Michigan*, 501 U.S. 957 (1991), Justice Kennedy wrote a concurring opinion regarding the proportionality principle, the reasoning of which was utilized in the Supreme Court's opinion stating its judgment in *Ewing v. California*, 538 U.S. 11 (2003). *Ewing*, 538 U.S. at 23–24; *see also Walker*, 473 F.3d at 81 (noting that, in *Ewing*, the Court "adopted the use of [the] principles in [Justice Kennedy's concurring opinion in *Harmelin*] in the proportionality analysis"). In his concurring opinion in *Harmelin*, Justice Kennedy explained that courts need not "always engage in an analysis of the second and third *Solem* factors when conducting a proportionality review: 'intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence

imposed leads to an inference of gross disproportionality.'" *Walker*, 473 F.3d at 81 (quoting *Harmelin*, 501 U.S. at 1005).[4]

For its part, the Third Circuit has explained that, in "using the *Solem* factors to evaluate proportionality challenges to sentences under the Eighth Amendment, courts 'should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes.'" *Id.* at 82 (quoting *United States v. MacEwan*, 445 F.3d 237, 247 (3d Cir. 2006)). The Third Circuit has also "noted that the 'principle of substantial deference therefore restrains us from an extended analysis of proportionality save in rare cases.'" *Id.* (quoting *MacEwan*, 445 F.3d at 247–48). Accordingly, "'the first proportionality factor acts as a gateway or threshold. If the defendant fails to show a gross imbalance between the crime and the sentence, our analysis is at an end.'" *Id.* (quoting *MacEwan*, 445 F.3d at 248).

> **b.  Neither the Mandatory Minimum Sentence at Count I Nor the Mandatory Minimum Sentence at Count II Violate Mr. Terry's Right to be Free From Cruel and Unusual Punishment**

The Court finds that neither the ten (10) year mandatory minimum sentence at Count I nor the ten (10) year mandatory minimum sentence at Count II is grossly disproportionate to the severity of Mr. Terry's crimes at those Counts.

Indeed, Mr. Terry offers no specific argument on this score (ECF No. 264). Further, the evidence at trial permitted reasonable jurors to find beyond a reasonable doubt that Mr. Terry

---

[4] In his concurring opinion, Justice Kennedy also explained that "the following principles inform the Court's proportionality analysis: 'the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors.'" *Walker*, 473 F.3d at 81 (quoting *Harmelin*, 501 U.S. at 1001). Justice Kennedy further "suggested that these principles 'inform the final' principle that the 'Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sanctions that are 'grossly disproportionate' to the crime.'" *Id.* (quoting *Harmelin*, 501 U.S. at 1001).

-9-

134

both conspired to distribute and to possess with the intent to distribute and possessed with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine. *See United States v. Terry*, No. 3:18-CR-24, 2023 WL 4465051 (W.D. Pa. July 11, 2023). In a continued effort to punish large-volume drug traffickers, *Chapman*, 500 U.S. at 465, Congress currently requires a mandatory minimum sentence of ten years for the offenses at Counts I and II of which Mr. Terry was convicted. 21 U.S.C. § 841(b)(1)(A)(viii). The Court finds that Congress could "with reason conclude" that the threat posed to the individual and society by large-volume drug traffickers, such as those trafficking (or conspiring to traffic) 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and cocaine, like Mr. Terry, is "momentous enough to warrant the deterrence and retribution" of ten-year mandatory minimum sentences. *Walker*, 473 F.3d at 82–83 (internal quotation marks and citation omitted). Therefore, the Court finds that the harshness of the mandatory minimum sentences at Counts I and II, balanced against the gravity of Mr. Terry's offenses, does not violate the proportionality principle of the Eighth Amendment. *Id.* Accordingly, the Court finds that those mandatory minimum sentences do not violate the Eighth Amendment.[5]

> **c.** **The Mandatory Minimum Sentence at Count V Does Not Violate Mr. Terry's Right to be Free From Cruel and Unusual Punishment**

---

[5] Finally, to the extent that Mr. Terry is arguing that the mandatory minimum sentences at Counts I and II violate our nation's evolving standards of decency, the Court finds that argument unavailing. *Cf. United States v. Shields*, 281 F. App'x 100, 101 (3d Cir. 2008) (noting that the Third Circuit has consistently held that the mandatory minimum sentences for crack offenses, "which are set forth in 21 U.S.C. § 841(b)," do not violate the "Eight Amendment's prohibition on cruel and unusual punishments").

