No. 23-2575

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN T. TERRY,

Appellant.

_____

Appeal from Judgment of Conviction and Sentence
Entered by the United States District Court
for the Western District of Pennsylvania (Gibson, J.)
at Criminal No. 18-24

_____

**RESPONSE BRIEF FOR APPELLEE
THE UNITED STATES OF AMERICA**

_____

ERIC G. OLSHAN
United States Attorney

DONOVAN COCAS
Assistant U.S. Attorney

700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania
Tel:   (412) 894-7389
Fax:   (412) 644-6995

Email: donovan.cocas@usdoj.gov

**TABLE OF CONTENTS**

JURISDICTION ..................................................................................................1

ISSUES PRESENTED AND STANDARDS OF REVIEW .........................2

STATEMENT OF FACTS AND STATEMENT OF THE CASE.................4

SUMMARY OF ARGUMENT....................................................................16

ARGUMENT

    I.      TO THE EXTENT THE ISSUE IS NOT BARRED BY JUDICIAL ESTOPPEL OR WAIVER, THE DISTRICT COURT DID NOT ERR IN DENYING THE MOTION TO SUPPRESS .................................................17

    II.     THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN FINDING NO VIOLATION OF THE FEDERAL RULES OF EVIDENCE...............................28

    III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO ORDER A NEW TRIAL BASED ON PROSECUTORIAL MISCONDUCT .................................................................36

    IV.    THE DISTRICT COURT DID NOT PLAINLY ERR IN APPLYING U.S.S.G. §2D1.1 AND THE MANDATORY MINIMUM IN 21 U.S.C. §841(b)(1)(A)(viii) AT SENTENCING ...................................45

CONCLUSION ...........................................................................................48

CERTIFICATES OF COMPLIANCE AND SERVICE

## **TABLE OF CITATIONS**

**Federal Cases**                                                             **Pages**

Abdul-Akbar v. McKelvie,
   239 F.3d 307 (3d Cir. 2001) ........................................................ 41, 43

Alleyne v. United States,
   570 U.S. 99 (2013) ..................................................................... 3, 4, 46

Bastardo-Vale v. Attorney General,
   934 F.3d 255 (3d Cir. 2019) .................................................................38

Blackledge v. Allison,
   431 U.S. 63 (1977) ................................................................................23

Brendlin v. California,
   551 U.S. 249 (2007) ..............................................................................18

Chapman v. United States,
   500 U.S. 453 (1991) ..............................................................................47

Costa v. Attorney General,
   757 F. App'x 110 (3d Cir. 2018)...........................................................38

Florida v. Jimeno,
   500 U.S. 248 (1991) ..............................................................................21

Graboff v. Colleran Firm,
   744 F.3d 128 (3d Cir. 2014) .................................................................47

Heien v. North Carolina,
   574 U.S. 54 (2014) ................................................................................17

Karlo v. Pittsburgh Glass Works, LLC,
   849 F.3d 61 (3d Cir. 2017) ...................................................................36

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,
   337 F.3d 314 (3d Cir. 2003) .................................................................22

Miranda v. Arizona,
   384 U.S. 436 (1966) ................................................................................2

Montrose Med. Group Participating Savs. Plan v. Bulger,
   243 F.3d 773 (3d Cir. 2001) .................................................................22

New Hampshire v. Maine,
   532 U.S. 742 (2001) ..............................................................................22

Ohio v. Robinette,
   519 U.S. 33 (1996) ................................................................................24

Old Chief v. United States,
   519 U.S. 172 (1997) ..............................................................................35

Rakas v. Illinois,
   439 U.S. 128 (1978) ..............................................................................23

Rodriguez v. United States,
   575 U.S. 348 (2015) ................................................................ 18-19
Rolan v. Coleman,
   680 F.3d 311 (3d Cir. 2012) .............................................................31
Schneckloth v. Bustamonte,
   412 U.S. 218 (1973) ........................................................................21
Stecyk v. Bell Helicopter Textron, Inc.,
   295 F.3d 408 (3d Cir. 2002) ..................................................... 36, 39
TD Bank N.A. v. Hill,
   928 F.3d 259 (3d Cir. 2019) .............................................................39
United States v. Anderson,
   859 F.2d 1171 (3d Cir. 1988) ...........................................................23
United States v. Arvizu,
   534 U.S. 266 (2002) ........................................................................21
United States v. Bailey-Snyder,
   923 F.3d 289 (3d Cir. 2019) .............................................................32
United States v. Baker,
   221 F.3d 438 (3d Cir. 2000) .............................................................24
United States v. Bansal,
   663 F.3d 634 (3d Cir. 2011) .............................................................29
United States v. Barbosa,
   271 F.3d 438 (3d Cir. 2001) .............................................................47
United States v. Battaglini,
   751 F. App'x 242 (3d Cir. 2018) .......................................................27
United States v. Birt,
   966 F.3d 257 (3d Cir. 2020) .............................................................47
United States v. Bowens,
   224 F.3d 302 (4th Cir 2000) .............................................................47
United States v. Burwell,
   763 F. App'x 840 (11th Cir. 2019) ....................................................24
United States v. Calloway,
   2022 WL 989362 (3d Cir. Apr. 1, 2022) ...................................... 29, 30
United States v. Chavez-Lopez,
   767 F. App'x 431 (4th Cir. 2019) ......................................................41
United States v. Combs,
   369 F.3d 925 (6th Cir. 2004) ...........................................................29
United States v. Console,
   13 F.3d 641 (3d Cir. 1993) ...............................................................30
United States v. Cruz,
   757 F.3d 372 (3d Cir. 2014) .............................................................41

United States v. Davitashvili,
   97 F.4th 104 (3d Cir. 2024) ........................................................ 29, 30
United States v. Delfin-Colina,
   464 F.3d 392 (3d Cir. 2006) .............................................................17
United States v. Eylicio-Montoya,
   70 F.3d 1158 (10th Cir. 1995) ..........................................................23
United States v. Flores-Mejia,
   759 F.3d 253 (3d Cir. 2014) .............................................................48
United States v. Fulton,
   837 F.3d 281 (3d Cir. 2016) ...................................................... 32, 42-43
United States v. Gant,
   2023 WL 5625498 (3d Cir. Aug. 31, 2023) ..................................32
United States v. Garner,
   961 F.3d 264 (3d Cir. 2020) ........................................................ 19-21
United States v. Givan,
   320 F.3d 452 (3d Cir. 2003) .............................................................24
United States v. Gori,
   324 F.3d 234 (3d Cir. 2003) .............................................................47
United States v. Gunter,
   462 F.3d 237 (3d Cir. 2006) .............................................................48
United States v. Gunther,
   2023 WL 6804573 (3d Cir. Oct. 16, 2023) ...................................47
United States v. Guzman,
   2022 WL 2816521 (3d Cir. July 19, 2022) ...................................18
United States v. Harmon,
   2022 WL 17369594 (3d Cir. Dec. 2, 2022) ..................................41
United States v. Hoffecker,
   530 F.3d 137 (3d Cir. 2008) ...................................................... 26, 44
United States v. Hunter,
   88 F.4th 221 (3d Cir. 2023) ........................................................ 19-20
United States v. Iglesias,
   535 F.3d 150 (3d Cir. 2008) .............................................................41
United States v. Jabateh,
   974 F.3d 281 (3d Cir. 2020) .............................................................28
United States v. Jackson,
   849 F.3d 540 (3d Cir. 2017) ........................................................ 42-43
United States v. Jimenez-Chaidez,
   96 F.4th 1257 (9th Cir. 2024) ..................................................... 40- 41
United States v. Johnson,
   899 F.3d 191 (3d Cir. 2018) ..............................................................3

iv

United States v. Joseph,
  730 F.3d 336 (3d Cir. 2013) ........................................................ 2, 25-26, 46
United States v. Langford,
  516 F.3d 205 (3d Cir. 2008) ....................................................................46
United States v. Lewis,
  672 F.3d 232 (3d Cir. 2012) ......................................................................2
United States v. Lingala,
  91 F.4th 685 (3d Cir. 2024) .....................................................................46
United States v. Lucas,
  2021 WL 4099241 (6th Cir. Sept. 9, 2021) ..............................................41
United States v. Mack,
  892 F.2d 134 (1st Cir. 1989) ....................................................................29
United States v. Marsh,
  568 F. App'x 15 (2d Cir. 2014) ................................................................41
United States v. Montalvo-Flores,
  81 F.4th 339 (3d Cir. 2023) ......................................................................23
United States v. Montijo-Maysonet,
  974 F.3d 34 (1st Cir. 2020) ............................................................... 40-41
United States v. Morales,
  861 F.3d 396 (3d Cir. 1988) .....................................................................24
United States v. Mosley,
  454 F.3d 249 (3d Cir. 2006) ............................................................. 17-18
United States v. Pruden,
  398 F.3d 241 (3d Cir. 2005) .....................................................................26
United States v. Ramos,
  826 F. App'x 131 (3d Cir. 2020) ..............................................................21
United States v. Randolph,
  230 F.3d 243 (6th Cir. 2000) ....................................................................47
United States v. Reed,
  780 F.3d  (4th Cir. 2015) ..........................................................................43
United States v. Repak,
  852 F.3d 230 (3d Cir. 2017) .....................................................................34
United States v. Ross,
  456 U.S. 798 (1982) .................................................................................24
United States v. Silveus,
  542 F.3d 993 (3d Cir. 2008) .....................................................................22
United States v. Soberon,
  929 F.2d 935 (3d Cir. 1991) .....................................................................28
United States v. Soriano,
  976 F.3d 450 (5th Cir. 2020) ....................................................................24

United States v. Steiner,
    847 F.3d 103 (3d Cir. 2017) ........................................................29
United States v. Stewart,
    92 F.4th 461 (3d Cir. 2024) ................................................. 19-20
United States v. Tinsley,
    62 F.4th 376 (7th Cir. 2023) .......................................................39
United States v. Tomko,
    562 F.3d 558 (3d Cir. 2009) .......................................................48
United States v. Vasquez-Algarin,
    821 F.3d 467 (3d Cir. 2016) .......................................................22
United States v. Villafranco-Elizondo,
    897 F.3d 635 (5th Cir. 2018) ......................................................25
United States v. Walker,
    155 F.3d 180 (3d Cir. 1998) .......................................................31
United States v. Watson,
    260 F.3d 301 (3d Cir. 2001) ..................................................3, 41
United States v. Weatherly,
    525 F.3d 265 (3d Cir. 2008) .......................................................34
United States v. Welshans,
    892 F.3d 566 (3d Cir. 2018) ............................................ 2, 32, 34
United States v. Williams,
    83 F.4th 994 (5th Cir. 2023) .................................................41, 43
United States v. Williams,
    974 F.3d 320 (3d Cir. 2020) .......................................................36
United States v. Wilson,
    852 F. App'x 84 (3d Cir. 2021) ..................................................44
United States v. Wilson,
    960 F.3d 136 (3d Cir. 2020) .................................................18, 20
United States v. Womack,
    55 F.4th 219 (3d Cir. 2022) ...................................................3, 44
United States v. Young,
    470 U.S. 1 (1985) ......................................................................32
United States v. Zillgitt,
    286 F.3d 128 (2d Cir. 2002) .......................................................47
Waldorf v. Shuta,
    142 F.3d 601 (3d Cir. 1998) .......................................................39
Whren v. United States,
    517 U.S. 806 (1996) ..................................................................18

**Federal Guidelines, Rules, and Statutes**                     **Pages**

18 U.S.C. §924(c) ................................................................15
18 U.S.C. §3553(a) ..............................................................15
18 U.S.C. §3742.....................................................................1
18 U.S.C. §922(g)................................................................12
21 U.S.C. §841.............................................................. 11, 47
21 U.S.C. §841(b) ........................................................ 15-16
21 U.S.C. §841(b)(1) .................................................... 45-46
21 U.S.C. §841(b)(1)(A)(viii)...........................................*passim*
21 U.S.C. §846....................................................................11
28 U.S.C. §1291.....................................................................1
18 U.S.C. §3553(a) ..............................................................48
Fed. R. App. P. 28...............................................................26
Fed. R. App. P. 32.................................................................1
Fed. R. Crim. P. 12 ..........................................................2, 29
Fed. R. Evid. 701 ...............................................................42
Fed. R. Evid. 702 .........................................................*passim*
U.S.S.G. §2D1.1 ...........................................................*passim*

**State Statutes**                                             **Pages**

75 Pa. Cons. Stat. §3309.............................................. 5, 7, 9, 18
75 Pa. Cons. Stat. §3310....................................................5, 18

No. 23-2575

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN T. TERRY,

Appellant.

