**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-2575

_____

UNITED STATES OF AMERICA

v.

JOHN T. TERRY,
a/k/a Tyree Terry,
Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 3:18-cr-00024-001)
District Judge:  Honorable Kim R. Gibson

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
October 29, 2024

_____

Before:  HARDIMAN, PHIPPS, and FREEMAN, *Circuit Judges*

(Filed: May 6, 2025)

_____

OPINION[*]

_____

PHIPPS, *Circuit Judge*.

A passenger in a car that was stopped for two minor traffic infractions received a 420-month prison sentence for four federal gun and drug offenses based on information learned during that traffic stop.  In this appeal, the passenger raises eight arguments: four

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

suppression challenges, two claims of prosecutorial misconduct, one challenge to the admissibility of expert witness testimony, and one attack on the calculation of his sentence. For the reasons below, the passenger's challenges fail, and we will affirm the judgment of the District Court.

## I. FACTUAL BACKGROUND

Around 2:30 in the afternoon of April 4, 2018, Pennsylvania State Trooper Ryan Marmol was driving westbound on the Pennsylvania Turnpike in Somerset County in light snow flurries. With his cruiser in the left lane of a two-lane stretch of divided highway, he observed a red Ford Taurus in front of him change lanes and then follow closely behind another vehicle in the right lane. Marmol pursued the car and pulled it over for making an unsafe lane change and tailgating. *See* 75 Pa. Cons. Stat. §§ 3309(1), 3310(a) (prohibiting unsafe lane changes and tailgating, respectively).

Once both his cruiser and the Taurus were on the shoulder, Marmol approached the passenger side of the car. Inside the car were two men, and Marmol asked the driver for his license, which the driver produced while his hand was visibly shaking. The license identified the driver as Gerald Terry. Marmol then asked the driver whether it was his car. The driver responded that the Taurus belonged to a friend's wife and handed the car's registration over to Marmol. Marmol then inquired about the men's travel plans, and they responded that they were going to a Narcotics Anonymous meeting in Pittsburgh where Gerald would be speaking and that they would be returning to Philadelphia afterward. Marmol also requested identification from the passenger. The passenger produced an ID, and Marmol learned that he was John Terry.

Those interactions took about two minutes, and afterward Marmol returned to his cruiser to run a background check. Within a minute, he learned that Gerald had previously

2

been arrested. He also discovered that the vehicle's registered owner, a man named Kelli Royster, had previously committed drug and firearms offenses.

At that point, less than three minutes into the stop, those observations prompted Marmol to call for backup. While waiting for backup to arrive, Marmol discovered that both Gerald and John Terry had criminal histories including robbery, assault, and firearms offenses and that Gerald's criminal history also included drug possession with intent to deliver. And upon conducting a further search of the registered owner, Royster, Marmol discovered that he was on supervised release for conspiracy to distribute cocaine base and for unlawful possession of a firearm by a felon.

When the second trooper arrived approximately fourteen minutes later, Marmol re-approached the Taurus and requested that the driver exit, but both men got out of the car. After telling Gerald that he would give only an oral warning for the traffic infraction, Marmol mentioned that he knew of Gerald's extensive criminal history, and he asked whether there was "anything illegal in the car." Day 2 Trial Tr. 51:5–10 (Suppl. App. 240). Gerald replied, "[n]o," and Marmol asked if he could search the car. *Id.* Gerald visibly nodded and responded, "Yeah, yeah." Suppression Hr'g Tr. 38:15–17 (App. 217).

After patting down both men and leaving them under the watch of the second trooper by the side of the road, Marmol began searching the car. When he looked inside the glove compartment, Marmol noticed that its door dropped down farther than normal. Upon inspecting the undercarriage of the dashboard, Marmol discovered a suspicious box – a hidden aftermarket compartment – welded into place where the airbag would normally be mounted. He had learned from specialized training that hidden aftermarket compartments, also known as 'traps,' were used to store contraband. About one and a half hours after initiating the traffic stop, Marmol pried open that box and found a handgun and

approximately three kilograms of a white powder, which later tested positive for cocaine and methamphetamine. He also took two cell phones from the car: an iPhone and a Samsung Galaxy.