Turning to the mandatory minimum (and consecutive) sentence of twenty-five (25) years at Count V, the Court notes that the evidence at trial permitted reasonable minds to find that Mr. Terry possessed a loaded firearm directly next to distribution-level quantities of controlled substances in a hidden compartment in a vehicle. *See Terry*, 2023 WL 4465051 at *14. The Court further notes that "Congress's purpose in amending Section 924(c)(1) to require mandatory minimum sentences was to … protect society by incapacitating those criminals who demonstrate a willingness to repeatedly engage in serious felonies while in possession of firearms," to "deter criminals from possessing firearms during the course of certain felonies," and "to protect our communities from violent criminals who repeatedly demonstrate a willingness to employ deadly weapons by punishing them more harshly." *Walker*, 473 F.3d at 82 (internal quotation marks and citations omitted). Therefore, the Court finds that "Congress could with reason conclude that the threat posed to the individual and society by possessing firearms in connection with serious felonies, [such as possessing with intent to distribute significant amounts of substances containing methamphetamine and cocaine], is momentous enough to warrant the deterrence and retribution of lengthy consecutive sentences," such as the twenty-five (25) year mandatory minimum (and consecutive) sentence that Mr. Terry is facing in this case. *Id.* at 82–83 (internal quotation marks and citation omitted). Accordingly, the Court holds that the harshness of the mandatory minimum sentence at Count V, balanced against the gravity of Mr. Terry's offense, does not violate the proportionality principle of the Eight Amendment. *Id.* at 83. In light of the

136

foregoing, the Court finds that the mandatory minimum (and consecutive) sentence of twenty-five (25) years at Count V does not violate the Eighth Amendment. *Id.*[6]

Therefore, the Court finds that Mr. Terry's objections to the mandatory minimum sentences at Counts I, II, and V are unavailing.

**B.  The Court Finds Unavailing Mr. Terry's Objections to His Base Offense Level and Adjusted Offense Level**

In the PSR, the Probation Office concluded that Mr. Terry's base offense level, adjusted offense level, and total offense level are all 32. (ECF No. 239 at 11).

Mr. Terry asserts that his base offense level should be 26 rather than 32 because "the Government failed to prove beyond a reasonable doubt that there was a detectable amount of methamphetamine to make it a mixture." (ECF No. 264 at 3).

The Court finds this argument unavailing. In this case, the jury found, beyond a reasonable doubt, that the mixture or substance involved in the offenses at Counts I and II weighed 500 grams or more and contained a detectable amount of methamphetamine and cocaine. (ECF No. 217 at 1–4). Further, in resolving the post-trial motions in this case, the Court found that, based on the evidence that the Government produced at trial, "a reasonable juror could conclude, beyond a reasonable doubt, that Mr. Terry conspired to distribute and possess with intent to distribute and possessed with the intent to distribute 500 grams or more of a mixture and substance containing a *detectable amount of methamphetamine and cocaine*[.]" *Terry*, 2023

_____

[6] Finally, to the extent that Mr. Terry is arguing that the mandatory minimum (and consecutive) sentence at Count V violates our nation's evolving standards of decency, the Court finds that argument unavailing. *Walker*, 473 F.3d at 83–84 (finding that the defendant's 55-year consecutive mandatory minimum sentence for three violations of Section 924(c)(1) did not violate our nation's "evolving standards of decency").

-12-

137

WL 4465051, at *10 (emphasis added). Therefore, the Court finds that Mr. Terry's contention on this score is unavailing.

Mr. Terry also asserts that, under USSG § 3B1.2, he should receive a reduction in his adjusted offense level because he was either a minimal participant or a minor participant in the offense(s). (ECF No. 264 at 4). Specifically, Mr. Terry argues that it was "Gerald Terry who made arrangements for the car and the drug transaction." (*Id.*).

The Court finds this argument unavailing. Indeed, Mr. Terry has provided the Court with very little argument in support of his contention that he was a minimal or minor participant in the offense(s). (*See* ECF No. 264). Further, there was evidence produced at trial tending to indicate that Mr. Terry did not play a minimal or minor role in the offense(s), but rather a significant one. For example, Robert Dillard testified that it was Mr. Terry, not Gerald Terry, from whom he ordered the illegal drugs in this case. *Terry*, 2023 WL 4465051, at *6.