---

Appeal from Judgment of Conviction and Sentence
Entered by the United States District Court
for the Western District of Pennsylvania (Gibson, J.)
at Criminal No. 18-24

---

**RESPONSE BRIEF FOR APPELLEE
THE UNITED STATES OF AMERICA**

---

## JURISDICTION

John T. Terry ("John") appeals his conviction and sentence. Appx148.[1] The district court had jurisdiction under 18 U.S.C. §3742, and 28 U.S.C. §1291 supplies this Court's jurisdiction.

---

[1] John's first name is used to distinguish him from his brother, Gerald, who also plays a role in this case. Citations to "Appx" refer to the Appendix filed with the Opening Brief ("Br."), and "PSR" refers to the Presentence Investigation Report. "SAppx" refers to the Supplemental Appendix filed in support of this Response Brief. Finally, "Vid." refers to the dashcam video and body-mic audio of the traffic stop, lodged with this Response Brief.

1

## ISSUES PRESENTED AND STANDARDS OF REVIEW

1.    Should the district court have suppressed the evidence found during a consent search of a car in which John was a passenger, and suppressed John's post-arrest statement?

(a)    That issue is *partially* preserved.  Appx1-64.  The argument John raises on appeal under Miranda v. Arizona, 384 U.S. 436 (1966), differs from the one he raised below.  Compare Br.23-25 with SAppx14-15.

(b)    For preserved arguments on a motion to suppress, the court's factual findings are reviewed for clear error and its legal rulings receive plenary review.  United States v. Lewis, 672 F.3d 232, 236-37 (3d Cir. 2012). Unpreserved suppression arguments are waived.  United States v. Joseph, 730 F.3d 336, 338 (3d Cir. 2013).

2.    Did the district court err in finding that no prosecutorial misconduct occurred during Grand Jury proceedings, that the prosecution did not vouch for its witnesses during summation, and that the prosecutor's brief references to a document not in evidence during summation was harmless?

(a)    None of these arguments were preserved.  Appx150-79; see also SAppx879, 915-16.

(b)    Allegations of misconduct in the procurement of an indictment are waived unless raised before trial.  See Fed. R. Crim. P. 12.  Unpreserved objections to alleged misconduct occurring during trial receive plain-error review.  United States v. Welshans, 892 F.3d 566, 573 (3d Cir. 2018).

3.    Did the prosecution's expert render opinions outside the scope of his expertise at trial in violation of Rule 702 of the Federal Rules of Evidence?

(a)    The issue is *partly* preserved.   Of the ten examples of supposedly-improper testimony cited in the Opening Brief, only *two* were

2

objected-to at trial.    See Br.4, 35-36; see also Appx112 n.13 (noting contemporaneous objections to "certain of" the testimony).

(b)    Abuse-of-discretion review applies to preserved objections. United States v. Watson, 260 F.3d 301, 306 (3d Cir. 2001).    Unpreserved objections receive plain-error review.    Id.

4.    Did the district court err in concluding that the jury had made sufficient findings to permit it to calculate the advisory range under U.S.S.G. §2D1.1 of the United States Sentencing Guidelines ("Guidelines") and apply the mandatory minimum in 21 U.S.C. §841(b)(1)(A)(viii) at sentencing?

(a)    These issues are *not* preserved because defense counsel raised different objections to Section 2D1.1's application and to 841(b)(1)(A)(viii)'s mandatory minimum below.    Appx128-38.

(b)    Plain-error review applies.    United States v. Womack, 55 F.4th 219, 241 (3d Cir. 2022) (unpreserved objection to Guideline error), cert. denied, 144 S. Ct. 1012; United States v. Johnson, 899 F.3d 191, 200 (3d Cir. 2018) (unpreserved Alleyne v. United States, 570 U.S. 99 (2013) objection to mandatory minimum).

3

## STATEMENT OF FACTS AND STATEMENT OF THE CASE

**A.    April 4, 2018: After Stopping A Car on an Interstate Highway, a Pennsylvania State Police Trooper Obtains the Driver's Consent to Search it and Discovers a Hidden Compartment Containing Three Kilograms of a Cocaine/Methamphetamine Mixture and a Loaded Gun.**

On April 4, 2018, Pennsylvania State Police ("PSP") Trooper Ryan Marmol was patrolling Interstate 76 ("the Turnpike") in Somerset County in his capacity as a SHIELD officer. Appx183-95.[2] That stretch of the Turnpike consisted of four lanes total, with two lanes in each direction. Appx195. Trooper Marmol was uniformed, and his cruiser was a marked SUV with a light bar and sirens. Appx193-94, 325.

At about 2:30 p.m., Trooper Marmol spotted a red Ford Taurus traveling westbound in the left lane on the Turnpike. Appx192-97. The Taurus first caught Marmol's eye because an aftermarket film tinted its taillights. Appx196-97, 203. Marmol believed this was a violation of state law, so he followed the vehicle. Appx197; see also Vid.00:01-00:36.

As Trooper Marmol approached the Taurus in the left lane, its driver signaled and abruptly changed lanes, pulling behind a motorist traveling in the right lane. Vid.00:37-00:40. The Taurus executed this maneuver leaving approximately one car-length to spare at or near the 70-mph posted speed limit. Id.; see also Appx204-05. Given the cars' proximity at that speed, plus the windy, snowy conditions, Appx196, Marmol believed the Taurus had

---

[2] "SHIELD" is an acronym for "Safe Highway Initiative through Effective Law Enforcement Detection." Appx185. SHIELD units patrol Pennsylvania's highways and are trained to spot drug- and weapons-smuggling. SAppx226.

executed an unsafe lane change and was tailgating to boot, in violation of 75 Pa. Cons. Stat. §§3309 and 3310.

So Trooper Marmol activated his lights to execute a traffic stop. Vid.00:40-00:50; see also Appx203-04, 261-62. The driver of the Taurus signaled and stopped on the shoulder. Vid.00:50-01:00. Marmol stopped his cruiser and ran the license plate of the Taurus, which revealed the vehicle was registered to "Kelli Royster." Appx206, 215.[3]

Trooper Marmol exited his cruiser and approached the car, where he saw two men inside. Vid.01:15-01:30. Gerald Terry ("Gerald") was driving, and the passenger was his youngest brother, John. Appx208-09; see also SAppx814-15. Marmol greeted them, identified himself, and asked for Gerald's driver's license, an interaction recorded on his lapel mic. Appx194; see also Vid.01:32-01:44.

As Gerald rummaged for his license, Trooper Marmol asked who owned the Taurus, but Gerald said nothing and handed over the registration. Vid.05:44-05:50. Marmol scanned the registration and, already knowing the Taurus was registered to someone named "Kelli," asked if the car's owner was "a girl," to which Gerald responded that a "friend's wife" owned it. Vid.01:50-01:56; see also Appx206-08.

Gerald's hand shook as he tendered his license. Appx207-08; see also Vid.05:55-05:58. Trooper Marmol gave a reason for the stop --- the tailgating --- and inquired about the Terrys' travel plans, to which Gerald replied they were driving from Philadelphia to Pittsburgh for "a few hours" so he could speak at a Narcotics Anonymous ("NA") meeting. Vid.01:57-02:39; see also

---

[3] The court reporter at the suppression hearing misspelled this name as "Kelly Royster." Appx215. At trial, the spelling was corrected to "Kelli Royster." SAppx295.

Appx209-10.  Marmol requested identification from John --- who had spent the encounter staring "straight ahead" --- and John produced a Pennsylvania State Identification Card.  Vid.02:39-02:55; see also Appx208-09, SAppx685-86.  John's carotid artery was pulsating visibly.  Appx209.

Paperwork in hand, Trooper Marmol returned to his cruiser.  Vid.02:55-03:07.  Marmol began conducting "the business of the traffic stop," Appx215, beginning with a criminal history check on Gerald through the cruiser's onboard computer: which "immediately" alerted him that Gerald had arrests for drug-distribution and resisting arrest.  Appx211-12; see also Vid.06:01-06:08.  At that point, Marmol wanted to seek permission to search the Taurus.  Appx213.  But Marmol was outnumbered by the Terrys, Appx194, so he radioed for backup.  Vid.03:54-04:04.  Meanwhile, Marmol researched Royster and discovered that this was "a male, not a female" as Gerald had indicated.  Appx211-12; see also Vid.05:40-05:43.

Two minutes after Trooper Marmol requested backup, dispatch informed him that it was en route.  Vid.07:48-07:52.  While awaiting reinforcement, Marmol scrutinized Gerald's record, as well as John's, and discovered that both had "very violent criminal histories."  Vid.12:18-12:22.  Another look at the owner of the Taurus revealed that Royster was on federal supervision for his role in a cocaine-distribution conspiracy.  Vid.14:10-14:39; see also Appx215-16.

After digesting this information, Trooper Marmol decided not to reapproach the Taurus until backup arrived about four minutes later.  Vid.14:40-18:35.  PSP Trooper Nicholas Petrosky introduced himself to Marmol, who summarized what he had seen and learned about the occupants of the Taurus and its owner.  Vid.18:36-19:32.  Marmol then approached the driver's side of the Taurus and asked Gerald to exit the car, which he did.

Vid.20:20-20:30. As John stepped out of the car unbidden, Marmol told Gerald he would give him a verbal warning about the tailgating and said to "tell your buddy about the tinted taillight covers." Vid.20:31-20:54.

Trooper Marmol then told Gerald that he had discovered his "pretty extensive" criminal record, and asked whether there was "anything illegal in the car?" to which Gerald said "no." Vid.20:55-21:02; see also Appx217. Marmol then asked, "can I search the car," and Gerald replied, "yeah, yeah," nodding affirmatively. Vid.21:02-21:05; see also Appx217. Marmol, who still had the identification cards and registration, explained he would hand this paperwork to Trooper Petrosky and asked for permission to frisk the Terrys. Vid.21:05-21:12. Both submitted and, when Marmol found no contraband on their persons, they waited beside Petrosky near the cruiser. Vid.21:12-22:00.

SHIELD officers, including Trooper Marmol, are trained to look for hidden compartments in cars. Appx186-91. In Marmol's experience, hidden compartments, or "traps," exist "for one purpose and one purpose only, and that purpose is to conceal contraband." Appx191-92. As of this search, Marmol personally had found thirteen hidden compartments, or "traps," secreted inside vehicles; of those, nine or ten contained contraband --- drugs, guns, or drug money --- when he opened them. Id.