The officers then arrested and *Mirandized* both men, who are brothers. After they were transported to the State Police barracks in Somerset, the passenger, John Terry, according to Marmol, took "responsibility for . . . the red Ford Taurus." *Id.* at 67:9–10 (App. 246); *see also* Day 2 Trial Tr. 92:25–93:1 (Suppl. App. 281–82) (describing how John Terry "related that he was responsible for the vehicle"). Marmol subsequently filed a criminal complaint against him. The two cell phones seized from the car later prompted interest at the federal level, and information obtained from those phones pursuant to a search warrant linked John Terry to a drug dealer in Pittsburgh.

## II. PROCEDURAL HISTORY

In October 2018, federal prosecutors went before a grand jury in Johnstown, Pennsylvania, to indict John Terry on drug and gun charges. *See* 18 U.S.C. § 3231. During those proceedings, FBI Special Agent James Simpson testified about the investigation that he inherited from Trooper Marmol. In doing so, Simpson stated that Terry had taken responsibility for the drugs and gun found in the car. The grand jury returned a three-count indictment and later a four-count superseding indictment that charged Terry with possession with intent to distribute a controlled substance, *see* 21 U.S.C. § 841(a)(1), conspiracy to distribute a controlled substance, *see id.* § 846, unlawful possession of a firearm by a felon, *see* 18 U.S.C. § 922(g)(1), and unlawful possession of a firearm in furtherance of drug trafficking, *see id.* § 924(c)(1)(A).

As part of his pretrial defense, Terry moved to suppress evidence that he asserted had been obtained in violation of the Fourth, Fifth, and Sixth Amendments. He argued that

the vehicle stop was not justified, that the vehicle search that produced the drugs and the gun was illegal, and that he was not properly *Mirandized* before he made his statement at the police station about taking responsibility for the red Taurus. The District Court rejected those arguments and denied the motion. *United States v. Terry*, 2019 WL 2176330, at \*29–30 (W.D. Pa. May 20, 2019).

In addition to his suppression motions, Terry moved to sever and bifurcate the trial so that his gun possession charges and status as a felon would not taint the drug charges. *See* Fed. R. Crim. P. 14(a) (permitting courts to "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires"). He proposed a first phase in which the jury would decide the drug charges alone. Then, in a second trial, the jury would decide whether Terry knowingly possessed the firearm, with evidence of his felony record withheld. And finally, only if the jury found against Terry on those elements would the government be allowed to present his criminal history to prove the final element of the felon-in-possession charge. The District Court granted that motion in part, allowing bifurcation of the trial so that the jury would first decide the drug charges, without hearing evidence about the gun or Terry's status as a felon, and then the jury would separately consider the gun charges in light of Terry's criminal history. After the jury returned guilty verdicts with respect to the two drug charges, however, Terry sought a bench trial for the remaining two firearms charges. After accepting Terry's waiver of his right to a jury trial on the remaining charges, the District Court found Terry guilty of both gun offenses. *See id.* 23(a), (c).

The District Court then calculated Terry's sentence. Because the roughly three kilograms of drugs found in the car tested positive for both methamphetamine and cocaine, Terry's base offense level under the Sentencing Guidelines was 32. *See* U.S. Sent'g

Guidelines Manual § 2D1.1(c)(4), (c)(7) (U.S. Sent'g Comm'n 2023) (providing a base offense level of 32 for between 1.5 and five kilograms of methamphetamine but an offense level of 26 for between two and 3.5 kilograms of cocaine); *id.* § 2D1.1, Note (A) to the Drug Quantity Table (instructing the use of the greater offense level where a mixture of drugs tests positive for more than one drug). Terry's prior convictions placed him in criminal history Category III. Coupled with his criminal history, the offense level associated with Terry's two drug convictions and two gun convictions in this case yielded an advisory Guidelines range of 151 to 188 months' incarceration.