In short, the Court finds that, in completing the PSR, the Probation Office correctly calculated Mr. Terry's base offense level, adjusted offense level, and total offense level.

Therefore, the Court enters the following order:

**AND NOW**, this 9th day of August, 2023, **IT IS HEREBY ORDERED** that the Court **ADOPTS** the Probation Office's Supplemental Addendum to the PSR, including all changes to the PSR reflected in the Supplemental Addendum.

Further, insofar as Mr. Terry contends that the statutory mandatory minimums are unconstitutional, the Court finds that objection **UNAVAILING**. Therefore, **IT IS FURTHER ORDERED** that the Court will apply the mandatory minimum sentences at Counts I, II, and V in the appropriate manner at Mr. Terry's sentencing.

-13-

138

Finally, insofar as Mr. Terry argues that his total offense level should be 26 because the offenses of which he was convicted did not involve methamphetamine, and insofar as Mr. Terry asserts that his adjusted offense level should be lower because he was either a minimal or minor participant in the offense(s), the Court finds Mr. Terry's objections **UNAVAILING**. Therefore, **IT IS FURTHER ORDERED** that the Court will apply the total offense level (32) and the adjusted offense level (32) set forth in the PSR at the time of sentencing. The Court stresses that it is deferring considering Mr. Terry's additional arguments for a departure and/or a variance (those that the Probation Office did not address in the Supplemental Addendum) until the time of the sentencing hearing in this matter.

**BY THE COURT**

_____

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**

139

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
### Western District of Pennsylvania

UNITED STATES OF AMERICA

v.

JOHN T. TERRY

)
)
)
)
)
)
)
)
)
)
)

## JUDGMENT IN A CRIMINAL CASE

Case Number:  CR 3:18-24-01

USM Number:  51359-066

Sandra Thompson, Esquire
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1, 2, 3 and 5 of the Superseding Indictment
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possess with the Intent to to Distribute 500 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine and | 4/4/2018 | I |

   The defendant is sentenced as provided in pages 2 through _____8_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/10/2023
Date of Imposition of Judgment

Signature of Judge

KIM R. GIBSON, UNITED STATES DISTRICT JUDGE
Name and Title of Judge

August 14, 2023
Date

140

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1A

Judgment—Page   2   of   8

DEFENDANT:   JOHN T. TERRY
CASE NUMBER:   CR 3:18-24-01

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| | Cocaine, Schedule II Controlled Substances | | |
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 841(b)(1)(B)(ii) | Possession with the Intent to Distribute 500 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine and Cocaine, Schedule II Controlled Substances | 4/4/2018 | II |
| 18 U.S.C. § 922(g)(1) | Unlawful Possession of a Firearm by a Convicted Felon | 4/4/2018 | III |
| 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(C)(i) | Unlawful Possession of a Firearm in Furtherance of a Drug Trafficking Crime | 4/4/2018 | V |

141

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    3    of    8

DEFENDANT:    JOHN T. TERRY
CASE NUMBER:    CR 3:18-24-01

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

120 months at Counts 1, 2, and 3, to be served concurrently with each other and 300 months at Count 5, to be served consecutive to Counts 1, 2, and 3, resulting in a total term of imprisonment of 420 months.

☑  The court makes the following recommendations to the Bureau of Prisons:

That in its designation process that the Defendant be housed in a facility geographically close to Philadelphia, Pennsylvania so that he can have contact with his family during his incarceration.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

   ☐  at _____ ☐ a.m.  ☐ p.m.   on _____ .

   ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐  before 2 p.m. on _____ .

   ☐  as notified by the United States Marshal.

   ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

142

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3 — Supervised Release

Judgment—Page __4__ of __8__

DEFENDANT:    JOHN T. TERRY
CASE NUMBER:   CR 3:18-24-01

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

5 years to consist of 5 years at Counts 1, 2 and 5, and 3 years at Count 3, to run concurrently with each other.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

143

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3A — Supervised Release

|  | Judgment—Page | 5 | of | 8 |
|--|--|--|--|--|

DEFENDANT:  JOHN T. TERRY
CASE NUMBER:  CR 3:18-24-01

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

144

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3B — Supervised Release

Judgment—Page __6__ of __8__

DEFENDANT: JOHN T. TERRY
CASE NUMBER: CR 3:18-24-01

## ADDITIONAL SUPERVISED RELEASE TERMS

The Defendant shall submit his person, property, house, residence, vehicle, papers, business or place of employment, to a search, conducted by the United States Probation or Pretrial Service Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation. The Defendant shall inform any other residents that the premises may be subject to searches pursuant to this condition.