That training paid off: minutes after he began searching the Taurus, Trooper Marmol returned to the Terrys and informed them they were being "detained for now" so he could "check something out," explaining that they would be handcuffed and placed in the back of Trooper Petrosky's cruiser for everyone's safety. Vid.32:50-34:54. Once the Terrys were in the cruiser, Marmol told them and Petrosky that "I believe I found a trap in the car." Vid:34:54-35:22.

7

So Trooper Marmol returned to the Taurus. Appx227-28, 304. Beneath the dash, in a cavity designed for a passenger-side airbag, Marmol saw a box with "spot welds." Vid.35:38-35:40; see also Appx222-23. Seconds later, Marmol confirmed that this was a trap. Vid.35:56-35:58. Gentle prying exposed the hidden compartment, where Marmol spotted kilogram-sized packages. Appx227.

But Trooper Marmol still could not open the trap without breaking it, so he telephoned his supervisor for advice. Appx227-28; see also Vid.36:42-45:20.[4] After the call, Marmol soliloquized that he could "see a package in" the trap but was "not quite sure" what it contained. Vid.45:20-47:17. So he kept working, pausing only to show Trooper Petrosky the trap. Vid.47:17-56:40.

Meanwhile, Trooper Marmol or Trooper Petrosky summoned a tow truck. Appx227. As they waited, Marmol continued attempting to open the trap without success. Compare Appx227, 314-15 with Vid.56:40-1:20:55. When the truck arrived, Marmol greeted the driver and obtained a tool from him. Appx317-18; see also Vid.1:20:55-1:22:22.

Minutes later, and as snow swirled, Trooper Marmol opened the trap. Vid.1:22:22-1:30:00. Marmol carried its contents ---- three kilogram-sized packages wrapped in plastic, plus a loaded handgun --- to his cruiser. Vid.1:30:00-1:30:30. As the tow-truck driver secured the Taurus, Marmol memorialized his discovery and ended the stop. Vid.1:30:30-1:31:07.

At that point, Trooper Marmol returned to Trooper Petrosky's cruiser and arrested the Terrys, reading them their Miranda rights. Appx240-48, 320-

---

[4] During telephone conversations, Trooper Marmol explained that he turned off his lapel mic so as not to violate Pennsylvania wiretap laws inadvertently. Appx306-07.

22. Marmol then took the Terrys to the nearest PSP barracks, where he had the Taurus towed. Appx244-45. During his inventory of the Taurus, Marmol found and seized two smartphones: an iPhone 8 and a Samsung Galaxy. SAppx721-22.

The Terrys sat together on a bench while Trooper Marmol processed the evidence about 15 feet away, and John waived his <u>Miranda</u> rights. Appx245-46. As Marmol field tested the packages, John said "he was responsible for the vehicle" and that he had borrowed it. Appx245-47; <u>see also</u> SAppx281-82. Preliminary testing showed the packages contained cocaine, Appx245, so John was booked on state charges. PSR ¶¶16, 52.

**B.    July – October 2018: In Another Investigation, Authorities Learn the Intended Recipient of the Drugs in the Taurus was Robert Dillard, Who Agreed to Cooperate.**

Later in 2018, the DEA and the Allegheny County District Attorney's Narcotics Enforcement Team ("DANET") were investigating drug distribution in Pittsburgh when, by sheer luck, they found the would-be buyer of the drugs in the Taurus. PSR ¶17. During that investigation, investigators focused on Robert Dillard, who lived in the Pittsburgh suburb of Braddock. <u>Id.</u>; <u>see also</u> SAppx575, 590. Convinced Dillard was distributing cocaine, DANET arrested him in July 2018. PSR ¶17.

By late October 2018, Dillard met with DEA and DANET agents and cooperated. PSR ¶18. Among other things, Dillard identified the Terry brothers as one of his drug sources. <u>Id.</u> Dillard said that, a few months earlier, the Terrys had been arrested on the Turnpike with three kilograms of cocaine earmarked for him. <u>Id.</u> The DEA and DANET had been unaware of these arrests, so agents reached out to the PSP, which corroborated that much of Dillard's story. <u>Id.</u>

9

As John awaited his fate on state charges, Trooper Marmol had delivered the three plastic-wrapped packages seized from the Taurus to the PSP Bureau of Forensic Services for testing.  SAppx554.  Individual lab testing of each package confirmed that each contained a mixture of cocaine and methamphetamine, and that the packages weighed 2,995 grams total. SAppx561-62, 569-70.  One package bore a distinctive backwards "2" stamped on it.  SAppx255-56, 468-69.

The FBI took over the investigation, obtained search warrants for the iPhone 8 and the Samsung, and performed Cellebrite data extractions of both devices.  SAppx361-75, 652-54.  The Samsung was subscribed to John and contained, among other things, a March 29, 2018 incoming text sent on Gerald's behalf with the address "1429 Grant Street, Braddock, PA 15104." SAppx452-57, 712.  That was Dillard's home address, and it was the destination for the cocaine/methamphetamine that Trooper Marmol intercepted.  SAppx590.  But the Samsung was not John's only phone, because in late March 2018 he used it to text Gerald to say that his "other phone died."  SAppx456, 714.

John's "other phone" was the iPhone 8 that Trooper Marmol had seized, and it contained photos of John's Pennsylvania Identification Card, a photo of John alongside a girlfriend, and a photo of an email addressed to "John Terry." SAppx680, 685-87, 691.  That iPhone also contained a March 30, 2018 text from Gerald with the same 1429 Grant Street address that had been texted to John's Samsung, SAppx682, which address John input into a map application. SAppx684.  Elsewhere on the iPhone were text messages wherein John told someone named "Nas" about a trap in his car, and a photo of a white substance with the same distinctive backwards "2" found on a package in the trap. SAppx465-68, 681, 699-700.

10

Finally, the FBI examined the firearm seized from the trap, a Smith & Wesson .40 caliber semi-automatic handgun. SAppx245, 625. That handgun was test-fired successfully, and it was manufactured outside of Pennsylvania. SAppx625-26. This firearm had been reported stolen by its lawful owner in Philadelphia in 2017. SAppx625.

Close review of John's background confirmed Trooper Marmol's initial assessment that he had a "violent criminal histor[y]." Compare Vid.12:18-12:22; with PSR ¶¶38-40. Two adult convictions, which resulted in multi-year state and federal prison sentences, precluded John from possessing firearms. SAppx624.

**C.    July 2019 – August 25, 2022: A Federal Grand Jury Indicts the Terrys for The Drugs and Firearm Recovered During Trooper Marmol's Traffic Stop and, After Gerald Pleads Guilty, A Jury Convicts John of the Drug Offenses in the First Phase of a Bifurcated Trial Proceeding.**

On July 9, 2019, a Grand Jury in the Western District of Pennsylvania handed down a six-count Superseding Indictment against the Terrys for the contraband that Trooper Marmol recovered during the April 2018 traffic stop. PSR ¶5. The state charges were dismissed. PSR ¶52.

Count One of the Superseding Indictment charged the Terrys with conspiracy to distribute and possess with intent to distribute 500 grams or more of a mixture containing methamphetamine and cocaine, a violation of 21 U.S.C. §846. PSR ¶5. Count Two charged them with possession with intent to distribute that mixture, a violation of 21 U.S.C. §841. Id. Counts Three and Five charged John with unlawful possession of a firearm by a

11

convicted felon, and unlawful possession of same in furtherance of a drug-trafficking crime, violations of 18 U.S.C. §§922(g) and 924(c).  Id.[5]

The Terrys initially pleaded not guilty.  SAppx738.  John then moved to suppress the evidence on numerous grounds, a subset of which he raises in this appeal.  Compare SAppx1-24 with Br.14-24.  The United States opposed the motion, SAppx25-52, and the district court conducted an evidentiary hearing.  Appx180-337.  After reviewing proposed findings from the parties, SAppx53-80, the court denied the motion.  Appx1-63.

Gerald eventually pleaded guilty to Counts One, Two, and Four of the Superseding Indictment.  PSR at 1; see also SAppx742.  John, however, was tried alone in a bifurcated proceeding.  SAppx110.  In the first phase, the jury weighed John's guilt on the drug-related offenses in Counts One and Two.  SAppx110-11.  If the jury convicted John of either of those counts, it would decide his fate on the firearms-related offenses alleged at Counts Three and Five in a second phase.  SAppx110-11.

The evidence at the first phase of John's trial was as set forth *supra*, except that the jury saw a video of the traffic stop edited to omit any mention of criminal records.  SAppx163-616, 762-984.  The jury learned of the firearm recovered from the trap, SAppx245-46, but not that it was stolen.  Trooper Marmol testified subject to those limitations.  Compare SAppx224-330 with Appx180-337.  Next, Justin Sarvey, the FBI's forensic examiner, explained the Cellebrite data extraction he performed on the smartphones.  SAppx339-388.  Then, FBI Special Agent ("SA") James Simpson testified as case agent and as an expert in the field of drug-trafficking and the coded language used

---

[5] Counts Four and Six were alleged against Gerald, but were otherwise identical to Counts Three and Five as alleged against John.  PSR ¶5.

in drug trafficking, using exhibits from the extractions.  SAppx401-548.  The PSP chemist who tested the packages found in the trap testified that each contained a cocaine/methamphetamine mixture, and that this mixture weighed 2,995 grams total.  SAppx549-74.

Beyond that evidence, SAppx643-722, the jury also heard from the cooperating witness, Dillard.  SAppx574-608.  Dillard attested that, before April 2018, John and Gerald sold him multi-kilogram quantities of cocaine for about $28,000 per kilogram.  SAppx583-88.  Dillard said that the Terrys agreed to deliver three kilos of cocaine to his home at 1429 Grant Street in April 2018, and he recalled giving them that address.  Appx589-90.  But the duo never arrived, and John later told Dillard that the cocaine had been found when Trooper Marmol "ran his license."  SAppx590-92.

John testified.  SAppx767.  His story was that, on April 4, 2018, he was accompanying Gerald to an NA meeting in Pittsburgh.  SAppx770.  John admitted Googling Dillard's address, but said he believed it was the site of the NA meeting.  SAppx770-71, 805-09.  John denied knowing who owned the Taurus or where Gerald got it, even though John "grew up" with Royster.  SAppx772, 780, 788.  And John insisted he had been unaware the trap or its contents until Trooper Marmol displayed the contraband on the hood of his cruiser.  SAppx775-79.  Finally, John denied telling Marmol that he took responsibility for the Taurus.  SAppx775-76, 837.

John admitted that the Samsung belonged to him but denied any knowledge of the iPhone 8.  SAppx779-82, 807, 839.  But John could only speculate why the iPhone contained his indicia, including the photo of him and a girlfriend, the scan of his Pennsylvania Identification Card, and the photo of the T-Mobile letter to "John Terry."  Compare SAppx685-87, 691 with SAppx776-82, 834.  Nor could John explain why his fiancée had

13

contacted the iPhone 33 times between April 1 and April 4, 2018. SAppx459-61, 708-09; see also SAppx807, 830-31, 836-37. Ultimately, John suggested that the FBI's extraction process had "mixed up" data from his Samsung with data found on the iPhone. SAppx792-800, 824-33, 837.

After John rested, the parties proceeded to arguments and the district court instructed the jury.[6] SAppx876-965. Shortly thereafter, the jury convicted John of Counts One and Two and found beyond a reasonable doubt that the drug was a mixture of cocaine and methamphetamine weighing at least 500 grams. SAppx971-73.