That advisory range gave way, however, to two statutory provisions that impose mandatory minimum sentences. First, because the three-kilogram mixture recovered from the car contained detectable amounts of methamphetamine (in addition to cocaine), the offenses based on that mixture – possession with intent to distribute and conspiracy – carried ten-year minimum sentences. *See* 21 U.S.C. § 841(a)(1) (criminalizing possession of controlled substances with intent to distribute); *id.* § 841(b)(1)(A)(viii) (mandating a ten-year minimum sentence for possessing more than fifty grams of a "substance containing a detectable amount of methamphetamine"); *id.* § 846 (criminalizing conspiracy to violate § 841(a)(1) and mandating the same penalties for committing conspiracy as for committing the object offense).[1] Second, because Terry had a prior conviction for knowingly possessing a firearm as a felon, *see* 18 U.S.C. § 922(g)(1), his conviction for possession of a weapon in furtherance of a drug offense carried a mandatory consecutive sentence of 300 months, *see id.* § 924(c)(1)(C)(i), (D)(ii). Thus, despite the advisory

---

[1] If the three-kilogram mixture had contained only cocaine, then a five-year mandatory minimum would have applied to the charges based on the mixture. *See* 21 U.S.C. § 841(b)(1)(B)(ii) (mandating a five-year minimum sentence for possessing more than 500 grams of cocaine); *id.* § 846 (mandating the same penalties for conspiracy to violate § 841(a)(1) as for committing the object offense).

Guideline range of between 151 and 188 months' imprisonment, Terry's statutory minimum prison sentence was 420 months – and that is the prison term the District Court imposed.

On appeal, Terry challenges several aspects of his arrest, indictment, conviction, and sentencing.  *See* 28 U.S.C. § 1291.

### III.  DISCUSSION

#### A. The Suppression Challenges

*1.  The Challenge to the Initial Traffic Stop*

John Terry argues that Trooper Marmol lacked reasonable suspicion of unlawful activity required by the Fourth Amendment for the traffic stop.  Specifically, he attacks that stop as pretextual and contends that Marmol was subjectively unreasonable in making the stop.  But an objective standard governs the reasonableness of a Fourth Amendment seizure. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *cf. Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (explaining that a *Terry* stop must be supported by "at least a minimal level of *objective* justification" for a reasonable suspicion of criminal activity (emphasis added)).  And under that objective standard, both the dashcam footage and Marmol's testimony provide objectively reasonable suspicion sufficient to initiate the stop – the red Taurus appeared to violate two Pennsylvania traffic rules: the prohibitions on unsafe lane changes, *see* 75 Pa. Cons. Stat. § 3309(1), and on tailgating, *see id.* § 3310(a). It was therefore not clear error for the District Court to conclude as a matter of fact that Gerald Terry had committed those traffic offenses, and thus on *de novo* review of the legal determination, the District Court did not err in concluding that Marmol had reasonable suspicion to stop the vehicle. *See United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) ("We review findings of fact for clear error, but we exercise [*de novo*] review over legal

determinations."); *United States v. Thompson*, 772 F.3d 752, 758 (3d Cir. 2014) ("[Reasonable] suspicion is … less demanding than … probable cause.") (internal citations omitted).

### 2. *The Challenge to Prolonging the Stop*

Terry also contends that the traffic stop was improperly extended because Marmol lacked the requisite reasonable suspicion to investigate any crime other than the traffic offenses for which the vehicle was pulled over. Under the Fourth Amendment, "a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The mission of a traffic stop includes collecting identifying information, conducting a search of the driver's criminal status, and inspecting the vehicle's registration. *See id.* at 355 ("Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."); *Delaware v. Prouse*, 440 U.S. 648, 658–59 (1979); 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.3(c) (6th ed. Nov. 2024 update) [hereinafter LaFave] ("The bare essentials of a 'routine traffic stop' consist of causing the vehicle to stop, explaining to the driver the reason for the stop, verifying the credentials of the driver and the vehicle, and then issuing a citation or a warning."); *cf. id.* (explaining that officers are typically justified in doing basic checks on the motorist's criminal status, "given the fact that traffic stops are 'especially fraught with danger to police officers,' . . . even if it does 'prolong' the traffic stop" (emphasis removed) (quoting *Rodriguez*, 575 U.S. at 356–57)). And if, in fulfilling that mission for a traffic stop, an officer obtains a reasonable suspicion of additional criminal activity, then the

officer may investigate the suspicion of criminal activity. *See Rodriguez*, 575 U.S. at 355; *United States v. Stewart*, 92 F.4th 461, 467 (3d Cir. 2024).