The Defendant shall participate in a program of testing and, if necessary, treatment for substance abuse, said program to be approved by the probation officer, until such time as Defendant is released from the program by the Court. Further, the Defendant shall be required to contribute to the costs of services for any such treatment in an amount determined by the probation officer but not to exceed the actual cost. The Defendant shall submit to one drug urinalysis within 15 days after being placed on supervision and at least two periodic tests thereafter.

It is further ordered that the Defendant shall not intentionally purchase, possess and/or use any substance designed to simulate or alter in any way the Defendant's own urine specimen. In addition, the Defendant shall not purchase, possess and/or use any device designed to be used for the submission of a third party urine specimen.

The Defendant shall forfeit to the United States a black Smith & Wesson M&P .40 caliber handgun bearing serial number HSU6371.

The Defendant shall participate in the United States Probation Office's Workforce Development Program as directed by the probation officer.

The Court finds that the Defendant cannot pay a fine; therefore, imposition of a fine is waived.

It is further ordered that the Defendant shall pay to the United States a special assessment of $400, which shall be paid to the United States District Court Clerk forthwith.

AO 245B (Rev. 09/19)     Judgment in a Criminal Case
                         Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: JOHN T. TERRY
CASE NUMBER: CR 3:18-24-01

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ 400.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $            0.00 | $            0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the     ☐ fine     ☐ restitution.

☐ the interest requirement for the     ☐ fine     ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

146

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 6 — Schedule of Payments

Judgment — Page __8__ of __8__

DEFENDANT: JOHN T. TERRY
CASE NUMBER: CR 3:18-24-01

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ __400.00__ due immediately, balance due

   ☐ not later than _____ , or
   ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:

A black Smith & Wesson M&P .40 caliber handgun bearing serial number HSU6371.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

147

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : Criminal No. 3:18-cr-00024-KRG |
| | : |
| v. | : |
| | : |
| JOHN T. TERRY (aka "Tyree Terry"), | : Judge Kim R. Gibson |
| Defendant | : |

**NOTICE OF APPEAL**

Notice is hereby given that John T. Terry, Defendant, appeals to the United

States Court of Appeals for the Third Circuit from the Judgment of Sentence filed

on August 15, 2023 (Doc 270) of the Honorable Kim R. Gibson, District Court

Judge.

DATED: August 28, 2023          Respectfully Submitted:

_____
Sandra Thompson, Esq. PA I.D. 84345
Law Office of Sandra Thompson, LLC
351 E. Princess St., P.O. Box 1901
York, PA 17405
Telephone/Fax: 215-987-3650
Email: sthompsonLLC@gmail.com
Counsel for Defendant

148

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      : Criminal No. 3:18-cr-00024-KRG
     :
           v.              :
     :
JOHN T. TERRY (aka "Tyree Terry"),    : Judge Kim R. Gibson
         Defendant          :

## PROOF OF SERVICE

I, Sandra Thompson, Esq., Counsel for Defendant, do hereby certify that the

Government was served with a true and correct copy of the Defendant's Notice of

Appeal pursuant to LCvR 5.6 by electronic means to the extent and in the manner

authorized by the Standing Order regarding Electronic Case Filing Policies and

Procedures and the ECF User Manual as follows:

Arnold P. Bernard, Jr., A.U.S. A
United States Attorney's Office, Suite 200 - Penn Traffic Building
319 Washington Street, Johnstown, PA 15901
Email: Arnold.bernard@usdoj.gov

DATED: August 28, 2023          Respectfully Submitted:


_____
Sandra Thompson, Esq. PA I.D. 84345
Law Office of Sandra Thompson, LLC
351 E. Princess St., P.O. Box 1901
York, PA 17405
Telephone/Fax: 215-987-3650
Email: sthompsonLLC@gmail.com
Counsel for Defendant

149