**D.    August 26, 2022: In the Second Phase of the Bifurcated Proceeding, John Chooses a Bench Trial of the Weapons Charges and the District Court Finds Him Guilty of Both.**

John waived his right to a jury for the second phase of trial. SAppx617-23. To streamline that phase, the district court incorporated the evidence from phase one. SAppx623-24. The parties stipulated that John had been "convicted of a crime punishable by imprisonment for a term exceeding one year," and that he knew this. SAppx624. They also agreed that the handgun in the trap was loaded, fully-functional, had been manufactured outside of Pennsylvania, and was stolen. SAppx625-27.

The district court convicted John of Counts Three and Five, crediting the testimony of Trooper Marmol. SAppx635-40. John filed a post-trial motion for judgment of acquittal, SAppx81-109, 143-62, which the United States opposed. SAppx110-42. The court denied that motion. Appx64-126.

---

[6] Neither party called Gerald, who intended to assert his rights under the Fifth Amendment. SAppx857-59, 872-73.

14

**E.    August 10, 2023: The District Court Imposes a Mandatory Minimum Sentence.**

John's sentencing will be examined *infra* to minimize repetition. Succinctly, John objected to the PSR.  Appx126.  The district court overruled John's objections.  Appx126-39.  After calculating his Guideline range, the court varied downward under 18 U.S.C. §3553(a) to impose an aggregate sentence of 420 months in prison, which reflected the consecutive mandatory minima prescribed by 21 U.S.C. §841(b) and 18 U.S.C. §924(c).  Compare PSR ¶¶74-75 with Appx387-90.

This appeal followed.  Appx148.

## SUMMARY OF ARGUMENT

Of the five suppression issues the Opening Brief raises, Br.14-25, the opening 20 minutes of the dashcam recording refutes the first two. John is judicially estoppel from raising the next two because they contradict his trial testimony, which confirmed that he lacked Fourth-Amendment standing vis-à-vis the Taurus. So the district court correctly rejected all four of those arguments. Appx1-62. John's fifth argument sounds in <u>Miranda</u>, but it is waived because he raised a distinct argument below. It is meritless anyway.

And while John accuses the prosecutor of offering false testimony at Grand Jury proceedings and vouching for witnesses and evidence during summation at trial, Br.25-32, the district court rejected these arguments when he raised them for the first time after trial. Appx93-108. This Court should affirm. John's claim of Grand Jury misconduct is waived and meritless, and his accusations of vouching at trial fail on plain-error review.

Next, John insists SA Simpson's testimony about the content of the smartphones exceeded his expertise. Br.32-38. John's post-trial motion for judgment of acquittal raised these arguments, SAppx96, but the district court properly rejected them. Appx110-15. Regardless, John *admitted* using the Samsung, and several items on the iPhone 8 made his use of it undeniable, with or without Simpson's testimony to that effect.

Last, John complains that the district court should have calculated his offense level for Counts I and II under U.S.S.G. §2D1.1, and his mandatory minimum under 21 U.S.C. §841(b), using the least-punished controlled substance because his jury did not find the weight of each substance in his mixture. Br.39. But John voiced different objections below, SAppx128-38, so he must show plain error. And he cannot. The Guideline range became moot when the court sentenced John to the *correct* mandatory minimum.

16

## ARGUMENT

I.    **TO THE EXTENT THE ISSUE IS NOT BARRED BY JUDICIAL ESTOPPEL OR WAIVER, THE DISTRICT COURT DID NOT ERR IN DENYING THE MOTION TO SUPPRESS.**

Before trial, John raised five suppression arguments. SAppx1-80. The district court rejected each and denied his motion to suppress. Appx1-63. On appeal, John resurrects four of those arguments, contradicting his sworn testimony in two. Br.14-22. And although John's fifth suppression argument below asserted a <u>Miranda</u> violation, on appeal he raises a brand-new <u>Miranda</u> argument. <u>Compare</u> Br.22-25 <u>with</u> Appx51-61. Each argument will be discussed *seriatim* under the pertinent standard of review. All are meritless.

   A.    *Reasonable Suspicion Supports Trooper Marmol's Initial Stop of the Taurus.*

John's first argument is that Trooper Marmol lacked reasonable suspicion to stop the Taurus. Br.14-17. "[A] traffic stop is a seizure of everyone in the stopped vehicle," so passengers "have 'standing' to object to the stop." <u>United States v. Mosley</u>, 454 F.3d 249, 253 (3d Cir. 2006). But if Marmol had "a particularized and objective basis for suspecting" that the driver violated a traffic law, the stop was justified. <u>Heien v. North Carolina</u>, 574 U.S. 54, 60 (2014) (citation omitted). Marmol "need not [have been] factually accurate in [the] belief that a traffic law had been violated"; it was enough if he "reasonably believed that a violation had taken place." <u>United States v. Delfin-Colina</u>, 464 F.3d 392, 398 (3d Cir. 2006).

Trooper Marmol testified that, while the aftermarket taillight tint caught his eye initially, Appx196-97, 203; <u>see also</u> Vid.00:01-00:36, he stopped the Taurus because its driver executed an abrupt lane change which put him about a car's-length behind another motorist on the Turnpike, where the posted speed-limit was 70 mph. Appx202-05. The dashcam video corroborates

17

Marmol's testimony. Vid.00:37-00:40; <u>see also</u> Vid.01:57-02:39. So Marmol had reasonable suspicion to believe Gerald violated 75 Pa. Cons. Stat. §§3309 and 3310. <u>See</u> Apx22-26.

Based on the evidence, John cannot show that the district court clearly erred in crediting Trooper Marmol's testimony or misapplied the law. An officer seeing Gerald's lane-change could conclude that it was unsafe, and that he was tailgating once he had completed the maneuver. This court has upheld such stops. <u>United States v. Wilson</u>, 960 F.3d 136, 145 (3d Cir. 2020) (finding reasonable suspicion supported stop for tailgating where "we can see the tailgating violation for ourselves on the video"); <u>accord</u> <u>United States v. Guzman</u>, No.21-3017, 2022 WL 2816521, at *3 (3d Cir. July 19, 2022) (same, where officer's testimony that the driver "ma[d]e an 'abrupt' and 'unsafe' lane change" on the Turnpike was "consistent with the dashcam footage").[7]

> **B.**    *Trooper Marmol's Review of Gerald's Criminal History Was Part of the Mission of the Stop, and After Acquiring this Information, Marmol Had Reasonable Suspicion that Another Crime was Afoot.*

Second, John challenges the duration of the stop, and the seizure of his person, as exceeding the scope of the traffic violations that Trooper Marmol observed. Br.17-19. This much, he may do. <u>Brendlin v. California</u>, 551 U.S. 249, 258-59 (2007) (citing *inter alia* <u>Mosley</u>, 454 F.3d at 253). Curiously, though, John never cites <u>Rodriguez v. United States</u>, 575 U.S. 348, 357-58

---

[7] John insists the stop was pretextual. Br.16-17. The district court properly rejected this argument as irrelevant. Appx26 n.5. "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." <u>Mosley</u>, 454 F.3d at 252 (citing <u>Whren v. United States</u>, 517 U.S. 806, 811-13 (1996)).

(2015), which the district court relied upon when it rejected this argument. Appx26-38. The court's decision was correct.

A traffic stop must last "no longer than is necessary to effectuate" its mission, and must end "when tasks tied to the traffic infraction are --- or reasonably should have been --- completed." Rodriguez, 575 U.S. at 354 (cleaned up). An officer must reasonably suspect an additional crime to extend the stop. Id. at 355. To determine whether a stop was unlawfully extended, this Court identifies the "Rodriguez moment"; i.e., the point "when the stop was measurably extended" beyond its mission. United States v. Stewart, 92 F.4th 461, 467 (3d Cir. 2024). The Court then ascertains "whether the facts available to the officer up to that moment," viewed collectively, "established reasonable suspicion of criminal activity" beyond the reason for the stop. Id. This requires an officer to "have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring." United States v. Garner, 961 F.3d 264, 271 (3d Cir. 2020).

Albeit without citing Rodriguez, on appeal John suggests that the Rodriguez moment occurred when Trooper Marmol "check[ed] [Gerald's] criminal history," an action which John claims "was unnecessary and was not justified by any articulable suspicion of wrongdoing." Br.18. Quite correctly, the district court rejected this argument. Appx34. Marmol needed no additional suspicion to investigate Gerald's background if it was an "ordinary inquir[y] incident to the traffic stop." Rodriguez, 575 U.S. at 355. And it was. See id. Officer-safety concerns justify checking a driver's criminal history. United States v. Hunter, 88 F.4th 221, 225-26 (3d Cir. 2023), cert. denied, 144 S. Ct. 858 (2024); see also Stewart, 92 F.4th at 465-67.

Nor did Trooper Marmol impermissibly extend the stop *after* discovering Gerald's criminal history, when he summoned backup. Br.18.

19

The district court assumed that the Rodriguez moment occurred at that juncture, but determined that Marmol had reasonable suspicion of another crime afoot by then based on all he knew or had observed, to wit:

> (1) [Gerald's] hand was shaking when he handed his license to [Marmol], exhibiting nervousness; (2) [Gerald] gave confusing information about the vehicle's registered owner; (3) the [Taurus] was owned by a third party; (4) the [Taurus] was coming from Philadelphia, a known source city for narcotics; (5) the [Taurus] was traveling to Pittsburgh, a known consumption/distribution city for narcotics; (6) the trip itinerary was short, which is typical of drug smuggling activities; (7) the travel itinerary given by [Gerald] was implausible; (8) [John's] carotid artery was pulsing, which is a nervous behavior; and (9) [Gerald] had an arrest record.

Appx36-38. Reasonable suspicion exists to extend traffic stops where the officer observes third-party vehicle use, an odd itinerary, driver nervousness, and other behaviors consistent with drug-trafficking. Stewart, 92 F.4th at 468; see also Garner, 961 F.3d at 271-72; Wilson, 960 F.3d at 146.

Ignoring the district court's findings, John offers an underinclusive list of facts known to Trooper Marmol when he summoned backup. Br.18 (claiming that "Marmol justified his actions due to [Gerald's] nervousness, the itinerary of the vehicle (traveling from Philadelphia to Pittsburgh), and the vehicle being registered to a third party."). But a reasonable-suspicion inquiry examines "the whole picture," not just those portions of it a defendant accepts. Garner, 961 F.3d at 271. Positing innocent explanations for a few of the facts that round out the total tableau while skipping many others, as John does, Br.18-19, is not enough. See Stewart, 92 F.4th at 468 (rejecting this divide-and-conquer approach).

In sum, the mission of the stop included checking Gerald's criminal history. Hunter, 88 F.4th at 225-26; Stewart, 92 F.4th at 465-67. That

exercise, plus everything else Trooper Marmol knew by then, cleared the "very low bar" of reasonable suspicion that another crime was afoot when he radioed for backup. United States v. Ramos, 826 F. App'x 131, 133 (3d Cir. 2020) (citing United States v. Arvizu, 534 U.S. 266, 274 (2002)). John's refusal to accept most of the facts the district court found and his failure to engage with what it actually ruled leaves him unable to show otherwise.

C. *John is Judicially Estopped From Repudiating His Trial Testimony, Which Confirms that He Lacked Standing to Challenge the Voluntariness of Gerald's Consent to the Search of the Taurus or the Scope of that Search.*

The third and fourth suppression arguments John raises are that Gerald's consent to search the Taurus was involuntary under Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973), and that the search exceeded the scope of Gerald's consent per Florida v. Jimeno, 500 U.S. 248, 251 (1991). Br.19-23. This Court need not decide these issues on their merits because John's sworn trial testimony confirms that he lacks standing to raise either of them.