Here, on *de novo* review, the moment when the traffic stop was measurably extended occurred three minutes into the stop. At that point, Marmol had observed the men's visible nervousness, learned of their criminal histories as well as of the status of the registered owner of the car, and debunked Gerald's claim that he was driving a car owned by a friend's wife. That information provided him with reasonable suspicion of criminal activity – and also motivated him to call for backup. *See Stewart*, 92 F.4th at 471 (affirming the extension of a traffic stop into a criminal investigation upon the development of reasonable suspicion); *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (explaining that reasonable suspicion requires more than a "mere 'hunch'" but "considerably" less than a preponderance of the evidence (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968))). Because he was justified in extending the stop for the time needed to "diligently pursue[] a means of investigation that was likely to confirm or dispel [his] suspicions quickly," Marmol did not violate Terry's Fourth Amendment rights by waiting for backup to arrive or investigating his suspicions once it did. *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

### 3. *The Challenge to the Search of the Vehicle's Interior*

Terry also advances two alternative theories of Fourth Amendment violations with respect to the search of the Taurus. He challenges the District Court's conclusion that the search was voluntary because Gerald said "yeah, yeah" and nodded in response to Trooper Marmol's request. *Terry*, 2019 WL 2176330, at *21 (citing Suppression Hr'g Tr. 38:15–17 (App. 217)). Alternatively, he argues that the search exceeded the scope of any voluntary consent.

To proceed with either challenge, however, Terry must first establish standing under the Fourth Amendment. Passengers have standing to challenge the stop of the vehicle because they are stopped as well, *see United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006), but absent an ownership interest in the vehicle, passengers generally have no expectation of privacy inside a vehicle, so they do not have standing to contest searches of the interior, *see United States v. Burnett*, 773 F.3d 122, 131–32 (3d Cir. 2014). A narrow exception exists for people who borrow vehicles and have responsibility over or control of the vehicle at the time of search. *See, e.g.*, *United States v. Baker*, 221 F.3d 438, 442–43 (3d Cir. 2000).

On appeal, Terry invokes that exception based on his statements at the barracks that he had responsibility for the vehicle. But at the time of the search, he gave no indication that the car was in his control – he did not drive it or claim ownership of it.

Even if Terry has Fourth Amendment standing to challenge the vehicle search, *see Baker*, 221 F.3d at 442–43, his own conduct during the stop belied any reasonable expectation of privacy in the vehicle or any particular compartment within that vehicle. After Gerald's initial consent, Terry did not object, and therefore Marmol could reasonably rely upon Gerald's express unqualified consent to search the vehicle. *See United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) (explaining that to "[stand] by and watch[] without objection . . . is completely inconsistent with the contention that [one has] an expectation of privacy"); LaFave, § 8.3(g) (explaining that "the claim of authority [to consent to a search] can be reasonably relied upon by the police precisely because of the silence of another person present who could be expected to object were that claim in error").

Terry's alternative argument that the search of the car's passenger-side dashboard exceeded the consent given by Gerald also fails.  Neither Terry nor Gerald disputed the unconditional consent given for the vehicle search – Gerald's initial consent was unqualified, and at no point during the search did either brother attempt to limit the search.  *See Anderson*, 859 F.2d at 1177.  Accordingly, the District Court did not err in denying Terry's suppression motion.

### 4.  *The* Miranda-*Based Challenge to Terry's Statement at the Barracks in Which He Took Responsibility for the Car*

Terry next raises a new suppression argument: he contends that his statement at the barracks that he had responsibility for the vehicle should have been suppressed because he was not properly *Mirandized*.  In making this assertion, Terry acknowledges that he was *Mirandized* once at the barracks prior to interrogation; his point is that a second warning was required because Marmol's question came after that formal interrogation had ended.  The problem for Terry is that "a suppression argument raised for the first time on appeal is forfeited," *United States v. Scarfo*, 41 F.4th 136, 169 (3d Cir. 2022), and Terry did not present an argument based on the "same facts" and "same legal rule" to the District Court.  *United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013).  In District Court, he sought suppression of his statements at the roadside stop because at that time he had not received any *Miranda* warning; now he tries to suppress his statement made at the barracks for not renewing the *Miranda* admonition that was given when he was taken into custody.  Those arguments do not rest on the same facts, and without attempting to overcome that waiver through a showing of good cause, Terry's challenge is barred.