At the suppression hearing, Trooper Marmol testified that John told him he "borrowed" and "took responsibility" for the Taurus. Appx326. John eschewed the stand at that hearing, so Marmol's testimony was uncontradicted when the district court ruled on his motion. Consequently, the court found some "evidence that [John] borrowed the vehicle," but determined that he lacked standing to challenge *either* the voluntariness of Gerald's consent or the scope of Marmol's search. Appx39-51. Based on the suppression-hearing record, John suggests that he acquired Fourth-Amendment standing by telling "[Marmol] that he was responsible for the vehicle" and, perhaps, by "hiding something" in it. Br.20.

But when reviewing the denial of a motion to suppress, this Court views the facts in the light most favorable to the United States. Garner, 961 F.3d at

21

269. This means "the entire record": the Court is "not restricted to the evidence presented at the suppression hearing[.]" <u>United States v. Vasquez-Algarin</u>, 821 F.3d 467, 471 (3d Cir. 2016) (cleaned up). So trial testimony is fair game. <u>United States v. Silveus</u>, 542 F.3d 993, 1001 (3d Cir. 2008).

If the question of Fourth-Amendment standing had been debatable at the suppression hearing, and it was not, then John's trial testimony resolved it against him. John swore to a jury that, on April 4, 2018, Gerald picked him up in a Taurus of unknown origin. SAppx771-72, 780. John asserted ignorance of the trap or the contraband it contained until Trooper Marmol arrayed the drugs and gun on the hood of his cruiser, and denied "hiding" anything in the Taurus. SAppx775-79. Most critically, John denied telling Marmol that he took responsibility for or borrowed the Taurus. SAppx775-76, 837.

To protect the integrity of the judicial process, John must be estopped from taking positions on appeal that contradict his sworn trial testimony. <u>See</u> <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749-51 (2001). Judicial estoppel applies when a party (1) takes two irreconcilable positions; (2) did so "to play fast and loose with the court"; and when (3) no other sanction will suffice. <u>Montrose Med. Group Participating Savs. Plan v. Bulger</u>, 243 F.3d 773, 779-80 (3d Cir. 2001). The party to be estopped need not have benefitted from his prior inconsistent position. <u>Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.</u>, 337 F.3d 314, 324 (3d Cir. 2003).

<u>Montrose</u> applies here. First, John's sworn trial testimony that he never told Trooper Marmol that he was responsible for the Taurus, SAppx771-80, cannot be reconciled with his unsworn assertion, repeated six times in his Opening Brief, to the exact contrary. <u>See</u> Br. 2, 11, 20, 24, 25, 29. And John is playing fast-and-loose with the record: he summarizes his testimony to omit

22

its pivotal averment --- his sworn denial that he told Marmol that he took responsibility for the car, Br.12 --- and abridges his Appendix to exclude his testimony in its entirety, *without announcing the abridgment.* Appx373-74. Finally, no lesser remedy exists because there is no greater affront to the judicial process than a defendant's willingness to recant his own "[s]olemn declarations in open court" when it suits him. Blackledge v. Allison, 431 U.S. 63, 74 (1977).

Taken at face-value, John's trial testimony that he had no clue where Gerald got the Taurus or that it contained contraband, plus John's sworn *denial* that he told Trooper Marmol that he accepted responsibility for the car, defeat his standing under Schneckloth and Jimeno. If estopped from denying these averments, John was a mere passenger. And mere passengers lack Fourth-Amendment standing. Rakas v. Illinois, 439 U.S. 128, 148-49 (1978).

But even ignoring John's sworn trial testimony, he still lacks standing to challenge the voluntariness of Gerald's consent or the scope of the search, as the district court found. Appx39-49. If John borrowed the Taurus, SAppx281-82, he still was but a passenger without keys to it. Permission to ride in a car cannot confer standing. United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995). And John said nothing while he watched Trooper Marmol search the car. Compare Vid.21:39-1:30:00 with United States v. Anderson, 859 F.2d 1171, 1177 (3d Cir. 1988) (finding that standing by and watching the search of a car without objection was "completely inconsistent" with any expectation of privacy in it). Nor could John, a holder of a Pennsylvania Identification Card, Appx208, have driven the Taurus: a fact that, while not dispositive of standing when a defendant objects *before* a vehicle is searched, see United States v. Montalvo-Flores, 81 F.4th 339, 345 & n.10 (3d Cir. 2023), surely undercuts his expectation of privacy when he

23

only speaks up later. This case is simply not United States v. Baker, 221 F.3d 438, 442 (3d Cir. 2000), where the defendant had a reasonable expectation of privacy in a car *he* had borrowed and driven for at least a month, whose keys *he* carried, and which *he* was caught driving alone.

Even if John had standing, the district court correctly rejected his suppression arguments on their merits. Appx43-47. The United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003) factors confirm that Gerald's consent was voluntary. Appx39-47. The dashcam video reflects that Gerald --- an intelligent adult and no stranger to the criminal justice system --- readily assented when Trooper Marmol cordially sought consent to search the Taurus beside the Turnpike in broad daylight. Vid.20:55-21:12. Marmol did not inform Gerald he could refuse, and had not returned his paperwork before asking, but neither was required. Ohio v. Robinette, 519 U.S. 33, 35 (1996); accord United States v. Soriano, 976 F.3d 450, 455-58 (5th Cir. 2020) (consent valid despite officer neither informing defendant he could refuse nor returning his paperwork before seeking consent). That is especially so, given that Gerald consented after Marmol told him he was being given a verbal warning. Vid.20:31-20:54. The possibility that Marmol's largesse might have encouraged Gerald's consent is immaterial. See, e.g., United States v. Burwell, 763 F. App'x 840, 845-46 (11th Cir. 2019).

Finally, Gerald's assent encompassed the entire car under United States v. Ross, 456 U.S. 798, 809-22 (1982), as the district court concluded. Appx47-51. Absent something in "this record to show that [Gerald] had any special privacy interest in the hidden area beyond that which he had in the car itself," United States v. Morales, 861 F.3d 396, 400 (3d Cir. 1988), his consent reasonably encompassed the trap: as evidenced by Gerald's failure to withdraw or limit his consent after Trooper Marmol announced he had found

24

it. Vid:34:54-35:22. Regardless, the sight of the trap, together with Marmol's training, experience, and everything he knew by then, created probable cause to search that compartment, as the court found. Compare Appx50-51 (noting Marmol's testimony that traps are "used for one purpose and one purpose only": the concealment of contraband) with Appx191-92 and United States v. Villafranco-Elizondo, 897 F.3d 635, 643 (5th Cir. 2018).

### D.    John's Newly-Minted Miranda Argument is Waived and Meritless Besides.

Fifth, and finally, after admitting that Trooper Marmol had "properly Mirandized" him by the time they reached the barracks, John concedes that he waived Miranda. Br.24. Nevertheless, John claims that, at some indeterminate subsequent point, but while still at the barracks, Marmol resumed interrogation "without re-Mirandizing him," supposedly "elicit[ing]" John's statement "that he took responsibility for the vehicle." Id. Assuming this argument is not waived entirely --- either by John's failure to raise it below, the want of legal authority for it in the Opening Brief, or John's sworn trial testimony that he made no such statement[8] --- it is meritless.

A defendant who chooses to ride-or-die with one suppression argument in the district court may not swap horses on appeal. Joseph, 730 F.3d at 338. He must invoke "the same legal rule or standard" on "the same facts" in both arenas. Id. at 342. Below, John maintained that his post-arrest Miranda warnings were invalid because they came *too late*, and should have been given

---

[8] Again, John's belated concession that Trooper Marmol "elicited from [him] that he took responsibility for the vehicle," Br.24, cannot be squared with his trial testimony that he never said this. SAppx775. But because Marmol told the jury otherwise, SAppx281-82, the United States will address the new Miranda argument on its merits, even though the district court never had that opportunity.

during the traffic stop.  Compare SAppx14-15, 79-80 with Appx58-61.  Now, John concedes his post-arrest Miranda warnings were valid, but insists they came *too soon* because too much time elapsed between them and his statement.  Br.23-25.  These arguments differ, so the new one is waived.  Id. at 339.

But if this Court reaches it, John's new contention that the prophylactic effect of the Miranda warnings he received had worn off by the time he made the incriminating statement, see Br.24, is meritless.  As this Court has said:

> [W]hether a time lapse renders Miranda warnings "stale" may be reduced to answering two questions: (1) At the time the Miranda warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?

United States v. Pruden, 398 F.3d 241, 246-47 (3d Cir. 2005).  Though John now faults Trooper Marmol for "failing to issue a renewed Miranda warning before eliciting the statement," Br.24, his Opening Brief never cites Pruden or any other legal authority requiring a refreshed warning.  So John has not adequately developed this new argument on appeal.  See United States v. Hoffecker, 530 F.3d 137, 162-63 (3d Cir. 2008) (citing Fed. R. App. P. 28(a)).

If this Court overlooks John's failure to raise this suppression issue below or to develop it here, and it should not, the argument still fails.  In addressing the distinct argument that John did raise, the district court found his initial Miranda waiver uncoerced.  Appx59-60.  The first prong of Pruden was thus satisfied, and all that remains is to determine whether anything occurring between the warnings and the statement vitiated the warnings' force, per its second prong.  Pruden, 398 F.3d at 246-47.  But here, John comes

to this Court empty-handed.  For while Trooper Marmol clarified *what* John's statement was, nobody pinned Marmol down as to *how much time* separated John's <u>Miranda</u> waiver from his statement, or established any significant intervening event.  Appx324-29.  John's own testimony is unhelpful, since he denied ever making the statement.  SAppx775.  Where a defendant's failure to raise a suppression issue leaves a critical void in the record, the issue is unreviewable.  <u>United States v. Battaglini</u>, 751 F. App'x 242, 244-45 (3d Cir. 2018).  Correctly given John's age, intelligence, and experience with the law, the court found his statement voluntary anyway.  Appx60-61.

Ultimately, John's five suppression arguments go nowhere.  Trooper Marmol's observations supplied reasonable suspicion of a traffic violation to initiate the stop, as the district court found.  Appx22-26.  Marmol did not extend his investigation beyond the stop's mission until he had Gerald's consent to do so.  Appx34-38.  And even if John is not judicially estopped from eating his *sworn* words, the court correctly found that he lacked standing to challenge the voluntariness of Gerald's consent or the scope of the search, and concluded that no <u>Schneckloth</u> or <u>Jimeno</u> violation occurred regardless.  Appx39-51.  Finally, John waived his new contention that the staleness of his <u>Miranda</u> warnings rendered inadmissible any statement he made to Marmol: an argument he fails to reconcile with <u>Pruden</u> and for which he developed no record support.

27

**II.** **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO ORDER A NEW TRIAL BASED ON PROSECUTORIAL MISCONDUCT.**

Next, John accuses the United States of presenting false testimony to the Grand Jury and vouching for its witnesses and evidence during summation at trial. Br.25-32. The district court rejected these claims when John raised them after trial. Appx93-108. Each of John's arguments will be addressed *seriatim*, but all lack merit.

  *A.*   *The Prosecution Presented No Perjured Testimony from SA Simpson to the Grand Jury.*

The prosecution presented its Indictment to the Grand Jury in 2018, followed by its Superseding Indictment in 2019, through the testimony of SA Simpson, who spoke with Trooper Marmol and read his report. Appx95; see also SAppx119. Based on that input, Simpson attested that John told Marmol that he took responsibility for the Taurus and the contraband it contained. Appx95-96. But at the 2019 suppression hearing, Marmol testified that John actually "took responsibility for the vehicle," Appx246, without explicitly taking responsibility for the contraband inside. Appx326-28. Based on this discrepancy, John accuses the prosecutor of deliberately presenting perjured testimony to the Grand Jury. Br.27-29.