## B.  The Prosecutorial Misconduct Allegations

Terry next makes two accusations of prosecutorial misconduct.  First, he argues that the indictment should have been dismissed because the prosecution knowingly presented

false evidence to the grand jury. Second, he contends that his convictions should be vacated because the prosecution improperly 'vouched' for the credibility of its witnesses.

### 1. *The Challenge to Special Agent Simpson's Grand Jury Testimony*

Terry's argument that the indictment should have been dismissed due to prosecutorial misconduct attempts to exploit an ambiguity in Marmol's police report. That report states that Terry admitted responsibility for the vehicle while at the barracks. But when Special Agent Simpson testified before the grand jury, he stated that Terry admitted responsibility at the barracks for the drugs and the gun. Terry contends that Simpson mischaracterized his admission because he took responsibility for only the car – not its contents.

Although there are multiple shortcomings to Terry's argument – he did not raise the issue before trial, *see* Fed. R. Crim. P. 12(b)(3)(A)(v), and he has not shown that Simpson's statement to the grand jury tainted the petit jury, *see United States v. Console*, 13 F.3d 641, 672 (3d Cir. 1993) (citing *United States v. Mechanik*, 475 U.S. 66, 70 (1986)) – it is appropriate to resoundingly reject the substance of such a serious allegation of prosecutorial misconduct. Prosecutorial misconduct by the knowing presentation of false testimony requires evidence of a "willful intent to provide false testimony"; by contrast, "confusion, mistake, or faulty memory" is not enough. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (detailing elements of perjury). *Compare Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding that a prosecutor's knowing presentation of false testimony violates the Constitution), *with* 18 U.S.C. § 1623(a) (criminalizing knowingly making false statements to grand juries while under oath). Here, the inference made by Simpson – that Terry, by taking responsibility for the car, after drugs and a gun were discovered inside it, also took responsibility for the drugs and the gun – was contextually

justified.  Indeed, Marmol, who heard Terry make the statement, testified at the suppression hearing that he understood Terry's statement that "he was responsible for the vehicle" to mean that Terry "was responsible for the vehicle and everything inside."  Suppression Hr'g Tr. 147:20–23 (App. 326).   Both officers rationally and naturally construed Terry's statements, and permitting Simpson to testify to his understanding is far removed from prosecutorial misconduct.

### 2.  *The Assertion of Improper Vouching*

Terry also contends that the prosecutor engaged in two forms of misconduct during the closing.  First, Terry asserts that the prosecution improperly vouched for the credibility of two of its witnesses – Marmol and Simpson.   Second, Terry argues that it was misconduct for the prosecutor to invite the jury to compare Simpson's testimony with exhibits that had been excluded.  Terry's counsel did not object to either instance of alleged misconduct at the time, so his challenges are reviewed for plain error.  *See United States v. Welshans*, 892 F.3d 566, 573 (3d Cir. 2018) (reviewing unpreserved allegations of prosecutorial misconduct for plain error).[2]

The prosecutor's statements as to Marmol's and Simpson's credibility were based on record evidence.  He referenced Marmol's nine-year tenure with the Pennsylvania State Police and Simpson's over-ten-year tenure with the FBI as bases for their credibility.  And because both of those facts were in the record, and not the product of only the prosecutor's personal knowledge, they do not constitute improper vouching.  *See United States v. Lore*,

---

[2] To prevail under plain error review, an appellant must demonstrate (1) that an error occurred – evaluated under the standard of review that error would have received if it had been properly preserved, *see United States v. Adair*, 38 F.4th 341, 355–56 (3d Cir. 2022); (2) that the error was "plain"; (3) that it affected "substantial rights"; and (4) that it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (quoting in the last instance *United States v. Young*, 470 U.S. 1, 15 (1985)).