Knowingly presenting perjurious testimony to a Grand Jury constitutes prosecutorial misconduct. United States v. Soberon, 929 F.2d 935, 940 (3d Cir. 1991). To establish misconduct, John must establish that SA Simpson "willfully made a false statement under oath before [the Grand Jury] about a material matter," see United States v. Jabateh, 974 F.3d 281, 300 (3d Cir. 2020) (cleaned up), and that the prosecutor knew it.

The district court treated this issue as preserved. Appx93-99. Yet it was *not*. Non-jurisdictional defects in an indictment must be raised before

trial under Rule 12 of the Federal Rules of Criminal Procedure. United States v. Steiner, 847 F.3d 103, 115 (3d Cir. 2017). Although this Court has not reached the issue, see United States v. Calloway, No.20-1124, 2022 WL 989362, at *3 n.6 (3d Cir.), cert. denied, 143 S. Ct. 222 (2022), Rule 12 appears to covers perjury presented in the procurement of an indictment. United States v. Combs, 369 F.3d 925, 936 (6th Cir. 2004) (citing United States v. Mack, 892 F.2d 134, 135-36 (1st Cir. 1989)). John knew of this issue by 2019, SAppx983-1051, yet never raised it before trial. Instead, he saved it *for three years*, until his trial in 2022, as fodder for cross-examination of SA Simpson. SAppx523-37. John only briefed this issue after trial. SAppx81-109. That is too late, so the issue is waived. See United States v. Bansal, 663 F.3d 634, 659 (3d Cir. 2011).

Should this Court forgive John's waiver, it would review this issue for plain error only. Bansal, 663 F.3d at 659 (cleaned up). This requires John to show "(1) a legal error that is (2) obvious and (3) has affected his substantial rights," and that the error (4) "seriously affects the fairness, integrity, or reputation of judicial proceedings." United States v. Davitashvili, 97 F.4th 104, 108 (3d Cir. 2024) (cleaned up). The willful falsity of SA Simpson's testimony, and the prosecutor's willfulness in presenting it, must be "obvious" and not "subject to reasonable dispute." Id. at 113.

John cannot establish that SA Simpson's Grand Jury testimony was false, much less *plainly* so. The district court properly found that Simpson's testimony before the Grand Jury that John "took responsibility for the drugs and the gun" was "a reasonable deduction from the evidence that [Simpson] had at his disposal," not perjury. Appx97. At the suppression hearing, Trooper Marmol testified that, when John accepted responsibility for the Taurus, "I took that statement to believe that he was responsible for the vehicle

29

and its contents." Appx246; see also Appx326 ("I took that as that he was responsible for the vehicle and everything inside[....]"). That inference was reasonable, if not inescapable. John knew he was under arrest because of the contents of the Taurus, not the car itself, so it would have been a *non sequitur* for him to volunteer responsibility for the car without specifically disavowing responsibility for its contents: which until trial, he never did. The inference was so natural that Simpson drew it, too, apparently without realizing that it *was* an inference. SAppx118-20. Either way, John cannot show Simpson's Grand Jury testimony was false, let alone prove that he and the prosecutor both knew it.

Nor can John demonstrate prejudice. See Davitashvili, 97 F.4th at 108. "A petit jury's guilty verdict [...] renders harmless" any alleged perjury before the Grand Jury. See Calloway, 2022 WL 989362, at **1-2 (citing United States v. Console, 13 F.3d 641, 672 (3d Cir. 1993)). At trial, Trooper Marmol explained "exactly what [John] said to him following his arrest," Appx98, including the fact that John did not specifically take responsibility for the contraband in the car. SAppx311-12. Also at trial, SA Simpson explained "what [Marmol] did and did not write in his report," Appx98, admitted interpreting John's statement to encompass the car and its contents, SAppx528-30, and explained his Grand Jury testimony. SAppx542-43. The jury still convicted John after hearing Simpson raked over the coals about the discrepancy on cross-examination, SAppx524-38, so the district court properly concluded that any harm was "negated." Appx98-99.

B. *The Prosecution Did Not Improperly Vouch for its Witnesses or its Evidence.*

Next, John asserts that the prosecution improperly vouched twice during summation: first by vouching for the veracity of two law-enforcement

30

witnesses; and second, by inviting the jury to compare trial exhibits with Forensic Examiner Sarvey's full extractions --- even though the latter had only been admitted to establish chain-of-custody --- thus vouching for the FBI's data extraction.  Br.29-32.  Neither argument was preserved, and the district court rightly rejected both.  Appx99-108.

The basis for John's first claim of vouching unfolded like this: At trial, John testified that Trooper Marmol was lying when he said John accepted responsibility for the Taurus; John also insisted that SA Simpson lied about the data extracted from the iPhone 8.  SAppx836-37.  Anticipating that John would make these accusations the centerpiece of his closing argument, in his summation the prosecutor framed the issue as whether John was more believable than Marmol, "a nine-year member of" SHIELD.  SAppx879.  As expected, in closing argument the defense accused Marmol of lying *and* claimed that Simpson had falsified the extraction reports.  SAppx895-904.  The defense also argued that *Gerald* took responsibility for the Taurus during the traffic stop.  Appx899-901.  In rebuttal, the prosecutor told the jury to review the dashcam video to assure itself that Gerald said no such thing and, after summarizing Simpson's credentials, questioned why Simpson "would risk his entire career" to "create [a] falsified" extraction.  SAppx912-16.

Vouching is misconduct when the prosecutor assures the jury "of the credibility of a Government witness through personal knowledge or by other information outside of" the record.  United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998) (citations omitted).  This Court must ascertain whether "the prosecutor's comments to the jury so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Rolan v. Coleman, 680 F.3d 311, 321 (3d Cir. 2012) (cleaned up).  The actions are examined "in context and in light of the entire trial."  Id. (cleaned up).

31

Because John never objected, SAppx879, 915-16, he must establish that the district court plainly erred in failing to strike these remarks *sua sponte*. Welshans, 892 F.3d at 573. Even then, reversal is unwarranted unless John shows an error so "egregious" that leaving it uncorrected will cause "a manifest miscarriage of justice." United States v. Fulton, 837 F.3d 281, 307 & n.194 (3d Cir. 2016). "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone," United States v. Young, 470 U.S. 1, 11 (1985), particularly on plain-error review. Id. at 16-17.

No plain error occurred, as the district court found. Appx100-03. Even before John testified that Trooper Marmol and SA Simpson had lied, the court recognized he had so "implied," and invited the prosecutor to "make that argument" to the jury. SAppx822-23. Minutes later, John did more than imply: he called both witnesses liars. SAppx836-37. The prosecution's closing remarks about Marmol and Simpson hewed to the evidence, SAppx224-28, 401-14, and its assessment of the risks Simpson would incur by lying was a fair response to defense counsel's actual attack on his veracity during closing. See United States v. Gant, No.21-3117, 2023 WL 5625498, at *3 & n.7 (3d Cir. Aug. 31, 2023) (holding that a "prosecutor did not improperly vouch for the officers when she stated [... that they] would be risking their careers if they lied on the stand," even though some of her remarks were anticipatory) (citing United States v. Bailey-Snyder, 923 F.3d 289, 295-96 (3d Cir. 2019)).

To understand the other instance of improper vouching that John alleges --- the prosecutor's reference to documents not in evidence during summation, Br.31 --- additional background is necessary. At trial, Forensic Examiner Sarvey testified that he performed full data extractions of the

Samsung and iPhone 8, offered as Exhibits 22 and 24, respectively, using Cellebrite. SAppx367, 373-74. Sarvey added that SA Simpson reviewed the full extractions and flagged subsets of potentially-relevant items, which Sarvey saved as "summary" reports for the Samsung and the iPhone, Exhibits 25 and 26 respectively. SAppx375-85, 417-25. But when the United States offered Exhibits 22, 24, 25 and 26 into evidence, John objected. SAppx367-68.

Ultimately, the district court admitted those exhibits through Forensic Examiner Sarvey, but only to "show chain of custody," ruling that they would "not be displayed to the jury." SAppx368-74. Questions asked of Sarvey during cross-examination suggested that the defense was poised to argue that the FBI had manipulated or edited the extractions, prompting the prosecution to worry that John would exploit the exclusion of the full extractions. SAppx376-85. The court deemed this concern "premature," but promised to "deal with" it if the defense so argued. SAppx385-86. Otherwise, only the individual exhibits that SA Simpson had selected from the summary reports in Exhibits 25 and 26 would be admitted. SAppx383-84.

Later, John testified that Forensic Examiner Sarvey and SA Simpson had commingled data extracted from his Samsung with data from the iPhone 8, and accused both witnesses of lying to create the false impression that he used the iPhone. SAppx787-807, 837. So in closing, the prosecutor told the jury it could compare the exhibits to the full extractions if it chose. SAppx883. This was incorrect; the district court's ruling remained in force. SAppx386. But instead of objecting, defense counsel argued that the FBI had falsified the extractions and told the jury that, contrary to the prosecutor's statement, it could not see the full extractions. SAppx897-904. In rebuttal, the prosecutor reiterated that the jury could perform this comparison, again without

33

objection.    SAppx915-16.    Immediately after arguments, the prosecutor argued that John had opened the door and asked the court to send the full extractions back with the jury: but the court declined unless the jury asked for this evidence, which it never did.  SAppx961-69.

On this record, the district court found that referring to the full extractions was "minor" misconduct, but declined to reverse.  Appx103-08. Especially on plain-error review, Welshans, 892 F.3d at 573, that decision is unassailable.  First, as the court noted, Appx107, the jury presumably obeyed its instruction that the "arguments of the lawyers" were "not evidence." Compare United States v. Repak, 852 F.3d 230, 259 (3d Cir. 2017) with SAppx923.  Second, and as the court noted, it had not entirely foreclosed the admission of the full extractions and, after hearing the parties' arguments, John arguably *had* opened the door.  Compare Appx107 with SAppx961-62. Third, the jury did *not* request the full extractions.  Appx107.  Instead, it reexamined the dashcam video, SAppx965-69, apparently to put to rest John's baseless argument that Gerald took responsibility for the Taurus during the stop.  SAppx912.

Ultimately, none of this alleged prosecutorial misconduct entitles John to another trial.  If not waived entirely, John's accusation of perjury before the Grand Jury is meritless and he cannot establish prejudice in light of the verdict.  Nor was it vouching to ask the jury to infer that falsifying evidence would submarine the careers of Trooper Marmol and SA Simpson.  See United States v. Weatherly, 525 F.3d 265, 271-72 (3d Cir. 2008).  Finally, John cannot show that any alleged misconduct, including the prosecutor's references to the full extractions, prejudiced him.  The evidence was "very strong," as the court found, Appx107, particularly Dillard's testimony that Gerald *and John* were bringing him the drugs that Marmol seized: testimony

corroborated in part by the presence of Dillard's home address in text messages on both devices, including the Samsung that John admitted owning. SAppx586-91, 802.    If anything, the prosecution prejudiced *itself* by promising evidence it did not deliver.  See Old Chief v. United States, 519 U.S. 172, 188 (1997) ("If jurors' expectations are not satisfied, triers of fact may penalize the party who disappoints them by drawing a negative inference against that party.").  Defense counsel knew this when she exploited the prosecutor's mistake instead of objecting.  SAppx904.  But this go-for-broke gambit failed, and John cannot wrench victory from the jaws of defeat on plain-error review.