430 F.3d 190, 211 (3d Cir. 2005) (limiting improper vouching claims to the assurance of a government witness's credibility based on the prosecutor's "claimed personal knowledge or other information not contained in the record"). Without establishing an error, this challenge fails to satisfy plain-error review.

Terry's second claimed instance of prosecutorial misconduct – the invitation for the jury to view excluded exhibits – also fails on plain-error review. One of the showings required for plain error is that there would have been a reasonable probability of a different outcome. *See Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). Yet here, Terry does not explain how without the invitation from the prosecutor to view excluded evidence, which the jury could not and did not accept, there would have been a reasonable probability that Terry would not have been convicted.

## C. The Challenge to Special Agent Simpson's Expert Testimony

Terry next asserts that the District Court erred by allowing Special Agent Simpson to testify beyond his expertise. The portions of Simpson's testimony that Terry now contests arose in the context of a dispute over whether Terry owned the iPhone found in the car. Terry testified that the iPhone was not his. But Simpson opined that he believed the phone belonged to Terry. Before eliciting that opinion from Simpson, the prosecutor represented that the questions would not require "getting into specifics about file paths and expertise as to analysis," but instead would rely on "a basic understanding of incoming, outgoing" communications from an iPhone. Day 3 Trial Tr. 46:14–16 (Suppl. App. 441). Nonetheless, at the outset of that line of inquiry, Terry objected by asserting that the opinion "would be expert opinion, so it's improper as he is not qualified to do so." *Id.* at 46:19–20. The District Court overruled that objection on the grounds that "it's not expert

testimony regarding metadata, but just basically being able to glean whether something is sent or received." *Id.* at 46:23–47:1 (Suppl. App. 441–42).

That ruling by the District Court was not an abuse of discretion because Simpson's opinion was not based on "specialized knowledge" but rather on the contents of several text messages on the phone. Fed. R. Evid. 701(c). One was sent to a number belonging to Gerald in which the iPhone's user wrote, "Other phone died. It's me big bro." Day 3 Trial Tr. 61:8–9 (Suppl. App. 456). In another communication, the iPhone's user directed Gerald to "[m]eet me at our parents['] house." *Id.* at 96:1 (Suppl. App. 491). And another text stated, "I couldn't find my . . . ID, so . . . I got a duplicate" and then attached a photo of a state identification card belonging to John Terry. *Id.* at 42:6–8 (Suppl. App. 437). The contents of those messages readily allow the inference that Terry owned the iPhone, and without Simpson ever providing a legal opinion that Terry was guilty, the District Court was well within its discretion to permit Simpson's testimony on these topics. *See United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000) (applying abuse-of-discretion review to preserved evidentiary rulings).

## D. The Sentencing Challenge

Terry also argues that the District Court erred by sentencing him based on possession of methamphetamine when he was convicted of possession of a substance containing both methamphetamine and cocaine. *Compare* 21 U.S.C. § 841(b)(1)(A)(viii) (ten-year mandatory minimum for fifty or more grams of methamphetamine), *with id.* § 841(b)(1)(B)(ii) (five-year mandatory minimum for 500 or more grams of cocaine). According to Terry, under *United States v. Barbosa*, 271 F.3d 438 (3d Cir. 2001), the imposed sentence must be based on the lesser of the two charged drugs. That overextends *Barbosa*. In that case, the drug quantity was known, but drug identity was not, so based

on the rule of lenity and *Apprendi* principles, this Court concluded that the "failure to submit drug identity for a jury determination" was error.  *Id.* at 456.  But here, the drug identity issue was presented to the jury, and the jury found beyond a reasonable doubt that the mixture contained detectable amounts of both methamphetamine and cocaine. Accordingly, the District Court did not err in sentencing Terry based on a statute that prohibits the possession of "500 grams or more of a mixture or substance containing a detectable amount of methamphetamine."  21 U.S.C. § 841(b)(1)(A)(viii).

**CONCLUSION**

For the foregoing reasons, we will affirm the District Court's judgment.