### III. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN FINDING NO VIOLATION OF THE FEDERAL RULES OF EVIDENCE.

Next, John contends that SA Simpson's trial testimony about the contents of the Samsung and the iPhone 8 exceeded the scope of his expertise under Rule 702 of the Federal Rules of Evidence. Br.32-38. The district court rejected this argument. Appx110-15. John cannot demonstrate error. The mostly-unpreserved objections John identifies were to non-expert testimony given in Simpson's capacity as case agent. If any of it was improper, Dillard's testimony, plus several "smoking gun" items on both devices, rendered it harmless.

Under Rule 702 of the Federal Rules of Evidence, an expert must be qualified and offer reliable testimony that fits the case. Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 80 (3d Cir. 2017). To show an abuse of discretion, John must establish that the admission of expert testimony "was arbitrary, fanciful or clearly unreasonable," such that "no reasonable person" would have admitted it. Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002). Trial judges have "broad discretion" to admit expert testimony. United States v. Williams, 974 F.3d 320, 359 (3d Cir. 2020).

Additional background is necessary. At trial, the district court did not permit the jury to see the full extractions of the iPhone 8 and the Samsung, but admitted the texts, photos, and call logs SA Simpson selected with Forensic Examiner Sarvey. SAppx430-32, 673-718. Some of those exhibits featured attributive headers (i.e., "John Terry's iPhone 8") or bubbles (i.e., "JT") that Simpson added, so John objected to them as hearsay. SAppx201-08. To resolve this objection, the court required Simpson to identify during his testimony his "interpretations" on any exhibit in which they appeared.

36

SAppx432. Defense counsel accepted this solution, SAppx432-33, but maintained a running hearsay objection to the exhibits themselves. SAppx443.

Accordingly, while discussing his training and experience, SA Simpson explained how he analyzed cellphone extractions. SAppx412-13. Without objection, the district court qualified Simpson as an expert in drug trafficking and coded drug language. SAppx414. Simpson detailed how he and Forensic Examiner Sarvey reviewed the full extractions. SAppx417-24. Then, Simpson testified how, as case agent, he traced the Samsung and the iPhone 8 to John. SAppx425. Without objection, Simpson attested that he obtained subscriber information and harvested certain items from these devices: including indicia (such as videos, photos or IDs), names or monikers, and repeated contacts from phones traceable to specific people. SAppx425-26. The Samsung was subscribed to John, who admitted owning it. SAppx440, 782.

Also without objection, SA Simpson detailed how his investigation pointed to John as the iPhone 8's owner, even though that device was not subscribed in his name. SAppx433-34, 514-15. As Simpson explained, the iPhone's contact list contained phone numbers for "Gees" and "Gees Good," two numbers Gerald had given his probation officer. SAppx427-28, 541, 665. Simpson added that the iPhone contained a contact called "Floc," a phone number Royster had provided his own probation officer. SAppx428-29, 503, 665. The presence of those contacts in the iPhone, plus incoming communications from both, SAppx446-47, 661, 692, tended to eliminate Gerald and Royster as the iPhone's owner: leaving John.

As the district court ordered, SA Simpson identified his notations to "John Terry's iPhone 8" atop various exhibits, plus his "JT" notations in

message bubbles of text exhibits. SAppx434-35. Simpson emphasized that these attributions were not in the extractions, but inferences he drew after comparing the device's contents to his knowledge of the investigation. SAppx425-26. Then, Simpson said, he affixed those notations to the documents to keep the players straight in his mind. SAppx539. Simpson also detailed why he adjusted some exhibits to reflect Eastern Standard Time. SAppx435-36. Everything else in the iPhone exhibits, however, mirrored the full extraction reports. SAppx433-50. Simpson parsed the Samsung exhibits the same way. SAppx450-63.

The iPhone 8's substantive content suggested that its user was involved in the drug-trade with Gerald, and perhaps others. In a text-message exchange between it and "Nas," the iPhone's user instructed "Nas" how to find a trap in a car. SAppx465-67, 681. A photo on the iPhone also depicted a white substance with the same distinctive backward "2" that appeared on one of the kilograms of cocaine/methamphetamine seized from the Taurus. SAppx467-75, 699-707. And in early April 2018, Gerald texted Dillard's address to the iPhone, whose user input that address into a map application. SAppx475-77, 682, 684.

Against this backdrop, John primarily disputes SA Simpson's qualifications to testify about information he received from Forensic Examiner Sarvey's full extractions --- and, derivatively, suggests Simpson's testimony was unreliable --- *without addressing* the district court's written opinion. Br.32-38. This will not do. An opening brief must engage any ruling and explain why it was wrong. Bastardo-Vale v. Attorney General, 934 F.3d 255, 268 (3d Cir. 2019). If it is insufficient to "assert in passing that the [court's] conclusion was wrong but offer no argument against it," Costa v.

38

Attorney General, 757 F. App'x 110, 113 (3d Cir. 2018), then ignoring the lower court's conclusion results in waiver.

The district court rejected John's arguments when he raised them in his motion for judgment of acquittal. Appx110-15. In denying John's post-trial motion for judgment of acquittal, the court ruled that SA Simpson's testimony about evidence obtained from the Cellebrite extractions fell within the scope of his drug-trafficking expertise. Appx113-14. While the court's logic is sound,[9] the United States seeks affirmance for another reason: the testimony at issue *required no expert at all*. See TD Bank N.A. v. Hill, 928 F.3d 259, 276 n.9 (3d Cir. 2019) (ruling may be upheld on any basis supported by the record, whether or not argued below).

Before undertaking that errand, this Court must address preservation. The district court noted that "certain" of John's objections were preserved, Appx112 n.13, but most were not. On appeal, John provides record citations for three categories of SA Simpson's supposedly-unqualified "expert" testimony: (1) "who owned and used" the Samsung and iPhone 8; (2)

---

[9] Rule 702 of the Federal Rules of Evidence is read "liberally," requiring only that the expert "possess skill or knowledge greater than the average layman." Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998). SA Simpson's experience included mining cellphones in drug investigations, SAppx412, and he was qualified as an expert without objection. SAppx414. Simpson described "the things I'm looking for to identify the phone as that person's," which included "any indicia like driver's licenses," "pictures with their friends or girlfriends," or text messages revealing "who they're talking to." SAppx426. Momentarily assuming that expert testimony was required to mine documents obtained from a Cellebrite trawl for this information, but see *infra*, John does not argue that "no reasonable" judge would find that this fell within the scope of Simpson's expertise in drug-trafficking. Compare Appx113-14 with Stecyk, 295 F.3d at 412. Any error was harmless in light of defense counsel's cross-examination and the jury instructions, as discussed *infra*. See United States v. Tinsley, 62 F.4th 376, 384-85 (7th Cir. 2023).

testimony that the iPhone took "a photograph of the cocaine"; and (3) "metadata" testimony. Br.35-36. Elsewhere in his Opening Brief, John cites, without categorizing, two other purported instances of improper expert testimony. See Br.4. But of the *twelve* record citations John gives across his categorized and uncategorized issues, he concedes he only objected *twice* on the ground he raises here: i.e., that they implicated improper expert testimony. Compare Br.4 (identifying the two objections) with SAppx440-42, 470-71.

The district court properly overruled John's two preserved objections at trial. John objected to "expert testimony about metadata" when SA Simpson was asked if an item had been sent or received from the iPhone 8. Appx440-41. John insisted this testimony "would have been better from [Forensic Examiner] Sarvey," but the court ruled that "it's not expert testimony regarding metadata, but just basically being able to glean whether something is sent or received." SAppx441-42. The court was right. See United States v. Montijo-Maysonet, 974 F.3d 34, 47 (1st Cir. 2020) (holding that no expertise is required to "interpret the words in [text-messaging] bubbles as messages sent and received").[10] And when John objected to testimony that an iPhone captured a photo of cocaine was "interpreting the metadata," the court overruled him because Simpson was simply reading from the extraction: and reading requires no "expert interpretation." SAppx470-71. That ruling was correct, too. Compare SAppx667-68 with United States v. Jimenez-Chaidez, 96 F.4th 1257, 1267 (9th Cir. 2024) (holding that a "witness was not required to testify as an expert when all she did was to read from the extraction report") (cleaned up) (quoting Montijo-Maysonet); accord

---

[10] SA Simpson generally could determine from an extraction report whether an item was sent or received, but he could not do so for that particular exhibit. SAppx441-42.

United States v. Lucas, No.19-6390, 2021 WL 4099241, at *20 (6th Cir. Sept. 9, 2021).

John voiced no contemporaneous objection to the other testimony for which he provides record citations. Compare Br.36 with SAppx414, 418-19, 444-45, 452, 468-69, 473, 474, 479.[11] So John must show it was *plainly* inadmissible. See Watson, 260 F.3d at 306. He cannot. It is not plain that *any* cellphone extraction requires expert testimony. All five Circuits to reach the issue have held that it does not. Jimenez-Chaidez, 96 F.4th at 1267; United States v. Williams, 83 F.4th 994, 995 (5th Cir. 2023); Montijo-Maysonet, 974 F.3d at 47; United States v. Chavez-Lopez, 767 F. App'x 431, 433-34 (4th Cir. 2019); United States v. Marsh, 568 F. App'x 15, 17 (2d Cir. 2014). Absent contrariwise binding authority, any error is not plain. See United States v. Cruz, 757 F.3d 372, 387 n.11 (3d Cir. 2014).

Assuming *arguendo* that some extraction materials might implicate expertise, SA Simpson's discussion of his winnowing of Forensic Examiner Sarvey's extractions to generate the trial exhibits "largely was not opinion testimony, and to the extent it was, it was based on his perception and not specialized knowledge." Jimenez-Chaidez, 96 F.4th at 1267. Primarily, Simpson testified as the case agent discussing *his* investigation, not as an expert. John has not argued that such dual-capacity testimony was plainly erroneous, and it was not. See United States v. Harmon, No.18-2683, 2022

---

[11] The two uncategorized instances of "expert" testimony John cites are unpreserved, as he interposed *different* objections at trial. Br.4 (citing SAppx430-33 (objection to leading)); 453-60 (objection to certain exhibits, but not testimony, as containing hearsay). So plain-error review would apply. See United States v. Iglesias, 535 F.3d 150, 158 (3d Cir. 2008). But John develops no such argument, Br.36, and he cannot do so in a reply brief. See Abdul-Akbar v. McKelvie, 239 F.3d 307, 316 n.2 (3d Cir. 2001).

WL 17369594, at *3 (3d Cir. Dec. 2, 2022), <u>cert. denied sub. nom.</u> <u>Little v.</u> <u>United States</u>, 143 S. Ct. 2692 (2023).   And <u>Fulton</u>, which John touts as holding that only an expert may attest to "specifics about cell phone usage and data," Br.35, actually recognized that agents *may* offer *lay* opinion testimony about conclusions they draw from cellular data.  <u>See</u> 837 F.3d at 289-92.  The problem in <u>Fulton</u> was that the agent's interpretations of the evidence were "dead wrong," rendering them unhelpful under Rule 701 of the Federal Rules of Evidence.  <u>Id.</u> at 292-94.

Not so here.  Several items on the iPhone 8 *confirmed* that John used it.  First, the iPhone contained an outgoing text message which read in part: "I forgot my f*****g ID," but added "I got a duplicate"; attached to that message were front-and-back images of a Pennsylvania Identification Card bearing John's name, photo, date of birth, and address.  SAppx680.  Second, during a text-message exchange, the iPhone's user asked someone to send "that pic you sent me of us," prompting the recipient to text a photo of John and herself.  SAppx691, 694-95.  Third, the iPhone contained an image of a letter informing "John Terry" of a Samsung promotion.  SAppx687.

If this were all it contained, the iPhone 8's user could have been John's namesake and doppelganger.  But it was not.  In the days before April 4, 2018, the iPhone communicated 33 times with *this* John Terry's fiancée.  SAppx708-09, 777.  The iPhone also retained an incoming message from Gerald to "meet me at our parents' house."  SAppx689.  So if SA Simpson's testimony was improper, SAppx433-43, 449-52, 461-64, it was superfluous and therefore harmless: the jury could review the exhibits itself.  <u>See</u> <u>United</u> <u>States v. Jackson</u>, 849 F.3d 540, 555 (3d Cir. 2017) (finding opinion testimony

harmless where the jury could review the evidence the agent "interpreted to reach its own conclusion").[12]

Other considerations further mitigated any prejudice from SA Simpson's testimony. First, Simpson never vouched for the Cellebrite reports: nor could he, because Forensic Examiner Sarvey already had conceded their limitations during his cross-examination. Compare SAppx375-78 with Williams, 83 F.4th at 997. Second, on his own cross-examination, Simpson admitted the iPhone 8 was subscribed to someone else and that its Apple ID was linked to yet another person, neither of whom he had investigated. SAppx488-524. Cross-examination exposing unfollowed leads can neutralize improper opinion testimony. Fulton, 837 F.3d at 294-95. Third, the jury heard *Dillard* testify that the cocaine Trooper Marmol seized was destined for him. Compare SAppx586-891 with Jackson, 849 F.3d at 555 (holding that co-conspirator testimony linking defendant to drug-conspiracy rendered improper opinion testimony harmless). Dillard's testimony stood apart from Simpson's, yet the appearance of Dillard's address on *both* devices shortly before John's arrest corroborated a key aspect of it. SAppx682, 713. Consequently, and because the district court instructed the jury how to evaluate Simpson's testimony both as expert and as a law-enforcement

---

[12] Only two of these five exhibits contained SA Simpson's attributions to "JT" or "John Terry." SAppx680, 689. The district court overruled John's objections to those exhibits on hearsay grounds, SAppx203-04, but he does not appeal that ruling so it is waived. See Abdul-Akbar, 239 F.3d at 316 n.2. The ruling was correct because Simpson identified his additions to each exhibit. Compare SAppx433-35, 501 with United States v. Reed, 780 F.3d 280, 268 (4th Cir. 2015) (upholding the admission of exhibits containing the case agent's substitutions of defendants' names for phone numbers, where agent testified that these reflected his attributions based on his investigation).

witness, SAppx932-34, it correctly found that any improper opinion testimony was harmless.  Appx115.[13]

In sum, John's list of mostly-unobjected-to testimony that supposedly violated Rule 702 of the Federal Rules of Evidence implicated no data-extraction expertise, but consisted of SA Simpson's observations in his capacity as the case agent helming the investigation.  This testimony permissibly "helped connect the dots between multiple pieces of evidence." United States v. Wilson, 852 F. App'x 84, 88 (3d Cir. 2021).  If expertise was required, Simpson's testimony fit comfortably within his drug-trafficking wheelhouse.  And even if Simpson's testimony exceeded the scope of his expertise or violated another evidentiary rule, it was harmless.

---

[13] The district court rightly rejected John's belated contention that SA Simpson opined on any "ultimate issue."  Compare Br.37-38 with Appx114. Simpson gave no "legal opinion" as to John's guilt.  See Hoffecker, 530 F.3d at 171.  Any error was harmless for the reasons stated *supra*.  See Womack, 55 F.4th at 230.

**IV.    THE DISTRICT COURT DID NOT PLAINLY ERR IN APPLYING U.S.S.G. §2D1.1 AND THE MANDATORY MINIMUM IN 21 U.S.C. 841(b)(1)(A)(viii) AT SENTENCING.**

Last, John insists the district court miscalculated his offense level under U.S.S.G. §2D1.1, and applied the wrong mandatory minimum under 21 U.S.C. §841(b)(1)(A)(viii). Br.39. Both of these purported errors occurred because John's phase one jury "did not determine the weight of each substance" in the drug mixture found in the Taurus. Br.39-45. These arguments are forfeited and meritless besides.

More background is helpful. At phase one, the prosecution proved, and the jury found, that the drugs in the Taurus were a mixture of cocaine and methamphetamine weighing 2,995 grams total. SAppx549-74, 972-73. Abiding by U.S.S.G. §2D1.1, the PSR calculated John's offense level for Counts I and II using the drug carrying the higher penalty --- here, methamphetamine --- and noted that a 10-year mandatory minimum applied under 21 U.S.C. §841(b)(1)(A)(viii). PSR ¶¶27, 74. John objected to Section 841's mandatory minimum on a slew of constitutional grounds, and argued that, "because the Government failed to prove beyond a reasonable doubt that there was a detectable amount of methamphetamine to make it a mixture," the drug triggering the *lower* offense level under Section 2D1.1 --- cocaine, in his case --- applied. The district court disagreed. Appx128-38.

On appeal, John moves the goalposts. John no longer denies that the evidence sufficiently showed that his offense involved a mixture containing "500 grams or more of methamphetamine and cocaine," and he *concedes* that his jury so found. Br.4. But now, John argues that the district court should have determined his offense level under U.S.S.G. §2D1.1 and his mandatory minimum under 21 U.S.C. §841(b)(1) using the drug carrying the lightest

45

sentencing implications (i.e., cocaine) because his jury "did not return specific findings as to the amount of each substance" in the mixture. Br.44-45. Obviously, these arguments differ from those John raised below. Compare Appx128-38 with Joseph, 730 F.3d at 342. So plain-error review applies. United States v. Lingala, 91 F.4th 685, 697 (3d Cir. 2024).

No error occurred, plain or otherwise. John's contention that the district court misapplied U.S.S.G. §2D1.1 is irrelevant. Br.39. The court calculated John's advisory Guideline range for Counts I and II under Section 2D1.1, which prescribed 151 to 188 months in prison. Appx137-38, 382-85. However, those same convictions triggered a 10-year mandatory minimum under 21 U.S.C. §841(b)(1)(A)(viii), *and the court varied downward to that minimum.* Appx384-87. Any miscalculation of John's advisory Guideline range is therefore immaterial, since the mandatory minimum drove his sentence. See United States v. Langford, 516 F.3d 205, 215 (3d Cir. 2008).

So John's real quarrel is with the mandatory minimum that 21 U.S.C. §841(b)(1)(A)(viii) prescribed. But the district court applied it correctly, despite the jury's failure to determine exactly how much of each controlled substance John's cocaine/methamphetamine mixture contained. Congress prescribes a 10-year mandatory minimum for anyone who knowingly possesses "500 grams or more of a mixture or substance containing a detectable amount of methamphetamine." Id. The PSP chemist's uncontradicted testimony proved these elements. SAppx549-74. And John's jury so found, beyond a reasonable doubt. SAppx972-73.

Although he never cites it, John may be invoking Alleyne, which holds that any fact increasing a mandatory minimum for a crime must be proven to a jury beyond a reasonable doubt. 570 U.S. at 103. The interplay of drug quantity and type triggered a higher mandatory minimum under 21 U.S.C.

46

§841(b)(1), so these were elements of Counts I and II. United States v. Birt, 966 F.3d 257, 262 (3d Cir. 2020). But John's jury answered interrogatories finding the type of drugs in his *mixture* (methamphetamine and cocaine) and the weight of that *mixture* (at least 500 grams) beyond a reasonable doubt. SAppx972-73.

No more was needed. To require the prosecution to prove the weight of each drug within a mixture is to lose the forest for the trees by "read[ing] a 'purity' requirement into [21 U.S.C. §] 841's definition of 'mixture,'" which this Court declines to do. United States v. Gori, 324 F.3d 234, 238-39 (3d Cir. 2003); see also United States v. Gunther, No.21-2791, 2023 WL 6804573 at *3 (3d Cir. Oct. 16, 2023) ("[Section 841(b)] is concerned with the total weight of the substance, not just the weight of the pure drug it contains.") (citing Chapman v. United States, 500 U.S. 453, 460 (1991)).

John's reliance on United States v. Barbosa, 271 F.3d 438 (3d Cir. 2001), Br.43-45, is misplaced. There, the trial court "submitted neither the quantity nor identity of the drugs for a factual determination," allowing a jury to convict based on *any* controlled substance of any amount. Id. at 452-53.[14] Those facts might trigger Alleyne, but they are not *John's* facts. John's jury did not hand down a "general verdict," as he inaccurately claims. Br. 39, 42-43. It found the type and quantity of the drugs in the mixture in interrogatories. Compare SAppx972-73 with Graboff v. Colleran Firm, 744 F.3d 128, 137-38 (3d Cir. 2014) (differentiating a case submitted to a jury on interrogatories from a general verdict).

---

[14] The juries in the out-of-circuit cases John cites also failed to find drug type, weight, or both. See Br.43 (citing United States v. Bowens, 224 F.3d 302, 314 (4th Cir 2000), United States v. Randolph, 230 F.3d 243, 252 (6th Cir. 2000), and United States v. Zillgitt, 286 F.3d 128, 132 (2d Cir. 2002)).

In the end, John cannot show that the district court plainly misapplied U.S.S.G. §2D1.1 to his detriment, or establish that it erred in imposing the mandatory minimum that 21 U.S.C. §841(b)(1)(A)(viii) requires. So John's challenge to his sentence is meritless.[15]

## CONCLUSION

Respectfully, John's conviction and sentence must be affirmed.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney

*/s/ Donovan Cocas*
DONOVAN COCAS
Assistant United States Attorney

---

[15] Intermittently, John frames his challenge to his sentence as either a procedural reasonableness issue under 18 U.S.C. §3553(a), or a question of substantive reasonableness. Br.39-45. This conflates steps two and three of the three-step analysis prescribed in United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006). Regardless, any procedural reasonableness claim would receive plain-error review because John did not object after pronouncement of sentence. SAppx390-96; United States v. Flores-Mejia, 759 F.3d 253, 256 (3d Cir. 2014) (*en banc*). Here, the district court varied downward and imposed the mandatory minima for all counts. Compare PSR ¶¶74-75 with Appx387. John identifies no flaw in the court's Section 3553(a) analysis. And the consecutive mandatory minimum terms John received represented "the lowest possible sentence that can be imposed by law." Appx386. John has not argued that no reasonable court would have imposed this same aggregate sentence. United States v. Tomko, 562 F.3d 558, 568 (3d Cir. 2009) (*en banc*).

## **CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32, because it contains *12,986* words, excluding the parts exempted by the rule.

2.  This brief complies with the typeface requirement of Fed. R. App. P. 32 and the type style requirement of that rule because it has been prepared in proportional typeface using Microsoft Word 2010 in Times Roman 14-point font.

3.  The text of this e-brief and the hard copies of it are identical.

4.  A virus check was performed on this e-brief with Microsoft EndPoint Security.

*/s/ Donovan Cocas*
DONOVAN COCAS
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following is a filing user who will be served electronically by the Notice of Docketing Activity.  Hard copies of this brief also were mailed to:

Matthew M. Robinson, Esq.
Robinson & Brandt, PSC
629 Main Street, Suite B
Covington, KY 41011
*Counsel for Appellant John T. Terry*

<u>/s/ Donovan Cocas</u>
DONOVAN COCAS
Assistant U.S. Attorney

Dated: June 7, 2024